PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| IN RE LOESTRIN 24 FE ANTITRUST LITIGATION | MDL No. 2472 |
| THIS DOCUMENT RELATES TO: | Master File No. 1:13-md-2472 |
| Direct Purchaser Class Actions | |

**DIRECT PURCHASER CLASS PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   PARTIES ............................................................................................................... 6

III.  JURISDICTION AND VENUE ........................................................................... 10

IV.   INDUSTRY BACKGROUND ............................................................................ 11

    A.    The Regulatory Structure for Approval and Substitution of Generic
        Drugs ............................................................................................................12

        1.    The Hatch-Waxman Amendments .......................................................... 12

        2.    Paragraph IV Certifications .................................................................... 14

        3.    First ANDA filer's statutory or de facto exclusivity ............................... 15

    B.    The Competitive Effects of AB-Rated Generic Competition ......................16

        1.    The first AB-rated generic is priced below the brand................................ 17

        2.    Later generics drive prices down further .................................................. 19

        3.    Authorized generics compete on price, like other generics ....................... 20

    C.    Brand and Generic Companies Have Strong Financial Incentives to
        Agree to Anticompetitive Terms .................................................................22

V.    STATEMENT OF FACTS .................................................................................. 24

    A.    The FDA Approved the First Loestrin Products in the 1970s ....................24

    B.    Twenty Years Later, EVMS Scientists Study Whether Administering
        Loestrin 1/20 Tablets for Longer Than 21 Days Decreases the
        Incidence of Breakthrough Bleeding ...........................................................26

        1.    Ten Monkeys: Some decrease in breakthrough bleeding in later cycles
            only ...................................................................................................... 27

        2.    Thirty Women: No significant differences in breakthrough bleeding ....... 28

    C.    EVMS Obtains the '394 Patent for a Method of Contraception
        Characterized by a Reduced Incidence of Breakthrough Bleeding ............29

    D.    In 2006, the FDA Concludes that Loestrin 24 Does Not Reduce the
        Incidence of Breakthrough Bleeding ...........................................................31

i

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

E.      Warner Chilcott Lists the '394 Patent in the Orange Book As a Bar to Generic Competitors ................................................................................... 33

    1.   The '394 Patent very likely does not cover Loestrin 24 ............................. 33

    2.   The '394 Patent is very likely obvious in light of the prior art.................... 34

    3.   The '394 Patent is very likely unenforceable ............................................ 35

F.      Warner Chilcott Enters into a Reverse Payment Settlement Agreement with Watson ............................................................................................... 36

    1.   Warner Chilcott sues Watson for allegedly infringing the '394 patent ..................... 36

    2.   Warner Chilcott bribes Watson to avoid a decision on the merits ............................ 38

    3.   Warner Chilcott and Watson enter an Exclusion Payment Agreement ..................... 39

G.     Warner Chilcott Sues Lupin for Allegedly Infringing the '394 Patent....................... 43

    1.   Warner Chilcott and Lupin enter an Exclusion Payment Agreement........................ 44

H.     Warner Chilcott Sues Mylan for Allegedly Infringing the '394 Patent...................... 46

    1.   Warner Chilcott and Mylan enter an agreement............................................... 47

I.      Warner Chilcott's Agreements with Watson, Lupin, and Mylan Required Continuing Performance in Order to Inflict Continuing Overcharges on Direct Purchasers ................................................................. 48

J.      Recent Acquisition of Warner Chilcott by Actavis and Warner Chilcott's Calculated Discontinuation of Loestrin 24 ................................. 49

VI.   CLASS ALLEGATIONS ............................................................. 50

VII.  MARKET POWER AND RELEVANT MARKET ............................................. 53

VIII. MARKET EFFECTS AND DAMAGES TO THE CLASS ................................... 59

IX.   ANTITRUST IMPACT ............................................................. 61

X.    EFFECT ON INTERSTATE COMMERCE ................................................ 61

XI.   CLAIM FOR RELIEF ............................................................. 62

XII.  DEMAND FOR JUDGMENT.......................................................... 63

XIII. JURY DEMAND ................................................................. 64

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

Direct Purchaser Class Plaintiffs American Sales Company, LLC ("American Sales") and Rochester Drug Co-Operative, Inc. ("RDC") (collectively referred to as "Direct Purchaser Class Plaintiffs") bring this class action, on behalf of themselves and all others similarly situated, against Defendants Warner Chilcott Public Limited Company, Warner Chilcott Company, Inc., Warner Chilcott Company, LLC, Warner Chilcott (US), LLC, Warner Chilcott Laboratories Ireland, Limited, Warner Chilcott Holdings Company III, Ltd, Warner Chilcott Corporation, Warner Chilcott Sales (US), LLC (collectively, "Warner Chilcott"), Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc. (collectively, "Watson"); (Warner Chilcott and Watson are collectively referred to as the "Defendants"), based upon personal knowledge as to facts pertaining to them, and upon information and belief as to all other matters, and allege as follows:

## I.      INTRODUCTION

1.      This is a civil antitrust action seeking treble damages arising out of the Defendants' unlawful scheme to allocate the market for oral contraceptives comprised of 24 active norethindrone acetate/ethinyl estradiol tablets (containing l mg of norethindrone acetate and 20 mcg ethinyl estradiol) and 4 ferrous fumarate placebo tablets ("Fe"), that Warner Chilcott sells under the brand name Loestrin 24 Fe (also referred to as "Loestrin 24").  As described below, Warner Chilcott entered into agreements to settle patent infringement litigation with generic competitors to delay entry of AB-rated generic versions of Loestrin 24 in exchange for substantial payments that exceeded saved litigation costs.  As alleged below, Defendants' market-allocation scheme injured Direct Purchaser Class Plaintiffs and the class of direct purchasers they seek to represent (as defined below), causing them to pay overcharges.

1

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

2.      Oral contraceptive products bearing the "Loestrin" name have been sold in the United States since 1973.  All Loestrin products include active tablets containing norethindrone acetate and ethinyl estradiol, intended to prevent pregnancy; some include ferrous fumarate placebo tablets, some do not.  Older versions of Loestrin contained 21 norenthindrone acetate and ethinyl estradiol tablets.  The Food and Drug Administration ("FDA") approved the first Loestrin New Drug Application ("NDA"), NDA 17354, for Loestrin Fe 1/20 ("Loestrin 1/20"), on April 30, 1973.  Loestrin 1/20 contains 21 norenthindrone acetate and ethinyl estradiol tablets (containing 1 mg of norethindrone acetate and 20 mcg ethinyl estradiol) and seven ferrous fumarate placebo tablets.

3.      One of the known side effects of birth control tablets that include relatively low doses of hormones – like Loestrin 1/20 – is breakthrough bleeding or spotting.

4.      Nearly 20 years after Loestrin 1/20 was approved, in the early 1990s, a scientist at the Eastern Virginia Medical School, Gary Hodgen, studied whether using the active tablets from Loestrin 1/20 for longer than 21 days decreased the rates of breakthrough bleeding.  In one study of thirty women (the "human study"), Hodgen compared incidence of breakthrough bleeding in women who took Loestrin 1/20 tablets for 25 days to the incidence of breakthrough bleeding in women who took Loestrin 1/20 tablets for the recommended 21 days.  Hodgen found *no significant differences* in the incidence of breakthrough bleeding.

5.      Despite the lack of difference in the incidence of breakthrough bleeding in Hodgen's human study, Hodgen set out to obtain a patent for an oral contraceptive regimen with similar amounts of the same hormones contained in Loestrin 1/20 that decreased the incidence of breakthrough bleeding.  To support his application to the United States Patent and Trademark Office ("PTO"), Hodgen cited data from a study done in two groups of five monkeys who took

2

reformulated, adjusted versions of Loestrin 1/20 for 21 days and 24 days, respectively, that ostensibly showed a decrease in the incidence of breakthrough bleeding in later cycles.  Hodgen never disclosed the existence of his human study, let alone the negative results, to the PTO.  Nor did Hodgen disclose prior art that described taking oral contraceptives for more than 21 days.

6.      In 1996, knowing nothing of these misrepresentations and omissions, the PTO issued a new patent for an oral contraceptive regimen containing identical amounts of the same hormones in earlier Loestrin products, such as Loestrin 1/20, where active tablets are taken for 24 days, instead of 21 days, purportedly to decrease the incidence of breakthrough bleeding – U.S. Patent No. 5,552,394 (the "'394 Patent").

7.      On February 17, 2006, the FDA approved Warner Chilcott's Loestrin 24 – ostensibly the commercial embodiment of the '394 Patent.  The FDA approved this new product even though it was nothing more than administering thirty-year-old Loestrin 1/20 active tablets for an extra three days.  The FDA noted that the data provided by Warner Chilcott did *not* show a clinically meaningful reduction in the incidence of breakthrough bleeding as between women who took the Loestrin 1/20 active tablets for 21 days and women who took the Loestrin 1/20 active tablets for 24 days.  The FDA approved Loestrin 24 but warned Warner Chilcott not to make comparative claims.

8.      Warner Chilcott listed only the method of use '394 Patent in the FDA's Orange Book as covering Loestrin 24.  The active ingredients in Loestrin 24, norethindrone acetate and ethinyl estradiol, are not protected by any patent.

9.      Predictably, generic manufacturer Watson almost immediately applied for FDA approval to sell less expensive generic versions of Loestrin 24 before the '394 Patent expired.  On June 19, 2006 – just four months after Loestrin 24 was approved – Watson notified Warner

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

Chilcott that it sought FDA approval to market generic Loestrin 24.  Watson already sold generic versions of all of the first generation Loestrin products and thus manufactured and sold the exact same active tablets used in Loestrin 24 in Watson's versions of older Loestrin products.

10.     The '394 Patent claims only a narrow method of using active ingredients (*i.e.*, adding three extra days of active tablets to the dosing regimen) that have been employed for decades as oral contraceptives.  Generic manufacturers, including Watson, Lupin,[1] and Mylan,[2] knew the '394 Patent was likely invalid and/or unenforceable, and that their products did not infringe.  If Warner Chilcott sued Watson, Lupin, or Mylan for infringing the '394 Patent, the generic could defend itself by asserting the patent was either invalid and/or not infringed.  The generics knew that the stark light of patent litigation would reveal that the '394 Patent was highly likely to be adjudged either invalid or unenforceable as a result Hodgen's misrepresentations and omissions, or not infringed by the generics' products.

11.     Warner Chilcott sued generic drug manufacturers, including Watson, Lupin, and Mylan, that submitted applications to the FDA for approval to sell generic versions of Loestrin 24, asserting that the generics infringed the '394 Patent.  Under the Hatch-Waxman Act (discussed below), the mere filing of these lawsuits prevented the FDA from approving the generic drug applications for 30 months, regardless of the merits of the lawsuit.  To get the automatic 30 months of delay, Warner Chilcott did not have to win the patent cases, it only had to file them.

12.     Warner Chilcott knew that the '394 Patent was not strong enough to prevent generic competition, *i.e.*, that Warner Chilcott could not get preliminary injunctions to prevent

---

[1] Lupin Ltd. and Lupin Pharmaceuticals Inc. ("Lupin").

[2] Mylan Inc., Mylan Pharmaceuticals, Inc., and Famy Care Ltd. ("Mylan").

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

generic versions of Loestrin 24 from launching based on the patent and in fact was very likely to lose the patent cases if they were litigated to conclusion.

13.     However, rather than negotiating a settlement where Watson's generic could launch well before the expiration of the '394 Patent based on the relative risk faced by the parties, their expected litigation expenses, and the strengths and weaknesses of the '394 Patent, Warner Chilcott bribed Watson to stay out of the market for approximately five years.  Warner Chilcott literally bought itself more time without generic competition.  Warner Chilcott and Watson – competitors – conspired to allocate the market for Loestrin 24 in a manner that gave each company more exclusivity than it was entitled to in order to maximize profits at the expense of purchasers of Loestrin 24.

14.     As the 30 month stay against Watson, the first potential generic competitor, neared its  expiration date – on or about January 28, 2009 – Warner Chilcott and Watson entered into an agreement on January 9, 2009 that, among other things, paid Watson to withdraw its patent challenges and delay entry into the market.  In exchange for substantial payments from Warner Chilcott (a share of the monopoly profits from the lack of generic competition)  – in the form, *inter alia*, of a promise to forgo selling its own authorized generic product – Watson agreed to stay out of the market until January 2014, just six months before the '394 Patent is set to expire on July 22, 2014.

