**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| IN RE LOESTRIN 24 FE ANTITRUST LITIGATION | MDL No. 2472 |
| | Master File No. 1:13-md-2472-S-PAS |
| THIS DOCUMENT RELATES TO: ALL END-PAYOR CLASS ACTIONS | |

**MEMORANDUM OF LAW IN SUPPORT OF END-PAYOR**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND**
**APPOINTMENT OF CLASS COUNSEL**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS .................................................................................................4

    A.    Defendants' Anticompetitive Scheme ................................................................4

    B.    Impact on Plaintiffs and the Class ....................................................................9

ARGUMENT ......................................................................................................................9

  I.    THE IMPORTANCE OF CLASS CERTIFICATION ...........................................9

    A.    General Standards for Applying Rule 23 ........................................................ 10

    B.    Choice of Law ................................................................................................ 11

  II.  THE PROPOSED END-PAYOR CLASS .......................................................... 12

  III. CLASS CERTIFICATION IS APPROPRIATE UNDER FED. R. CIV. P. 23(a) ........... 13

    A.    Class Members Are So Numerous That Joinder Is Impracticable .................. 13

    B.    Plaintiffs' Claims Present Common Issues of Law and/or Fact .................... 13

    C.    Plaintiffs' Claims Are Typical of Those of the Class .................................... 15

    D.    Plaintiffs Will Adequately Represent the Class ............................................ 17

    E.    The Class Is Ascertainable ............................................................................ 18

  IV. CLASS CERTIFICATION IS APPROPRIATE UNDER FED. R. CIV. P. 23(b)(3) ..... 19

    A.    Common Issues Predominate Across Plaintiffs' Antitrust Claims ............... 19

    B.    A Class Action Is Superior for Litigating this Dispute and Is Manageable ............... 27

  V.  COUNSEL MEET THE REQUIREMENTS OF RULE 23(G) .......................... 29

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ............................................................................................................ passim

*Amgen Inc. v. Conn. Retirement Plans and Trust Funds ,*
    133 S. Ct. 1184 (2013) ............................................................................................................. 11, 19

*Bogosian v. Gulf Oil Corp.,*
    561 F.2d 434 (3d Cir. 1977).......................................................................................................... 24

*Cannon v. Cherry Hill Toyota, Inc.,*
    184 F.R.D. 540 (D.N.J. 1999).......................................................................................................... 16

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,*
    79 F.3d 182 (1st Cir. 1996).......................................................................................................... 22

*Comcast Corp. v. Behrend,*
    133 S.Ct. 1426 (2013) .......................................................................................................... 26

*Comty. Commc'ns Co. v. City of Boulder,*
    455 U.S. 40 (1982) .............................................................................................................. 9

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974).......................................................................................................... 11, 28

*Ellington v. Davol, Inc.,*
    No. 07-cv-470, 2012 WL 2021908 (D.R.I. June 5, 2012) ................................................ 12

*Fears v. Wilhemina Model Agency, Inc.,*
    No. 02-cv-4911, 2003 U.S. Dist. LEXIS 11897 (S.D.N.Y. 2003) ................................. 17

*Ferrell v. Wyeth-Ayerst, Labs., Inc.,*
    No. 01-cv-447, 2007 U.S. Dist. LEXIS 44391 (S.D. Ohio June 19, 2007)........................2

*FTC v. Actavis, Inc.,*
    133 S. Ct. 2223 (2013) ..............................................................................................1, 7, 21

*Garcia-Rubiera v. Calderon,*
    570 F.3d 443 (1st Cir. 2009) ................................................................................... 13

*Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972)......................................................................................................... 10

*In re Abbott Labs. Norvir Antitrust Litig.*,
No. 04-cv-1511 (N.D. Cal., Aug. 27, 2008) ............................................................. 2

*In re Abbott Labs. Norvir Antitrust Litig.*,
Nos. 04-cv-1511, 04-cv-4203, 2007 WL 1689899 (N.D. Cal. June 11, 2007) ............................. 2

*In re Aggrenox Antitrust Litig.*,
No. 14-md-2516, 2015 WL 4459607 (D. Conn. July 21, 2005) .......................................... 21

*In re Ampicillin Antitrust Litg.*,
55 F.R.D. 269 (D.D.C. 1972) ..................................................................... 2

*In re Antibiotics Antitrust Actions*,
333 F. Supp. 278 (S.D.N.Y. 1971) ................................................................. 2

*In re Bank of Boston Corp. Sec. Litig.*,
762 F.Supp. 1525 (D. Mass. 1991) ............................................................... 16

*In re Buspirone Antitrust Litig.*,
No. 01-md-01413 (S.D.N.Y. April 21, 2003) ........................................................ 2

*In re Carbon Black Antitrust Litig.*,
No. 03-cv-10191, 2005 WL 102966 (D. Mass. Jan. 18, 2005) ................................ 10, 16, 17, 28

*In re Cardizem CD  Antitrust Litig.*,
200 F.R.D. 297 (E.D. Mich. 2001) .......................................................... 16, 23, 24

*In re Cardizem CD Antitrust Litig.*,
200 F.R.D. 326 (E.D. Mich. 2001) ........................................................... passim

*In re Cardizem CD Antitrust Litig.*,
218 F.R.D. 508 (E.D. Mich. 2003) ................................................................ 2

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
No. 07-cv-5944, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ...................................... 11

*In re Children's Ibuprofen Oral Suspension Antitrust Litig.*,
No. 04-mc-535 (D.D.C. Dec. 11, 2006) ............................................................. 2

*In re Children's Ibuprofen Oral Suspension Antitrust Litig.*,
No. 04-mc-535 (D.D.C. Jan. 6, 2006) .............................................................. 2

*In re Cipro Cases I & II*,
17 Cal. Rptr. 3d 1 (Cal. App. Ct. 2004) .......................................................... 25

*In re Citigroup, Inc. Capital Accumulation Plan Litig.*,
MDL No. 1354, 2010 WL 9067986 (D. Mass. Jan. 6, 2010) ........................................... 16

*In re Dial Complete Mktg. & Sales Practices Litig.,*
320 F.R.D. 326 (D.N.H. 2017)...................................................................... 25

*In re Disposable Contact Lens Antitrust Litig.,*
170 F.R.D. 524 (M.D. Fla. 1996) ................................................................. 28

*In re Domestic Air Transp. Antitrust Litig.,*
137 F.R.D. 677 (N.D. Ga. 1991)................................................................... 28

*In re DRAM Antitrust Litig.,*
No. M 02–1486, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ...................... 23

*In re Evergreen Ultra Short Opportunities Fund Secs. Litig.,*
275 F.R.D. 382 (D. Mass. 2011).................................................................. 16

*In re Flat Glass Antitrust Litig.,*
191 F.R.D. 472 (W.D. Pa. 1999) ................................................................. 16

*In re Flonase Antitrust Litig.,*
284 F.R.D. 207 (E.D. Pa. 2012)............................................................. passim

*In re Lidoderm Antitrust Litig.,*
No. 14–md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)............... passim

*In re Lorazepam & Clorazepate Antitrust Litig.,*
202 F.R.D. 12 (D.D.C. 2001)........................................................... 2, 10, 24

*In re McKesson Governmental Entities Average Wholesale Price Litig.,*
767 F. Supp. 2d 263 (D. Mass. 2011) .......................................................... 14

*In re Mercedes-Benz Antitrust Litig.,*
213 F.R.D. 180 (D.N.J. 2003)...................................................................... 28

*In re NASDAQ Market-Makers Antitrust Litig.,*
169 F.R.D. 493 (S.D.N.Y. 1996).................................................... 16, 24, 28

*In re Neurontin Antitrust Litig.,*
MDL No. 1479, 2011 WL 286118 (D.N.J. Jan. 25, 2011)............................ 20

*In re Nexium (Esomeprazole) Antitrust Litig.,*
296 F.R.D. 47 (D. Mass. 2013) .............................................................. passim

*In re Nexium (Esomeprazole) Antitrust Litig.,*
297 F.R.D. 168 (D. Mass. 2013), *aff'd,* 777 F.3d 9 (1st Cir. 2015) ..................2

*In re Nexium Antitrust Litig.,*
777 F.3d 9 (1st Cir. 2015) ..................................................................... passim

*In re Pharmaceutical Industry Average Wholesale Price Litig.,*
  582 F.3d 156 (1st Cir. 2009) ................................................................................24, 25

*In re Playmobil Antitrust Litig.,*
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ................................................................... 16

*In re PolyMedica Corp. Secs. Litig.,*
  432 F.3d 1 (1st Cir. 2005) .................................................................................. 11

*In re Prudential Ins. Co. of Am. Sales Practice Litig.,*
  148 F.3d 283 (3d Cir. 1998) ............................................................................... 16

*In re Prudential Sales Practices,*
  962 F. Supp. 450 (D.N.J. 1997) .......................................................................... 24

*In re Relafen Antitrust Litig.,*
  221 F.R.D. 260 (D. Mass. 2004) .................................................................. passim

*In re Remeron End Payor Antitrust Litig.,*
  Nos. 02-2007, 04–5126, 2005 U.S. Dist. LEXIS 27011 (D.N.J. Sep. 13, 2005) ............................2

*In re Scrap Metal Antitrust Litig.,*
  527 F.3d 517 (6th Cir. 2008) .............................................................................. 20

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,*
  No. 14-md-2503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) .......................... passim

*In re Sumitomo Copper Litig.,*
  182 F.R.D. 85 (S.D.N.Y. 1998) ........................................................................... 24