15.     To shore up its market allocation agreement with Watson, Warner Chilcott entered into a similar agreement with the second potential generic competitor, Lupin.  Warner Chilcott again agreed to share some of the monopoly profits with its potential competitor.  In exchange, Lupin agreed to withdraw its challenge to the '394 Patent and delay entry until July 2014 - six months after Watson.

16.     Again, to shore up its market allocation agreement with Watson, Warner Chilcott entered into a settlement agreement with the third potential generic competitor Mylan.  Warner Chilcott and Mylan entered a settlement and license agreement under which Mylan withdrew the challenge to the '394 Patent and agreed to delay entry until July 2014 – six months after Watson.

17.     But for the anticompetitive scheme and agreements, a generic version of Loestrin 24 would have been available as early as September 2009, when the FDA granted final approval to Watson's generic Loestrin 24.  Other generic versions of Loestrin 24, including an authorized generic version marketed directly or indirectly by Warner Chilcott, would also have entered simultaneously, driving generic prices down to near marginal cost.  Direct Purchaser Class Plaintiffs and the members of the Class would have substituted the less expensive generic products for their purchases of branded Loestrin 24.

18.     Defendants' unlawful scheme and agreements were designed to and did in fact: (a) delay the entry of less expensive, AB-rated generic versions of Loestrin 24; (b) fix, raise, maintain or stabilize the price of Loestrin 24 and AB-rated generic versions of Loestrin 24; and (c) allocate 100% of the United States market for Loestrin 24 and its AB-rated generic equivalents to Warner Chilcott for more than four years.

19.     As alleged in more detail below, Defendants violated section 1 of the Sherman Act through their conspiracy to improperly restrain trade by foreclosing competition from lower-priced AB-rated generic versions of Loestrin 24.

## II.     PARTIES

20.     Plaintiff American Sales Company, LLC ("American Sales") is a Delaware limited liability company with its principal place of business in Lancaster, Erie County, New York.  American Sales brings this action on its own behalf and as an assignee of McKesson

6

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

Corp. ("McKesson").  During the class period, McKesson purchased branded Loestrin 24 directly from Warner Chilcott, and American Sales purchased branded Loestrin 24 from McKesson (and will purchase the generic version once it becomes available), at supracompetitive prices, and has thereby been injured.

21.     Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a stock corporation duly formed and existing under the New York Cooperative Corporations Law, with its principal place of business located at 50 Jet View Drive, Rochester, New York 14624.  During the class period, as defined below, RDC purchased branded Loestrin 24 directly from Warner Chilcott (and will purchase its generic version once it becomes available), at supracompetitive prices and has thereby been injured

22.     Defendant Warner Chilcott Public Limited Company is a company organized and existing under the laws of Ireland, having its principal place of business at 1 Grand Canal Square, Docklands Dublin 2, Ireland L2 00000.

23.     Defendant Warner Chilcott Company, LLC is a limited liability company organized and existing under the laws of the Commonwealth of Puerto Rico, having its principal place of business at Union St., Road 195, Km 1.1, Fajardo, Puerto Rico.  This defendant holds an approved NDA from the FDA for a formulation of oral contraceptives comprising 24 norethindrone acetate/ethinyl estradiol (1mg/20mcg) tablets and 4 ferrous fumarate tablets, which it sells throughout the United States under the brand name Loestrin 24. This defendant is a wholly owned subsidiary of Warner Chilcott PLC.

24.     Defendant Warner Chilcott Holdings Company III, Ltd. is a privately-owned, for profit company organized and existing under and the laws of Bermuda, having its office and principal place of business located at 100 Enterprise Drive, Rockaway, New Jersey 07866.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

25.     Defendant Warner Chilcott Corporation is a corporation organized and existing under the laws of Delaware, having its principal place of business at 100 Enterprise Drive, Rockaway, New Jersey 07866.

26.     Defendant Warner Chilcott (US), LLC is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 100 Enterprise Drive, Rockaway, New Jersey 07866.

27.     Defendant Warner Chilcott Sales (US), LLC is a limited liability company organized and existing under the laws of Delaware, having its principal place of business at 100 Enterprise Drive, Rockaway, New Jersey 07866.

28.     Defendant Warner Chilcott Laboratories Ireland Limited is a company organized and existing under the laws of the Republic of Ireland, having its principal place of business at Union St., Road 195, Km 1.1, Fajardo, Puerto Rico.

29.     Defendant Warner Chilcott Company, Inc., is a company organized and existing under the laws of the Commonwealth of Puerto Rico, having its principal place of business at Union St., Road 195, Km 1.1, Fajardo, Puerto Rico.

30.     The foregoing defendants are collectively referred to herein as "Warner Chilcott." Warner Chilcott is engaged in the worldwide marketing, production, and distribution of pharmaceutical products, including in this district.  On May 20, 2013, Actavis, Inc. announced that it was acquiring Warner Chilcott.  This acquisition was completed on October 1, 2013 and Warner Chilcott is now part of Actavis plc.

31.     Defendant Actavis plc is a company organized and existing under the laws of Ireland, having its principal place of business at 1 Grand Canal Square, Docklands Dublin 2,

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

Ireland.  Actavis plc also has a place of business at 400 Interplace Parkway, Parsippany, New Jersey 07054.

32.     Defendant Watson Pharmaceuticals, Inc. is a company organized and existing under the laws of Nevada, having its principal place of business at 400 Interplace Parkway, Parsippany, New Jersey 07054.  Effective on or about January 24, 2013, Watson Pharmaceuticals, Inc. changed its name to Actavis, Inc.  Actavis, Inc. changed its name to Actavis, plc on or about October 1, 2013.

33.     Defendant Watson Laboratories, Inc. is a company organized and existing under the laws of Nevada, having its principal place of business at 311 Bonnie Circle, Corona, California 92880.  Watson Laboratories, Inc. is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., which is now Actavis plc.

34.     Defendants Actavis plc, Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc. are collectively referred to herein as "Watson."  Watson is engaged in the worldwide marketing, production and distribution of generic pharmaceutical products, including in this judicial district.

35.     All of Defendants' actions described in this complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

### III.   JURISDICTION AND VENUE

36.     This action arises under section 1 of the Sherman Act, 15 U.S.C. § 1, and section 4 of the Clayton Act, 15 U.S.C. § 15(a), and seeks to recover threefold damages, costs of suit and reasonable attorneys' fees for the injuries sustained by American Sales, RDC and members of the class (defined below) resulting from Defendants' conspiracy to restrain trade in the United States market for Loestrin 24.  The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

37.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the class period, the Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce discussed below has been carried out in this District.

38.     Defendants' conduct, as described in this complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

39.     During the class period, Warner Chilcott manufactured, sold and shipped Loestrin 24 in a continuous and uninterrupted flow of interstate commerce.  The conspiracy in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

40.     During the class period each defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.

41.     This Court has personal jurisdiction over each defendant, because each defendant – throughout the United States and including in this District – has transacted business,

10

maintained substantial contacts, and/or committed overt acts in furtherance of its illegal scheme and conspiracy.  The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.    INDUSTRY BACKGROUND

42.    Drug companies obtain patents that cover their new prescription drug products. Valid patents provide a limited protection from competition by other drug companies for a fixed period of time.

43.    The health and welfare of millions of Americans depends on access to safe, effective, and affordable medications.  Modern medicine treats chronic conditions and prevents serious illnesses with maintenance prescription drugs – drugs that are taken for many months or years.  The high cost of drugs can mean no treatment, or inadequate treatment, for many. Affordable drugs lead to better treatment and prevention.

44.    On the other hand, the American pharmaceutical industry is a business. Companies that sell brand name drugs seek to recoup their research and development investment, cover their marketing costs, and turn a profit for their shareholders.

45.    To accommodate these economic concerns, brand name drugs have a statutory period of time to charge very high prices for medications that cost little to manufacture.  Once the lawful exclusivity period expires, generic manufacturers may get FDA approval to manufacture and sell a generic drug that is as safe and effective as the brand name drug, but far less expensive than the brand.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

A.    **The Regulatory Structure for Approval and Substitution of Generic Drugs**

46.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers that create a new drug must obtain FDA approval to sell the product by filing a New Drug Application ("NDA").  21 U.S.C. §§ 301-392.  An NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.  21 U.S.C. § 355(a), (b).

47.    When the FDA approves a brand manufacturer's NDA, the manufacturer may list in the "Approved Drug Products with Therapeutic Equivalence Evaluations" (known as the "Orange Book") any patents that the manufacturer believes could reasonably be asserted against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patents.  The manufacturer may list in the Orange Book within thirty days of issuance any patents issued after the FDA approved the NDA.  21 U.S.C. §§ 355(b)(1) & (c)(2).

48.    The FDA relies completely on the brand manufacturer's truthfulness about patent validity and applicability, as it does not have the resources or authority to verify the manufacturer's patents for accuracy or trustworthiness.  In listing patents in the Orange Book, the FDA merely performs a ministerial act.

1.    **The Hatch-Waxman Amendments**

49.    The Hatch-Waxman Amendments, enacted in 1984, simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs.  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).  A manufacturer seeking approval to sell a generic version of a brand drug may instead file an Abbreviated New Drug Application ("ANDA").  An ANDA

12

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

relies on the scientific findings of safety and effectiveness included in the brand manufacturer's original NDA, and must further show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug, and is absorbed at the same rate and to the same extent as the brand drug.  This establishes that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand drug.  The FDA assigns generic drugs that are therapeutically equivalent to their brand-name counterpart an "AB" rating.

50.     The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another.  Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j)(8)(B).

51.     Congress enacted the Hatch-Waxman Amendments to expedite the entry of less expensive generic competitors to branded drugs, thereby reducing healthcare expenses nationwide.  Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

52.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches, and ushering in an era of historic high profit margins for brand manufacturers.  In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did.  In 1984,

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

prescription drug revenue for branded and generic drugs totaled $21.6 billion; by 2009 total prescription drug revenue had soared to $300 billion.

### 2.   Paragraph IV Certifications

53.   To obtain FDA approval of an ANDA, a manufacturer must certify that the generic drug will not infringe any patents listed in the Orange Book.  Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

    i.    that no patent for the brand drug has been filed with the FDA (a "Paragraph I certification");

    ii.    that the patent for the brand drug has expired (a "Paragraph II certification");

    iii.    that the patent for the brand drug will expire on a particular date and the manufacturer does not seek to market its generic product before that date (a "Paragraph III certification"); or

    iv.    that the patent for the brand drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

21 U.S.C. § 355(j)(2)(A)(vii).

54.   If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement.  If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the Paragraph IV certification ("Paragraph IV Litigation"), the FDA will not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA.  21 U.S.C. § 355(j)(5)(B)(iii).  Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product.  The FDA may grant an ANDA tentative approval

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

when it determines that the ANDA would otherwise be ready for final approval but for the 30 month stay.

### 3.   First ANDA filer's statutory or de facto exclusivity

55.     Generics may be classified as (i) first filer generics, (ii) later generic filers, and (iii) authorized generics.

56.     To encourage manufacturers to seek approval of generic versions of branded drugs, the Hatch-Waxman Amendments grant the first paragraph IV generic manufacturer ANDA filer ("first filer") a 180 day exclusivity period to market the generic version of the drug, during which the FDA may not grant final approval to any other generic manufacturer's ANDA for the same brand-name drug. 21 U.S.C. § 355(j)(5)(B)(iv) and 21 U.S.C. § 355(j)(5)(D).  That is, when a first filer files a substantially complete ANDA with the FDA and certifies that the unexpired patents listed in the Orange Book as covering the branded product are either invalid or not infringed by the generic's product, the FDA cannot approve a later generic company's ANDA until that first generic has been on the market for 180 days, or until its first-filer exclusivity has been forfeited.

57.     First filers that wait until all Orange Book listed patents expire before marketing their product do not get a 180 day reprieve.  Congress created this 180 day window to incentivize generic manufacturers to challenge weak or invalid patents, or to invent around such patents by creating non-infringing generics.

58.      This 180 day window is referred to as the first filer's six-month or 180 day "exclusivity."  The label is a bit of a misnomer because, while later ANDA filers must wait six months after the first filer's market entry to get final FDA approval, a brand's "authorized" generic may enter at any time; this market dynamic is described below.

15

59.    The Supreme Court has recognized that "this 180 day period of exclusivity can prove valuable, possibly worth several hundred million dollars"[3] to the first filer.