*In re Sumitomo Copper Litig.,*
  194 F.R.D. 480 (S.D.N.Y. 2000) ......................................................................... 16

*In re Synthroid Mktg. Litig.,*
  188 F.R.D. 287 (N.D. Ill. 1999) ............................................................................2

*In re Synthroid Mktg. Litig.,*
  188 F.R.D. 295 (N.D. Ill. 1999) .....................................................................2, 16

*In re Terazosin Hydrochloride Antitrust Litig.,*
  203 F.R.D. 551 (S.D. Fla. 2001) ...................................................................23, 25

*In re Terazosin Hydrochloride,*
  No. 99-md-1317 (S.D. Fla. Dec. 19, 2002) ..........................................................2

*In re Tricor Indirect Purchaser Litig.,*
  252 F.R.D. 213 (D. Del. 2008) .............................................................................2

*In re Tricor Indirect Purchaser Litig.*,
　No. 05-360 (D. Del. May 8, 2009).................................................................2

*In re Vitamins Antitrust Litig.*,
　209 F.R.D. 251 (D.D.C. 2002) ................................................................ 16

*In re Volkswagen & Audi Warranty Extension Litig.*,
　692 F.3d 4 (1st Cir. 2012) ........................................................................ 11

*In re Warfarin Sodium Antitrust Litig.*,
　212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004)...................................2, 16, 22

*In re Wellbutrin XL Antitrust Litig.*,
　282 F.R.D. 126 (E.D. Pa. 2011) ........................................................2, 12

*Kinney v. Metro Glob. Media, Inc.*,
　No. 99-cv-579, 2002 WL 31015604 (D.R.I. Aug. 22, 2002) ........................................16, 27

*Mace v. Van Ru Credit Corp.*,
　109 F.3d 338 (1997) ............................................................................... 27

*Matamoros v. Starbucks Corp.*,
　699 F.3d 129 (1st Cir. 2012) ..............................................................17, 18

*McCuin v. Sec'y of Health and Human Svcs.*,
　817 F.2d 161 (1st Cir. 1987) .................................................................. 10

*McDonough v. Toys 'R Us, Inc.*,
　638 F. Supp. 2d 461 (E.D. Pa. 2009) ....................................................... 20

*Meijer, Inc. v. Ranbaxy Inc.*,
　No. 15-cv-11828, 2016 WL 4697331 (D. Mass. Sept. 7, 2016)........................................4

*Natchitoches Parish Hosp. Svc. Dist. v. Tyco Intern. Ltd.*,
　247 F.R.D. 253 (D. Mass. 2008).........................................................14, 20

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
　259 F.3d 154 (3d Cir. 2001)...................................................................... 16

*Nichols v. Smithkline Beecham Corp.*,
　No. 00-6222, 2005 U.S. Dist. LEXIS 7061 (E.D. Pa. Apr. 22, 2005) ............................................2

*Payne v. Goodyear Tire & Rubber Co.*,
　216 F.R.D. 21 (D. Mass. 2003) ............................................................... 20

*Ryan-House v. GlaxoSmithKline PLC*,
　No. 02-cv-442 (E.D. Va. July 28, 2004)......................................................2

*Smilow v. Southwestern Bell Mobile Systems, Inc.*,
  323 F.3d 32 (1st Cir. 2003) ................................................................................................10, 20

*Teva Pharm. USA, Inc. v. Abbott Labs.*,
  252 F.R.D. 213 (D. Del. 2008) ................................................................................20, 23, 25

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972) ...................................................................................................................9

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
  246 F.R.D. 349 (D.D.C. 2007) ...............................................................................................2

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011) ............................................................................................................ 14

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
  208 F.3d 288 (1st Cir. 2000) ..................................................................................... 11, 19, 20

*Yaffe v. Powers*,
  454 F.2d 1362 (1st Cir. 1972) ............................................................................................... 28

*Zenith Radio Corp. v. Hazeltine Research*,
  395 U.S. 100 (1969) .........................................................................................................23, 24

## Other Authorities

1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.10 (4th ed. 2002) ............ 14

1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012) .................................. 17

149 Cong. Rec. S15533-02 (Nov. 22, 2003)...................................................................................4

2 Herbert B, Newberg & Alba Conte, Newberg on Class (3d ed. 1992)..........................................24

22 Am. Jur. 2d *Damages* § 491 (1988) ..........................................................................................24

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure
  (2d ed.1986).......................................................................................................................... 18

FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions
  (January 2010), http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf ..........................4

Restatement (Second) of Conflict of Laws § 188 (1971) ........................................................ 11

## Rules

Fed. R. Civ. P. 23............................................................................................................... passim

## INTRODUCTION

The End-Payor Plaintiffs ("EPPs" or "Plaintiffs") seek certification of a damages Class[1] pursuant to Fed. R. Civ. P. 23(b)(3). The EPPs allege, on behalf of themselves and the Class, that Defendants Warner Chilcott ("Warner Chilcott"),[2] Watson ("Watson"),[3] Lupin Ltd. and Lupin Pharmaceuticals Inc. (together, "Lupin") (collectively, "Defendants") violated state antitrust and consumer protection laws by engaging in a series of anticompetitive tactics to suppress generic competition for Loestrin 24 Fe.

Warner Chilcott first used sham litigation to enforce a fraudulently obtained patent against potential generic competitors. It then settled its sham patent lawsuits against Watson and Lupin by unlawfully making large and unjustified payments to them in exchange for their promise to delay their generic launches. *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013). With the unlawfully agreed-upon delayed generic entry date for Loestrin 24 Fe approaching, Warner Chilcott then engaged in an exclusionary product hop. It eliminated the Loestrin 24 Fe

---

[1] The Class is defined as:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Loestrin 24 Fe and/or its AB-rated generic equivalents in any form, and/or Minastrin 24 Fe and/or its AB-rated generic equivalents in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class" or the "End-Payor Class"), other than for resale, during the period September 1, 2009 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, persons or entities "purchased" Loestrin 24 Fe, Minastrin 24 Fe, or their generic equivalents if they indirectly purchased, paid and/or reimbursed for some or all of the purchase price.

Excluded from the Class are several categories of persons or entities. *See* End-Payor Plaintiffs' Second Amended Consolidated Class Action Complaint ("CAC") (filed under seal) ¶¶ 287-88, attached as Exhibit 1 to the Declaration of Michael M. Buchman dated July 30, 2018 ("Buchman Decl.").

[2] Defendant Warner Chilcott includes the following entities: Warner Chilcott (US), LLC; Warner Chilcott Sales (US), LLC; Warner Chilcott Company, LLC; Warner Chilcott plc; and Warner Chilcott Limited. *Id.*, Ex. 1 (CAC) ¶ 27-32.

[3] Defendant Watson includes the following entities: Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc. Currently, Defendants Warner Chilcott and Watson are part of the multinational corporation, Allergan plc. *Id.*, Ex. 1 (CAC) ¶ 27, 34-36.

1

prescription base and switched patients to a "new" product, Minastrin 24 Fe—a chewable version

of Loestrin 24 Fe that provided no additional benefit to consumers. Product hopping to Minastrin

24 Fe was only beneficial to Warner Chilcott, which was able to retain most of its branded sales

that otherwise would have dramatically shifted to lower priced Loestrin 24 generics via pharmacy

substitution.

End-payors consist of people and entities at the end of the pharmaceutical distribution

chain. By impairing generic competition, Defendants' anticompetitive conduct caused EPPs and

the proposed class to suffer classwide injury in the form of overcharge damages. Federal courts

routinely certify indirect purchaser/end-payor classes in pharmaceutical antitrust cases alleging

the same type of anticompetitive conduct and harm alleged here.[4] Indeed, the First Circuit

---

[4] *See* Buchman Decl., Ex. 2, discussing: *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168 (D. Mass. 2013), *aff'd*, 777 F.3d 9 (1st Cir. 2015); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004); *In re Buspirone Antitrust Litig.*, No. 01-md-04115 (S.D.N.Y. April 21, 2003) (ECF No. 148); *In re Antibiotics Antitrust Actions*, 333 F. Supp. 278, 280 (S.D.N.Y. 1971); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 264 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *Nichols v. Smithkline Beecham Corp.*, No. 00-6222, 2005 U.S. Dist. LEXIS 7061 (E.D. Pa. Apr. 22, 2005); *In re Remeron End Payor Antitrust Litig.*, Nos. 02-2007, 04-5126, 2005 U.S. Dist. LEXIS 27011 (D.N.J. Sep. 13, 2005); *In re Tricor Indirect Purchaser Litig.*, 252 F.R.D. 213 (D. Del. 2008); *In re Tricor Indirect Purchaser Litig.*, No. 05-360 (D. Del. May 8, 2009) (ECF No. 509); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126 (E.D. Pa. 2011); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012); *Ryan-House v. GlaxoSmithKline PLC*, No. 02-cv-442 (E.D. Va. July 28, 2004) (ECF No. 137); *Ryan-House v. GlaxoSmithKline PLC*, 2005 U.S. Dist. LEXIS 33711 (E.D. Va. Jan. 10, 2005; *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 374, 396 (D.D.C. 2002); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 357 (D.D.C. 2007); *In re Children's Ibuprofen Oral Suspension Antitrust Litig.*, No. 04-mc-535 (D.D.C. Jan. 6, 2006) (ECF No. 30); *In re Children's Ibuprofen Oral Suspension Antitrust Litig.*, No. 04-mc-535 (D.D.C. Dec. 11, 2006) (ECF No. 33); *Ferrell v. Wyeth-Ayerst Labs, Inc.*, No. 1:01-cv-447 (S.D. Ohio, July 1, 2004) (ECF No. 100); *Ferrell v. Wyeth-Ayerst, Labs., Inc.*, No. 01-cv-447, 2007 U.S. Dist. LEXIS 44391, at *6 (S.D. Ohio June 19, 2007); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 517 (E.D. Mich. 2003); *In re Abbott Labs. Norvir Antitrust Litig.*, Nos. 04-cv-1511, 04-cv-4203, 2007 WL 1689899 (N.D. Cal. June 11, 2007); *In re Abbott Labs. Norvir Antitrust Litig.*, No. 04-cv-1511 (N.D. Cal., Aug. 27, 2008) (ECF No. 612); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017); *In re Terazosin Hydrochloride*, 220 F.R.D. 672 (S.D. Fla. 2004); *In re Terazosin Hydrochloride*, No. 99-md-1317 (S.D. Fla. Dec. 19, 2002) (ECF No. 913). *See also In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269 (D.D.C. 1972); *In re Synthroid Mktg. Litig.*, 188 F.R.D. 287 (N.D. Ill. 1999) (third-party payor nationwide class for deceptive marketing); *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (consumer nationwide class).