60.    In some circumstances, even if the first filer is not entitled to regulatory exclusivity for the 180 day period, it may enjoy a period of de facto "exclusivity" that protects it from competition with other ANDA filers because the FDA has not yet approved any other ANDAs.  In those circumstances, that period of de facto exclusivity is just as valuable as the Hatch-Waxman provided 180 day exclusivity, but it may last for more or less than 180 days.

61.    Of course, just as described above, a brand's "authorized" generic may enter at any time including during this period of de facto exclusivity.

**B.     The Competitive Effects of AB-Rated Generic Competition**

62.    Generic versions of brand name drugs contain the same active ingredient, and are determined by the FDA to be just as safe and effective as their brand name counterparts.  The only material difference between generic drugs and their corresponding brand name versions is their price.  Because generic versions of a corresponding branded drug product are commodities that cannot be differentiated, the primary basis for generic competition is price.  Typically, generics are at least 25% less expensive than their brand name counterparts when there is a single generic competitor, and this discount typically increases to 50% to 80% (or more) when there are multiple generic competitors on the market for a given brand.  Consequently, the launch of a generic drug usually results in significant cost savings for all drug purchasers.

63.    Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered

---

[3] *FTC v. Actavis*, 133 S.Ct. 2223, 2229 (2013) (citation omitted).

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

otherwise).  Substitution laws and other institutional features of pharmaceutical distribution and use create the economic dynamic that the launch of AB-rated generics results both in rapid price decline and rapid sales shift from brand to generic purchasing.  Once a generic equivalent hits the market, the generic quickly captures sales of the corresponding branded drug, often capturing 80% or more of the market within the first six months.  In a recent study, the Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand drug sales and (with multiple generics on the market) prices had dropped 85%.[4]  As a result, competition from generic drugs is viewed by brand name drug companies, such as Warner Chilcott, as a grave threat to their bottom lines.

64.     Generic competition enables all members of the proposed Class to: (a) purchase generic versions of the drug at substantially lower prices; and/or (b) purchase the brand drug at a reduced price.

65.     Until a generic version of the brand drug enters the market, however, there is no bioequivalent generic drug to substitute for and compete with the brand drug, and therefore the brand manufacturer can continue to profitably charge supracompetitive prices.  Brand manufacturers, such as Warner Chilcott, are well aware of generics' rapid erosion of their brand sales.  Branded manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible – including illegal means.

**1.     The first AB-rated generic is priced below the brand**

66.     The 180 day period and periods of de facto generic exclusivity are even more valuable to the first filer – likely far more than twice as valuable – if the brand does not launch

---

[4] See FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions, January 2010 at *http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.*

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

an authorized generic.  Without an authorized generic, the first filer with regulatory or de facto exclusivity is left with 100% of generic sales until a second ANDA filer generic manufacturer launches.  With an authorized generic, the first filer with regulatory or de facto exclusivity obtains just 50% of generic sales.  Even a first filer without any exclusivity obtains far more in generic sales without an authorized generic than it does when an authorized generic is launched.

67.     Experience and economic research show that the first generic manufacturer to launch prices its product below the prices of its branded counterpart.[5]  Every state either requires or permits that a prescription written for the branded drug be filled with an AB-rated generic.  Thus, the first generic manufacturer almost always captures a large share of sales from the branded form of the molecule.  At the same time, there is a reduction in average price paid for a prescription for the molecule.

68.     During the regulatory or de facto exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market.  As recognized by the Supreme Court, it is often the case that most of a first filer's profits are earned during the exclusivity period.[6]

69.     If there is no authorized generic on the market, then the first filer prices its product below the brand product, but not as low as if it were facing competition from other generics, including an authorized generic.  Since in these circumstances the first filer's product may compete only with the brand, and because the branded company rarely drops the brand price to match the first filer, the first filer does not face the kind of price competition it will when

---

[5] Saha, A., H. Grabowski, H. Birnbaum, P. Greenberg and O. Bizan, "Generic Competition in the US Pharmaceutical Industry," International Journal of the Economics of Business, n. 1, v. 13 (February 2006), pp. 15-38 ("Saha, et al. (2006)") (For 40 drugs that experienced generic entry between July 1992 and January 1998, the average price of generics was 76% of the brand price one month after generic entry).

[6] *See Actavis*, 133 S.Ct. at 2229.

18

additional generic products, including an authorized generic, are available.  A first filer earns

substantially greater sales and profits without an authorized generic being marketed alongside it,

compared with when an authorized generic is marketed.

### 2.    Later generics drive prices down further

70.    When multiple generic competitors enter the market, one sees the competitive

process accelerate and prices drop to their lowest levels.  Multiple generic sellers typically

compete vigorously with each other over price, driving prices down toward marginal

manufacturing costs.[7]

71.    According to the FDA and the FTC, the greatest price reductions are experienced

when the number of generic competitors goes from one to two.  In that situation, there are two

commodities that compete on price.  Some typical estimates are that a single generic launch

results in a near term retail price reduction of around 10%, but that with two generic entrants

near term retail price reduction is about 50%.

72.    Soon after generic competition begins, the vast majority of the sales formerly

enjoyed by the brand shift to generic sellers.  A 2009 FTC Study found that generics captured

between approximately 72% and 85% of sales in the first six months.[8]  In the end, total payments

to the brand manufacturer of the drug decline to a small fraction of the amounts paid prior to

generic entry.  "Although generic drugs are chemically identical to their branded counterparts,

they are typically sold at substantial discounts from the branded price.  According to the

---

[7] *See, e.g.*, Danzon, Patricia and Li-Wei Chao, "Does Regulation Drive Out Competition in Pharmaceutical Markets?" *The Journal of Law and Economics*, Oct. 2000; Regan, Tracy, "Generic Entry and Price Competition in the Prescription Drug Market--18 Years after the Waxman-Hatch Act," Working Paper, Department of Economics, University of Miami, February 14, 2004; Frank, R., "The Ongoing Regulation of Generic Drugs," *The New England Journal of Medicine*, v. 357, n. 20 (November 2007), pp. 1993-1996 ("Frank (2007)").

[8] FTC Study, Federal Trade Commission, "Authorized Generics: An Interim Report," June 2009.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies.  Even more billions are saved when hospitals use generics."[9]

### 3.    Authorized generics compete on price, like other generics

73.    Nothing prevents a brand manufacturer from selling a generic version of its own branded drug, a so-called "authorized generic" at any time.  An authorized generic is chemically identical to the brand drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party distributor.  An authorized generic is essentially the same as the brand drug but in a different package.  Competition from an authorized generic substantially reduces drug prices and the revenue of the first filer generic.  If the first filer generic has regulatory or de facto exclusivity, an authorized generic reduces the revenue of the first filer generic by approximately half.  The absence of an authorized generic can double the first-filer's revenue.

74.    Authorized generics are priced like other generics and compete on price with other generics.  A 2006 study sponsored by the brand drug company trade group, PhRMA, for example, found that the presence of an authorized generic causes generic prices to be 16% lower than when there is no authorized generic.[10]

75.    Branded manufacturers can also begin pre-selling authorized generics before the first-filer generic launches, in order to secure multi-year purchase contracts with direct purchasers and load the generic pipeline at the expense of the first-filer generic.

---

[9] *See* FDA Website, Generic Drugs: Questions and Answers, *available at* http://www.fda.gov/drugs/resourcesforyou/consumers/questionsanswers/ucm100100.htm.

[10] IMS Consulting, Assessment of Authorized Generics in the U.S., Spring 2006.

76.    One study notes that "pharmaceutical developers facing competition from generics have large incentives to compete with their own or licensed 'authorized generics.'"[11] A study by Berndt analyzing three examples of authorized generics found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[12]  And the FTC's 2009 study shows prices with authorized generic entry are lower during the 180 day exclusivity period.

77.    In a report by the FTC issued at the request of Congress in 2011 entitled *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (the "FTC Study"), the FTC found that authorized generics capture a significant portion of sales, reducing the first-filer generic's revenues by approximately 50% on average.  The first-filing generic's revenues decrease when it faces competition from an authorized generic because (1) the authorized generic takes a large share of unit sales away from the first filer; and (2) the presence of an additional generic in the market causes prices, particularly generic prices, to decrease.

78.    Drug purchasers benefit from lower prices caused by authorized generic entry.

79.    A brand manufacturer's agreement not to launch an authorized generic therefore has tremendous financial value to a first-filer generic manufacturer.  However, such non-competition agreements deprive drug purchasers of the lower prices resulting from two forms of competition: (1) among the branded and the generic products; and (2) between the generic products.

---

[11] Hassett, K. A. and R. J. Shapiro, "The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals," *Sonecon*, May 2007, p. 3.

[12] Berndt, E., R. Mortimer, A. Bhattacharjya, A. Parece and E. Tuttle, "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," *Health Affairs*, v. 26, n. 3, May/June 2007, p. 796.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

80.     Freedom from an authorized generic is exceedingly valuable to the first-filer generic company.  Consequently, brand companies sometimes use the right to launch an authorized generic as a powerful tool to induce the first filer generic to delay its entry.  Payment to the first filer in the form of an agreement not to launch an authorized generic is economically equivalent to a cash payment by the brand manufacturer because the agreement effectively doubles the revenues and profits of that generic company (if the generic company has regulatory or de facto exclusivity), or increases them somewhat less (if the generic company lacks regulatory or de facto exclusivity), and the brand manufacturer foregoes the substantial sales and revenue that it otherwise would make with its own authorized generic.  By eliminating competition from an authorized generic, this form of payment – called an "exclusion payment" or a "reverse payment" – artificially inflates the prices for drugs.

81.     For a first filer, like Watson, of a branded product that sold hundreds of millions of dollars annually, like Loestrin 24, the difference between selling a generic product without having to compete against an authorized generic and selling in competition with such an authorized generic can amount to hundreds of millions of dollars.  These economic realities are well known in the pharmaceutical industry.  No-authorized-generic agreements like the one between Warner Chilcott and Watson thus allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

**C.     Brand and Generic Companies Have Strong Financial Incentives to Agree to Anticompetitive Terms**

82.     The anticompetitive agreement entered into between the brand and first filer often invites later ANDA filers to join in the anti-competitive delayed entry date chosen by the brand manufacturer and the first filing generic.

22

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

83.     Later ANDA filers have more modest financial expectations because they have no expectation of market exclusivity.  By the time they enter the market there is at least the brand and one other generic on the market (if not also a second, in the form of an authorized generic).

84.     In the absence of an anticompetitive agreement between the branded company and the first filer, however, the later ANDA filers have pro-competitive incentives.  They are motivated to fight patents, enter as early as possible, and expend money to challenge the brand company's patent (knowing that the first filer generic is also fighting a patent infringement suit).

85.     When an anticompetitive agreement with the first filer is already in place, however, litigation becomes less attractive to later filers.  The later generic manufacturers know that the first filer is not leading the charge against the brand's patent (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive, reverse payment settlement).  The later generics have to bear the brunt of the litigation costs themselves, and, upon prevailing in the patent litigation, expect to face competition from at least the first filer generic, and typically an authorized generic as well.  The first settlement between a brand and first filer generic will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer is permitted to launch then as well – draining the incentive the later filer would otherwise have to continue fighting to enter as soon as possible.

86.     Thus, some later generics decide to conspire with the brand company and (by extension) the first filer generics to drop their attacks on the brand's patents and to stay off the market for at least as long as the first filer generic promised to stay off the market.   In exchange, the brand company pays them too.

87.     These abuses of the Hatch Waxman Amendments statutory scheme are fundamentally anticompetitive.  In particular, they seek to extend the brand manufacturer's monopoly profits by blocking access to more affordable generic drugs, forcing purchasers to buy the expensive brands instead.

88.     Here, Warner Chilcott and Watson's overarching scheme – which Lupin and Mylan facilitated – resulted in years of unlawfully prolonged monopolization in the lucrative market for Loestrin 24 and its AB-rated generic equivalents.  Warner Chilcott delayed generic entry by buying off Watson, the first ANDA filer.  Warner Chilcott entered agreements with Lupin and Mylan as well under which Lupin and Mylan agreed to drop their patent challenges and delay entry until July 2014, when the '394 Patent expires.

## V.     STATEMENT OF FACTS

### A.     The FDA Approved the First Loestrin Products in the 1970s

89.     The active ingredients in Loestrin 24, the hormones norethindrone acetate and ethinyl estradiol, are not protected by any patent.  In fact, norethindrone and ethinyl estradiol have served as active ingredients in Loestrin-branded oral contraceptives since the early 1970s.