affirmed certification of an end-payor class that brought virtually identical "pay-for-delay" claims concerning the drug Nexium. *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) (recognizing end-payors in these types of cases are "the very group that Rule 23(b)(3) was intended to protect.").[5] Moreover, a District Court in the First Circuit recently certified an end-payor class bringing pay-for-delay claims concerning the drug Solodyn. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017). In this case, the requirements for certification under Fed. R. Civ. P. 23(a) are similarly satisfied:

- the members of the Class are so numerous that joinder is impracticable;
- the claims of the class members involve common questions of law and/or fact;
- the claims of the named plaintiffs are typical of the claims of the other class members; and
- the named plaintiffs will fairly and adequately represent the interests of the Class.

Furthermore, the proposed Class satisfies Fed. R. Civ. P. 23(b)(3):

- the parties opposing the Class have acted or refused to act on grounds generally applicable to the class;
- common questions of law and/or fact predominate over individual issues; and
- class certification is superior to other available means of adjudication.

Plaintiffs' claims, arising from a single anticompetitive scheme, which injured all U.S. purchasers of Loestrin 24 Fe, Minastrin 24 Fe and/or their AB-rated generic equivalents, are ideally suited for class treatment. Rule 23 was designed to facilitate the classwide adjudication of similar claims and to achieve economies of time, effort and expense while promoting uniformity of decision as to all persons similarly situated. The class action mechanism is not only the superior method to adjudicate claims such as those alleged here, but it also is the only viable

---

[5] In *Nexium*, the First Circuit affirmed the decision of Former Chief Judge Young of the U.S. District Court for the District of Massachusetts. *See In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47 (D. Mass. 2013). This was not the first time that Former Chief Judge Young certified a class of end-payors in a generic drug case. *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004).

method of doing so.  Accordingly, EPPs respectfully request: (1) certification of the Class; (2) designation of the named Plaintiffs as Class Representatives; and (3) appointment of Motley Rice LLC, Miller Law LLC, Hilliard & Shadowen LLP and Cohen Milstein Sellers & Toll PLLC as Co-Lead Class Counsel; and (4) appointment of Motley Rice LLC as Liaison Counsel.[6]

## STATEMENT OF FACTS

### A.  Defendants' Anticompetitive Scheme

In 1984, Congress enacted the Hatch-Waxman Act to "get less expensive drugs to the market faster" for the benefit of U.S. consumers. *Meijer, Inc. v. Ranbaxy Inc.*, No. 15-cv-11828, 2016 WL 4697331, at *21 (D. Mass. Sept. 7, 2016) (quoting 149 Cong. Rec. S15533-02 (Nov. 22, 2003)).  Generic competitors to branded drugs typically capture 90% of the brand's sales within the first nine months of market entry, while prices decrease approximately 85% within the first year of generic entry.[7]  Consumers and third-party payors, such as EPPs here, automatically benefit from these reduced prices, because the generic substitution laws in each state require/encourage pharmacists to dispense a generic version of the branded product when an AB-rated generic is available.

Loestrin 24 Fe is a brand name prescription for an oral contraceptive with 24 active tablets containing 1 mg norethindrone acetate and 20 mcg ethinyl estradiol, and four inactive iron tablets, that was manufactured by Defendant Warner Chilcott.  In February 2006, Warner Chilcott received approval from the Food and Drug Administration ("FDA") to market Loestrin 24 Fe.  From 2006 through 2012, Warner Chilcott earned over $1.7 billion in revenue from branded Loestrin 24 sales.  Buchman Decl., Ex. 1 (CAC) ¶ 127.

---

[6] Firm resumes are attached as Exhibits 6 through 9 to the Buchman Declaration.

[7] *See* FTC Staff Study, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions (January 2010), http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

To protect its Loestrin 24 Fe franchise, Warner Chilcott engaged in an anticompetitive scheme to delay and impair generic competition.

*First*, Warner Chilcott unlawfully listed a fraudulently obtained patent—U.S. Patent No. 5,552,394 (the "'394 patent")—in the FDA's Orange Book and asserted that patent in sham litigation. *Id.*, Ex. 1 (CAC) ¶¶ 2-3. Warner Chilcott did so despite knowing that it could not reasonably assert the '394 patent against generic manufacturers because it knew that the patent was unenforceable and invalid for obviousness. *Id.*, Ex. 1 (CAC) ¶¶ 110-169. The drugs claimed in the patent have been used for decades to prevent pregnancy and the only "invention" claimed by the patent was the obvious use of those drugs in a regimen of 24 days instead of 21. But Warner Chilcott was not concerned with succeeding on the merits of its patent lawsuit. Merely listing the patent in the Orange Book meant Warner Chilcott could sue generic drug manufacturers and erect barriers to entry that could delay introduction of their generic versions of Loestrin 24 Fe.

*Second*, after bringing sham patent infringement lawsuits against prospective manufacturers of generic versions of Loestrin 24 Fe, Warner Chilcott settled the lawsuits by paying them to delay their entry. *Id.*, Ex. 1 (CAC) ¶¶ 170-225. In June 2006, Watson notified Warner Chilcott that it submitted an Abbreviated New Drug Application ("ANDA") seeking to market a generic version of Loestrin 24 Fe. Watson's notification letter included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic Loestrin 24 Fe product would not infringe any valid claim of the patent over Loestrin 24 Fe. *Id.*, Ex. 1 (CAC) ¶ 173. Thereafter, Warner Chilcott filed a patent infringement lawsuit against Watson. *Id.*, Ex. 1 (CAC) ¶ 174. On or about July 31, 2009, Lupin notified Warner Chilcott that Lupin had filed an ANDA seeking to market generic Loestrin 24 Fe. Lupin's notice letter also included a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic product would

not infringe any valid and enforceable claim of Warner Chilcott's patent. *Id.*, Ex. 1 (CAC) ¶ 200. On or about September 9, 2009, Warner Chilcott sued Lupin for patent infringement. *Id.*, Ex. 1 (CAC) ¶¶ 201-204.  Rather than rely on its patent to protect it from competition, Warner Chilcott paid both Watson and Lupin millions of dollars to keep their generic versions of Loestrin 24 Fe off the market.

On January 9, 2008, Warner Chilcott and Watson entered into a series of related agreements that provided for large and unjustifiable payments to Watson in exchange for Watson's agreement not to introduce a generic version of Loestrin 24 Fe until January 2014. The payments to Watson included: (i) a promise not to market a competing authorized generic ("AG") version of Loestrin 24 during the first 180 days that Watson's generic Loestrin 24 was on the market (worth at least $41.34 million to Watson); (ii) a grant to Watson of rights to another Warner Chilcott product, Generess Fe, at below market rates (worth more than ████ ████ to Watson); (iii) above-market-rate payments to Watson to help market another Warner Chilcott product, Femring (worth at least ████████ to Watson); (iv) a promise not to grant a license to any other generic to enter the market until at least six months after Warner Chilcott had entered; and (v) an "acceleration clause" that promised that if any other generic manufacturer entered the market before Watson's licensed entry date (either at-risk of patent infringement or upon winning the patent litigation through appeal), then Watson's entry date would be accelerated accordingly, and if Warner Chilcott agreed to provide any other generic manufacturer an entry date earlier or within 180 days after Watson's, then Watson's entry would be accelerated to 180 days before that other generic's entry date.[8]  *Id.*, Ex. 1 (CAC) ¶¶ 4, 180-88.  As a result of these payments, Watson did not launch its generic Loestrin 24 Fe when it received FDA approval in September 1, 2009.

---

[8] EPPs reserve the right to update the value of the payments to Watson following further expert analysis.

To shore up its market allocation agreement with Watson, Warner Chilcott also entered into a series of agreements with Lupin, another generic manufacturer who had threatened to launch a generic version of Loestrin 24 Fe. Warner Chilcott and Lupin's agreements also provided for large and unjustifiable payments to Lupin in exchange for Lupin's agreement not to introduce a generic version of Loestrin 24 Fe until July 2014.  These payments included: (i) a grant to Lupin of rights to another Warner Chilcott product, Femcon Fe, at below-market rates (worth at least ███████ to Lupin); (ii) a grant to Lupin of contingent rights to another Warner Chilcott product, Asacol (400mg), at below market rates (worth at least ███████ to Lupin); and (iii) $4 million in cash.[9]  *Id.*, Ex. 1 (CAC) ¶¶ 214–221.