90.     On April 30, 1973, the FDA simultaneously approved NDAs for drugs later known as Loestrin Fe 1.5/30 (NDA 017355) and Loestrin 1/20 (NDA 017354).[13]  Both were approved as a method of oral contraception in women.  Both provide a continuous dosage regimen consisting of 21 progestogen-estrogen oral contraceptive tablets and seven placebo ferrous fumarate tablets for the balance of the cycle.

---

[13] For all Loestrin products, the "Fe" is sometimes dropped from the name.  "Loestrin Fe 1/20" and "Loestrin 1/20" refer to the same product.  "Loestrin 24 Fe" and "Loestrin 24" refer to the same product.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

91.     The contraceptive tablets contain the active ingredients norethindrone acetate and ethinyl estradiol.  The ferrous fumarate tablets are non-hormonal, and – according to the label – are present only to facilitate ease of drug administration via a 28-day regimen and do not serve any therapeutic purpose.  There is a question as to whether giving women iron tablets helps combat the potential anemia sometime associated with menstruation.

92.     The active tablets in Loestrin 1.5/30 are pink and contain 1.5 mg norethindrone acetate and 30 mcg ethinyl estradiol.  The active tablets in Loestrin 1/20 are yellow and contain 1 mg norethindrone acetate and 20 mcg ethinyl estradiol.

93.     The numerator in the fractions in the Loestrin drug products' names refers to the number of milligrams of norethindrone acetate contained in an active tablet.  The denominator refers to the number of micrograms of ethinyl estradiol contained in an active tablet.

94.     On October 1, 1976, the FDA approved two additional Loestrin formulations, Loestrin 21 1.5/30 (NDA 17875) and Loestrin 21 1/20 (NDA 17876) ("Loestrin 21").  The Loestrin 21 1.5/30 and Loestrin 21 formulations include only active tablets.  The patient takes one tablet daily for 21 consecutive days followed by one week of no tablets.  This is described as "three weeks on – one week off."

95.     Loestrin 1/20 and Loestrin 21 both contain 21 of the same active tablets.  The only differences between a pack of Loestrin 1/20 and a pack of Loestrin 21 is that the Loestrin 21 pack does not contain any placebo/iron tablets.

96.     Loestrin 1.5/30 and Loestrin 21 1.5/30 both contain the same active tablets.  The only difference between a pack of Loestrin 1.5/30 and Loestrin 21 1.5/30 is that the Loestrin 21 1.5/30 does not contain any placebo/iron tablets.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

97.     Generic versions of all four first-generation Loestrin products have been available for decades.  Defendant Watson and generic manufacturer Barr Pharmaceuticals, Inc. sell, or used to sell, FDA-approved generic version of all four products.  Generic manufacturer Vintage Pharms LLC also sells, or used to sell, FDA-approved generic versions of Loestrin 1/20 and Loestrin 1.5/30 products.

98.     This complaint addresses Defendants' anticompetitive conduct in the market for Loestrin 24 and its AB-rated generic equivalents.  Loestrin 24 contains the same active tablets as Loestrin 1/20 and Loestrin 21, but includes 24 active tablets in each pack (instead of the 21 active tablets contained in each pack of Loestrin 1/20 and Loestrin 21).

**B.      Twenty Years Later, EVMS Scientists Study Whether Administering Loestrin 1/20 Tablets for Longer Than 21 Days Decreases the Incidence of Breakthrough Bleeding**

99.     Decades after the original Loestrin products were approved, scientists at the Eastern Virginia Medical School ("EVMS") conducted studies in monkeys and women to determine whether administering Loestrin 1/20 active tablets for longer than the recommended 21 days decreased the incidence of breakthrough bleeding.

100.     Breakthrough bleeding, also referred to as spotting or intermenstrual bleeding, refers to vaginal bleeding that occurs midcycle, as opposed to during menstruation.  Breakthrough bleeding is a common but annoying and potentially embarrassing side effect associated with many oral contraceptives.  It is thought to occur more often when women start taking an oral contraceptive or switch oral contraceptives.

101.     Breakthrough bleeding generally is greatest in the first 3 to 4 months after starting an oral contraceptive, and it steadily declines and typically stabilizes by the end of the fourth cycle.

102.     Breakthrough bleeding is different from withdrawal bleeding.  Women using oral contraceptives experience withdrawal bleeding during the week that they are taking inactive/placebo tablets.  It is similar in effect to menstruation, but unlike normal menstruation it is not caused by the natural cycling of hormones that surrounds ovulation, causing the lining of the uterus to be built up (for implantation of a fertilized egg) and eventually shed; rather, it is caused by suddenly taking away an external source of estrogen, which causes the uterine lining to be sloughed off.

**1.     Ten Monkeys: Some decrease in breakthrough bleeding in later cycles only**

103.     In 1992, ten adult female cynomolgus monkeys were divided into two groups. The scientists took commercially available Loestrin 1/20 active tablets and ground them into a powder.  They then "adjusted" the medication to fit the smaller body weight of the monkeys. Five monkeys received an ultra-low dose oral contraceptive for 21 consecutive days, followed by 7 non-treatment days.  Five monkeys received an ultra-low dose oral contraceptive for 24 consecutive days, followed by 4 non-treatment days.   Each group was treated for 3 cycles.  The study ostensibly showed a decrease in the incidence of breakthrough bleeding in cycles 2 and 3 in monkeys in the 24 day treatment group.

104.     Given the small number of monkeys in the study, the difference between a statistically significant results (p<.05) and a not statistically significant result (p>.05) is quite small.  Meaning, if a scientist had noticed breakthrough bleeding in additional monkeys in the 21-day treatment group, or missed breakthrough bleeding in monkeys in the 24 day treatment group, the study may not have shown that the 24 day treatment group had significantly less breakthrough bleeding than the 21 day treatment group.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

### 2.   Thirty Women: No significant differences in breakthrough bleeding

105.    Beginning on or around January 1993, scientists at the EVMS began the human study where women took Loestrin 1/20 active tablets for 25 consecutive days of the 28 day cycle.

106.    In the study, thirty healthy females (ages 22 to 35) were randomized to one of two low dose oral contraceptive regimens.  All patients were non-smokers on no hormonal medications and had regular menstrual cycles without breakthrough bleeding.  The 15 patients in Group A received a monthly regimen of 25 consecutive Loestrin 1/20 tablets followed by 3 placebo tablets.  The 15 patients in Group B received a conventional regimen of 21 Loestrin 1/20 tablets followed by 7 placebo tablets.  Each group was treated for 3 months.

107.    The study participants knew they were taking Loestrin 1/20 tablets.  Those in Group A knew they were taking Loestrin 1/20 tablets for 25 consecutive days of the 28 day cycle.  Participants were not obligated to keep the study design or methods confidential.

108.    Each subject self-reported bleeding patterns in a daily calendar.

109.    The scientists compared the two groups with respect to bleeding patterns.  *The scientists did not find any significant differences in the amount of breakthrough bleeding between the 2 groups*.

110.    The study's results were described in an abstract submitted to the 43rd Annual Meeting of the Society for Gynecologic Investigation, held March 20 to 23, 1996, in Philadelphia, Pennsylvania.  The authors were listed as L.M. Schenk, R.W. Whitcomb, G.D. Hodgen, and F.D. Anderson.  The abstract disclosed that the study included 30 women participants who were taking Loestrin 1/20 active tablets for 25 days straight. The abstract was

28

later published in the Journal of the Society for Gynecologic Investigation on or around March 20, 1996.

111.    In 1993, Loestrin 1/20 was commercially marketed by Parke-Davis of Morris Plains, NJ (the marketing arm of Warner Lambert).

112.    In 1993, Hodgen sent a letter proposing a "technology transfer agreement" with Parke Davis.  Hodgen explained to Roger Boissonneault (the former Vice President of Female Health Care at Parke Davis and later the CEO and President of Warner Chilcott) why Hodgen believed that Parke Davis should pay Eastern Virginia Medical School for the "technology" used in the human subject study.  Warner Chilcott's CEO and President was thus aware of Hodgen's human study, and presumably the negative results of that study, in 1993.

## C.    EVMS Obtains the '394 Patent for a Method of Contraception Characterized by a Reduced Incidence of Breakthrough Bleeding

113.    Despite the lack of differences in the incidence of breakthrough bleeding in the human trial, EVMS set out to obtain a patent for an oral contraceptive regimen with similar amounts of the same hormones contained in Loestrin 1/20 that decreased the incidence of breakthrough bleeding.

114.    On July 22, 1994, Gary Hodgen applied for a patent for a method of female contraception *characterized by a reduced incidence of breakthrough bleeding* by administering a combination of estrogen and progestin for 23-25 consecutive days of a 28 day cycle in which the daily amounts of estrogen and progestin are equivalent to about 5-35 mcg of ethinyl estradiol and about 0.025 to 10 mg of norethindrone acetate.  The title of the patent is "Low Dose Oral Contraceptives *with Less Breakthrough Bleeding* and Sustained Efficacy" (emphasis added).

115.    The patent specification states, "[i]t is the object of the present invention to provide a new estrogen-progestin combination and regimen for oral contraceptive use which

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

maintains the efficacy and *provides enhanced control of endometrial bleeding*" (emphasis added).

116.    Claim 1 recites

[a] method of female contraception *which is characterized by a reduced incidence of breakthrough bleeding* after the first cycle which comprises monophasicly administering a combination of estrogen and progestin for 23-25 consecutive days of a 28 day cycle in which the daily amounts of estrogen and progestin are equivalent to about 1-35 mcg of ethinyl estradiol and about 0.025 to 10 mg of norethindrone acetate, respectively, and in which the weight ratio of estrogen to progestin is at least 1:45 calculated as ethinyl estradiol to norethindrone acetate.  (Emphasis added.)

Claims 2-12 all depend on Claim 1.

117.    In support of the claim that a 24 day regimen reduced breakthrough bleeding, Hodgen submitted minimal data from the ten monkey study.  Hodgen never told the PTO that his human study showed no statistically significant differences in bleeding between women taking the active tablets in Loestrin 21 for 25 days and women taking the active tablets in Loestrin 21 for 21 days.

118.    On February 5, 1996, the Patent Examiner issued a notice of allowability for all claims.  After two supplemental amendments to ostensibly correct mathematical errors, the '394 Patent was issued in September 1996.

119.    Warner Chilcott is the fifth owner of the '394 Patent, which originally issued to EVMS.  EVMS sold the application that became the '394 Patent to Warner Lambert, which was acquired by Pfizer in 2000.  Galen Holdings plc acquired the '394 Patent from Pfizer in March 2003 at the same time that it acquired the entire Loestrin franchise.  In July 2004, Galen Holdings changed its name to Warner Chilcott.

**D.      In 2006, the FDA Concludes that Loestrin 24 Does Not Reduce the Incidence of Breakthrough Bleeding**

120.    On April 15, 2005, Warner Chilcott submitted NDA 21871 for approval to market a new dosing regimen of Loestrin that later became known as Loestrin 24.

121.    Loestrin 24 is, purportedly, a commercial embodiment of the '394 Patent.

122.    Loestrin 24 provides a dosage regimen consisting of 24 white progestin-estrogen contraceptive tablets and 4 brown ferrous fumarate placebo tablets.  The active tablets contain 1 mg norethindrone acetate and 20 mcg ethinyl estradiol.  The placebo tablets contain ferrous fumarate and do not serve any therapeutic purpose.  The patient takes one active tablet daily for 24 consecutive days followed by four days of no tablets.

123.    Loestrin 24 contains the same active tablets (and the same daily doses of norethindrone acetate and ethinyl estradiol) as Loestrin 1/20 and Loestrin 21.  Loestrin 24 is taken for 24 consecutive days instead of 21 consecutive days – *i.e.* an additional 3 days during each 28 day treatment cycle.

124.    The FDA observed that Loestrin 24 exposes women to daily doses of ethinyl estradiol and norethindrone acetate that are identical to those of Loestrin 1/20.

125.    After reviewing the data from the Loestrin 24 investigational new drug study ("IND"), the FDA concluded that, "for the most part, there were not statistically significant or clinically meaningful differences across the 2 treatment groups in term of any parameters of bleeding that were examined."  The FDA noted that "the findings of Study PR-0393 do not support the Applicant's hypothesis that 3 additional days of active treatment (*i.e.*, extending the active treatment period from 21 days to 24 days during each 28 day cycle) would reduce the incidence of intracyclic bleeding."