Warner Chilcott's "pay for delay" settlement agreements with Watson and Lupin harmed U.S. competition, consumers, and third-party payors in violation of federal and state competition laws.  *See FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013).   In addition to Warner Chilcott's unlawful payment to Watson, EPPs allege that Watson's acceleration clause was an independent anticompetitive restraint of trade that deterred later filers from attempting to enter before Watson's settlement date.  Buchman Decl., Ex. 1 (CAC) ¶¶ 190–194, 342.

*Third*, as the delayed entry dates for generic Loestrin 24 Fe approached, Warner Chilcott implemented an unlawful, anticompetitive product hop. Using its army of pharmaceutical representative "detailers," Warner Chilcott switched the prescription base over to Minastrin 24 Fe just months before generic Loestrin 24 Fe entered the market.  *Id.*, Ex. 1 (CAC) ¶ 260. Warner Chilcott bolstered its detailers' efforts by eliminating its promotion of Loestrin 24 Fe and switched its promotional efforts to Minastrin 24 Fe.  *Id.*

Minastrin 24 Fe represented only a trivial change from Loestrin 24 Fe. The two products have the same safety and efficacy profile and Warner Chilcott sought and received approval for

---

[9] EPPs reserve the right to update the value of the payments to Lupin following further expert analysis.

Minastrin 24 Fe by establishing bioequivalence to Loestrin 24 Fe. *Id.*, Ex. 1 (CAC) ¶ 251. The active tablets themselves are even identical. *Id.*, Ex. 1 (CAC) ¶¶ 250-51. The only difference between the products is that spearmint and a sweetener were added to the four inactive "reminder" pills in each back and the labeling of Minastrin initially indicated that the active tablets were to be chewed rather than swallowed. *Id.*, Ex. 1 (CAC) ¶¶ 252, 254.

While *de minimis*—if not undesirable—to patients, the product redesign had a tremendous impact on imminent competition from generic versions of Loestrin 24 FE. *Id.*, Ex. 1 (CAC) ¶¶ 245, 254-56. Minastrin 24 Fe's instruction to chew the tablets rendered Minastrin 24 Fe a different dosage "form" than Loestrin 24 Fe. *Id.*, Ex. 1 (CAC) ¶ 252. This prevented Minastrin 24 Fe from being AB-rated to Loestrin 24 Fe, and thus a prescription for Minastrin 24 Fe could not be substituted at the pharmacy with a lower priced generic equivalent to Loestrin 24 Fe. *Id.*, Ex. 1 (CAC) ¶ 245.

As part of Warner Chilcott's anticompetitive product hop, when Minastrin 24 Fe launched in mid-2013, Warner Chilcott discontinued Loestrin 24 Fe. *Id.*, Ex. 1 (CAC) ¶¶ 264-66; Ex. 4 (Expert Report of Gary L. French, Ph.D. Regarding Impact and Damages to End-Payor Plaintiffs ("Dr. French Rprt.")) ¶ 48. Pharmacies soon had far less or no product with which to fill a Loestrin 24 Fe prescription, forcing patients who otherwise demanded Loestrin 24 Fe to return to their doctors for a prescription for Minastrin 24 Fe. *Id.*, Ex. 1 (CAC) ¶¶ 264-66. By the time the first Loestrin 24 Fe generic entered in January 2014, the Loestrin 24 Fe prescription base was virtually eliminated going from an average of ███████████████████ ████████████████████████████ and moved out of reach from competition through pharmacy substitution, which is the cost-efficient means by which generics compete. *Id.*, Ex. 1 (CAC) ¶¶ 258-263; Ex. 4 (Dr. French Rprt.) ¶ 48. Without AB-substitutability, Warner Chilcott retained most of its branded sales through Minastrin 24 Fe that otherwise would have

shifted to lower-priced generic Loestrin 24 Fe. *Id.* Absent that intended exclusionary effect that impaired generic competition, Warner Chilcott would not have invested the resources necessary to launch Minastrin 24 Fe and switch the market because doing so would have been economically irrational. *Id.*, Ex. 1 (CAC) ¶¶ 267-270.

### B.  Impact on Plaintiffs and the Class

The proposed Class includes consumers and third-party payors, the last in line in the chain of distribution, who indirectly purchased, paid and/or provided reimbursement for Loestrin 24 Fe, Minastrin 24 Fe, or their generic equivalents, other than for resale, during the Class Period.  As a result of the Defendants' anticompetitive agreements, generic versions of Loestrin 24 Fe were not available prior to January 2014.  Absent the anticompetitive agreements, generic versions of Loestrin 24 Fe would have been on the market by no later than September 1, 2009. By that date, Watson had received FDA approval of its Loestrin 24 Fe ANDA. Watson, an authorized generic from Warner Chilcott, and eventually Lupin, would have competed with branded Loestrin 24 Fe, driving down prices for end-payors.  *Id.*, Ex. 1 (CAC) ¶ 321. Moreover, absent the anticompetitive effect of impairing Loestrin 24 Fe generic competition, Warner Chilcott would not have launched Minastrin 24 Fe and switched the market just before generic Loestrin 24 Fe entry. *Id.*, Ex. 1 (CAC) ¶ 270.  As a result of Defendants' anticompetitive conduct, Class members paid artificially inflated prices for their purchases during the Class Period.

## ARGUMENT

### I.    THE IMPORTANCE OF CLASS CERTIFICATION

The antitrust laws are "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *Comty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 57 n.19 (1982) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972)).  "[L]ong ago the Supreme Court recognized

9

the importance that class actions play in the private enforcement of antitrust actions . . . ." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 21 (D.D.C. 2001).  Rule 23 is designed to enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture.[10]  Courts regularly grant class certification for end-payors in cases involving anticompetitive practices in the pharmaceutical industry.[11]  The First Circuit has affirmed certification of an end-payor class in "pay for delay" litigation, *see Nexium*, 777 F.3d 9, and federal courts within this Circuit have certified end-payor classes in similar cases.  *See, e.g., Solodyn*, 2017 WL 4621777; *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004).  Likewise, the proposed Class in this case should be certified.

### A.  General Standards for Applying Rule 23

Plaintiffs seeking certification under Rule 23(a) must establish four elements: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation.  They must also establish one of the requirements of Rule 23(b).[12]  "Plaintiffs 'need not make that showing to a degree of absolute certainty[.]'  *Solodyn*, 2017 WL 4621777, at *3 (quoting *Nexium*, 777 F.3d at 27).

A district court has broad discretion in deciding whether to certify a class.[13]  Courts should resolve doubts in favor of certification.[14]  While a court's class certification analysis should

---

[10] *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 52 (D. Mass. 2013) (discussing the importance of class actions in the private enforcement of antitrust laws); *In re Carbon Black Antitrust Litig.*, No. 03-cv-10191, 2005 WL 102966, at *9 (D. Mass. Jan. 18, 2005) (explaining that "class actions are a particularly appropriate mechanism for achieving" private enforcement of the antitrust laws).

[11] A chart compiling decisions certifying end-payor/indirect purchaser classes in pharmaceutical antitrust cases is attached to the Buchman Declaration as Ex. 2.

[12] Fed. R. Civ. P. 23; *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).

[13] *See McCuin v. Sec'y of Health and Human Svcs.*, 817 F.2d 161, 167 (1st Cir. 1987).

[14] *Carbon Black*, 2005 WL 102966, at *9.

be rigorous, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)). "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1195 (2013). Thus, a court should not "allow[] the defendant to turn the class-certification proceeding into an *unwieldy* trial on the merits." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir. 2005) (emphasis in original); *see also Solodyn*, 2017 WL 4621777, at *6 ("'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage'") (quoting *Amgen*, 133 S. Ct. 1194–95); *In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47 (D. Mass. 2013) (recognizing that the court "should not engage in a 'full-blown merits analysis'") (quoting *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 24, 2013)). EPPs have shown that the requirements of Rule 23 are satisfied. Accordingly, the proposed Class should be certified in its entirety.

### B.  Choice of Law

EPPs' claims are brought under state law, and the proposed Class encompasses purchases of Loestrin 24 Fe, Minastrin 24 Fe, and/or their AB-rated generic equivalents, in 30 states, the District of Columbia and Puerto Rico. In an MDL, courts typically apply the choice of law rules of each of the transferor courts, which in turn apply the choice of law rules of the states in which they sit.[15]  The two transferor jurisdictions here – Pennsylvania and Rhode Island (*see* ECF No. 1) – look to the Restatement (Second) of Conflict of Laws for guidance and have adopted flexible

---

[15] *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 17-18 (1st Cir. 2012).

approaches that require consideration of all of the relevant policies and interests.[16]  Because the underlying policy of an indirect purchaser action is consumer protection, "[t]he location of consumers' purchases… assumes special significance" in the choice of law analysis.  *In re Relafen Antitrust Litig.*, 221 F.R.D. at 277-78 .  Thus, for both consumers and third-party payors, each purchase of the drugs at issue in this case is governed by the law of the state in which the purchase was made.[17]

## II.    THE PROPOSED END-PAYOR CLASS

The proposed End-Payor Class is defined as:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Loestrin 24 Fe and/or its AB-rated generic equivalents in any form, and/or Minastrin 24 Fe and/or its AB-rated generic equivalents in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class" or the "End-Payor Class"), other than for resale, during the period September 1, 2009 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").  For purposes of the Class definition, persons or entities "purchased" Loestrin 24 Fe, Minastrin 24 Fe, or their generic equivalents if they indirectly purchased, paid and/or reimbursed for some or all of the purchase price.