31

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

126.    The FDA observed that there was a trend toward a greater percentage of subjects in the Loestrin 24 group not having monthly withdrawal bleeding.  (As described above, withdrawal bleeding is distinct from intracyclic/breakthrough bleeding or spotting.)

127.    The FDA noted that even though the data had not shown that Loestrin 24 had a lower incidence of breakthrough bleeding than Loestrin 1/20, the drug should nonetheless be eligible for approval if it was both safe and effective for the prevention of pregnancy.

128.    On February 17, 2006, the FDA approved Loestrin 24 as a method of contraception in women.

129.    The FDA warned Warner Chilcott that it could not conclude that Loestrin 24 was superior to Loestrin 1/20, and that the label could not include any comparative claims.

130.    Despite the FDA's conclusion that Loestrin 24 did not reduce the incidence of breakthrough  bleeding, Warner Chilcott markets Loestrin 24 as providing an effective low dose birth control with shorter, lighter periods that produce less bleeding.

131.    Warner Chilcott has earned over $1.75 billion in revenue from Loestrin 24 sales through 2012.

| Year | Annual Revenue |
|------|----------------|
| 2012 | $389 million |
| 2011 | $396 million |
| 2010 | $342 million |
| 2009 | $247 million |
| 2008 | $197 million |
| 2007 | $148 million |

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

| 2006 | $ 44 million |
|------|--------------|

### E.  Warner Chilcott Lists the '394 Patent in the Orange Book As a Bar to Generic Competitors

132.    Despite the FDA's conclusion that the IND showed no significant difference either in the incidence of intracyclic bleeding or in the number of intracyclic bleeding/spotting days across the Loestrin 1/20 and Loestrin 24 treatment groups, and the fact that the '394 Patent covered an oral contraceptive regimen characterized by a reduced incidence of breakthrough bleeding after the first cycle (based on data that ostensibly compared bleeding rates in monkeys taking the active tablets in Loestrin 1/20 for 21 and 24 days), Warner Chilcott listed the '394 Patent in the FDA Orange Book as covering Loestrin 24 or a method of using Loestrin 24.

133.    On April 15, 2005, Warner Chilcott identified solely the '394 Patent as covering Loestrin 24.  Warner Chilcott told the FDA that the '394 Patent expired on July 22, 2014.

134.    Because the '394 Patent claims only a narrow method (*i.e.*, three extra days of tablets) of using active ingredients that have been employed for decades as oral contraceptives, generic manufacturers were eager to apply for FDA approval to market generic versions of Loestrin 24 long before the expiration of the '394 Patent.  The generic manufacturers believed that they could obtain a court ruling that the '394 Patent was either invalid and unenforceable or not infringed by their products.

#### 1.  The '394 Patent very likely does not cover Loestrin 24

135.    The '394 Patent claims a method of female contraception characterized by a reduced incidence of breakthrough bleeding after the first cycle.  That method is comprised of administering a specific combination of hormones for 24 days.

33

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

136.     According to the FDA, the data Warner Chilcott presented in its NDA did not support its hypothesis that Loestrin 24 reduced breakthrough bleeding.  The FDA determined, after comparing the incidence of bleeding in the group taking Loestrin active tablets for 24 days versus the group taking Loestrin active tablets for 21 days, that *there was no statistically or clinically significant difference in bleeding between the two groups*.  The FDA concluded that Warner Chilcott had not provided data to show that Loestrin 24 reduced the incidence of breakthrough bleeding as compared to Loestrin 1/20.

137.     Hodgen's claim of diminished breakthrough bleeding associated with his invention was as compared to Loestrin 1/20.  The only data Hodgen provided the PTO to support his claim that the subject matter of the '394 Patent diminished the incidence of breakthrough bleeding was a comparison of bleeding rates between Loestrin 1/20 tablets administered for the prescribed 21 days and Loestrin 1/20 tablets for 24 days.  The other comparison Hodgen knew of also compared bleeding rates between Loestrin 1/20 tablets administered for the prescribed 21 days and Loestrin 1/20 tablets administered for 24 days.

138.     If the '394 Patent does not cover Loestrin 24, the AB-rated generic versions of Loestrin 24 – that the FDA considers to be the same as the brand – very likely did not infringe the '394 Patent.

**2.     The '394 Patent is very likely obvious in light of the prior art**

139.     Loestrin 1/20 contains the specific estrogen and progestin compounds recited in the claims of the '394 Patent, in the claimed amounts and in the claimed weight ratios.  But the active tablets in Loestrin 1/20 are taken for 21 days, not the 23 to 25 days contemplated by the '394 Patent.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

140.    Based on the prior art, it was obvious to administer active tablets for more than 21 days.

141.    The prior art teaches that a seven day tablet-free period leads to follicular development, which can lead to pregnancy.  The prior art proposes to provide improved suppression of follicular development by using a 24 day regime of active tablets in oral contraceptive products while incrementally increasing the progestin.

142.    The prior art teaches that a seven-day tablet-free interval may be associated not only with diminished contraceptive efficacy, but also symptoms of estrogen withdrawal such as migraine headaches.

143.    The prior art teaches that the incidence of intermenstrual bleeding might, theoretically, be reduced by giving an additional combination tablet in each cycle.

144.    There are examples in the prior art of other 24 day regimes that are safe and effective.  One of ordinary skill would thus have expected that administering a combination of estrogen and progestin for 23-25 days, or specifically for 24 days, would be safe and effective.

145.    The prior art suggests that the seven-day tablet-free interval could be shortened to achieve additional benefits, such as reduced risk of follicular development, improved contraceptive efficacy, (theoretically) reduced breakthrough bleeding, as well as relief from certain symptoms of estrogen withdrawal such as migraine headaches.  One skilled in the art would be motivated to reduce the number of tablet-free days by administering additional active tablets.

**3.      The '394 Patent is very likely unenforceable**

146.    The '394 Patent is very likely unenforceable in light of the misrepresentations and omissions made to the PTO during the prosecution of the '394 Patent.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

147.    As described above, the Applicants made materials misrepresentations and omissions to the PTO.  But for those omissions, the '394 Patent would very likely not have issued.

148.    In the patent infringement suits, it was highly likely to be adjudged that Warner Chilcott could not enforce the '394 Patent against the generics – even though Warner Chilcott may not have been directly involved in the prosecution of the application for the '394 Patent.

**F.    Warner Chilcott Enters into a Reverse Payment Settlement Agreement with Watson**

**1.    Warner Chilcott sues Watson for allegedly infringing the '394 patent**

149.    On or about June 19, 2006, defendant Watson notified Warner Chilcott that Watson had filed ANDA 78267 in order to market a generic version of Loestrin 24.  Watson's notice letter included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic Loestrin 24 product would not infringe any valid claim of the '394 Patent.

150.    On July 28, 2006, Warner Chilcott sued Watson in the United States District Court for the District of New Jersey,[14] alleging that Watson's generic Loestrin 24 product would infringe the '394 Patent.  Simply by filing the case, Warner Chilcott prevented Watson from obtaining FDA approval to market generic Loestrin 24 for at least two-and-a-half years – regardless of whether Warner Chilcott's case had any merit.

151.    During the litigation, Watson challenged the validity and enforceability of the '394 Patent, as well as Warner Chilcott's infringement allegations.  Watson conducted discovery supporting a host of defenses focusing on: (1) the enforceability of the '394 Patent; (2) the validity of the '394 Patent; and (3) the weakness of Warner Chilcott's infringement allegations.

---

[14] *Warner Chilcott Co. v. Watson Pharms., Inc.*, C.A. No. 2:06-cv-3491 (D.N.J.).

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

152.     On January 23, 2008, Watson filed an amended answer and counterclaim.  The FDA's medical review of the Loestrin 24 NDA – including the FDA's conclusion that Loestrin 24 was not shown to be superior to Loestrin 1/20 on bleeding rates – was not available to Watson at the time.  The approval package for Loestrin 24 was posted on March 24, 2008 – two months after Watson filed its amended answer and counterclaim.[15]

153.     Watson offered two affirmative defenses:  invalidity and noninfringement. Watson asserted that the claims of the '394 Patent were invalid under one or more of 35 U.S.C. §102 (novelty; prior art), §103 (obviousness), and §112 (specification; written description).

154.     Watson alleged that the '394 Patent was unenforceable in view of equitable doctrines, including inequitable conduct, common law fraud, and unclean hands.  Watson alleged that the applicants for the '394 Patent, including the inventor, counsel, and others substantially involved in its prosecution, breached their duty of good faith and candor to the PTO (37 C.F.R. § 1.56 and common law) by intentionally misrepresenting material facts, failing to disclose material information, and submitting false information to the PTO with the intent to deceive.

Watson alleged the following:

- Applicants intentionally concealed from the PTO a public use of the claimed invention that occurred more than one-year before the filing date in violation of 35 U.S.C. § 102(b);

- Applicants intentionally made false statements and withheld material information from the PTO concerning the amount of estrogen in prior art oral contraceptives; and

- Applicants intentionally withheld prior art teaching an extended regimen of oral contraceptives (more than 21 days) for purportedly enhanced efficacy.

---

[15] *See* FDA Drug Approvals and Databases, Loestrin 24 Fe Drug Approval Package, *available at* http://www.accessdata.fda.gov/drugsatfda_docs/nda/2006/021871TOC.cfm.

155.    According to Watson, the claims of the '394 Patent were invalid because simply extending the regimen of a well-known prior art product by several days, as is taught in the literature and was practiced by women, was obvious.

### 2.    Warner Chilcott bribes Watson to avoid a decision on the merits

156.    To prevent Watson's generic product from coming to market, Warner Chilcott would have had to defeat each of Watson's bases regarding invalidity and unenforceability and prove that Watson's product actually infringed the '394 Patent.

157.    Warner Chilcott faced a substantial battle.  Watson was attacking the only patent providing any coverage for Loestrin 24 – a then $200 million a year drug – on three separate fronts:  invalidity, unenforceability, and non-infringement.  Discovery had revealed that Warner Chilcott had learned about the unsuccessful EVMS study in women back in 1993.  The FDA's newly-released medical review for Loestrin 24 confirmed that, on the basis of the data Warner Chilcott provided to the FDA, Loestrin 24 did not significantly reduce the incidence of breakthrough bleeding.  Hodgen's misrepresentations and omissions seriously called into question whether Warner Chilcott could enforce the '394 Patent even if it was infringed.

158.    For the reasons Watson alleged, and in light of the defects in the '394 Patent described elsewhere in this complaint, it was highly likely that Warner Chilcott would have lost the patent infringement suit if it had been litigated to conclusion.  So Warner Chilcott decided to settle its lawsuit against Watson.  Warner Chilcott had options for how it could structure such a deal.  It could have negotiated a settlement where Watson's generic launched some time before the expiration of the '394 Patent, where the launch date was based on the relative risk faced by the parties, their expected litigation expenses, and the strengths/weaknesses of the '394 Patent as perceived by both sides.  Given the serious weaknesses in Warner Chilcott's patent infringement

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

arguments, Watson would have been in a strong bargaining position.  And the agreed upon entry date would have been much earlier than the date contained in the unlawful agreement being challenged herein.

159.    Warner Chilcott opted to not enter into that type of a procompetitive agreement with Watson.  Instead, Warner Chilcott and Watson entered into an anticompetitive agreement where Warner Chilcott unlawfully paid Watson to withdraw its challenges to the validity and enforceability of the '394 Patent and delay its introduction of generic Loestrin 24 until just six months before the expiration of the '394 Patent.

160.    After fighting vigorously to obtain discovery materials since the inception of the case, Watson suddenly, in May 2008, entered into a series of stipulations to extend the close of discovery.

161.    On January 15, 2009, Warner Chilcott and Watson filed a stipulation of dismissal. The parties settled before they briefed, and before the Court finally decided, the substantive issues of invalidity, unenforceability, and infringement.