Buchman Decl., Ex. 1 (CAC), ¶ 287.  The following persons or entities are expressly excluded from the proposed Class:

> a.  Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;
>
> b.  All federal or state governmental entities, excluding cities, towns or municipalities with self-funded prescription drug plans;

---

[16] *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 135 (E.D. Pa. 2011); *Ellington v. Davol, Inc.*, No. 07-cv-470, 2012 WL 2021908, at *1 (D.R.I. June 5, 2012).

[17] *See Wellbutrin XL*, 282 F.R.D. at 135-36 ("The place of purchase is where the relationship between the parties is centered; it is where the transaction with the alleged overcharge actually occurs" as opposed to the "chance location of the TPP's principal place of business, the location of the TPP's [pharmacy benefit manager], or an individual purchaser's residence.").

c. All persons or entities who purchased Loestrin 24 Fe or its AB-rated generic equivalent, and/or Minastrin 24 Fe or its AB-rated generic equivalent, for purposes of resale or directly from Defendants or their affiliates;

d. Fully insured health plans (i.e., Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members);

e. Any "flat co-pay" consumers whose purchases were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price;

f. Any "brand loyalist" consumers or third-party payors who purchased Loestrin 24 Fe and who did not purchase any AB-rated generic equivalent after such generics became available; and

g. The judges in this case and any members of their immediate families.

*Id.*, Ex. 1 (CAC), ¶ 288.   For the reasons detailed below, the proposed Class satisfies the requirements of Rule 23 and should be certified.

## III.   CLASS CERTIFICATION IS APPROPRIATE UNDER FED. R. CIV. P. 23(a)

### A.  Class Members Are So Numerous That Joinder Is Impracticable

Rule 23(a)(1) requires that members of a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Classes of forty or more persons satisfy the numerosity requirement.[18]  Here, ███████ prescriptions for Loestrin 24 Fe and Minastrin 24 Fe, were filled during the Class Period, satisfying Rule 23(a)(1).  Buchman Decl., Ex. 4 (Dr. French Rprt.) ¶¶ 44, 48.[19]

### B.  Plaintiffs' Claims Present Common Issues of Law and/or Fact

Rule 23(a)(2) requires "questions of law or fact common to the class" and sets a "low bar." Fed. R. Civ. P. 23(a)(2); *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F.

---

[18] *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009); *Nexium*, 296 F.R.D. at 51.

[19] *See Solodyn*, 2017 WL 4621777, at *12 n.12 (certifying class where "millions of prescriptions are estimated to be involved . . . . establishing impracticability of joinder here.").

Supp. 2d 263, 269 (D. Mass. 2011).  A common question is one that is "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2545 (2011).  The Rule does not require that *all* questions be common to the class; to the contrary, even a single common question will suffice.[20]   In the antitrust context, "the existence of an alleged conspiracy or monopoly is a common issue that will satisfy the Rule 23(a)(2) prerequisite." *Natchitoches Parish Hosp. Svc. Dist. v. Tyco Intern. Ltd.*, 247 F.R.D. 253, 264 (D. Mass. 2008) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.10 (4th ed. 2002)).  Here, many key questions of law and/or fact are common to the Class, the most important of which center on Defendants' anticompetitive conduct.  As outlined in detail in the CAC, the key questions of law and/or fact that are common to the Class include, *inter alia*:

    a.  whether Defendants conspired to suppress generic competition to Loestrin 24 Fe;

    b.  whether Defendants Warner Chilcott and Watson entered into an unlawful agreement in restraint of trade;

    c.  whether, pursuant to the agreement, Watson agreed to delay its entry into the market with generic Loestrin 24 Fe;

    d.  whether, pursuant to the agreement, Warner Chilcott compensated Watson;

    e.  whether Warner Chilcott's compensation to Watson was for a purpose other than delayed entry of generic Loestrin 24 Fe;

    f.  whether Warner Chilcott's compensation to Watson was necessary to yield some procompetitive benefit that is cognizable and non-pretextual;

    g.  whether the agreement is illegal under the rule of reason;

    h.  whether Defendants Warner Chilcott and Lupin entered into an unlawful agreement in restraint of trade;

    i.  whether, pursuant to the agreement, Lupin agreed to delay its entry into the market with generic Loestrin 24 Fe;

---

[20] *Dukes*, 131 S. Ct. at 2556; *Solodyn*, 2017 WL 4621777, at *12, n.12; *McKesson*, 767 F. Supp. 2d at 269.

j.  whether, pursuant to the agreement, Warner Chilcott compensated Lupin;

k.  whether Warner Chilcott's compensation to Lupin was for a purpose other than delayed entry of generic Loestrin 24 Fe;

l.  whether Warner Chilcott's compensation to Lupin was necessary to yield some procompetitive benefit that is cognizable and non-pretextual;

m.  whether the agreement is illegal under the rule of reason;

n.  whether Warner Chilcott introduced, priced, and marketed Minastrin 24 Fe in order to impair competition from generic Loestrin 24 Fe;

o.  whether the law requires definition of a relevant market when direct proof of market power is available and, if so, the definition of the relevant market;

p.  whether the activities of Defendants as alleged herein have substantially affected interstate commerce;

q.  whether, and to what extent, Defendants' conduct caused antitrust injury (i.e., overcharges) to Plaintiffs and the members of the Class; and

r.  the *quantum* of aggregate overcharge damages to the Class.

Buchman Decl., Ex. 1 (CAC) ¶ 294.  Each of these common questions can be resolved classwide.[21]

## C.  Plaintiffs' Claims Are Typical of Those of the Class

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The claims of a named plaintiff are considered to be typical of the class when the plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims, and when the plaintiff's claims and those of the class are based on the same legal theory."  *Kinney v. Metro Glob. Media*,

---

[21] *See Solodyn*, 2017 WL 4621777, at *12, n.12 (commonality established where "EPPs' claims all stem from the same alleged anticompetitive conduct"); *Relafen*, 221 F.R.D. at 267 (commonality established because all class members' claims alleged injury arising from same conduct by defendants); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521, 2017 WL 679367, at *1 (N.D. Cal. Feb. 21, 2017) (common questions included: "Did defendants engage in anticompetitive conduct? Did that conduct lead to overcharges for brand and generic lidocaine patches? What aggregate damages resulted from the overcharges?"); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 217 (E.D. Pa. 2012) (commonality established because "proof of the essential elements" of antitrust claims would focus on "allegations surrounding [defendant's] alleged conduct in delaying generic entry").

*Inc.*, No. 99-cv-579, 2002 WL 31015604, at *4 (D.R.I. Aug. 22, 2002) (quoting *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1532 (D. Mass. 1991)).[22]   A plaintiff's claim will be typical of those of the class where all claims arise from some overarching scheme of the defendants.[23] "When the same unlawful conduct was directed at or affected both the named plaintiffs and the members of the putative class, the typicality requirement is usually met, irrespective of varying fact patterns that may underlie individual claims." *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 544 (D.N.J. 1999).[24]

Here, all end-payor claims arise from the same course of conduct, namely, Defendants' anticompetitive scheme to prevent and/or delay the availability of generic Loestrin 24 Fe and Defendant Warner Chilcott's anticompetitive product hop to Minastrin 24 Fe.   Defendants suppressed competition in a way that caused all end-payors to pay supracompetitive prices for Loestrin 24 Fe, Minastrin 24 Fe and their AB-rated generic equivalents during the Class Period. In addition, the claims are based upon common legal theories: conspiracy and combination in restraint of trade and monopolization.   The fact that the claims arise under multiple state laws

---

[22] *See also In re Evergreen Ultra Short Opportunities Fund Secs. Litig.*, 275 F.R.D. 382, 389 (D. Mass. 2011); *accord In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 250 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001); *Synthroid*, 188 F.R.D. at 299.

[23] *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) ("[T]his theory of an overarching conspiracy to fix prices and allocate the market in violation of antitrust laws will be common to all class members"); *Carbon Black*, 2005 WL 102966, at *12; *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 310 (3d Cir. 1998); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 511 (S.D.N.Y. 1996); *In re Sumitomo Copper Litig.*, 194 F.R.D. 480, 482 (S.D.N.Y. 2000).

[24] *See Solodyn*, 2017 WL 4621777, at *12, n.12 (end-payor plaintiffs established typicality where the named plaintiffs' claims arose "from the same unlawful conduct by the Defendants as absent class members and they suffered the same injury in the form of overpayments"); *In re Citigroup, Inc. Capital Accumulation Plan Litig.*, MDL No. 1354, 2010 WL 9067986, at *10 (D. Mass. Jan. 6, 2010) ("Representative plaintiffs fulfill the typicality criterion when their injuries and those of the class are caused by a common course of conduct by the defendants" and claims are based on same legal theories); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241-42 (E.D.N.Y. 1998) ("If a central conspiracy is established, differences in the way in which the plan was manifested are unimportant."); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999).

*does not* defeat typicality where, as here, the relevant state laws[25] mirror federal law and each other in their essential elements.[26]  Accordingly, the typicality requirement is satisfied.