### 3.    Warner Chilcott and Watson enter an Exclusion Payment Agreement

162.    Having stayed FDA approval of Watson's generic Loestrin 24 application for nearly 30 months by filing the patent infringement claim against Watson, Warner Chilcott decided to terminate the case just as the 30 month stay was to expire on or about January 2009. On January 9, 2009, Warner Chilcott and Watson entered into an Exclusion Payment Agreement ("Watson Exclusion Payment Agreement").  Pursuant to that Agreement, Warner Chilcott ended its '394 Patent litigation against Watson, and Watson dropped its counterclaims against Warner Chilcott.  At the time of the unlawful agreement, the court adjudicating the patent case had not issued any substantive rulings regarding the merits of the case.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

163.    Under the Watson Exclusion Payment Agreement, Watson covenanted and agreed to delay selling its generic Loestrin 24 product until the earliest of: (1) January 22, 2014; (2) 180 days before a date on which Warner Chilcott granted rights to a third party to market a generic version of Loestrin 24 in the United States; (3) the date on which another generic version of Loestrin 24 entered the market; or (4) the date on which any third party obtained a final and non-appealable judicial order that the '394 Patent is invalid, unenforceable or not infringed by that third party's generic version of Loestrin 24.

164.    In return for Watson's agreement to drop its challenge to the '394 Patent and to delay entry of its generic Loestrin 24 product, Warner Chilcott agreed to pay Watson substantial sums.  Warner Chilcott's payments to Watson under the Agreement took at least five forms.

165.    First, under the Watson Exclusion Payment Agreement, Warner Chilcott covenanted and agreed not to market, supply or license an authorized generic version of Loestrin 24 during Watson's first 180 days of marketing.  Absent the Watson Exclusion Payment Agreement, Warner Chilcott had the incentive and ability to launch an authorized generic version of Loestrin 24 upon entry of a competing generic version of Loestrin 24, and would have done so.  Indeed, Warner Chilcott has marketed authorized generic versions of several of its other branded drugs, including its oral contraceptive, Dovonex.  As discussed above, avoiding competition from an authorized generic was a huge financial benefit to Watson.  The agreement by Warner Chilcott not to launch an authorized generic during Watson's exclusivity period had a cash value to Watson of tens or hundreds of millions of dollars, and far more than the litigation costs either Watson or Warner Chilcott saved by entering into their agreement.

166.    Second, Warner Chilcott agreed to grant to Watson a "non-exclusive, fully paid, worldwide, royalty-free irrevocable license, under the ['394 Patent] and all regulatory

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

exclusivities pertaining thereto" to market Loestrin 24 everywhere in the world beginning

January 22, 2014.  The license to market Loestrin 24 outside the United States has substantially

more value to Watson than marketing the product only in the United States, but provides no

benefit to consumers in the United States.

167.    Third, the Watson Exclusion Payment Agreement provided that Warner Chilcott

 would pay Watson annual fees and a percentage

of net sales above a specified level in connection with Watson's co-promotion of Femring, a

Warner Chilcott hormone therapy product, beginning in 2009.

168.    Fourth, the Watson Exclusion Payment Agreement gave Watson the exclusive

right to earn highly profitable brand sales of a Warner Chilcott oral contraceptive that was in

late-stage development at that time                                         Watson now

markets that product under the brand name Generess Fe, a chewable oral contraceptive. Watson

has already earned tens of millions of dollars selling Generess Fe in the United States since its

launch in May 2011.

169.    Fifth, Warner Chilcott covenanted and agreed not to grant a license to any other

manufacturer to produce a generic version of Loestrin 24 – whether under Warner Chilcott's

NDA or under any ANDA – until at least 180 days after Watson entered the market. Warner

Chilcott thus guaranteed to Watson a period of 180 days of exclusivity as the only generic

Loestrin 24 on the market (absent another generic manufacturer entering following a 30 month

stay of FDA approval or obtaining a court order permitting such entry).  Watson forfeited its

entitlement to 180 day exclusivity under the Hatch-Waxman Act because it had failed to obtain

tentative FDA approval to market generic Loestrin 24 within 30 months of submitting its ANDA

in April 2006.  Thus, the contractual exclusivity granted by Warner Chilcott had substantial

value to Watson and precluded generic competition at the expense of Direct Purchaser Plaintiffs

and other Class Members.

170.    In a February 19, 2013 earnings call, Paul Bisaro, Watson/Actavis's CEO,

President and Director, represented that Watson retained 180 day exclusivity on Loestrin 24.

Because the FDA had determined that Watson was not entitled to the statutory exclusivity period

under Hatch-Waxman for failure to obtain tentative approval within 30 months of filing its

ANDA, Bisaro had to be referring to exclusivity that is the product of the Watson Exclusion

Payment Agreement.

171.    Warner Chilcott made these payments in exchange for Watson's agreement to

delay generic competition to Loestrin 24 for approximately *four-and-one-half years*.  Absent

Warner Chilcott's payments, Watson would not have agreed to delay entry until January 22,

2014, and would already have entered the market, pursuant to a settlement agreement bearing an

earlier agreed entry date or otherwise.  Absent Watson's agreement to delay entry of generic

Loestrin 24, Warner Chilcott would not have agreed to: (a) refrain from launching, or granting a

license to others to launch, an authorized generic Loestrin 24 during Watson's first 180 days of

marketing; (b) grant Watson a license to market Loestrin 24 globally beginning January 22,

2014; (c) designate Watson as a co-promoter of Femring; (d) grant Watson an exclusive license

to market and sell Generess Fe; (e) guarantee Watson 180 days of exclusivity, which it had

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

otherwise forfeited, to market a generic version of Loestrin 24; and/or (f) grant the price and/or other terms that it did under those provisions of the Agreement.

172.     To avoid competition, maintain its monopoly in the market for Loestrin 24 and AB-rated generic versions of Loestrin 24, and continue to reap monopoly profits, Warner Chilcott agreed to pay Watson what amounts to tens or hundreds of millions of dollars.  The large payment from Warner Chilcott to Watson had no justification other than to keep Watson's AB-rated generic version of Loestrin 24 off the market for nearly five years.  These payments far exceed the costs of continuing to litigate the settled patent infringement litigation.

173.     Warner Chilcott and Watson continue to adhere to the Watson Exclusion Payment Agreement.

## G.     Warner Chilcott Sues Lupin for Allegedly Infringing the '394 Patent

174.     As the first filer, Watson had an opportunity to earn 180 days of exclusivity under the Hatch Waxman Amendments.  At the time Watson filed its ANDA, of course, subsequent ANDA filers could not have predicted that Watson would ultimately forfeit its 180 day exclusivity.  If Watson had obtained an order finding the '394 Patent invalid or unenforceable, other generic manufacturers would have benefitted from that ruling without having to incur patent litigation costs.

175.     On or about July 30, 2009, six months after the announcement of the agreement between Warner Chilcott and Watson, Lupin notified Warner Chilcott that it had filed ANDA 91398 for the purpose of marketing generic versions of Loestrin 24.  Lupin's notice letter included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic product would not infringe any valid and enforceable claim of the '394 Patent.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

176.     On or about September 9, 2009, Warner sued Lupin for alleged infringement of the '394 Patent in the United States District Court for the District of Delaware.[16]  Lupin answered the complaint on October 21, 2009, and alleged special defenses, including invalidity of the '394 Patent and non-infringement.

177.     Warner Chilcott filed the case against Lupin without regard to its merits.  Simply by filing the case, Warner Chilcott obtained automatic exclusion of Lupin from the market for 30 months.  Had the case proceeded to a litigated conclusion, Warner Chilcott was very likely to have lost.

178.     During discovery, Lupin, like Watson before it, uncovered facts supporting a host of defenses that cast serious doubt on: (1) the enforceability of the '394 Patent; (2) the validity of its claims; and (3) the strength of Warner Chilcott's infringement allegations.

179.     To prevent generic entry by enforcing the '394 Patent, Warner Chilcott would have had to defeat each of Lupin's arguments regarding invalidity and unenforceability and prove that Lupin infringed the '394 Patent.  Warner Chilcott instead decided to protect its monopoly by paying Lupin to withdraw its challenges to the validity and enforceability of the '394 Patent and delay its introduction of generic Loestrin 24.

### 1.     Warner Chilcott and Lupin enter an Exclusion Payment Agreement

180.     Had Lupin obtained a final judgment invalidating the '394 Patent, it would have caused the entry into the market of generic Loestrin 24 that had been delayed by the Watson Exclusion Payment Agreement.  Instead, to make sure this did not happen, and to ensure that Watson could retain 180 days of de facto market exclusivity, Warner Chilcott paid Lupin, the

---

[16] *Warner Chilcott Co. v. Lupin Ltd.*, C.A. No. 09-673 (D. Del.).

second ANDA filer for Loestrin 24, to drop its patent challenge and stay out of the market until after Watson's own delayed launch pursuant to the Watson Exclusion Payment Agreement.

181.   On or about October 10, 2010, before the close of fact discovery and before the court could issue any substantive rulings, Warner Chilcott entered into a non-competition agreement with Lupin ("Lupin Exclusion Payment Agreement") and dismissed the case. Pursuant to that Agreement, Lupin agreed to drop its challenge to the '394 Patent and to delay entry of its generic version of Loestrin 24 until July 22, 2014, the month that the '394 Patent expires, in exchange for payments.

182.   Warner Chilcott's payments to Lupin under the Lupin Exclusion Payment Agreement took at least three forms.

183.   First, the Lupin Exclusion Payment Agreement granted to Lupin a non-exclusive license covering Femcon Fe, another branded oral contraceptive manufactured by Warner Chilcott, which permitted Lupin to begin marketing an authorized generic version of Femcon Fe, supplied by Warner Chilcott, in the United States beginning on the earlier of (i) 180 days after Teva Pharmaceutical Industries, Ltd (the first-filer with respect to Femcon Fe) entered the market with a generic equivalent to Femcon Fe, or (ii) January 1, 2013.  Pursuant to the Agreement, Lupin in fact entered the market with generic Femcon Fe in October 2011, and since that time has made substantial sales of that product.  But for the Lupin Exclusion Payment Agreement, Lupin could not have begun making generic Femcon Fe sales until the end of the 30-month stay in February 2012.

184.   Second, the Lupin Exclusion Payment Agreement gave Lupin the right to purchase and sell in the United States a generic version of Asacol 400 mg (a branded treatment

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

for inflammatory bowel disease), to be supplied by Warner Chilcott, if a generic version of Asacol 400 mg is launched by another generic manufacturer in the United States.

185. ███████████████████████████████████████

███████████████████████████

186. Warner Chilcott paid Lupin for delayed market entry of generic Loestrin 24, and ensured that Watson would have 180 days of de facto exclusivity upon its launch of generic Loestrin 24.

187. Warner Chilcott and Lupin continue to adhere to the Lupin Exclusion Payment Agreement.

## H.    Warner Chilcott Sues Mylan for Allegedly Infringing the '394 Patent

188. On or about April 20, 2011, six months after the announcement of the agreement between Warner Chilcott and Lupin, Mylan notified Warner Chilcott that it had filed ANDA 202742 for the purpose of marketing generic versions of Loestrin 24. Mylan's notice letter included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic product would not infringe any valid and enforceable claim of the '394 Patent.

189. On or about June 2, 2011, Warner sued Mylan for alleged infringement of the '394 Patent in the United States District Court for the District of New Jersey.[17] Mylan answered the complaint on August 29, 2011, and asserted counterclaims and special defenses, including invalidity of the '394 Patent and non-infringement.

190. Warner Chilcott filed the case against Mylan without regard to its merits. Simply by filing the case, Warner Chilcott obtained automatic exclusion of Mylan from the market for

---

[17] *Warner Chilcott Co. v. Mylan Inc.*, C.A. No. 3:11-cv-3262 (D.N.J.).

30 months.  Had the case proceeded to a litigated conclusion, Warner Chilcott was very likely to have lost.

191.    During discovery, Mylan, like Watson and Lupin before it, uncovered facts supporting a host of defenses that cast serious doubt on: (1) the enforceability of the '394 Patent; (2) the validity of its claims; and (3) the strength of Warner Chilcott's infringement allegations. The case continued through claim construction and was set for a bench trial to commence on August 12, 2013.  Mylan submitted its trial brief on July 24, 2013.

192.    To prevent generic entry by enforcing the '394 Patent, Warner Chilcott would have had to defeat each of Mylan's arguments regarding invalidity and unenforceability and prove that Mylan infringed the '394 Patent.  Warner Chilcott instead decided to protect its monopoly by entering an agreement with Mylan under which Mylan agreed to withdraw its challenges to the validity and enforceability of the '394 Patent and delay its introduction of generic Loestrin 24.