### D.  Plaintiffs Will Adequately Represent the Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy inquiry… serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  The inquiry should be based upon the "economic reality" of the representative parties and the class members.  *Relafen*, 221 F.R.D. at 270.  "[P]erfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable." *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012); *see also Solodyn*, 2017 WL 4621777 at *12 (same).  Only conflicts that are "fundamental to the suit and that go to the heart of the litigation" are pertinent. *Matamoros*, 699 F.3d at 138 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed. 2012)). Where, as here, the "overarching question" of an antitrust claim is the defendants' conduct, all end-payors, including EPPs, have the same objective – *i.e.*, proving that Defendants acted unlawfully.[27]  As in *Solodyn*, *Flonase*, *Nexium*, *Relafen* and *Lidoderm*, the "economic reality"

---

[25] EPPs have compiled the applicable state and federal antitrust and consumer protection statutes and the cases describing their similarities in Buchman Decl., Ex. 3.

[26] *See Flonase*, 284 F.R.D at 217-18 (end-payor's state law claims typical because the "state law claims for monopolization, [unfair and deceptive trade practices], and unjust enrichment arise from an identical course of conduct" by the defendant").

[27] *Carbon Black*, 2005 WL 102966, at *14 (citing *Fears v. Wilhemina Model Agency, Inc.*, No. 02-cv-4911, 2003 U.S. Dist. LEXIS 11897, at *18 (S.D.N.Y. 2003)); *Solodyn*, 2017 WL 4621777, at *12; *Cardizem*, 200 F.R.D. at 336 (adequacy satisfied where "named representative and the absent class members similarly assert that they were injured by the same illegal conduct on the part of the defendants.").

here is that all End-Payors[28] suffered identical injuries: overcharges for purchases of Loestrin 24 Fe, Minastrin 24 Fe and their AB-rated generic equivalents.[29]  Rule 23(a) is satisfied.

### E.  The Class Is Ascertainable

Some courts have held that Rule 23 has an implied "ascertainability" requirement – that the class members must be identifiable by objective criteria.  To the extent that such a requirement exists, EPPs satisfy it.  A class is ascertainable if its members can be identified by reference to objective criteria and in an administratively feasible manner.[30]

By referencing readily available, detailed data sources used in the data-rich pharmaceutical industry (*i.e.*, pharmacy level, managed care level),[31] EPPs can identify class members by reference to the objective criteria in the class definition: (1) purchases of Loestrin 24 Fe, Minastrin 24 Fe, and/or their generic equivalents, not for resale; (2) in applicable states; (3)

---

[28] There also is no conflict between the consumer and third-party payor class members as all suffered the same overcharge damages; have the same interest in establishing Defendants' liability for that harm; and have identical interests in establishing the full amount of that harm.  *See Solodyn*, 2017 WL 4621777, at *12 (rejecting argument that consumers and third-party insurers are fundamentally different groups and noting that "[t]his argument has been rejected by this Court and others certifying end-payor classes consisting of both consumers and third-party purchasers."); *Cardizem*, 200 F.R.D. at 337 (rejecting argument that third-party payors' interests conflicted with absent class members because each class member "has the same interest in maximizing the aggregate amount of classwide damages"); *Lidoderm*, 2017 WL 679367, at *26 (no fundamental conflict between third-party payors and consumers) *Nexium*, 297 F.R.D. at 172 (same).

[29] *See Solodyn*, 2017 WL 4621777, at *12 (sufficient "alignment of incentives" to support adequacy where "all putative members seek to show that they were injured in the same way—overcharges—through the same illegal conduct by Defendants."); *Nexium*, 297 F.R.D. at 172 (adequacy "supported by the fact that all payors in the putative class allegedly paid supracompetitive prices for a single product… and suffered identical economic injuries"); *Flonase*, 284 F.R.D. at 218 (no conflicts where "[e]ach class member purchased and/or reimbursed for [Flonase] at some point during the Class Period at a supracompetitive price" and thus "holds a strong common interest" in establishing defendant's liability).

[30] *Nexium*, 777 F.3d at 19-20; *Matamoros*, 699 F.3d at 139 (a class was not "unascertainable and overbroad" where it was defined in terms of an "objective criterion"); *Solodyn*, 2017 WL 4621777, at *13-14 (end-payor class ascertainable); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760, at 120–21 (2d ed.1986)) (criteria need only be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.").

[31] In *Solodyn*, the District of Massachusetts recognized that it is administratively feasible to ascertain end-payor class membership in the pharmaceutical industry given that data is collected and maintained at every transaction level.  *See, e.g., Solodyn*, 2017 WL 4621777, at *13-14.

during a discrete time period.  *See* n.1, *supra*; Buchman Decl., Ex. 1 at ¶ 287; Ex. 4 (Dr. French Rprt.) ¶¶44 (IQVIA data), 82, 86, 89, 91.[32]  Excluded from the class are several categories of purchasers who did not pay overcharges due to attributes of their health insurance plans (*e.g.* flat co-pay consumers) or for other reasons (*e.g.*, brand loyalist consumers).  *Id.*, Ex. 1 (CAC) ¶ 288; Ex. 4 (Dr. French Rprt.) ¶¶ 80, 84, 92.  These categories are also defined by reference to objective criteria.  *See also Nexium*, 777 F.3d at 19 ("The class definition here satisfies [the ascertainability] standards by being defined in terms of purchasers of Nexium during the class period (with some exceptions that also satisfy objective standards).").  Thus, the class is ascertainable.

## IV.   CLASS CERTIFICATION IS APPROPRIATE UNDER FED. R. CIV. P. 23(b)(3)

Class certification is appropriate under Rule 23(b)(3) if "questions of law or fact common to class members predominate over any questions affecting only individual members" and if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Both requirements are met here.

### A.  Common Issues Predominate Across Plaintiffs' Antitrust Claims

The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Nexium*, 297 F.R.D. at 174 (quoting *Amchem*, 521 U.S. at 623).  "Rule 23(b)(3)… does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof,'" but that "common questions '*predominate*' over any questions affecting only individual [class] members.'" *Amgen*, 133 S. Ct. at 1196.  Courts look for "a sufficient constellation of common issues bind[ing] class members together."  *Waste Mgmt. v. Mowbray*, 208 F.3d at 296.  Indeed, "[a] 'single, central issue' as to the

---

[32] *Solodyn*, 2017 WL 4621777, at \*13-14 (finding similarly-defined End-Payor class ascertainable).

defendant's conduct *vis-a-vis* class members can satisfy the predominance requirement even when other elements of the claim require individualized proof." *Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 27 (D. Mass. 2003); *accord Smilow*, 323 F.3d at 39 ("Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class."). Thus, where one or more common questions predominate regarding liability, individual issues regarding affirmative defenses or damages *will not* stand in the way of class certification.[33]  Here, as demonstrated below, common issues predominate as to EPPs' theories of liability, market power, antitrust impact and aggregate damages.

### 1. Common Issues Predominate as to Theories of Liability

"In antitrust actions, '[p]redominance is a test readily met'" where, as here, plaintiffs' theories of liability are necessarily premised on the defendants' conduct, not on issues particular to individual class members.  *Solodyn*, 2017 WL 4621777, at *6 (quoting *Amchem*, 521 U.S. at 625).[34]  All of EPPs' theories of liability in this case squarely focus on *Defendants'* unlawful conduct.  The key question in "pay for delay cases," such as this, is whether the brand manufacturer (here, Warner Chilcott) engaged in anticompetitive conduct by paying potential

---

[33] *Waste Mgmt. v. Mowbray*, 208 F.3d at 295-96.

[34] *See also Lidoderm*, 2017 WL 679367, at 1 (common questions concerning defendants' conduct predominated); *Flonase*, 284 F.R.D. at 218 (liability "can be proven through class-wide, common evidence because these issues focus on [defendant's] conduct, not on the actions of the individual class members."); *Relafen*, 221 F.R.D. at 275 ("The alleged antitrust violation relates solely to [defendant's] conduct, and as such, constitutes a common issue subject to common proof."); *Teva Pharm. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213, 228 (D. Del. 2008) (common issues predominated because "each putative class member, had they pursued their claims individually, would have been required to prove identical facts, such as defendants'... exclusionary scheme... conspiracy, and unreasonable restraint of trade."); *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2011 WL 286118, at *6 (D.N.J. Jan. 25, 2011) ("Courts have routinely found that proof of this [antitrust] violation focuses on the defendant's conduct, not on the conduct of individual class members, and is therefore well suited for class treatment."); *Natchitoches*, 247 F.R.D. at 269-70 (in antitrust cases, classwide liability issues such as conspiracy or monopolization can predominate over individual issues); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) (in antitrust cases, "proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case."); *McDonough v. Toys 'R Us, Inc.*, 638 F. Supp. 2d 461, 479-482 (E.D. Pa. 2009) (predominance satisfied where proof will focus on defendant's conduct).

generic competitors (here, Watson and Lupin) to delay market entry of a competing generic product.[35]  EPPs' common proof relating to their pay-for-delay allegations will include analysis of the terms of the relevant agreements; Defendants' negotiations and other communications leading to the agreements; and expert analysis demonstrating that the purpose and effect of the agreements were to induce Watson and Lupin to delay launching their generic products.  *See, e.g.*, Buchman Decl., Exs. 10-14.   In addition, EPPs' common proof relating to the product hop aspect of the anticompetitive scheme will include an analysis of Defendant Warner Chilcott's conduct with regard to introducing, pricing and marketing Minastrin 24 Fe and expert analysis demonstrating that the purpose and effect of this conduct was to impair competition from generic Loestrin 24 Fe.  *Id.*, Ex. 15.  All of this evidence will exclusively focus on Defendants' conduct.