### 1.    Warner Chilcott and Mylan enter an agreement

193.    Had Mylan obtained a final judgment invalidating the '394 Patent, it would have caused the entry into the market of generic Loestrin 24 delayed by the Watson Exclusion Payment Agreement.  Instead, to make sure this did not happen, and to ensure that Watson could retain 180 days of market exclusivity, Warner Chilcott entered a settlement and license agreement with Mylan, the third ANDA filer for Loestrin 24, to drop its patent challenge and stay out of the market until after Watson was permitted to enter the market pursuant to the Watson Exclusion Payment Agreement.

194.    On or about July 29, 2013, just weeks before a bench trial was scheduled to commence, Warner Chilcott entered into a non-competition agreement (in the form of a

settlement and license agreement) with Mylan and the case was subsequently dismissed. Pursuant to the Warner Chilcott and Mylan agreement, Mylan agreed to drop its challenge to the '394 Patent and to delay entry of its generic version of Loestrin 24 until July 22, 2014, the month that the '394 Patent expires.

195.    Warner Chilcott entered the agreement with Mylan for delayed market entry of generic Loestrin 24 to ensure that Watson would have 180 days of exclusivity upon its launch of generic Loestrin 24 – as Warner Chilcott and Watson agreed to do in the Exclusion Agreement.

196.    Warner Chilcott and Mylan continue to adhere to their agreement.

197.    Warner Chilcott has delayed generic entry in order to extend and protect its Loestrin 24 monopoly as long as possible.

## I.    Warner Chilcott's Agreements with Watson, Lupin, and Mylan Required Continuing Performance in Order to Inflict Continuing Overcharges on Direct Purchasers

198.    The anticompetitive effects of the reverse payment settlement agreements stem not merely from the execution of the agreements but also from the continued performance of those agreements over the past four years.  For the Defendants' anticompetitive scheme to be effective, they must each actually take steps to abide by the agreements.  That ongoing performance and conduct includes, but is not limited to the following:

a.    Warner Chilcott must actually pay Watson and Lupin according to the terms of the Agreements;

b.    Warner Chilcott must prosecute and delay later ANDA filers' attempts to launch a generic version of Loestrin 24;

c.    Watson must actually stay off the market through January 22, 2014;

      d.     Warner Chilcott has to cut deals to pay off other, later generic filers (including Lupin and Mylan) to protect the entry date Warner Chilcott and Watson agreed to;

      e.     Warner Chilcott and Watson must prevent a court ruling on the merits of the '394 Patent; and

      f.     Warner Chilcott's  continuing to overcharge direct purchasers for *years* following the agreements.

## J.    Recent Acquisition of Warner Chilcott by Actavis and Warner Chilcott's Calculated Discontinuation of Loestrin 24

199.    On May 20, 2013, Actavis announced that it was acquiring Warner Chilcott.

200.    On or around August 2013, Warner Chilcott announced that it was discontinuing production of Loestrin 24.  Warner Chilcott did not give any advance warning of this discontinuation.  Loestrin 24 was not discontinued for any safety reason, but was instead voluntarily discontinued by Warner Chilcott.  Warner Chilcott did not remove existing Loestrin 24 supplies from the market but instead simply ceased manufacturing Loestrin 24.

201.    Warner Chilcott simultaneously announced the replacement of Loestrin 24 with a purportedly new chewable version of Loestrin 24 sold under the brand name Minastrin 24 Fe ("Minastrin 24").  Minastrin 24 is chemically identical to Loestrin 24 and follows the same dosing regimen as Loestrin 24 Fe.  The only difference between Loestrin 24 and Minastrin 24 is that Minastrin 24 is chewable, but Loestrin 24 and Minastrin 24 are not substitutable for each other at the pharmacy counter.

202.    But for Defendants' unlawful conduct, AB-rated generic versions of Loestrin 24 would have entered the market long ago, which would have resulted in most Loestrin 24

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

prescriptions having been converted to AB-rated generic versions of Loestrin 24.  Minastrin 24 would not have been launched.

203.    On October 10, 2013, Actavis completed its acquisition of Warner Chilcott.

204.    As part of Actavis's acquisition of Warner Chilcott, on September 27, 2013, Actavis entered into Consent Orders with the FTC that required Actavis to divest four pharmaceutical products including Loestrin 24 and its generic equivalents.

205.    On September 30, 2013, Amneal Pharmaceuticals, LLC ("Amneal") announced that it had entered agreements with Actavis to acquire the four pharmaceutical products including Loestrin 24.  On November 8, 2013, Amneal announced that it will launch Loestrin 24 under the name Lomedia 24 Fe.

## VI.    CLASS ALLEGATIONS

206.    Direct Purchaser Class Plaintiffs bring this action as a class action R. Civ. P. 23(a) and (b)(3) on behalf of themselves and as representatives of a Class defined as follows:

> All persons or entities in the United States and its territories who purchased Loestrin 24 directly from Warner Chilcott at any time during the period September 1, 2009 through and until the anticompetitive effects of the defendants' conduct cease (the "Class Period").

Excluded from the Class are the Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

207.    Members of the Class are so numerous that joinder is impracticable.  Direct Purchaser Class Plaintiffs believe that there are dozens of class members.  Further, the Class is readily identifiable from information and records that Defendants are required by law to maintain.

208.    Direct Purchaser Class Plaintiffs' claims are typical of the claims of the members of the class.  Direct Purchaser Class Plaintiffs and all members of the Class were damaged by

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

Defendants' same wrongful conduct.  Specifically, they paid artificially inflated prices for oral contraceptives comprised of 24 norethindrone acetate/ethinyl estradiol tablets (containing l mg of norethindrone acetate and 20 mcg ethinyl estradiol) and 4 ferrous fumarate placebo tablets and were deprived – and are still deprived – of the benefits of competition from cheaper generic versions of Loestrin 24 as a result of the Defendants' wrongful conduct.

209.    Direct Purchaser Class Plaintiffs will fairly and adequately protect and represent the interests of the class.  Direct Purchaser Class Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.

210.    Direct Purchaser Class Plaintiffs and the Class are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation, and have particular experience with class action antitrust litigation involving pharmaceutical products.

211.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate.  Such generally applicable conduct is inherent in the Defendants' wrongful conduct.

212.    Questions of law and fact common to the Class include:

a.    whether Defendants conspired to restrain generic competition to Loestrin 24;

b.    whether Watson unlawfully agreed to delay its entry into the market for oral contraceptives comprised of 24 norethindrone acetate/ethinyl estradiol tablets (containing l mg of norethindrone acetate and 20 mcg ethinyl estradiol) and 4 ferrous fumarate placebo tablets, *i.e.*, Loestrin 24 and its AB-rated generic bioequivalents;

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

   c.   whether Warner Chilcott paid Watson in exchange for a delay in generic competition for Loestrin 24;

   d.   whether Warner Chilcott's compensation to Watson was necessary to yield some procompetitive benefit that is legally cognizable and non-pretextual;

   e.   whether Warner Chilcott entered agreements with subsequent filers, such as Lupin and Mylan, to protect Warner Chilcott's and Watson's anticompetitive scheme;

   f.   whether Defendants' challenged conduct suppressed generic competition to Loestrin 24;

   g.   whether Defendants' challenged conduct harmed competition in the market for oral contraceptives comprised of 24 norethindrone acetate/ethinyl estradiol tablets (containing l mg of norethindrone acetate and 20 mcg ethinyl estradiol) and 4 ferrous fumarate placebo tablets;

   h.   whether Warner Chilcott possessed market power in the market for oral contraceptives comprised of 24 norethindrone acetate/ethinyl estradiol tablets (containing l mg of norethindrone acetate and 20 mcg ethinyl estradiol) and 4 ferrous fumarate placebo tablets, *i.e.*, Loestrin 24 and its AB-rated generic bioequivalents;

   i.   whether the relevant antitrust market (if a relevant market must be defined) is the market for oral contraceptives comprised of 24 norethindrone acetate/ethinyl estradiol tablets (containing l mg of norethindrone acetate and 20 mcg ethinyl estradiol) and 4 ferrous fumarate placebo tablets, *i.e.*, Loestrin 24 and its AB-rated generic bioequivalents;

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

j.  whether Defendants' activities alleged herein have substantially affected interstate commerce;

k.  whether, and to what extent, Defendants' conduct caused antitrust injury to the business or property of Direct Purchaser Class Plaintiffs and members of the Class in the nature of overcharges; and

l.  the quantum of overcharges paid by Direct Purchaser Class Plaintiffs and the Class in the aggregate.

213.  Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

214.  Direct Purchaser Class Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.   MARKET POWER AND RELEVANT MARKET

215.  At all relevant times, Warner Chilcott had market power over oral contraceptives comprised of 24 norethindrone acetate/ethinyl estradiol tablets (containing l mg of norethindrone acetate and 20 mcg ethinyl estradiol) and 4 ferrous fumarate placebo tablets  – *i.e.* Loestrin 24 and its AB-rated generic equivalents – because Warner Chilcott had the power to maintain the price of these products at supracompetitive levels without losing substantial sales to other oral

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

contraceptive products. This market power may be shown directly, and therefore no relevant market needs to be defined.

216.     A small but significant, non-transitory price increase for Loestrin 24 by Warner Chilcott would not have caused a significant loss of sales to other oral contraceptive products sufficient to make such a price increase unprofitable.

217.     Loestrin 24 does not exhibit significant, positive cross-elasticity of demand with respect to price, with any other oral contraceptive product other than AB-rated generic versions of Loestrin 24.

218.     Loestrin 24 is not reasonably interchangeable with any products other than AB-rated generic versions of Loestrin 24.

219.     The existence of non-Loestrin 24 oral contraceptives did not constrain Warner Chilcott's ability to raise or maintain Loestrin 24 prices without losing substantial sales, and does not mean those other drug products are in the same relevant antitrust market product market with Loestrin 24. Therapeutic alternatives are not the same as economic alternatives.

220.     Functional similarities between Loestrin 24 and non-Loestrin oral contraceptive products are insufficient to permit inclusion of those other oral contraceptive products in the relevant market with Loestrin 24. To be an economic substitute for antitrust purposes, a functionally similar product must also exert sufficient pressure on the prices and sales of another product, so that the price of that product cannot be maintained above levels that would be maintained in a competitive market. No other oral contraceptive (except for AB-rated generic versions of Loestrin 24) will take away sufficient sales from Loestrin 24 to prevent Warner Chilcott from raising or maintaining the price of Loestrin 24 above levels that would prevail in a competitive market.

221.    Loestrin 24 is also not reasonably interchangeable with any products other than AB-rated generic versions of Loestrin 24 because Loestrin 24 has different attributes significantly differentiating it from other oral contraceptives and making it unique.  The FDA does not consider Loestrin 24 and other oral contraceptives interchangeable, and there is variation in the dosage of the active ingredients.  Oral contraceptives have different chemical compounds and formulations, such as varying amounts of progestin.

222.    Oral contraceptive pills are dispensed in packs, where each pack contains the right number of pills to last for one cycle (28 days).  Each pack contains between 21 and 28 pills. Each pill is labeled with either a day of the week (M, T, W, etc.) or the day of the cycle (Day 1, Day 2, Day 3, etc.) when it should be taken.



PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL



223.    Some formulations of oral contraceptives have higher failure rates in certain

classes of women, and they differ widely in their safety and side-effect profiles.  For example,

oral contraceptives differ in the endometrial, progestational, androgenic and estrogenic activity.

The differing efficacy, safety and side effect profiles of different oral contraceptives play a

critical role in doctors' selection of the most appropriate oral contraceptive for a particular

patient and a woman's decision to continue taking an oral contraceptive she has found to work

well.

224.    Price does not drive prescriptions for oral contraceptives.  The pharmaceutical

marketplace is characterized by a "disconnect" between the payment obligation and the product

selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products,

including Loestrin 24, to patients without a prescription written by a doctor.  This prohibition

introduces a disconnect between the payment obligation and the product selection.  The patient

(and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product,

but the patient's doctor chooses which product the patient will buy.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

225.     Warner Chilcott and other brand manufacturers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products.  These sales representatives do not advise doctors of the cost of the branded products.  Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products.  The result is a marketplace in which price plays a comparatively unimportant role in product selection.

226.     Thus, unlike many consumer products where consumers are provided with a choice of functionally similar products at the point of sale and make purchasing decisions primarily based on price, the prescribing decision for prescription drugs, such as oral contraceptives, is made by the physician, not female consumers of these products.  Additionally, once the physician and patient find a product that is well-tolerated, it is very unlikely that the patient will switch to a different oral contraceptive based on variations of price of 10% or less.