The fact that EPPs' claims are brought under state antitrust, consumer protection and unjust enrichment laws is of no moment and does not alter this conclusion.  A district court in the First Circuit recently recognized in a pay-for-delay case that "courts in this Circuit and elsewhere have certified classes in antitrust actions like this one despite the need to apply numerous states' laws." *Solodyn*, 2017 WL 4621777, at *19 (certifying class where end-payor plaintiffs asserted fifty distinct claims under the laws of forty different jurisdictions) (citing *Nexium*, 297 F.R.D. at 176 (twenty-six state laws at issue); *Relafen*, 221 F.R.D. at 278-94 (twelve states' antitrust laws at issue); *Lidoderm*, 2017 WL 679367, at *27 (seventeen states' laws at issue)).  For example, in *Nexium*, the district court held that any variations among end-payors' claims under state antitrust and consumer protection laws *did not* defeat predominance.  *See Nexium*, 297 F.R.D. at 175-76.   Former Chief Judge Young of the U.S. District Court for the

---

[35] *See Actavis*, 133 S. Ct. at 2236.  *See also In re Aggrenox Antitrust Litig.*, No. 14–md–2516, 2015 WL 4459607, at *10 (D. Conn. July 21, 2005) (in an *Actavis* case, "what matters is whether a settlement postpones market entry").

District of Massachusetts explained that the "substantial similarities" between the relevant state antitrust statutes and federal antitrust law, and the fact that the "violation of traditional antitrust elements constitutes a violation of the relevant consumer protection statute[s]," were sufficient to satisfy the predominance standard.  *Id.*[36]

Similarly, here, each of the applicable state antitrust statutes has language mirroring the federal antitrust laws, contains a federal harmonization provision, and/or has been interpreted in harmony with federal law.  Buchman Decl., Ex. 3 (compiling applicable federal and state laws and decisions).  Each of the consumer protection statutes has been interpreted to permit recovery for anticompetitive, unfair or unconscionable conduct, and EPPs' claims under these statutes are premised on the same unlawful conduct as their antitrust claims.  *Id.*; Ex. 1 (CAC) ¶¶ 375-79.  And EPPs' unjust enrichment claims are premised on the same alleged facts and will be proven using the same evidence as their antitrust and consumer protection claims.  *Id.*; Ex. 1 (CAC) ¶¶ 381-91.

## 2.   Common Issues Predominate as to Market Power

Market power can be established directly (through proof of supracompetitive pricing) or indirectly (through proof that Warner Chilcott has a dominant share in the relevant market).[37]  Here, EPPs will prove market power through evidence that is common to the Class, including

---

[36] *See also Flonase*, 284 F.R.D. at 219 (predominance satisfied because the plaintiffs in that case would "utilize the same operative evidence" to prove defendants' liability for state antitrust, consumer protection and unjust enrichment claims); *Warfarin* 391 F.3d at 528 (indirect purchasers' antitrust and consumer protection allegations "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members"); *Lidoderm*, 2017 WL 679367, at *27 (differences among state law claims "do not appear to be material or even significant").

[37] *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196-97 (1st Cir. 1996).

historical pricing data and Defendants' internal documents, models and forecasts.  Thus, common issues predominate as to market power.[38]

### 3. Common Issues Predominate as to Antitrust Impact

To prove antitrust impact, a plaintiff must show some damage due to a defendant's antitrust violations.[39]  A plaintiff need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a classwide basis using common proof.[40]  Here, EPPs allege antitrust injury in the form of overcharges that resulted from Defendants' agreements to delay generic competition.  Buchman Decl., Ex. 1 (CAC) ¶¶ 11-12, 321-337.  Expert testimony in this case will focus on the characteristics of the "but-for" world, *i.e.*, how the Loestrin 24 Fe market would have behaved during the Class Period absent Defendants' unlawful conduct.  *See* Buchman Decl., Ex. 4 (Dr. French Rprt.) ¶¶ 28- 31. If the generic would have sold for less than the brand during the Class Period, all class members who would have bought the generic were injured in the form of overcharges.[41]

Any argument by Defendants that Plaintiffs do not demonstrate predominance due to the purported presence of uninjured class members should be rejected.  The court in *Solodyn* recently rejected arguments that the presence of brand loyalists, coupons, vouchers and rebates caused non-common issues to predominate.  *Solodyn*, 2017 WL 4621777, at *15-18.   Likewise, in

---

[38] *See Flonase*, 284 F.R.D. at 218 (predominance satisfied where relevant market and monopoly power would be proven through classwide, common evidence); *Teva Pharm. USA, Inc. v. Abbott Labs.*, 252 F.R.D. at 228 (common issues predominated as to defendant's monopoly power).

[39] *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114, n.9 (1969).

[40] *See In re DRAM Antitrust Litig.*, No. 02-md-1486, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006).

[41] *See Solodyn*, 2017 WL 4621777, at *18 (concluding that end-payors would "be able to show antitrust impact through common proof: if the jury finds Defendants' conduct violated the state laws in question here, the vast majority of EPPs who purchased generic or brand Solodyn during this period and experienced injury in the form of overcharges"); *In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 555-56 (S.D. Fla. 2001) ("No one contends that the defendants' comprehensive agreements made cheaper generic drugs available in the United States to some class members, but not others."); *see also Cardizem*, 200 F.R.D. at 308.

*Nexium*, "the First Circuit recently affirmed class certification in a similar class of end-payors despite similar arguments regarding uninjured parties." *Solodyn*, 2017 WL 4621777, at *14 (citing *Nexium*, 777 F.3d at 14). Thus, proof of classwide impact is predominantly a common question.

### 4. Common Issues Predominate as to Measure of Damages

Damages in an antitrust case "may be determined on a classwide, or aggregate, basis . . . where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." *NASDAQ*, 169 F.R.D. at 526; *accord, Lorazepam*, 202 F.R.D. at 30.[42] "[D]oubts as to the certainty of damages will be resolved against the wrongdoer, as the wrongdoer must bear the risks of the uncertainty which [its] conduct has created." *Sumitomo Copper*, 182 F.R.D. 85, 92-93 (S.D.N.Y. 1998) (quoting 22 Am. Jur. 2d *Damages* § 491 (1988)); *see Cardizem* 200 F.R.D. at 350 (quoting 2 Herbert B, Newberg & Alba Conte, Newberg on Class Actions § 10.05 at 10-8 (3d ed. 1992)); *In re Prudential Sales Practices*, 962 F. Supp. 450, 517 n.46 (D.N.J. 1997).

As the First Circuit has recognized, "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 582 F.3d 156, 197-98 (1st Cir. 2009); *Solodyn*, 2017 WL 4621777, at *18 (same). At the class certification stage, EPPs are not required to "prove that every putative class member suffered injury." *Nexium*, 777 F.3d at 23. Moreover, certification is appropriate even if "damages will not be uniform across the class." *Id.* at 21.[43]

---

[42] The fact of injury should not be confused with the amount of injury. *See Zenith Radio Corp.*, 395 U.S. at 114 n.89; *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454–55 (3d Cir. 1977); *Cardizem CD*, 200 F.R.D. at 307.

[43] *Lidoderm*, 2017 WL 679367, at *11 ("[D]ifferences in damages will rarely suffice to defeat class certification."); *Flonase*, 284 F.R.D. at 232 (individual issues concerning allocation of damages among class members do not defeat class certification).

The damages model also need not be exact, so long as it ensures that "the defendants pay aggregate damages equivalent to the injury they caused." *Nexium*, 777 F.3d at 19; *Solodyn*, 2017 WL 4621777, at *19; *see also In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 337 (D.N.H. 2017), (recognizing that "at the class certification stage, it is not necessary that class damages be calculated to a mathematical certainty.") Where a plaintiff has presented a plausible methodology for calculating aggregate damages, class certification cannot be defeated merely by raising issues of fact with respect to the *amount* of damages.[44]

Here, as demonstrated in Dr. French's expert report, EPPs have a plausible methodology for calculating damages that is directly tied to the theory of liability.  Buchman Decl., Ex. 4 (Dr. French Rprt.) at ¶¶ 60-93.  The common evidence in this case will include:  (i) evidence of the impact of the Hatch-Waxman Act and related FDA regulations on market conditions; (ii) evidence of the effects of generic competition on prices; (iii) the actual prices and quantities sold for Loestrin 24 Fe, Minastrin 24 Fe, and their AB-rated generic equivalents during the Class Period; (iv) the prices and quantities sold for the "yardstick" products (products in a comparable market that is untainted by anticompetitive conduct); and (v) what the price and quantities sold for Loestrin 24 Fe and generic Loestrin 24 Fe would have been absent Defendants' unlawful conduct.  *Id.*, Ex. 4 (Dr. French Rprt.) at ¶¶ 60-93.  This approach has been approved by numerous courts as satisfying Rule 23(b)(3) in pharmaceutical antitrust cases,[45] and it should be

---

[44] *Lidoderm*, 2017 WL 679367, at *17-18; *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 582 F.3d at 197-98.