227.     Doctors generally select an oral contraceptive for their patients based on the clinical and pharmacological attributes of the drug and the relevant characteristics of the patient, rather than on the basis of price.  For clinical reasons, among others, physicians and patients prefer Loestrin 24 to other products designed to prevent pregnancy.  Due to, among other reasons, its use and varying ability to prevent pregnancy while causing shorter, lighter periods, Loestrin 24 is significantly differentiated from all products other than AB-rated generic versions of Loestrin 24.

228.     The existence of other products designed to prevent pregnancy has not significantly constrained Warner Chilcott's pricing of Loestrin 24.

229.    Warner Chilcott needed to control only Loestrin 24 and its AB-rated generic equivalents, and no other products, in order to maintain the price of Loestrin 24 profitably at supracompetitive prices.  Only the market entry of a competing, AB-rated generic version of Loestrin 24 would render Warner Chilcott unable to profitably maintain its current prices of Loestrin 24 without losing substantial sales.

230.    Despite the availability of other oral contraceptive products, including lower priced generics that are not AB-rated to Loestrin 24, sales of Loestrin 24 increased from 2008 to 2011, and the price of Loestrin 24 rose each year.  This is in stark contrast to what would have occurred if an AB-rated generic version of Loestrin 24 had come to market.  For example, when an AB-rated generic version of Yaz-28, an oral contraceptive sold by Bayer Healthcare, became available in 2010, sales of branded Yaz-28 dropped from a reported $781 million in 2009, to $150 million in 2011.  The generic version of Yaz-28 was not AB-rated, however, to Loestrin 24 and, thus, not surprisingly, while sales of branded Yaz-28 plunged from 2009 to 2011, sales of branded Loestrin 24 *increased* between 2009 and 2011.

231.    At all relevant times, Warner Chilcott has sold Loestrin 24 at prices well in excess of the competitive price.

232.    Warner Chilcott had, and exercised, the power to exclude and restrict competition to Loestrin 24 and AB-rated bioequivalents.

233.    Warner Chilcott, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

234.    To the extent that Plaintiffs are legally required to prove market power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant

58

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

product market is oral contraceptives comprising 24 norethindrone acetate/ethinyl estradiol (1mg/20mcg) tablets and 4 ferrous fumarate placebo tablets (*i.e.*, Loestrin 24 and its AB-rated generic equivalents).  During the relevant time, Warner Chilcott has been able to profitably maintain the price of oral contraceptives comprising 24 norethindrone acetate/ethinyl estradiol (1mg/20mcg) tablets and 4 ferrous fumarate tablets well above competitive levels.

235.    The relevant geographic market is the United States and its territories.

236.    Warner Chilcott's market share in the relevant market was 100% at relevant times.

## VIII.   MARKET EFFECTS AND DAMAGES TO THE CLASS

237.    But for the anticompetitive conduct alleged above, Watson would have entered the market with its generic Loestrin 24 as early as September 1, 2009 when its ANDA 78267 received final FDA approval.  Warner Chilcott would have launched an authorized generic version of Loestrin 24 simultaneously.  Lupin, Mylan, and other generic manufacturers would have entered the market with additional generic versions of Loestrin 24 thereafter.

238.    Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Loestrin 24 from generic competition.

239.    Watson, Lupin, and Mylan have extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products, and manufacturing commercial launch quantities adequate to meet market demand.

240.    Defendants' anticompetitive conduct, which delayed introduction into the United States marketplace of generic versions of Loestrin 24, has caused Direct Purchaser Class Plaintiffs and the Class to pay more than they would have paid for oral contraceptives

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

comprising 24 norethindrone acetate/ethinyl estradiol (1mg/20mcg) tablets and 4 ferrous

fumarate placebo tablets absent Defendants' illegal conduct.

241.    Typically, generic versions of brand drugs are initially priced significantly below

the corresponding brand drug to which they are AB-rated.  As a result, upon generic entry,

virtually all brand drug purchases are rapidly substituted for generic equivalents of the drug.  As

more generic manufacturers enter the market, prices for generic versions of a drug predictably

plunge even further due to competition among the generic manufacturers, and, correspondingly,

the brand drug loses even more of its market share to the generic versions of the drug.

242.    This price competition enables all purchasers of the drug to: (a) purchase generic

versions of a drug at substantially lower prices; (b) purchases generic equivalents of the drug at a

lower price, sooner; and/or (c) purchase the brand drug at a reduced price.  Consequently, brand

manufacturers have a keen financial interest in delaying and impairing generic competition, and

purchasers experience substantial cost inflation from that delay and impairment.

243.    But for Defendants' anticompetitive conduct, Direct Purchaser Class Plaintiffs

and members of the Class would have paid less for oral contraceptives comprising 24

norethindrone acetate/ethinyl estradiol (1mg/20mcg) tablets and 4 ferrous fumarate placebo

tablets by: (a) substituting purchases of less-expensive AB-rated generic Loestrin 24 for their

purchases of more-expensive branded Loestrin; (b) receiving discounts on their remaining

branded Loestrin 24 purchases; and (c) purchasing generic Loestrin 24 at lower prices sooner.

244.    Moreover, due to Defendants' anticompetitive conduct, other generic

manufacturers were discouraged from and/or delayed in (a) launching generic versions of

Loestrin 24, and/or (b) challenging the validity or infringement of the '394 Patent in court.

245. Thus, Defendants' unlawful conduct deprived Direct Purchaser Class Plaintiffs and the Class of the benefits of competition that the antitrust laws were designed to ensure.

## IX. ANTITRUST IMPACT

246. During the relevant period, Direct Purchaser Class Plaintiffs and members of the Class purchased substantial amounts of Loestrin 24 directly from Warner Chilcott. As a result of Defendants' illegal conduct, Direct Purchaser Class Plaintiffs and members of the Class were compelled to pay, and did pay, artificially inflated prices for their oral contraceptives comprising 24 norethindrone acetate/ethinyl estradiol (1mg/20mcg) tablets and 4 ferrous fumarate placebo tablets requirements. Those prices were substantially greater than the prices that Direct Purchaser Class Plaintiffs and members of the Class would have paid absent the illegal conduct alleged herein, because: (1) the price of Loestrin 24 was artificially inflated by Defendants' illegal conduct, and (2) Direct Purchaser Class Plaintiffs and Class members were deprived of the opportunity to purchase lower-priced generic versions of Loestrin 24.

247. As a consequence, Direct Purchaser Class Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

## X. EFFECT ON INTERSTATE COMMERCE

248. At all material times, Loestrin 24, manufactured and sold by Warner Chilcott, was shipped across state lines and sold to customers located outside its state of manufacture.

249. During the relevant time period, in connection with the purchase and sale of Loestrin 24, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

250.     During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce.  Defendants' activities were within the flow of, and have substantially affected, interstate commerce.

## XI.     CLAIM FOR RELIEF

### VIOLATION OF 15 U.S.C. § 1
### AGREEMENT RESTRAINING TRADE
### (Against Warner Chilcott and Watson)

251.     Direct Purchaser Class Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

252.     Defendants Warner Chilcott and Watson have engaged, and continue to engage, in an unlawful contract, combination or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

253.     The unlawful contract, combination or conspiracy consisted of Warner Chilcott and Watson entering into the Watson Exclusion Payment Agreement, under which Warner Chilcott agreed to pay Watson substantial consideration in exchange for Watson's agreement to delay bringing its generic version of Loestrin 24 to the market.  The  purpose and effect of this agreement and conduct were, and are, to: (a) allocate 100% of the market for Loestrin products in the United States to Warner Chilcott; (b) prevent the sale of generic versions of Loestrin 24 in the United States, thereby protecting Loestrin 24 from generic competition for five years or more; (c) fix, raise, maintain or stabilize the price at which direct purchasers would pay for Loestrin 24 or its AB-rated generic equivalent at supracompetitive levels; and (d) allocate 100% of United States generic Loestrin 24 sales to Watson during the first 180 days of generic sales.

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

254.    The Watson Exclusion Payment Agreement harmed Direct Purchaser Class Plaintiffs and the Class as set forth above.

255.    The Watson Exclusion Payment Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

256.    The agreement between and among Warner Chilcott and Watson and their conduct under the Watson Exclusion Payment Agreement is an illegal restraint of trade or commerce and a continuing violation of the Sherman Act.  There is and was no legitimate, nonpretextual, procompetitive business justification for the exclusion payment that outweighs its harmful effect.  Even if there were some conceivable justification, the payment was not necessary to achieve such a purpose, nor was it the least restrictive means of achieving any such purported justification.

257.    As a direct and proximate result of Warner Chilcott's and Watson's anticompetitive conduct, as alleged herein, Direct Purchaser Class Plaintiffs and the Class have been harmed and have sustained substantial losses and damage to their business and property in the form of overcharges as set forth above.

## XII.    DEMAND FOR JUDGMENT

WHEREFORE, American Sales and RDC, on behalf of themselves and the Class, respectfully request that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the class, and declare American Sales and RDC as representatives of the class;

B.    Enter joint and several judgments against the Defendants and in favor of American Sales, RDC and the Class;

C.    Award the class damages (*i.e.*, three times overcharges) in an amount to be determined at trial; and

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

    D.    Award American Sales, RDC and the Class their costs of suit, including reasonable attorneys' fees as provided by law.

## XIII.   JURY DEMAND

258.    Pursuant to Fed. Civ. P. 38, Direct Purchaser Class Plaintiffs, on behalf of themselves and the proposed class, demand a trial by jury on all issues so triable.

Dated: December 6, 2013           Respectfully submitted,

*/s/ Patrick Lynch*
Patrick C. Lynch (R. I. Bar. No. 4867)
Jeffrey B. Pine (R.I. Bar No. 2538)
Maria F. Deaton (R.I. Bar No. 7286)
**LYNCH AND PINE**
One Park Row, 5th Floor
Providence, RI 02903
(401) 274-3306
(401) 274-3326 (fax)
patrick@patricklynchgroup.com
jbp@pinelaw.com
mdeaton@lynchpine.com

*Liaison Counsel for Direct Purchaser Class Plaintiffs*

Thomas M. Sobol (R.I Bar No. 5005)
Kristen Johnson Parker (admitted *Pro Hac Vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700
(617) 482-3003 (fax)
tom@hbsslaw.com
kristenjp@hbsslaw.com

Joseph H. Meltzer (admitted *Pro Hac Vice*)
Terence S. Ziegler (admitted *Pro Hac Vice*)
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

jmetlzer@ktmc.com
tziegler@ktmc.com

David Sorensen (admitted *Pro Hac Vice*)
Michael J. Kane (admitted *Pro Hac Vice*)
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
(215) 875-4604 (fax)
dsorensen@bm.net
mkane@bm.net

Peter R. Kohn (admitted *Pro Hac Vice*)
Neill W. Clark (admitted *Pro Hac Vice*)
**FARUQI & FARUQI LLP**
101 Greenwood Ave., Suite 600
Jenkintown, PA 19046
(215) 277-5770
(215) 277-5771 (fax)
pkohn@faruqilaw.com
nclark@faruqilaw.com

*Interim Co-Lead Counsel for Direct Purchaser
Class Plaintiffs*

Barry S. Taus
Archana Tamoshunas
**TAUS, CEBULASH & LANDAU, LLP**
80 Maiden Lane, Suite 1204
New York, NY  10038
(212) 931-0704
atamoshunas@tcllaw.com
btaus@tcllaw.com

Peter S. Pearlman
**COHN LIFLAND PEARLMAN HERRMAN
& KNOPF LLP**
Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
(201) 845-9600
(201) 845-9423 (fax)
psp@njlawfirm.com

65

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

John Radice
**RADICE LAW FIRM**
34 Sunset Boulevard
Long Beach, NJ 08008
(646) 386-7688
jradice@radicelawfirm.com

*Additional Counsel for Direct Purchaser*
*Class Plaintiffs*

PUBLIC VERSION – CONTAINS REDACTIONS OF INFORMATION DESIGNATED HIGHLY CONFIDENTIAL

## <u>CERTIFICATE OF SERVICE</u>

I, Kristen Johnson Parker, hereby certify that I caused a redacted copy of Direct Purchaser Class Plaintiffs' Consolidated Amended Class Action Complaint and Jury Demand to be filed electronically via the Court's electronic filing system on December 6, 2013. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

Dated: December 6, 2013

Respectfully submitted,

/s/*Kristen Johnson Parker*

Kristen Johnson Parker
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
(617) 482-3700
(617) 482-3003 (fax)
kristenjp@hbsslaw.com