[45] *See, e.g., Nexium*, 297 F.R.D. at 176-183 (transactional data and expert's damages model); *Lidoderm*, 2017 WL 679367, at *17 ("defendants' own forecasts, academic research applicable to the generic/brand drug pricing market, and [their expert's] model"); *Teva Pharm.*, 252 F.R.D. at 229-30 ("scholarly economic literature, governmental studies and empirical evidence analyzing the market wide effects of unfettered generic competition on the prices and market shares of both brand and generic drugs"); *Cardizem*, 200 F.R.D. at 340-42 (economic literature, projections and sales data); *Flonase*, 284 F.R.D. at 220-225 ("yardstick" methodology, market data and general economic principles). *See also Relafen*, 221 F.R.D. 260, *Terazosin*, 220 F.R.D. at 698-99; *In re Cipro Cases I & II*, 17 Cal. Rptr. 3d 1, 6 (Cal. App. Ct. 2004).

approved here as well. Notably, EPPs' expert's aggregate damages calculations are based on similar methodologies to those approved by the First Circuit in *Nexium*. 777 F.3d at 25. There is no risk that the aggregate damages model will fail to "reflect the liability theory," because EPPs' damages theory is the same for all claims: EPPs and members of the Class were overcharged for purchases of Loestrin 24 Fe and Minastrin 24 Fe as a result of Defendants' anticompetitive conduct.[46] Moreover, the Class exclusions have been crafted to provide objective criteria that can be used to ensure that Class recoveries are restricted to end-payors who suffered overcharge damages. *See* CAC ¶ 288 (excluding from the class, *inter alia*, fully insured health plans and flat co-pay consumers). In his report, Dr. French demonstrates that all class members were overcharged and such damages are traceable to Defendants' anticompetitive conduct. Buchman Decl., Ex. 4 (Dr. French Rprt.) at ¶¶28-32. To the extent Defendants attempt to identify small numbers of members of the Class who may not have been injured, "[a] class may be certified even if it contains 'a de minimis number of potentially uninjured parties[.]'" *Solodyn*, 2017 WL 4621777, at *10 (quoting *Nexium*, 777 F.3d at 25); *accord Lidoderm*, 2017 WL 679367, at *11, 20; *Flonase*, 284 F.R.D. at 226-27.[47] Accordingly, common issues predominate as to the *quantum* of damages.

---

[46] *Nexium*, 777 F.3d at 23, citing *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013); *Lidoderm*, 2017 WL 679367, at *24 (rejecting challenge to end-payor's damages calculation under *Comcast* because plaintiffs "have one theory of injury and one consistent theory of damages").

[47] *See also Solodyn*, 2017 WL 4621777, at *18 (rejecting Defendants' argument that there were many uninjured third-party payor class members who insured brand-loyal consumers or only covered generic Solodyn and noting the great "likelihood that Defendants' arguments are inflating the number of uninjured members" because "[t]hird party payors, like all antitrust plaintiffs "need only suffer damage on one purchase to be injured . . . an insurer with brand-loyal members is only uninjured here if every one of its members would have been brand-loyal for all Solodyn purchases in each 'but-for' scenario[.]" which was "highly unlikely.

### B.   A Class Action Is Superior for Litigating this Dispute and Is Manageable

Rule 23(b)(3)'s superiority requirement is also satisfied here.  "The Court considers four factors within the superiority inquiry: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  *Solodyn*, 2017 WL 4621777, at *21 (quoting Fed. R. Civ. P. 23(b)(3)).  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) (internal quotation marks omitted).[48] Thus, "[t]he superiority inquiry . . . ensures that litigation by class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Solodyn*, 2017 WL 4621777, at *21 (quoting *Amchem*, 521 U.S. at 615).

This is a classic case in which a class action is superior to the alternatives:  thousands of individual actions or, worse, no actions at all.   Liability focuses on anticompetitive conduct by Defendants concerning Loestrin 24 Fe and Minastrin 24 Fe; the misconduct resulted in higher prices which impacted class members in a uniform way; and damages are susceptible of statistical proof in the same manner approved and followed in countless previous antitrust cases.  The classwide damages are large in the aggregate but, for most class members, the individual damages cannot possibly justify undertaking complex and expensive antitrust litigation.  A class action is the only practical means of adjudicating class members' claims while providing them

---

[48] *See also Solodyn*, 2017 WL 4621777, at *21; *Kinney*, 2002 WL 31015604, at *6.

with their day in court.[49]  As the court in *Domestic Air* aptly recognized in certifying a nationwide class of airline ticket purchasers, "[e]ither the case proceeds as a class action or it is over."  *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 694 (N.D. Ga. 1991); *see also In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 192 (D.N.J. 2003) ("A class action is likely the only way in which these liability issues will ever be litigated.").[50]

Finally, EPPs are not aware of any management difficulties that will be encountered in the litigation on behalf of the Class.[51]  The manageability factor focuses on "the practical problems that may render the class action format inappropriate for a particular suit."  *Eisen v. Carlisle and Jacqueline*, 417 U.S. at 164.  Denial of class certification on the grounds of "vaguely perceived manageability obstacles" is disfavored by courts and commentators because such an action would be "counter to the policy behind Rule 23."  *Yaffe v. Powers*, 454 F.2d 1362, 1365 (1st Cir. 1972).  Here, prosecution of these actions as class actions will "'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated[.]'"

---

[49] *See, e.g.*, *Solodyn*, 2017 WL 4621777, at *21 (in a pay-for-delay case, finding that "both fairness and efficiency support class certification, where otherwise 'the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies.'") (quoting *Flonase*, 284 F.R.D. at 234); *Carbon Black*, 2005 WL 102966, at *22 ("Antitrust class actions are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case."); *Flonase*, 284 F.R.D. at 234 ("I agree with the vast majority of district courts that in a delayed generic entry case such as this, class action treatment is superior to other available methods of adjudication."); *Cardizem*, 200 F.R.D. at 351 ("the class action device is appropriate where there is a large number of potential plaintiffs but no one particular person has suffered damages large enough to induce him to bring suit alone").

[50] In addition, the large size of the proposed Class makes a class action the superior method for the fair and efficient adjudication of the controversy.  "[T]he size of the class militates in favor of, not against[,] certification" because "[d]efendants should not be permitted to avoid responsibility for the magnitude of their alleged conspiracy."  *NASDAQ*, 169 F.R.D. at 528-29 (class involving millions of transactions); *see also Domestic Air*, 137 F.R.D. at 694 (class consisting of at least 12.5 million people and 400 million transactions was certified); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 524 (M.D. Fla. 1996) (class of up to 18 million replacement contact lens purchasers).

[51] EPPs submit a Proposed Trial Plan as Buchman Decl., Ex. 5.  Similarly, proposed trial plans were submitted with the end-payor plaintiffs' class certification motions in *Solodyn*, No. 14-md-02503, 2017 WL 4621777 (certifying end-payor class) and *Nexium*, 296 F.R.D. 47 (same).

*Solodyn*, 2017 WL 4621777, at \*21 (quoting *Amchem*, 521 U.S. at 615); *see also Relafen*, 221 F.R.D. at 287-88; *Flonase*, 284 F.R.D. at 234.   Indeed, Defendants acknowledged the benefits of consolidating these actions before the Judicial Panel on Multi-District Litigation, including conservation of the resources of the parties and the courts and avoidance of inconsistent rulings.[52]

## V.   COUNSEL MEET THE REQUIREMENTS OF RULE 23(G)

Rule 23(g) sets forth the criteria for appointing class counsel. Fed. R. Civ. P. 23(g) (providing that, when appointing class counsel, the court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class"). Interim Co-Lead Class Counsel and Interim Liaison Counsel ("Counsel") satisfy this criteria. *First*, Counsel thoroughly investigated potential claims in this litigation, including drafting and filing the lengthy CAC.  *Second*, they have extensive experience litigating complex class actions on behalf of plaintiffs to successful resolutions, including pay-for-delay and other antitrust class actions. *See* Buchman Decl., Exs. 6-9. *Third*, they have intimate knowledge of antitrust and consumer protection laws given their experience in similar cases. *Id.  Fourth*, they have contributed adequate firm resources to representing the EPPs and proposed Class to date and will continue to do so through resolution of this case.  Thus, Counsel satisfy the requirements of Rule 23(g) and respectfully request to be appointed as Class Counsel and Liaison Counsel.

---

[52] Defendants' Mem. of Law in Support of Their Motion for Transfer and Coordination, ECF No. 1-1, at 7.

## CONCLUSION

For the foregoing reasons, EPPs respectfully request that their motion be granted in its entirety.

Dated: July 30, 2018                    Respectfully submitted,

                                        **MOTLEY RICE LLC**

                                        By: */s/ Michael M. Buchman*

                                        Michael M. Buchman
                                        Michelle C. Zolnoski
                                        600 Third Avenue, Suite 2101
                                        New York, NY 10016
                                        (212) 577-0050
                                        mbuchman@motleyrice.com
                                        mzolnoski@motleyrice.com

                                        Marvin A. Miller
                                        Lori A. Fanning
                                        **MILLER LAW LLC**
                                        115 South LaSalle Street, Suite 2910
                                        Chicago, IL 60603
                                        (312) 332-3400
                                        mmiller@millerlawllc.com
                                        lfanning@millerlawllc.com

                                        Steve D. Shadowen
                                        Matthew C. Weiner
                                        **HILLIARD & SHADOWEN LLP**
                                        219 Congress Ave.
                                        Suite 1325
                                        Austin, TX 78701
                                        (855) 344-3298
                                        steve@hilliardshadowenlaw.com
                                        matt@hilliardshadowenlaw.com

                                        Sharon K. Robertson
                                        Donna M. Evans
                                        **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                        88 Pine Street, 14th Floor

New York, NY 10005
(212) 838-7797
srobertson@cohenmilstein.com
devans@cohenmilstein.com

*Interim Co-Lead Counsel for the Proposed End-Payor Class*

Donald A. Migliori
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
dmigliori@motleyrice.com

*Interim Liaison Counsel for the Proposed End-Payor Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2018, a true copy of the foregoing document was served on all counsel of record by electronically filing the document with the Court's CM/ECF system.

*/s/ Michael M. Buchman*
Michael M. Buchman