**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |  |
|---|---|---|
| IN RE LOESTRIN 24 FE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*All Direct Purchaser Class Plaintiff Actions* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 2472<br><br>C.A. No. 1:13-md-2472-S-PAS<br><br>**REDACTED PUBLIC VERSION** |

**MEMORANDUM OF LAW IN OPPOSITION TO DIRECT PURCHASER
CLASS PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

FACTS ................................................................................................................. 5

    A.    Sole Class Representative Ahold Is a Retailer—Not Wholesaler—With No Direct Purchases from Defendants .......................................................... 5

    B.    Retailer Ahold Claims to Be a Class Member Based on a Partial Assignment and Purchases from a Non-Defendant ..................................... 6

    C.    The Big Three Wholesalers Dominate the Proposed Class of Wholesalers—They Purchased ▇ of All Loestrin 24 ................................ 7

    D.    Neither Plaintiff Nor its Expert, Dr. Leitzinger, Make Any Attempt to Specify a Plausible "But-For" World Consistent with the Evidence ..................... 7

ARGUMENT ....................................................................................................... 10

I.    PLAINTIFF HAS NOT ESTABLISHED THE REQUIREMENTS OF RULE 23(a) ..... 11

    A.    With No More Than 16 Members, Plaintiff's Proposed Class Falls Far Short of Meeting Rule 23(a)(1)'s Numerosity Requirement ......................................... 11

        1.    Plaintiff's Proposed Class Impermissibly Includes 21 Generic-Only Purchasers that Lack Standing Because They Never Made Any Purchases from Defendants .................................................................... 13

        2.    The Six Brand-Only Purchasers Should Be Excluded from the Class Because There Is No Proof They Would Have Purchased a Generic Version of the Branded Product ......................................................... 17

        3.    Five Additional Entities Should Be Considered Together with Their Corporate Parents to Avoid Subverting the Numerosity Analysis ........... 19

        4.    Plaintiff Cannot Establish that Joinder Is Impracticable ........................... 20

    B.    Retailer Ahold's Claims Are Not Typical of Other Putative Class Members – Who Are Almost Entirely Wholesalers ............................................ 27

    C.    Sole Class Representative Retailer Ahold Would Not Be an Adequate Representative for a Direct Purchaser Class Comprised Overwhelmingly of Wholesalers ...................................................................... 29

        1.    Ahold Has No Interest in Establishing the Earliest Entry Date for Generic Loestrin 24 or in the "Product Hop" Allegations, Creating a Conflict with Other Class Members ......................................................... 30

        2.    Retailer Ahold Admittedly Has No Experience With and No Personal Knowledge of Directly Purchasing the Branded Loestrin 24 and Minastrin for Which the Class Is Claiming it Was Somehow Overcharged ................................................................................. 31

        3.    Retailer Ahold Cannot Establish Causation for Alleged Overcharges on Generic Loestrin 24 it Bought from Non-Defendant Amneal

████████████████████████████████████████
███████████████████████████ .............................................................. 32

    4.    Ahold Is Unable to Ensure Trial Availability of a Knowledgeable, Current Employee Available for Trial ..................................................... 32

II.    PLAINTIFF AHOLD HAS NOT ESTABLISHED THE REQUIREMENTS OF RULE 23(b)(3), PARTICULARLY AS CLARIFIED BY THE FIRST CIRCUIT IN *ASACOL* ........................................................................................................... 34

    A.    Individualized Issues Predominate with Respect to Antitrust Injury-in-Fact/Impact ........................................................................................... 35

        1.    Dr. Leitzinger's Scenarios Assume Away Earlier Minastrin Entry and Have No Basis in the Factual Record. ................................................ 37

        2.    There Is No Common Proof of Injury-in-Fact as to the 21 Generic-Only Purchasers. ...................................................................................... 39

        3.    There Is No Common Proof of Injury-in-Fact as to the Six Brand-Only Purchasers. ...................................................................................... 42

    B.    Individual Issues Predominate with Respect to Damages ..................................... 43

    C.    Class Treatment Plainly Is Not the Superior Method of Adjudication ................. 48

CONCLUSION ............................................................................................................. 50

## TABLE OF AUTHORITIES

### CASES

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013).................................................................................................10

*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................29, 30, 34

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985)...................................................................................20

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983).................................................................................................16

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979).....................................................................................38

*Bivens v. Crowell*,
  138 F.R.D. 18 (D.N.H. 1990) ...................................................................................12

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) .............................................................................36, 42

*CL-Alexanders Laing & Cruickshank v. Goldfeld*,
  127 F.R.D. 454 (S.D.N.Y. 1989) .............................................................................24

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)........................................................................................... passim

*Cowden v. Parker & Assocs., Inc.*,
  No. 09-cv-323, 2013 WL 2285163 (E.D. Ky. May 22, 2013)................................48

*Del. Valley Surgical Supply, Inc. v. Johnson & Johnson*,
  523 F.3d 1116 (9th Cir. 2008) .................................................................................14

*Dewey v. Volkswagen AG*,
  681 F.3d 170 (3d Cir. 2012).....................................................................................30

*Eisenberg v. Gagnon*,
  766 F.2d 770 (3d Cir. 1985).....................................................................................28

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...................................................................................11

*FTC v. Mylan Labs, Inc.*,
  62 F. Supp. 2d 25 (D.D.C. 1999) ......................................................................16, 17

iii

*Garcia-Rubiera v. Calderon*,
   570 F.3d 443 (1st Cir. 2009)...........................................................12

*Gen. Elec. v. Joiner*,
   522 U.S. 136 (1997).........................................................................39

*Georgine v. Amchem Prods., Inc.*,
   83 F.3d 610 (3d Cir. 1996)...............................................................48

*Henderson v. Bank of N.Y. Mellon*,
   322 F.R.D. 432 (D. Mass. 2017).......................................................32

*Howard's Rexall Stores, Inc. v. Aetna United State Healthcare*,
   No 00-cv-00031, 2001 U.S. Dist. LEXIS 6029 (D. Me. May 8, 2001)...................20

*Ill. Brick Co. v. Illinois*,
   431 U.S. 720 (1977)....................................................................13, 14

*In re Aggrenox Antitrust Litig.*,
   No. 3:14-md-02516, 2015 U.S. Dist. LEXIS 94516 (D. Conn. July 21, 2015).......26

*In re Androgel Antitrust Litig. (No. II)*,
   No. 09-md-02084, 687 F. Supp. 2d 1371 (N.D. Ga. 2010) ...................26

*In re Asacol Antitrust Litig.*,
   1:15-cv-12730 (D. Mass. Jan. 11, 2018).............................................33

*In re Asacol Antitrust Litig.*,
   No. 18-1065, 2018 U.S. App. LEXIS 28920 (1st Cir. Oct. 15, 2018)........... passim

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   691 F.2d 1335 (9th Cir. 1982) ........................................................15

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)............................................................17

*In re High-Tech Emp. Antitrust Litig.*,
   289 F.R.D. 555 (N.D. Cal. 2013)......................................................34

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008)...................................................11, 34, 35

*In re IMAX Securities Litig.*,
   No. 06-cv-6128, 2009 WL 1905033 (S.D.N.Y June 29, 2009) .................29

*In re K-Dur Antitrust Litig.*,
   No. 01-cv-1652, 2008 U.S. Dist. LEXIS 118396 (D.N.J. Apr. 14, 2008)...............18

iv

*In re Lipitor Antitrust Litig.*,
No. 12-cv-02389, 2012 U.S. Dist. LEXIS 150595 (D.N.J. Oct. 19, 2012) ...........................26

*In re Modafinil Antitrust Litig.*,
837 F.3d 238 (3d Cir. 2016)........................................................................................ passim

*In re Namenda Direct Purchaser Antitrust Litigation.*,
No. 15-cv-7488, 2018 U.S. Dist. LEXIS 140768 (S.D.N.Y. Aug. 16, 2018).........................17

*In re Neurontin Antitrust Litig.*,
No. 02-cv-1390, 2011 U.S. Dist. LEXIS 7453 (D.N.J. Jan. 25, 2011)...................................19

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ...........................................................................................34, 35, 36

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) ....................................................................................................11, 12

*In re Nexium (Esomeprazole) Antitrust Litig.*,
296 F.R.D. 47 (D. Mass. 2013)................................................................................................19

*In re Northrop Grumman Corp. ERISA Litig.*,
No. 06-06213-MMM, 2011 U.S. Dist. LEXIS 94451 (C.D. Cal. Mar. 29,
2011) ........................................................................................................................................33

*In re Pharm. Indus. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005)................................................................................................29

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .................................................................................................35

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
No. 1:12-md-02343, 2014 U.S. Dist. LEXIS 66707 (E.D. Tenn. May 15,
2014) .................................................................................................................15, 16, 17, 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-md-1827, 2012 U.S Dist. LEXIS 182374 (N.D. Cal. Dec. 26, 2012)....................15

*In re Vitamins Antitrust Litig.*,
2001 U.S. Dist. LEXIS 12114 (D.D.C. July 2, 2001)............................................................16

*In re Wellbutrin XL Antitrust Litig.*,
No. 08-cv-2431, 2011 U.S. Dist. LEXIS 90075 (E.D. Pa. Aug. 11, 2011) ...........................18

*J.B.D.L Corp. v. Wyeth-Ayerst Labs., Inc.*,
No. 1:01-cv-00704, 2005 U.S. Dist. LEXIS 11676 (S.D. Ohio June 13, 2005)...............36, 42

*Kansas v. Utilicorp United, Inc.*,
   497 U.S. 199 (1990) ..................................................................................................14

*King Drug Co. of Florence, Inc. v. Cephalon Inc.*,
   No. 2:06-cv-1797, 2017 U.S. Dist. LEXIS 137601 (E.D. Pa. Aug. 28, 2017) ............... passim

*Legrand v. New York City Transit Auth.*,
   No. 95-cv-0333 (JG), 1999 WL 342286 (E.D.N.Y. May 26, 1999) ......................................27

*Lindsey v. Normet*,
   405 U.S. 56 (1972) ....................................................................................................49

*Martin v. Ford Motor Co.*,
   292 F.R.D. 252 (E.D. Pa. 2013) ..................................................................................48

*Martins v. 3PD, Inc.*,
   No. 11-cv-11313, 2013 WL 1320454 (D. Mass. Mar. 28, 2013) ...........................................48

*Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*,
   362 F. App'x 332 (3d Cir. 2010) ..................................................................................37

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*,
   596 F.2d 573 (3d Cir. 1979) ...............................................................................15, 16

*Mullis v. Mt. State Univ., Inc.*,
   No. 12-03158, 2014 U.S. Dist. LEXIS 40686 (S.D.W. Va. Mar. 27, 2014) ..........................27

*Pagan v. The New Wilson's Meats, Inc.*,
   No. 08-cv-0751, 2011 WL 1876027 (E.D. Pa. May 17, 2011) ..............................................27

*Plotnick v. Comput. Scis. Corp. Deferred Comp. Plan*,
   182 F. Supp. 3d 573 (E.D. Va. 2016) ......................................................................29, 49

*Rochester Drug Co-op Inc. v. Unimed Pharms. Inc.* (*In re Androgel Antitrust
   Litig.*),
   2018 U.S. Dist. LEXIS 117760 (N.D. Ga. July 31, 2018)
   ...................................................................................................1, 12, 13, 22

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc*,
   No. 04-5898, 2010 U.S. Dist. LEXIS 105646 (E.D. Pa. Sept. 30, 2010) ...............................35

*United States v. Medtronic, Inc.*,
   189 F. Supp. 3d 259 (D. Mass 2016) .............................................................................14

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ...................................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ............................................................................................4, 10, 11, 49

*Weikel v. Tower Semiconductor, Ltd.*,
   183 F.R.D. 377 (D.N.J. 1998) ...............................................................................................33

*Weisman v. Darneille*,
   78 F.R.D. 669 (S.D.N.Y. 1978) ............................................................................................32

## STATUTES AND RULES

Clayton Act § 4 .....................................................................................................................14

Fed. R. Civ. P. 23 ........................................................................................................... passim

Fed. R. Civ. P. 26(b)(2)(C)(i) ...............................................................................................25

## MISCELLANEOUS

5 James Wm. Moore et al., Moore's Federal Practice § 23.24 ....................................................28

## INTRODUCTION

Plaintiff Ahold—the retailer that is attempting to represent a class of wholesalers—has not and cannot show that a direct purchaser class should be certified. Most importantly, (1) the proposed class is not numerous; (2) class-wide injury-in-fact/impact (i.e., whether each member of the class paid more than it would have absent the challenged conduct), a required element in antitrust cases (*Asacol*, *Nexium*), cannot be proved by class-wide evidence; and (3) Ahold's claims are not typical of the class, making Ahold an inadequate class representative.

***Lack of numerosity.*** Most fundamentally, Ahold's proposed class is not numerous— only 16 entities at most can establish standing and even claim to have suffered antitrust impact. A recent string of pharmaceutical antitrust cases rejecting certification of nearly identical classes of companies makes clear that joinder of so few direct purchaser class members "would not be impracticable." *In re Androgel Antitrust Litig.*, No. 1:09-md-02084, 2018 U.S. Dist. LEXIS 117760, at *28–29 (N.D. Ga. July 16, 2018) (denying certification of proposed 33-member class); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797, 2017 U.S. Dist. LEXIS 137601 (E.D. Pa. Aug. 28, 2017) ("*Provigil*") (denying certification of 24–25 member class after remand in *In re Modafinil*); *see also In re Modafinil Antitrust Litig.*, 837 F.3d 238, 242 (3d Cir. 2016) (reversing class certification and remanding for consideration of numerosity and joinder). Nor can there be any claim that any of these 16 entities lack the wherewithal to bring suit in their own right.

Aware of this fatal flaw on numerosity, Plaintiff Ahold baldly claims 48 potential class members. But the data from Plaintiff's own expert, Dr. Jeffrey Leitzinger confirms that 27 of those entities are not class members. Most (21 generic-only purchasers) lack standing or cannot show antitrust impact because they did not purchase directly from Defendants—and thus are

1

barred by the *Illinois Brick* rule, binding Supreme Court precedent making clear that only direct purchasers may sue for damages under the federal antitrust laws. *See infra* § I.A.1. Another six brand-only purchasers never purchased generic Loestrin 24, and thus have no claim of harm from the alleged delay of a product they did not purchase when it became available. *See infra* § I.A.2. And as to another five proposed class members, Ahold ignores that these companies were acquired by other class members and, as such, should be counted with their respective corporate parents, as Plaintiff did for other merged entities. *See infra* § I.A.3. The class thus numbers no more than 16—far below what courts find necessary to meet Rule 23(a)'s numerosity requirement—typically 40 or more. Moreover, these 16 companies are perfectly capable of proceeding without a class action—many boast annual revenues of billions or hundreds of millions of dollars and routinely litigate in federal court. And in *Provigil*, where the Court declined to certify a class of 24 or 25 direct purchasers, the litigation has proceeded as a consolidated action by 18 of the companies. *See infra* § I.A.4.

***No classwide method to establish antitrust injury-in-fact/impact***. Although Ahold's failure to satisfy the numerosity requirement of Rule 23(a) is itself enough to defeat class certification here, certification fails for the independent reason that the individualized inquiry required to address injury-in-fact/impact will predominate over common issues such that class treatment would not be the superior method of adjudication. *See infra* § II. Just this week, the First Circuit rejected class certification in a "product hopping"/"delayed generic entry" case like this one and emphasized the need for class-wide proof of injury, holding that "[p]roof of injury, also called 'injury-in-fact,' is a required element of a plaintiff's case." *In re Asacol Antitrust Litig.*, No. 18-1065, 2018 U.S. App. LEXIS 28920, at *19 (1st Cir. Oct. 15, 2018) (citing *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008)). And

the First Circuit directed that "at the time of certification," the court must "offer a reasonable and workable plan for how" defendants will be provided an "opportunity to press at trial genuine challenges to allegations of injury-in-fact." *Id.* at *37. That opportunity must be "in a manner that is protective of the defendant's constitutional rights and *does not cause individual inquiries to overwhelm common issues*." *Id.* at *37 (emphasis added).

Here, the necessary individualized inquiry regarding injury-in-fact would overwhelm the common issues. Individualized inquiry would be required for at least 56% (27 out of 48) of the proposed class. For example, as explained below (*see infra* § II.A.2), Ahold's expert Dr. Leitzinger[1] assumes that class members that only purchased generic versions of Loestrin 24 (the 21 generic-only purchasers) would have paid less in the scenarios where Defendants had not engaged in the challenged conduct (the so-called "but-for world"). But Dr. Leitzinger failed to test that assumption against the actual purchase data in this case. In fact, the actual purchase data directly contradicts Dr. Leitzinger's assumption, revealing that generic prices did not decline in lockstep with additional generic competition. It is assumptions of just this kind that the First Circuit warned against in *Asacol*.

Similarly, Dr. Leitzinger assumes that purchasers that only ever bought branded versions of Loestrin and Minastrin (the six brand-only purchasers) would have substituted at least *some* lower priced generic Loestrin 24 in the but-for world had generic Loestrin launched earlier. *See infra* § II.A.3. This assumption again ignores the facts, which show that these brand loyal purchasers *never* purchased generic Loestrin 24 after it came to market in 2014. This is not

---

[1] Defendants have separately moved to exclude Dr. Leitzinger's opinions for the reasons discussed in the Defendants' Memorandum of Law in Support of Motion to Exclude the Opinions and Testimony of Direct Purchaser Plaintiff's Expert Jeffrey J. Leitzinger, filed contemporaneously.

surprising—it is likely the customers of these wholesalers preferred to purchase generic products directly from the manufacturer, which is common in the industry.

Like the plaintiffs in *Asacol*, Ahold here has not enabled the Court to articulate an approach that would protect Defendants' constitutional rights—Defendants intend to challenge each class member's ability to show injury. *See Asacol*, 2018 U.S. App. LEXIS 28920, at *36-37 (citing *New Motor Vehicles*, 522 F.3d at 20); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (requiring plaintiff to show that the type of injury alleged is amenable to common, class-wide proof). The fact that such individualized challenges will be required as to at least 56% of the proposed class makes clear that individualized inquiries would swamp common ones, in violation of the principles reiterated in *Asacol*. *See infra* § II.A.

***The retailer Ahold is neither "typical" nor adequate as a class representative***. Plaintiff Ahold fails to "affirmatively demonstrate . . . compliance" with the typicality and adequacy elements of Rule 23. *Dukes*, 564 U.S. at 350; *see also infra* §§ I.B, I.C. An artificial plaintiff like retailer assignee Ahold—which operates a chain of supermarkets—is not adequate as the sole representative for this putative direct purchaser class of *drug wholesalers*, and Ahold's claims certainly are not typical of the class. For example, Ahold never purchased any product at issue in this case directly from Defendants and, thus, has no personal knowledge of, or experience with, the direct purchasing of Loestrin 24 or Minastrin from Defendants. Ahold bought branded Loestrin 24 and Minastrin from wholesaler McKesson, and never dealt directly with Warner Chilcott. Ahold never bought any generic Loestrin 24 or Minastrin product from Watson—it purchased generic Loestrin 24 only from Amneal, a non-defendant.

Further, because Ahold has no direct purchases of Minastrin, Ahold has no stake in the product hop allegations. *See infra* § I.C.1. In contrast, other putative class members would wish

4

to establish overcharges on their Minastrin purchases, thus making Ahold plainly inadequate to represent such class members. Similarly, Ahold seeks damages as to Loestrin 24 solely based on an assignment from its wholesaler McKesson, but this ███████████████████████, which puts Ahold at odds with class members that have an interest in the ████████████ of the proposed class period, which starts in September 2009. *Id.* Defendants are unaware of any case in the pharmaceutical industry where the sole proposed class representative faced such unique challenges and was so dissimilar to the vast majority of the putative class, especially where, as here, there are so few class members that individual claims are more than feasible.

For these and additional reasons addressed below, Plaintiff has failed to meet its burden to establish that class certification is appropriate under Rule 23, and the Court should deny Plaintiff's Motion for Class Certification.

## FACTS

### A.   Sole Class Representative Ahold Is a Retailer—Not Wholesaler—With No Direct Purchases from Defendants

Ahold USA, Inc. ("Ahold" or "Plaintiff") is the sole proposed class representative.[2] Ahold is the United States subsidiary of a Dutch grocery conglomerate that operates supermarket chains across the United States (including Stop & Shop, Food Lion, and Giant), as well as the delivery service Peapod. Some of Ahold's supermarket stores include pharmacies.[3] Ahold seeks to represent, not a class of supermarkets nor a class of pharmacies, but rather a class comprised of "direct purchasers," i.e., entities that directly purchased Loestrin 24 or Minastrin from Defendants, or generic Loestrin 24 from non-defendant Amneal—in short, retailer Ahold seeks

---

[2] Rochester Drug Co-Operative, Inc. ("RDC"), a drug wholesaler, recently withdrew as a proposed class representative. ECF No. 559.

[3] *See* Ahold Delhaize, Ahold USA, https://www.aholddelhaize.com/en/home/ (last visited Oct. 15, 2018).

to represent a class of *wholesalers*.  Direct Purchaser Class Pls.' Mem. of Law in Supp. of Mot.

for Class Certification at 4 (July 30, 2018), ECF No. 518-1 ("Mem."). █████



Ex. 1, Expert Rep. of

Pierre-Yves Cremieux ¶ 60, dated Oct. 19, 2018 ("Cremieux Rep.").  Nor did Ahold make direct

purchases of *generic* Loestrin 24 from Defendants during the alleged damages period, which for

purchases of generic Loestrin 24 ends on June 3, 2015.  Cremieux Rep. ¶ 61; Mem. at 4; Ex. 2,

Deposition of Dr. Jeffrey Leitzinger 178:1-14 (███████████████████████)

("Leitzinger Dep. Tr.").

### B.   Retailer Ahold Claims to Be a Class Member Based on a Partial Assignment and Purchases from a Non-Defendant

Ahold claims to be a class member by virtue of a partial assignment of claims from its

wholesaler, McKesson.  As discussed below, McKesson, one of the largest companies in

America, is a member of the putative class as well, but apparently has elected not to bring a suit

of its own.

The assignment term commences ████████████ after the start of the alleged

class period.  *See* Ex. 3, Direct Purchaser Class Pls.' Am. Resps. & Objs. To Defs.' First Set of

Interrogs. at 44 (identifying ASC-025652 and ASC-025654); Ex. 4 at ASC-025652; Ex. 5 at

ASC-025654.



████   Ex. 4 at ASC-025652; Ex. 5 at ASC-025654.

Ahold also claims class membership based on limited purchases of generic Loestrin 24

from the generic manufacturer Amneal.  Direct Purchaser Pls.' Third Am. Consol. Class Action

Compl. & Jury Demand ¶ 16 (Mar. 30, 2018), ECF No. 380-01 ("Compl."). But Amneal is not a defendant, which means Ahold never purchased generic Loestrin 24 directly from Defendants during the alleged damages period.

### C. The Big Three Wholesalers Dominate the Proposed Class of Wholesalers— They Purchased ███ of All Loestrin 24

The Big Three wholesalers, AmerisourceBergen, Cardinal, and McKesson collectively account for *more than* ███ *of the alleged class purchases* of Loestrin 24, Minastrin, and generic Loestrin 24. Cremieux Rep. Ex. 4a. The Big Three wholesalers have a combined annual revenue in 2017 of over $510 billion (McKesson $209.9 billion, AmerisourceBergen $163.8 billion, Cardinal $136.8 billion). *See* Cremieux Ex. 14; Appendix A. Aside from retailer Ahold, each of the remaining class members in the group of 16 that may be potentially viable class members is a wholesaler. Cremieux Ex. 9b. The smallest wholesaler has $15.7 million in annual revenues. Cremieux Ex. 14; Appendix A.

### D. Neither Plaintiff Nor its Expert, Dr. Leitzinger, Make Any Attempt to Specify a Plausible "But-For" World Consistent with the Evidence

The proposed class seeks to recover for alleged overcharges to class members on purchases of Loestrin 24, Minastrin, and generic Loestrin 24. Plaintiff's theory of injury-in-fact/impact and damages is based on several hypothesized "but-for" worlds—that is, scenarios describing the world as it allegedly would have existed absent (i.e., "but-for") the challenged conduct. Plaintiff's identify four baseline "but-for" worlds which have a number of features in common: (1) Watson launching a generic version of Loestrin 24 no later than September 1, 2009, the date Watson actually received FDA approval for its generic; (2) Warner Chilcott launching an authorized generic ("AG") version of Loestrin 24 on the same date in 2009; and (3) ███████

███████████████████████████████████████████████████

███████████████. Decl. of Jeffrey J. Leitzinger, Ph.D. ¶ 26 (July 30, 2018), ECF No. 518-3

("Leitzinger Rep."); *see also* Mem. at 17-18; Compl. ¶¶ 15, 331. ███████████████



███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ █

      ███████████████████████████████████████████████████

█████████████████████████████████████ ████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████  ████████████████████████████████████████████████████

████████████████████████████████ absent the challenged January 9, 2009 patent

litigation settlement with Watson, Warner Chilcott would have secured FDA approval for its

pending Minastrin New Drug Application ("NDA") shortly thereafter and launched Minastrin in

2009 rather than waiting until 2013—a scenario that would complicate the simplistic injury-in-

fact story Plaintiff seeks to present.

---

[4] █████████████████████████████████████████████████████████████
███████████████████████████████████████████████

[5] █████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████

██████████████████████████████████████

████████████████████████████████████████ *Id.* at 56:19-57:2.  As

Ahold admits, by January 2009, Warner Chilcott's May 20, 2008 Minastrin NDA, was mere

"months away from expected FDA approval."  Compl. ¶ 289.  The FDA took only about 10

months to approve the resubmitted July 2012 NDA for Minastrin.[6]  Thus, by Plaintiff's own

reckoning ██████████████████████ Warner Chilcott readily could have obtained approval

for Minastrin in the first quarter of 2009, ahead of Dr Leitzinger's assumed September 2009

launch date for Watson's generic Loestrin 24.

Moreover, both Ahold and Dr. Leitzinger ignore evidence that Warner Chilcott had every

incentive in Ahold's but-for world to launch Minastrin, given that it would have the same three

years of regulatory exclusivity for Minastrin that it received in the actual world,[8] and that Warner

Chilcott planned all along to launch Minastrin as soon as possible if it was unable to settle the

patent litigation with Watson.[9]  Yet neither Plaintiff nor Dr. Leitzinger offer any evidence—

---

[6] Ten months from July 2012 NDA submission to May 2013 approval.  Compl. ¶ 258 (alleging that the final Minastrin NDA was submitted on July 9, 2012, and approved ten months later, on May 8, 2013).

[7] ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

[8] DPPs admit that Minastrin was entitled to this three year period of regulatory exclusivity.  Compl. ¶ 288. And there is no doubt that Warner Chilcott would have sought this exclusivity.  Ex. 6, deVries (Warner Chilcott) Dep. Tr. 47:16–48:11 (Warner Chilcott always sought product exclusivity, either through patent or regulatory means).

[9] *See, e.g.*, Ex. 7, McClenaghan (Warner Chilcott) Dep. Tr. 46:5–47:9; 113:6–17 (Warner Chilcott prepared to launch chewable product in order to better position it to compete once generics launched); Ex. 6, deVries (Warner Chilcott) Dep. Tr. 52:11–53:4 (Warner Chilcott emphasized developing innovative products and bringing them to market as soon as possible); Ex. 8, Reichel (Warner Chilcott) Dep. Tr. 211:18–213:4 (describing contraceptive market and explaining chewable product was viewed as innovative approach to distinguishing a product in a market with a "lot of choices"); ████████████████

indeed, they do not even offer a theory—suggesting that, absent the settlement with Watson, Warner Chilcott would somehow have failed to obtain FDA approval and thus been unable to launch Minastrin by about March 2009, well before the FDA approved Watson's Loestrin 24 ANDA.

Nor does Dr. Leitzinger explain why, even if generic versions of Loestrin 24 had entered in 2009 ahead of a Minastrin approval and launch, Warner Chilcott would have abandoned the new chewable Minastrin product in which it had invested resources to develop. Warner Chilcott previously had succeeded with chewable formulations (such as Femcon) and new dosing regimens for oral contraceptive products (such as Loestrin 24 itself), even in the face of generic competition.[10] Plaintiff ignores this evidence.

## **ARGUMENT**

The Supreme Court has repeatedly warned that class actions under Rule 23 are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Dukes*, 564 U.S. at 350 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). Rule 23 "imposes stringent requirements for certification that in practice exclude most claims," even those brought under the antitrust laws. *Am. Express Co. v. Italian Colors Rest.*,

---

[10] Warner Chilcott launched its 24-day pill Loestrin 24 after generic versions of its 21-day version of Loestrin 1/20 entered the market. *See* Drugs@FDA, Barr's ANDA for generic Loestrin 1/20 approved May 2003 (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&App lNo=076380). Warner Chilcott's Femcon oral contraceptive chewable Ovcon, increased its sales even after market entry of generic Ovcon and during a period when the market was trending to products with lower estrogen dosing than Femcon's 35 micrograms. *See, e.g.,* Warner Chilcott, 2010 Form 10-K, at 64, 71 (showing 2008-2010 sales for Femcon); Ex. 10, Herendeen (Warner Chilcott) Dep. Tr. 323:13–324:6 ("I mean, the trend in oral contraceptives was to low – to lower the exposure to an exogenous estrogen, and so the trend was from 100 to 50s to 35 to 30 to 20, to ultimately 10. . . We featured the fact that it was – when it was Loestrin 24, we featured the fact that it was a 20 microgram product, of course, and then ultimately with the introduction of LoLo, we featured the fact that it was the lowest available – the oral contraceptive with the lowest available amount of estrogen.").

570 U.S. 228, 234 (2013).   A court may not "relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims" involve antitrust violations.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321–22 (3d Cir. 2008).

Under Rule 23(a), DPPs are required to establish numerosity, commonality, typicality, and adequacy.  In addition, DPPs must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods" for resolving this dispute.  Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard."  *Dukes*, 564 U.S. at 350.  Rather, the Plaintiff "must affirmatively demonstrate [its] compliance with the Rule."  *Id.*  Accordingly, Plaintiff has the burden of proving Rule 23's requirements by a preponderance of the evidence. *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015).  In turn, this Court must conduct a "rigorous analysis" to determine whether Plaintiff has met its burden through "evidentiary proof."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Where Plaintiff's proof consists of expert opinion, the Court must "judg[e the] persuasiveness of the evidence presented," and cannot simply "end its analysis" if it finds that the evidence is admissible.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).  Moreover, the Court must determine whether Ahold has satisfied its burden under Rule 23, "even when that requires inquiry into the merits of the claim."  *Comcast*, 569 U.S. at 35.

## I.   PLAINTIFF HAS NOT ESTABLISHED THE REQUIREMENTS OF RULE 23(a)

### A.   With No More Than 16 Members, Plaintiff's Proposed Class Falls Far Short of Meeting Rule 23(a)(1)'s Numerosity Requirement

To satisfy numerosity, Plaintiff Ahold must show that the "class is so numerous that joinder of all [class] members would be impracticable."  Fed. R. Civ. P. 23(a)(1).  The analysis starts with the number of proposed class members.  *Modafinil*, 837 F.3d at 250.  In general,

11

classes of more than 40 members often satisfy numerosity, particularly where the proposed class member are unlikely to be able to commence actions in their own right. *See Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009). For classes with fewer than 21 members, courts typically find that numerosity has not been satisfied. *See Modafinil*, 837 F.3d at 250 (finding that class of "20 or fewer" members "is usually insufficiently numerous"); *see also Bivens v. Crowell*, 138 F.R.D. 18, 19–20 (D.N.H. 1990) (indicating "a very small class may not meet the numerosity requirement because joinder of all members is practicable" and refusing to certify class of 10 members) (citing *Andrews v. Bechtel Power Corp.*, 790 F.2d 124, 131–132 (1st Cir. 1985)). Where the class is between 21 and 40 members, courts evaluate multiple factors to determine whether plaintiffs have shown it would be "uneconomical" for the proposed class members to be "individually joined as parties in a traditional lawsuit." *Modafinil*, 837 F.3d at 252–53, 259 (identifying factors affecting whether joinder is impracticable); *Androgel*, 2018 U.S. Dist. LEXIS 117760, at *24–25 (assessing factors in practicability of joinder analysis).

Plaintiff Ahold can muster at most 16 potentially viable class members here—its claim of a 48-member class is inflated. *Infra* §§ II.A.1–II.A.3. More than half of Ahold's proposed class (27 proposed members) must be excluded for lack of standing and/or lack of any plausible claim of injury-in-fact/impact. *Infra* §§ I.A.1.–I.A.2 Five must be consolidated for the joinder analysis as they are no longer stand-alone companies, but are corporate affiliates of other class members. *Infra* § I.A.3. No court has *ever* certified a class of only 16 members in a case alleging delayed generic pharmaceutical entry. Notably, fewer than half of the cases Plaintiff cites, Mem. at 2 n.2, 22 n.87, even involve a contested motion for class certification, and of those the smallest approved class is *Nexium* with 24–29 members. *Id.* at 22 n.87.

Moreover, joinder is practicable here for the same reasons as in *Androgel* and *Provigil*, two recent cases involving similar claims (delayed generic entry) in which the courts refused to certify even larger proposed classes—consisting of many of the same members involved here. *E.g.*, *Androgel*, 2018 U.S. Dist. LEXIS 117760, at *28–29 (denying certification of proposed 33-member class); *Provigil*, 2017 U.S. Dist. LEXIS 137601, at *25–40 (denying certification of proposed class of 24–25).

      1.      **Plaintiff's Proposed Class Impermissibly Includes 21 Generic-Only Purchasers that Lack Standing Because They Never Made Any Purchases from Defendants**

Incredibly, although Ahold's claim is based on the notion that direct purchasers of Loestrin 24 and Minastrin were "overcharged" because (Ahold says) cheaper generic versions should have been available sooner (Compl. ¶¶ 15, 337), Ahold includes in its proposed class 21 companies that ***never*** directly purchased branded Loestrin 24 or Minastrin in the class period. Cremieux Rep. ¶ 10.  Instead, these 21 companies purchased the generic version of Loestrin 24 from a *non-defendant* generic manufacturer, Amneal.[11]  These 21 generic-only purchasers are disqualified by *Illinois Brick*, where the Supreme Court established a bright-line rule that only direct purchasers from antitrust defendants could sue for damages under the federal antitrust laws.  *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977) ("[W]e decline to abandon the construction given . . . in *Hanover Shoe* – that the overcharged direct purchaser, and not others in

---

[11] The 21 Amneal-only generic purchasers are:



Cremieux Rep. Ex. 11b; *see also* Appendix A.

Ahold also fits this Amneal-only generic purchaser category but is not included among the 21 entities to be excluded because of its limited assignment from McKesson as to certain branded purchases.

the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of the section."); *Del. Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120–21 (9th Cir. 2008) (noting that *Illinois Brick* established "a bright line rule . . . [that] only direct purchasers have standing under § 4 of the Clayton Act to seek damages for antitrust violations"); *see also Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207 (1990) (plaintiffs were "indirect purchasers" because "they are not the immediate buyers from the alleged antitrust violators"). These 21 Amneal-only generic purchasers are not "immediate buyers" from Defendants. They thus do not have standing to pursue a claim for damages and must be excluded from the proposed class.

Ahold buries in a footnote the bare suggestion that the 21 Amneal-only generic purchasers somehow qualify as class members because Amneal obtained from Defendant Watson the rights to and ownership of Watson's generic version of Loestrin 24 after the FTC required Watson to divest the product to third-party Amneal as a condition of the Actavis-Warner Chilcott merger in 2013. Mem. at 5 n.6; Decision & Order, *In re Actavis, Inc.*, FTC File No. C-4414, https://www.ftc.gov/sites/default/files/documents/cases/130927actavisdo.pdf (requiring divestiture of rights to generic Loestrin 24 to Amneal). But neither *Illinois Brick* nor its progeny contain an exception allowing the 21 Amneal-only generic purchasers to deem themselves purchasers from Watson,[12] and Plaintiff cites no authority support this proposition. This failure is reason alone to exclude this category of proposed class members. *See, e.g.*, *United States v. Medtronic, Inc.*, 189 F. Supp. 3d 259, 282 (D. Mass 2016) ("Generally

---

[12] The only possible exceptions to the *Illinois Brick* rule recognized by the Supreme Court are the cost-plus exception and the owner/controller exception. *Ill. Brick Co v. Illinois*, 431 U.S. 720, 736, 736 n.6 (1977); *see also Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 217 (1990) (citing *Ill. Brick* and *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968)). Ahold does not even attempt to claim that either applies to the 21 Amneal-only generic purchasers.

'arguments raised only in a footnote or in a perfunctory manner are waived.'" (quoting *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n.17 (1st Cir. 1999)).

If Plaintiff invokes (for the first time on reply) a theory of "umbrella damages" to justify including the 21 Amneal-only generic purchasers, that effort fails as well because that theory has been rejected.[13]   Such damages claims have been rejected by "the overwhelming majority of recent court decisions," including in the pharmaceutical context.  *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-md-02343, 2014 U.S. Dist. LEXIS 66707, at *33 (E.D. Tenn. May 15, 2014) ("[T]he overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory . . . have rejected 'umbrella' claims.") (quoting *In re Vitamins Antitrust Litig.*, MDL No. 1285, 2001 U.S. Dist. LEXIS 12114, at *27–29 (D.D.C. July 2, 2001) (rejecting umbrella claims because they rest on causal connection "necessarily attenuated by significant intervening factors, such as independent pricing decisions of the nonconspiring suppliers")); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2012 U.S Dist. LEXIS 182374, at *60–61 (N.D. Cal. Dec. 26, 2012) (recognizing that "most federal courts in recent years" have rejected umbrella damages claims); *see also Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 585–87 (3d Cir. 1979) (adopting bright line rule denying standing to purchasers from "competitors of the defendants").

---

[13] An "umbrella damages" claim seeks damages not for purchases from antitrust defendants, but instead for purchases of different products from non-defendants, on the theory that defendants' conduct created a pricing "umbrella" that allowed other sellers (in this case, non-defendant generic manufacturer Amneal) to charge higher prices as well.  *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1338–39 (9th Cir. 1982) (umbrella theory attempts to hold antitrust defendants "liable for harm allegedly flowing from the illegal conduct even though the . . . defendants received none of the illegal gains and were uninvolved in their competitors' pricing decisions"), *cert. denied*, 464 U.S. 1068 (1984).

Antitrust decisions reject "umbrella" liability because the alleged injury is too remote and indirect, and the damages sought are "highly conjectural" such that "it cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from" a non-defendant manufacturer were injured. *Mid-West Paper,* 596 F.2d at 584; *Skelaxin*, 2014 U.S. Dist. LEXIS 66707, at *35-36 (examining pricing decisions of non-conspirators in case alleging delayed generic entry "introduces the same level of uncertainty and complexity that courts have rejected in similar 'umbrella' cases"); *In re Vitamins Antitrust Litig*., 2001 U.S. Dist. LEXIS 12114, *20–21; ABA Section of Antitrust Law, Proving Antitrust Damages: Legal & Economic Issues 226-31 (2d. ed. 2010); Cremieux Rep. ¶ 51 n.71.

Here, among other things, the pricing decisions of companies other than Defendants, about products other than Loestrin 24 and Minastrin, as well as the purchasing decisions by wholesalers and retailers that did not purchase directly from Defendants, would have to be examined. Cremieux Rep. ¶ 51. But that is the very type of inquiry into decisions of remote third-parties courts have rejected as too speculative. *See, e.g.*, *Skelaxin*, 2014 U.S. Dist. LEXIS 66707, at *36 (rejecting damage claim based on pricing decisions of non-conspirators in generic delay case as "too speculative"); *see also Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537–45 (1983) (setting forth factors to be considered in assessing standing).

Courts specifically have declined to extend standing to purchasers from non-defendants in pharmaceutical cases involving alleged market manipulation or delayed generic entry. *See, e.g.*, *Skelaxin*, 2014 U.S. Dist. LEXIS 66707, at *35–36; *FTC v. Mylan Labs, Inc.*, 62 F. Supp.

2d 25, 39 (D.D.C. 1999).[14]   As the *Skelaxin* court explained, nothing about pharmaceutical antitrust cases warrants creating an exception to the rule that only purchasers from defendants have standing.   2014 U.S. Dist. LEXIS 66707, at *40–41 (noting that in such cases harm to generic-only purchasers "was clearly never intended to be caused" since the defendants allegedly "sought to preclude generic competitors from reaching market entirely," and finding that this factor made the connection between defendants' acts and any purported harm to generic purchasers even more attenuated); *Mylan Labs,* 62 F. Supp. 2d at 39 (rejecting monopolization claims against pharmaceutical manufacturer based on purchasers from non-party competitors as unacceptably complex given many variables competitors would consider in deciding how to price their products, "including the cost of production, marketing strategy, elasticity of demand, and the price of comparable items").

      **2.**      **The Six Brand-Only Purchasers Should Be Excluded from the Class Because There Is No Proof They Would Have Purchased a Generic Version of the Branded Product**

Six additional purported class members should be excluded because they are "brand-only" purchasers, that is, they ***only*** purchased Loestrin 24 and/or Minastrin and ***never*** purchased any generic version of Loestrin 24, despite its availability for many years during the class period. Cremieux Rep. ¶ 57.[15]   But, as noted, Plaintiff's entire theory of harm is based on the idea that class members were denied an opportunity to purchase generic Loestrin 24 sooner.   Where, as

---

[14] *In re Namenda Direct Purchaser Antitrust Litigation.*, No. 15-cv-07488, 2018 U.S. Dist. LEXIS 140768 (S.D.N.Y. Aug. 16, 2018) is an outlier and its cursory discussion is entitled to little weight because the court relied almost entirely on an inapposite decision that exclusively involved direct purchases from the defendants.   *Id.* at *121-23 (citing *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009)); *see also DDAVP*, 585 F.3d at 682 (explaining that plaintiffs were solely direct purchasers of defendants' branded drug).

[15] The ▮ brand-only purchasers are: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Cremieux Rep. Ex. 11b; *see also* Appendix A.

here, these entities never purchased the generic, even after it became available, there is no basis to infer they would have done so had the generic come to market sooner.  In short, Plaintiff's theory of harm as to these entities is rank speculation.  Cremieux Rep. ¶¶ 56-58.  Further, Dr. Cremieux explains that economic factors influence wholesaler stocking decisions and that wholesalers may decide against carrying generic versions because—in a classic example of cutting out the middle man—"generic manufacturers often deal directly with pharmacies." Cremieux Rep. ¶ 56.  Plaintiffs have failed to show with evidence common to the class that brand-only purchasers would have purchased cheaper generic Loestrin 24 in place of more expensive branded Loestrin 24 or Minastrin in the "but-for" world.  *See In re Asacol Antitrust Litig.*, 2018 U.S. App. LEXIS 28920, at *19, *26, *36–37 (1st Cir. Oct. 15, 2018) (holding "a class cannot be certified" where questions regarding injury for more than a *de minimis* amount of class members requires individualized inquiries and the court, at the time of certification, cannot offer a reasonable plan for how defendants will be provided an opportunity at trial to challenge allegations of injury-in-fact).

Courts routinely exclude "brand-only" purchasers from direct purchaser classes in cases alleging delayed generic entry because an individualized inquiry would be required to determine whether such purchasers would have replaced their brand purchases with cheaper generic purchases had the generic been available sooner.  *See, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, No. 08-2431, 2011 U.S. Dist. LEXIS 90075, at *40–41 (E.D. Pa. Aug. 11, 2011) (excluding brand-only purchasers because determination of their antitrust injury-in-fact/impact "would require individual analysis" rather than "class-wide evidence" due to their refusal to purchase the generic after it became available); *In re K-Dur Antitrust Litig.*, No. 01-1652, 2008 U.S. Dist. LEXIS 118396, at *70 (D.N.J. Apr. 14, 2008) (excluding brand-only purchasers), *aff'd* 686 F.3d

197, 220 n.13 (3d Cir. 2012); *see also In re Neurontin Antitrust Litig.*, No. MDL No. 1479, 2011

U.S. Dist. LEXIS 7453, at *33-38 (D.N.J. Jan. 25, 2011) (requiring plaintiffs to remove from the

proposed class entities that had not purchased both the branded drug and its generic equivalent).

The same result is warranted here.

### 3. Five Additional Entities Should Be Considered Together with Their Corporate Parents to Avoid Subverting the Numerosity Analysis

In an attempt to artificially inflate their class total, Ahold counts members of the same

corporate family as separate class members. But there is no legitimate basis in the numerosity

analysis to count these affiliates separately; they should be considered together. *See In re*

*Nexium (Esomeprazole) Antitrust Litig.,* 296 F.R.D. 47, 51 (D. Mass. 2013) (consolidating

subsidiaries with their parents for numerosity analysis). Here, nine of the proposed class

members are owned by other potential class members; four of the nine already should be

excluded for reasons discussed above (either generic-only or brand-only purchasers), leaving five

to be consolidated for the numerosity analysis with their corporate affiliates.[16] Recognizing this

principle. Plaintiff already grouped together four other sets of corporate affiliates[17] but offer no

---



[16]

*See* Appendix A.

[17]

explanation for stopping there and not grouping together the remaining sets of affiliates, at least for purposes of considering the practicability of joinder.

To be clear, Defendants are ***not*** asserting that affiliated companies cannot sue separately to vindicate their respective rights or recover their respective damages.  However, under Rule 23(a)(1), Plaintiff bears the burden of showing that "joinder . . . is impracticable."  Fed. R. Civ. P. 23(a)(1).  Common sense, informed by common practice in this and other multi-district litigations, leave little doubt that members of a single corporate family with antirust claims based on the same alleged conduct would sue together—or as a practical matter would be able to join together in a suit.  More importantly, Plaintiff offers no evidence to suggest that in this case members of the same corporate family would be unlikely to litigate together through joinder or that it would be impracticable for them to do so.  Accordingly, affiliated class members should not be double-counted for purposes of the numerosity analysis.

### 4.     Plaintiff Cannot Establish that Joinder Is Impracticable

Plaintiffs seeking class certification bear the burden of showing that joinder is impracticable.  *Modafinil*, 837 F.3d at 248; *Howard's Rexall Stores, Inc. v. Aetna United State Healthcare*, No 00-cv-00031, 2001 U.S. Dist. LEXIS 6029, at *17–18 (D. Me. May 8, 2001).  The joinder analysis focuses on whether plaintiffs have shown it would be "uneconomical" for the proposed class members to be "individually joined as parties in a traditional lawsuit."  *In re Modafinil*, 837 F.3d at 259.  By the terms of Rule 23(a)(1), the Court focuses on the practicality of joinder in a single proceeding, not separate actions.  *See, e.g., Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 132 (1st Cir. 1985) (focusing on whether plaintiffs could "join or be joined in a suit of named parties"); *Modafinil*, 837 F.3d at 256 n.16 ("Rule 23(a)(1) envisions only two scenarios: joinder of all class members or a class action." (citation omitted)).

20

As discussed above, proposed classes of fewer than 21 members (here, 16) typically fail on numerosity grounds, while the "inquiry into impracticability should be particularly rigorous" for proposed classes with between 21 and 40 members. *Modafinil*, 837 F.3d at 250.   In *Modafinal*, a case claiming delayed generic entry, the Third Circuit recently outlined the factors "appropriate for district courts to consider when determining whether joinder would be impracticable." 837 F.3d at 252–53 (citing 5 Moore's Federal Practice § 23.22, and 5 Newberg on Class Actions § 3.12).   As applied here, each factor is either neutral or weighs against class certification.

*Class members have the ability and motivation to be joined as plaintiffs*.  Plaintiff Ahold provides no support for its bare assertion (Mem. at 21) that "a number of Class members have claims that are not large enough to make an individual suit practicable."   Dr. Leitzinger calculated aggregate damages for the entire proposed class of ███████████████████ ███████████████████████████████████████████████ *See* Leitzinger Dep. Tr. 45:7-13, 45:17-24 (██████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████████████████████).

Such alleged damages would provide more than sufficient motivation for each proposed class member to be joined as plaintiffs.   Under Ahold's view, the Big Three wholesalers likely have ████████████████████████████████████ given their large volume of purchases, which collectively accounts for over ████ of the class purchases.   Cremieux Rep. Ex. 4b (showing total purchases by each putative class member using Dr. Leitzinger's data).   And the 16 adjusted class members purchased more than ████ of the units that Plaintiff claims were

subject to an overcharge and thus likely have substantial treble damages claims.  Cremieux Rep.

Exs. 4a & 4c.

Even the few putative class members with smaller claims would have sufficient incentive

to sue.  The Court in *Provigil*, faced with a motion for class certification for "an analogous class

of 22 direct purchasers" (*see* Mem. at 21 n.86),[18] denied certification on numerosity grounds,

finding that the ability to share costs and obtain legal representation on a contingent fee basis

made joinder practicable even for plaintiffs with smaller claims.  *Provigil*, 2017 U.S. Dist.

LEXIS 137601, at \*36 ("[T]he fact that all class members, even those with such so-called 'small'

claims, would likely be represented on a contingent basis undermines Direct Purchasers' position

that taking on litigate via joinder would necessarily be a losing proposition for such 'small'

claimants.").  More recently, the court in *Androgel* reached the same result for similar reasons.

*Androgel*, 2018 U.S. Dist. LEXIS 117760, at \*27–28 (explaining that "the fact that all class

members, even those with such so-called 'small' claims, would likely be represented on a

contingent basis undermines [the plaintiffs'] position' that litigating via joinder would result in a

negative claim" and that "[a]s joined parties, no individual plaintiff will bear the costs of those

experts completely on their own. Here, the class plaintiffs would very likely sign joint litigation

agreements and hire joint experts, just as the other Plaintiffs in this case have done for years.").

And *Provigil* and *Androgel*'s rejection of the "negative value" argument plaintiffs often

raise even came before the First Circuit in *Asacol* this week cautioned against giving such

---

[18] Indeed, many of the class members in *Provigil* overlap with class members here.  *Compare* King Drug Direct Purchaser Pls.' Status Report Pursuant to the Court's Order of November 30, 2017, *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-01797 (E.D. Pa. Jan. 23, 2018), ECF No. 1081 (indicating the six class representatives intended to proceed with the suit on an individual basis), *and* Order, *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797 (E.D. Pa. June 7, 2018), ECF No. 1106 (granting motion to intervene and join for additional thirteen class members, two of which were part of the AmerisourceBergen corporate family), *with* Leitzinger Rep. Ex. 4 (identifying class members).

arguments weight in these circumstances.  The First Circuit held that even "negative value" suits grant "no license to create a Rule 23(b)(3) class in every negative value case by either altering or reallocating substantive claims or departing from the rules of evidence." *Asacol*, 2008 U.S. App. LEXIS 28920, at \*33.  The First Circuit went on to explain that even in negative value classes "[t]here are other tools available to address the problem of low-value, high-volume claims that pose individual issues of causation." *Id.* (citing FTC suits and other government action as appropriate remedies).

Moreover, the actual experience with joinder of such direct purchasers further underscores that the class action device is unnecessary here.  In *Provigil*, at least eighteen of the direct purchasers (over 70%) chose to proceed through a joint action, after named plaintiffs' counsel "informed all non-named direct purchasers" of the class certification denial as well as the opportunity to join the action and proceed against defendants on a joint basis.[19]  The joiners include the Big Three wholesalers, which likely dominate the damages claim, and a number of purchasers with smaller claims.  *See In re Modafinil*, 837 F.3d at 258 (identifying "three class members, none of whom are named plaintiffs, each have claims estimated at over $1 billion" which "make[s] up over 97% of the total value of the class claims").  Wal-Mart, one of the largest companies in the United States with massive resources, and a small group of other purchasers have not joined, but many factors affect a company's decision whether to pursue an action, including, for example, the class member's determination about the likelihood of success

---

[19] *See supra* n. 17.  Plaintiffs' reference to 16 joiners (Mem at 21 n.86) is thus incorrect.

relative to the burdens of litigation, and whether the proposed class member contemplates a settlement without the need for litigation.[20]

Plaintiff's suggestion (Mem. at 21 n.86) that absent class members might be unlikely to join a lawsuit for fear of "retaliation by suppliers" is rank speculation.   The *Provigil* court rejected the exact same argument, holding that "Direct Purchasers have again failed to offer any concrete evidence to support their concern about hypothetical risk of retaliation."   2017 U.S. Dist. LEXIS 137601, at *36–37.   The same conclusion holds here.

*Judicial economy favors joinder.*  "In analyzing judicial economy, [courts] focus on whether the class action mechanism is substantially more efficient than joinder of all parties. . . . This primarily involves considerations of docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record."   *Modafinil*, 837 F.3d at 254, 257; *see also CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 457–58 (S.D.N.Y. 1989) (focusing on difficulty of joining class members versus convenience of trying case as class action).

Proceeding as a class action is no more efficient than a case involving joined parties. Joined plaintiffs commonly file joint briefs, retain experts jointly, and share resources and costs. *See Provigil*, 2017 U.S. Dist. LEXIS 137601, at *28.   For example, Ahold and RDC (until it dismissed its claim) shared the cost of litigation for the proposed class by retaining experts jointly and filed motions (or responses to motions) jointly.   Ahold and RDC also litigated issues

---

[20] *Compare Provigil*, 2017 U.S. Dist. LEXIS 137601, at *23-24 (identifying Wal-Mart as a potential class member), *with* Order, *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797 (E.D. Pa. June 7, 2018), ECF No. 1106 (Wal-Mart not listed as an intervener).   The fact that 70% of the proposed class members joined the litigation, while only a few did not, underscores the practicability of joinder, which is the relevant inquiry.

jointly with the opt-out Retailer Plaintiffs, who themselves have litigated jointly. Even a limited survey reveals that nearly half (23 of 48) of the proposed class has litigated jointly side-by-side, with another putative class member in at least one other case. *See* Cremieux Rep. ¶ 66 & Ex. 13. Any additional discovery needed as to the joining plaintiffs can be managed to follow proportionality requirements and avoid cumulative or duplicative work. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). Just like in *Provigil*, the "judicial economy concerns weigh *against* certifying the Direct Purchaser litigation class," because "cost and resource sharing mechanisms exist" sufficient to address such concerns. *Provigil*, 2017 U.S. Dist. LEXIS 137601, at *26, *28 (emphasis added).[21]  *C.f. Asacol*, 2018 U.S. Dist. LEXIS 28920, at *33-33 (warning that district courts should adhere to Rule 23 in part because other means exist to secure relief on behalf of multiple claimants).

*Class members have sufficient financial resources to pursue litigation.* The proposed class members have ample resources to pursue litigation on their own or via jointly-retained counsel. Some of the proposed class members, like the Big Three wholesalers, ███████, are among the largest corporations in the United States, each with an annual revenue in excess of $100 billion. Cremieux Rep. Ex. 14. For the 16 entities properly considered as proposed class members, 8 have annual revenues in excess of $1 billion, 12 have annual revenue in excess of $100 million, and every one still in operation has annual revenue in excess of $35 million. Cremieux Rep. Ex. 14; *see also* Appendix A. Even as to Plaintiff's broader group of proposed

---

[21] As discussed *supra*, the experience in *Provigil* shows that joinder of class members is not complicated and can be effectively managed. In fact, some of the counsel representing *Provigil* named class representatives also represent the later-joined class members. *Compare* King Drug Direct Purchaser Class Plaintiffs' Supplemental Motion for Certification of the Direct Purchaser Class at 3-4, No. 2:06-cv-01797 (E.D. Pa. Feb. 3, 2017), ECF No. 1034 (listing counsel for named direct purchaser plaintiffs), *with* Mot. to Intervene of Additional Pls., No. 2:06-cv-01797 (E.D. Pa. Mar. 20, 2018), ECF No. 1092 (listing counsel for additional plaintiff class members).

class members, at least 35 of the 48 class members proposed by Dr. Leitzinger have annual revenues in excess of $50 million, and 31 have annual revenues over $100 million. Cremieux Rep. Ex. 14; *see also* Appendix A; *accord Provigil*, 2017 U.S. Dist. LEXIS 137601, at *37 (finding the "class members' significant financial resources . . . weighs against certification").

*Geographic dispersion does not preclude joinder.* Geographic dispersion is not sufficient to render joinder impracticable. *See Provigil*, 2017 U.S. Dist. LEXIS 137601, at *38 ("Although the parties are geographically dispersed, the sophistication of the class members, the fact that many of the class members have previously litigated in Pennsylvania and the participation of geographically disperse named plaintiffs and counsel in the case to date, all undercut the weight that should be placed on this factor."). Plaintiff Ahold and former proposed class representative RDC have been able to litigate this case for years even though they are located in Pennsylvania and New York, respectively. Leitzinger Rep. Ex. 5. The indirect purchaser class representatives have been able to do the same despite being located in other states. *See* End-Payor Pls.' Second Am. Consol. Class Action Compl. ¶¶ 15–26. Moreover, the proposed direct purchaser class members are sophisticated parties, many of which have litigated pharmaceutical antitrust cases[22] and other claims in courts around the country.[23] Further, concerns regarding location are mitigated in a case like this one where the potential plaintiffs have been identified and located.

---

[22] *E.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Appendix A (providing list of cases where class members have been named plaintiffs in antitrust cases).

[23] Cremieux Rep. ¶ 65 & Ex. 12 (showing in just First, Second, and Third Circuits that 25 of 48 proposed class members have litigated claims as named plaintiffs).

*Mullis v. Mt. State Univ., Inc.*, No. 12-03158, 2014 U.S. Dist. LEXIS 40686, at *13 (S.D.W. Va. Mar. 27, 2014). The class members' geographic dispersion provides no basis for finding joinder impracticable.

*Ability to identify future claimants.* This factor weighs against class certification because the alleged class period has ended, and Plaintiff has identified all potential class members. *See* Leitzinger Rep. at Ex. 4 (identifying "List of Class Members").

*Claim is for damages not injunctive relief.* "As Direct Purchasers are not seeking injunctive relief, this factor weighs against certification of the Direct Purchaser class." *Provigil*, 2017 U.S. Dist. LEXIS 137601, at *39. The same is true here.

*   *   *   *   *

"The touchstone of the numerosity inquiry is . . . the practicability of joining [the] plaintiffs." *Pagan v. New Wilson's Meats, Inc.*, No. 08-0751, 2011 U.S. Dist. LEXIS 52438, at *14 (E.D. Pa. May 17, 2011) (denying class certification where Plaintiff failed to satisfy numerosity requirement) (citation omitted). Although Defendants believe that Plaintiff has attempted to gerrymander the class roster to evade its numerosity problems, the members of the class it proposed are identifiable and easily joinable. They are sophisticated businesses with substantial claims capable of protecting their rights and filing their own lawsuits. "Class certification will thus produce no saving of judicial effort, while joinder, on the other hand, would fortify control over the proceeding." *Legrand v. N.Y.C. Transit Auth.*, No. 95-cv-0333, 1999 U.S. Dist. LEXIS 8020, at *14 (E.D.N.Y. May 26, 1999).

## B.   Retailer Ahold's Claims Are Not Typical of Other Putative Class Members – Who Are Almost Entirely Wholesalers

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement is a

27

mechanism to screen out class actions in which the legal or factual position of the proposed representative(s) is "markedly different" from that of members of the class they seek to represent, even if common issues of law or fact are present.  7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1764 (3d ed. 2005); *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) (to determine typicality, a court must examine "whether the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based") (internal citations omitted); 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.24 (Matthew Bender 3d ed.) ("This 'typicality' requirement attempts to ensure that the representative parties' (named plaintiffs') interests are substantially aligned with those of absent class members.").

Here, class representative Ahold's circumstances are "markedly different" than most of the proposed class:

- *Ahold has no stake in the "product hop" allegations*. Ahold has no direct ▇▇ ▇▇▇▇ Minastrin purchases.  Cremieux Rep. ¶¶ 28, 60.  Thus, unlike other proposed class members with Minastrin purchases, Ahold has no "skin in the game" as to the claim that Defendants' conduct harmed purchasers of Minastrin.

- *Ahold has no stake in establishing the earliest generic entry date*. ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇  Cremieux Rep. ¶ 28.  Unlike 23 members (47%) of the proposed class that have Loestrin 24 direct purchases starting at the beginning of the class period, Ahold has no interest in establishing generic entry as of September 2009—▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇.  *Infra* § I.C.1.

- *Ahold is not a wholesaler and is not affected by the purchasing patterns that reduces damages for certain wholesaler class members*.  Ahold is a retailer that did not even purchase directly from Defendants; thus its "individual circumstances" are "materially different" than the wholesalers whose purchases comprise the vast majority of the proposed class.  Among other things, Ahold would not be affected by the fact that wholesalers typically lose volume when a generic enters, because many retail pharmacies purchase generics directly from

28

generic manufacturers (whereas branded products are typically purchased through wholesalers).  *See infra* § II.B.

- *Ahold is the only member of the proposed class relying on an assignment*.  Ahold is unlike any other class member because Ahold is pursuing a sliver of wholesaler McKesson's claims for Loestrin 24 purchases based on a ████████████.  Cremieux Rep. ¶ 28.  Every other class member with potential damages for branded purchases relies on its own direct purchases.

Plaintiff Ahold consequently lacks an interest in pursuing key aspects of the class's claims such that, if the Court were to "permit it to continue as lead plaintiff, it is possible that these issues could ultimately severely prejudice the class."  *In re IMAX Securities Litig.*, No. 06-cv-6128, 2009 U.S. Dist. LEXIS 58219, at *11 (S.D.N.Y June 29, 2009); s*ee also In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 80 (D. Mass. 2005) (third party payers not typical/adequate representatives of a class of Medicare beneficiaries in part because of a "possible conflict" created by "the different economic interests of the groups").

### C.    Sole Class Representative Retailer Ahold Would Not Be an Adequate Representative for a Direct Purchaser Class Comprised Overwhelmingly of Wholesalers

To satisfy Rule 23(a)(4)'s adequacy-of-representation requirement, the proposed class representative must (1) "be part of the class," (2) "possess the same interest" as the class members, *and* (3) "suffer the same injury" as the class members.  *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) (citation omitted).   The adequate representation requirement is not met, and thus a class cannot be certified, when "conflicts of interest [exist] between named parties and the class they seek to represent."  *Id.* at 625; *Plotnick v. Comput. Scis. Corp. Deferred Comp. Plan*, 182 F. Supp. 3d 573, 584 (E.D. Va. 2016) ("It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented.").  A conflict of interest is "fundamental" and precludes class certification if it "go[es] to the specific issues in

29

controversy," rather than being tangential to the subject matter at issue in litigation. *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).

An artificial class representative like retailer-assignee Ahold is not adequate as the sole representative for this putative direct purchaser class consisting primarily of wholesalers. *See, e.g.*, *Dewey v. Volkswagen AG*, 681 F.3d 170, 184, 187–90 (3d Cir. 2012) (reversing order certifying class settlement finding a conflict existed between different "group[s]" of plaintiffs such that one group could not adequately represent the other).

### 1. Ahold Has No Interest in Establishing the Earliest Entry Date for Generic Loestrin 24 or in the "Product Hop" Allegations, Creating a Conflict with Other Class Members

Ahold's interests conflict with class members in at least two additional ways. First, Ahold has no stake in the "product hop" allegations because Ahold never purchased Minastrin from Defendants. Second, under its assignment from McKesson, Ahold's alleged damages accrue, if at all, no earlier than ▮▮▮▮▮. This creates a conflict with class members that allegedly have damages starting as early as ▮▮▮▮▮ earlier, at the start of the class period (September 2009). Ahold's litigation interests thus are contrary to class members that want to establish (a) the earliest generic entry date possible and (b) harm on Minastrin purchases flowing from the alleged product hop. Ahold has no incentive to devote litigation resources to those issues, creating a clear and disqualifying conflict. *E.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 610, 625–28 (1997) (finding adequacy not met where class representatives' interests in allocating recovery were not aligned with other types of class members); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 577 (E.D. Tenn. 2014) (denying certification in generic delay case in part because differently situated class members had "incentive to define price risk differently so as to maximize its own recovery").

### 2.   Retailer Ahold Admittedly Has No Experience With and No Personal Knowledge of Directly Purchasing the Branded Loestrin 24 and Minastrin for Which the Class Is Claiming it Was Somehow Overcharged

Ahold is a retail supermarket chain that only purchased branded Loestrin 24 and Minastrin indirectly. Ahold admittedly *never* purchased Loestrin 24 or Minastrin directly from Warner Chilcott. For the Loestrin 24 that Ahold purchased through its wholesaler McKesson, Ahold claims to stand in McKesson's shoes pursuant ███████████████. But that assignment does not turn Ahold into a wholesaler or otherwise make Ahold an adequate class representative for a group of wholesalers.

Ahold was not involved in the McKesson price negotiations for Loestrin 24 and has no experience in purchasing Loestrin 24 directly from Warner Chilcott. Cremieux Rep. ¶¶ 59–60. The interests of a retailer like Ahold and a wholesaler like McKesson (and the other putative wholesaler members of the class) are not aligned. As Dr. Cremieux explains, retailers and wholesalers operate at different levels of the distribution chain, and have economic interests that can put them in conflict with one another. Cremieux Rep. ¶ 70.

Further, because Ahold is not a wholesaler, Ahold has no interest in addressing Defendants' assertion that wholesaler damages have to be reduced to account for the reduction in volume experienced by wholesalers when generics enter and retailers switch from purchasing the brand from wholesalers to purchasing the generic directly from the generic manufacturers. *See infra* § II.B. Ahold can hardly serve as an adequate representative where it has no stake in pursuing arguments critical to the wholesaler's interests.

31

3. **Retailer Ahold Cannot Establish Causation for Alleged Overcharges on Generic Loestrin 24 it Bought from Non-Defendant Amneal** ████████

████████████

Ahold claims it was overcharged for generic Loestrin 24 because absent the alleged conduct there would have been multiple generic competitors in the market prior to Amneal's entry with a generic version of Loestrin 24 in January 2014.  Compl. ¶ 15.  Ahold thus claims that it and other purchasers of generic Loestrin 24 in the actual world were deprived of price reductions from that additional generic entry and paid too much as a result.  *Id.*

But Ahold's claim does not hold up for many putative generic-only purchasers (see *supra* § I.A.1), █████████████████████████████

██████████████████████████████

██████████████████████████████

███████  ██████████████████████

██████████████████████████████

██████████████████████████████

████████████████████ ), and consequently Ahold cannot be an adequate class representative for any putative class member seeking damages as to generic Loestrin 24 purchases.  Cremieux Rep. ¶ 61.

4. **Ahold Is Unable to Ensure Trial Availability of a Knowledgeable, Current Employee Available for Trial**

Class representatives must be able to "check the otherwise unfettered discretion of counsel" and provide "personal knowledge" of the underlying facts.  *Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978); *see also Henderson v. Bank of N.Y. Mellon*, 322 F.R.D. 432, 435 (D. Mass. 2017) (class representatives' "knowledge of and involvement in the class action" must be sufficient to protect against attorneys' "possibly competing interests").

32

The "kind of participation" expected includes "being willing to travel . . . to testify at trial if necessary." *In re Northrop Grumman Corp. ERISA Litig.*, No. 06-06213-MMM, 2011 U.S. Dist. LEXIS 94451, at *59–61 (C.D. Cal. Mar. 29, 2011); *see also Weikel v. Tower Semiconductor, Ltd.*, 183 F.R.D. 377, 396 (D.N.J. 1998) (inability to attend trial could "seriously interfere[e] with his obligation to vigorously prosecute [the] action"). A named plaintiff's inability to make a knowledgeable witness available for trial further implicates the court's mandate to ensure that class adjudication will not deprive defendants of their Seventh Amendment and due process rights. *See Asacol*, 2018 U.S. App. LEXIS 28920, at *20–21 (requiring adjudication to be "protective or defendants' Seventh Amendment and due process rights"); Electronic Order, *In re Asacol Antitrust Litig.*, 1:15-cv-12730 (D. Mass. Jan. 11, 2018) (ECF No. 691) (requiring class representative plaintiffs to make a witness available to defendants at trial).

Here, the only witness Ahold discussed and made available—Ahold's 30(b)(6) witness—is a  former employee, . And Ahold has offered no assurance that it can make a witness available for trial who possess the relevant personal knowledge. *See* Ex. 12, . Moreover, cast doubt on whether "there is anyone else at Ahold who has knowledge or information" pertaining to Ahold's allegations. *See id.* at 18:10–18 ).

\* \* \* \* \*

Each of these factors shows fundamental antagonism between Ahold and the large majority of the class because Ahold (1) may not be a member of the class, (2) does not "possess

the same interest'" as other class members, and (3) did not "'suffer the same injury'" as many

class members.

## II.     PLAINTIFF AHOLD HAS NOT ESTABLISHED THE REQUIREMENTS OF RULE 23(b)(3), PARTICULARLY AS CLARIFIED BY THE FIRST CIRCUIT IN *ASACOL*

Rule 23(b)(3)'s predominance inquiry is "far more demanding" than Rule 23(a)'s

commonality requirement.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).  To

prevail on its claims, Plaintiff must prove a violation of the antitrust laws, causation and injury

(i.e., antitrust impact) stemming from such violation, and quantifiable damages.  *See Asacol*,

2018 U.S. App. LEXIS 28920, at *19 ("Proof of injury, also called 'injury-in-fact,' is a required

element of a plaintiff's case."); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d

Cir. 2009).  The predominance inquiry in an antitrust case requires a plaintiff to show through

common proof that *each member of the proposed class* suffered antitrust injury-in-fact/impact

from the alleged unlawful conduct: in "antitrust class actions, common issues do not predominate

if the fact of antitrust violation and the fact of antitrust impact cannot be established through

common proof."  *New Motor Vehicles*, 522 F.3d at 20; *see also Asacol*, 2018 U.S. App. LEXIS

28920, at *37 ("But certainly where injury-in-fact is a required element of a claim, as it is in an

antitrust action, a class cannot be certified based on an exception expectation that the defendant

will have no opportunity to press at trial genuine challenges to injury-in-fact." (citation

omitted)); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 566 (N.D. Cal. 2013) (noting

that at least four other circuit courts have joined the First Circuit in holding that, in antitrust suits,

"common issues do not predominate unless the issue of impact is also susceptible to class-wide

proof").  Thus, proof of common evidence capable of establishing an antitrust violation alone is

not enough: Plaintiff must also prove injury to the putative class members through common,

formulaic evidence, or the proposed class fails.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 249, 252–53 (D.C. Cir. 2013) ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact."); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, plc*, No. 04-5898, 2010 U.S. Dist. LEXIS 105646, at *102 (E.D. Pa. Sept. 30, 2010) (requiring plaintiffs show damages "could be calculated in a formulaic way by common proof").

"In antitrust cases, impact often is critically important . . . because it is an element of the claim that may call for individual, as opposed to common, proof."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009).  In short, unless Plaintiff can put forward a model that relies on common proof to establish that (1) each of the proposed class members bought branded Loestrin 24 or Minastrin from Warner Chilcott, (or generic Loestrin 24 from Amneal, if that claim survives), when (2) each of them would have purchased a cheaper generic version of Loestrin 24 instead if not for the allegedly unlawful conduct, class certification should be denied.

Plaintiff has failed to do so, and thus fails the requirements of Rule 23(b)(3).

## A.     Individualized Issues Predominate with Respect to Antitrust Injury-in-Fact/Impact

The First Circuit has explained that class plaintiff's "must include some means of determining that each member of the class was in fact injured."  *New Motor Vehicles*, 522 F.3d at 28; *see also Asacol*, 2018 U.S. App. LEXIS 28920, at *31 ("[T]he defendant must be offered the opportunity to challenge each class member's proof that the defendant is liable to that class member.") (citing *Dukes*, 564 U.S. 366–67).  Plaintiff here does not.  Plaintiff's theory of impact relies on proving that ███████████████████████████████████████

███████████████████████████████

███████████████ Mem. at 16 (quoting Leitzinger Rep. ¶ 50).

Plaintiff's injury-in-fact/impact argument relies solely on the opinion of Dr. Leitzinger, but his flawed analysis cannot "establish, without need for individual determinations [], which [class members] were impacted by the alleged antitrust violation and which were not." *New Motor Vehicles*, 522 F.3d at 28; *Asacol*, 2018 U.S. Dist. LEXIS 28920, at *31 ("Accepting plaintiffs' proposed procedure for class litigation would also put us on a slippery slope, at risk of escalating disregard for the difference between representative civil litigation and statistical observations of tendencies and distributions."); *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005) (rejecting Dr. Leitzinger's testimony for failing to show antitrust injury through classwide proof).

Most fundamentally, Dr. Leitzinger improperly *assumes* that the general effects of generic entry would impact each class member in the same way. He relies on aggregate trends and averages that do not account for the facts of this case and thus hide the need for individualized inquiry. *Blades*, 400 F.3d at 570 (rejecting use of aggregate pricing data by Dr. Leitzinger because "evidence offered during the certification hearing demonstrated that these [aggregate prices] did not reflect the actual price paid by farmers"); *J.B.D.L Corp. v. Wyeth-Ayerst Labs., Inc.*, No. 1:01-cv-00704, 2005 U.S. Dist. LEXIS 11676, at *58 (S.D. Ohio June 13, 2005) (rejecting Dr. Leitzinger's reliance on "basic economic theory" that "a dominant seller will lower its product price in response to market entry of competitors" because "[t]here is a significant body of evidence that" contradicted Dr. Leitzinger's assumption).

1.   **Dr. Leitzinger's Scenarios Assume Away Earlier Minastrin Entry and Have No Basis in the Factual Record.**

Dr. Leitzinger's conclusions regarding both impact and damages are based on a "but-for"

world defined by unsupported assumptions and lacking any economic analysis. ████████

████████████████████████████████████ █  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ Dr. Leitzinger made no

effort to verify whether counsel's scenarios were supportable based on the factual record.  They

are not, which precludes the use of Dr. Leitzinger's opinion regarding antitrust injury-in-

fact/impact.  *See Mercedes-Benz USA, Inc. v. Coast Auto. Grp., Ltd.*, 362 F. App'x 332, 334 (3d

Cir. 2010) (excluding plaintiff's expert who "accepted without question" and without

"independently verify[ing]" the validity of the assumptions).

Most glaringly, ████████████████████████████████

████████████████████████████████████████████████, facts

Plaintiff itself extols in its complaint.  Compl. ¶ 289.  A substantial part of Warner Chilcott's

business strategy for its oral contraceptive portfolio was to compete by obtaining FDA approval

for Minastrin and launching it prior to entry of generic Loestrin 24.  *E.g.*, Ex. 9, ████████

████████████████████████████████████████████████

████████████████████████████████████.  Plaintiff's own complaint

alleges not only that Warner Chilcott filed its NDA for Minastrin in 2008, but also that Warner

---

[24] ████████████████████████████████████████████████

████████████████████████████████████████ Leitzinger Dep. Tr. 86:24-
87:12, 89:12-15.

Chilcott was only "months away" from receiving FDA approval in January 2009.  Compl. ¶ 289.
Warner Chilcott's documents and testimony confirm that it was on track to launch Minastrin
around March 2009, roughly six months prior to the September 2009 generic entry date Dr.
Leitzinger assumes.  *See supra* n.9.

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ .

Bringing a new product like Minastrin to market increases consumer choice and is pro-
competitive.  *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286–87 (2d Cir.
1979) (recognizing development of new products is "an essential element of lawful
competition"); Cremieux Rep. ¶ 98 n.133.   In Dr. Leitzinger's hypothetical but-for world,
Warner Chilcott would have every incentive to complete the FDA approval process and launch
Minastrin as quickly as possible to earn a return on its investment in development.  Cremieux
Rep. ¶ 93. ██████████████████████████████████████████████████

██████████████████████ .

Plaintiff offers no basis to believe that in any but-for scenario Warner Chilcott could not
proceed as it did in the real world and introduce Minastrin about six months prior to the first
generic Loestrin 24 product.   Warner Chilcott's marketing efforts would have moved a
substantial portion of Loestrin 24 purchases to Minastrin in 2009 prior to Dr. Leitzinger's
assumed generic entry date of September 2009, even assuming Loestrin 24 remained on the
market. ████████████████████████████████████████ .

███████████████████████████████████████████████████████

████████████████████████████   ████████████████████████ His
entire impact and damages analyses are thus "incomplete and unreliable."  Cremieux Rep. ¶ 48;

*see Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").[25]

> **2.     There Is No Common Proof of Injury-in-Fact as to the ▆ Generic-Only Purchasers.**



Leitzinger Dep. Tr. 141:19-25; Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment Due to Lack of Market Power, at ¶ 12 (July 30, 2018), ECF No. 530-01.

Dr. Cremieux, Defendants' expert, did review the price and purchasing data for proposed class members.  Dr. Cremieux's analysis showed that pricing did not move in the lockstep, commodity-type manner ▆▆▆▆▆▆—and that ▆▆▆▆▆▆ assumptions and averages masked important individual variation.  *First*, ▆▆▆▆▆, the data here show that generic Loestrin 24 prices varied, in part

---

[25] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

because they were "branded" generics.  Indeed, as illustrated in Exhibit 5 below, the prices for generic Loestrin 24 ███████████████████████ did *not* uniformly decline with additional generic entry but instead varied widely across manufacturers.  Specifically, ███

████████████████████████████████████████████████████

███████████████████ ██████████████ █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████ ███████████ ███ ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

---

[26] Such diverse pricing shows manufacturers relied on product differentiation through branding to maintain higher prices than would be expected for a generic, contrary to the standard pricing described in the economic literature ██████████████████.  Cremieux Rep. ¶ 39.



*Second*, ███████████████████████████████████

████████████████████████████████████████████

purchasers were loyal to their generic Loestrin 24 suppliers.   Sixteen of 42 (38%) of the proposed class members that directly purchased generic Loestrin 24 limited such purchases to a single generic manufacturer, regardless of price.   Cremieux Rep. ¶ 38 & Ex. 4a.   Purchasers would not exhibit such loyalty and "procure one product over all others" if, ████████████ ████████, purchasers viewed the products as strictly commodities.   Cremieux Rep. ¶ 38.

*Third*, ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

Dr. Leitzinger's reliance on presumptions and averages must be rejected given the actual data showing meaningful variation in generic prices and no common injury-in-fact/impact as to generic-only purchasers. *See Asacol*, 2018 U.S. App. LEXIS 28920, at *31-32 ("Accepting plaintiffs' proposed procedure for class litigation would also put us on a slippery slope, at risk of an escalating disregard of the difference between representative civil litigation and statistical observations of tendencies and distributions."); *Blades*, 400 F.3d at 570 (rejecting common proof of impact based on aggregate prices because "the evidence offered during the certification hearing demonstrated that these lists did not reflect the actual price paid by farmers" which "is relevant to a determination of impact"); *J.B.D.L Corp. v. Wyeth-Ayerst Labs., Inc.*, No. 1:01-cv-00704, 2005 U.S. Dist. LEXIS 11676, at *53 (S.D. Oh. June 13, 2005) (rejecting Dr. Leitzinger's reliance on "basic economic theory" where "[t]here is a significant body of evidence" that contradicted the theory).

    **3.**    **There Is No Common Proof of Injury-in-Fact as to the Six Brand-Only Purchasers.**

███████████████████████████████████████████

███████████████████████████████████████████

██████ Leitzinger Rep. ¶ 50.  Thus, ████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████  ███████████████████████████

█████████████████████████████████████████████████  Cremieux

Rep. ¶¶ 58, 106.  The fact that a number of wholesalers purchased Loestrin 24 but not generic

Loestrin 24 is not surprising, as a wholesaler may decide against carrying generic versions of a

product, or the manufacturer may sell instead directly to the retailers, cutting out the wholesaler

middle man.  *Id.* ¶ 68.  ██████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

*Asacol*, 2018 U.S. App. LEXIS at *25 ("A 'class cannot be certified on the premise that [the

defendant] will not be entitled to litigate its statutory defenses to individual claims.'") (quoting

*Dukes*, 564 U.S. at 367).

> ### B.     Individual Issues Predominate with Respect to Damages

As with his attempts to show injury-in-fact/impact on a classwide basis, Dr. Leitzinger's

proposed approach for measuring classwide damages also fails the requirements of Rule 23(b).

His model fails to establish that "damages are capable of measurement on a classwide basis."

*Comcast*, 569 U.S. at 34–35; *see also* Rule 23(b)(3).

For example, as explained below, ████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████  Cremieux Rep. ¶ 81. ████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████



, leading to a disqualifying mismatch between the liability theories allowed to proceed and the damages calculations.  *Comcast*, 569 U.S. at 35 ("[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the impact] theor[ies][accepted by the court].  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").[27]  These failures are covered in more detail below.

*Highly aggregated model is inaccurate and unreliable.*

Cremieux Rep. ¶ 78.  More fundamentally, when these disaggregated overcharge results are summed to get class-wide damages, the result is less than Dr. Leitzinger's class-wide estimate of for the scenario tested.

---

[27] Even applying partial corrections to Dr. Leitzinger's flawed approach reduces his estimate aggregated damages by depending on the scenario.  Cremieux Rep. ¶ 82 & Ex. 16.



Cremieux Rep. ¶ 81.[28]

Cremieux Rep. ¶ 81.[29]

*Aggregated methodology ignores individualized damages inquiries as to generic-only and brand-only purchasers that will overwhelm common issues*.  Dr. Leitzinger's aggregation of different types of class members and different types of harm masks the need for individualized damages inquiries.

Cremieux Rep. ¶ 106; *see supra* § II.A.3.   In each instance, as shown above, an individualized inquiry as to impact, and thus damages, would be required.  *See supra* §§ II.A.2., II.A.3.

*Failure to follow the facts regarding Minastrin entry*.  The "first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event."  Fed. Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011).

---

[28] This testing of Dr. Leitzinger's methodology is not an endorsement of any resulting calculations because Dr. Leitzinger's model is inaccurate and unreliable in many respects, as described in Dr. Cremieux's report.  Cremieux Rep. § VI.

[29] Dr. Cremieux's analysis also showed both substantial variation across these purchaser-specific, average but-for and actual prices, as well as substantial variation in the resulting average per unit overcharge result for each purchaser.  Cremieux Rep. ¶ 79.

████████████████████████ Minastrin would have entered the marketplace prior to generic Loestrin 24 even in any hypothetical but-for world free of the allegedly unlawful conduct. *See supra* § II.A.1. *Comcast* rejects damages analyses that ignore the relevant evidence. 569 U.S. at 35-36.

████████████████████████████████████████████

████████████████████████████ a wholesaler's sales volume may decline after generic entry because retailers shift from purchasing the brand indirectly through wholesalers to purchasing the generic directly from the manufacturer. Cremieux Rep. ¶ 69; ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ Wholesalers affected by this shift lose profits on the diverted volume, and thus may be better off prior to generic entry, but in any event suffer no economic "overcharge" on the lost volume. Cremiuex Rep. ¶ 69 ("If a wholesaler would not purchase generic Loestrin in the but-for world, an overcharge measure based on the difference between the price it actually paid for the purchased brand product and the price it would never have paid in the but-for world because it would not have purchased the generic product is nonsensical".). ████████████████

████████████████████████████████████████████

████████████████████████████████████████████ an individualized inquiry would be required to understand the scope of the likely volume shift as to any particular wholesaler class member. Cremieux Rep. ¶ 83. The First Circuit in *Asacol* warned against relying on promises that a plan will be developed in the future to address Rule 23 requirements. *Asacol*, U.S. App. LEXIS 28920, at *37 (requiring district court "at the time of certification offer a reasonable and workable plan" dealing with individualized issues in a

manageable manner that is "protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issue").

████████████████████████████████████████████████████

█████████████████████████████████████ Even though Plaintiff alleges several theories of harm that may differ depending on whether a class member purchased Loestrin 24, Minastrin, or generic Loestrin 24 from Amneal, ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ ████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ substantial numbers of patients and doctors chose Minastrin over generic Loestrin 24 *when both products were available*. *See* Cremieux Rep ¶ 74. Plaintiff consequently has proposed no model for properly assessing alleged damages should the Court allow some but not all of Plaintiff's theories of harm. *Comcast*, 569 U.S. at 35 (requiring a plaintiff's damages methodology to be consistent with its liability case).

\* \* \* \* \*

Plaintiff asserts that the "possibility of individual damages inquiries poses no obstacle to certification" (Mem. at 33), and seeks to defer to an undefined, post-trial process the allocation of damages ██████████████████████████████████████████████

████████████████████████████████████ But the difficulties inherent in determining

47

damages in this multi-faceted case cannot be avoided by a simplistic, post-trial allocation of a common "overcharge."   Such an approach ignores the fact that, as shown above, the alleged harm per unit to each proposed class member would vary.   Cremieux Rep. ¶ 79; *see also Asacol*, 2018 U.S. App. LEXIS 28920, at *32 ("Such a result would fly in the face of the core principle that class actions are the aggregation of individual claims, and do not create a class entity or re-apportion substantive claims.").   Certification thus is improper because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."   *Comcast*, 569 U.S. at 34;   *see also Martins v. 3PD, Inc*., No. 11-11313, 2013 U.S. Dist. LEXIS 45753, at *21– 22 n.3 (D. Mass. Mar. 28, 2013) (noting that in *Comcast*, the Supreme Court "has called . . . into question" the practice that "courts generally find the predominance requirement satisfied even if individual damages issues remain"); *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 274 (E.D. Pa. 2013) ("Even assuming breach could be proven on a classwide basis, the calculation of damages for Express Warranty Class members is 'nearly impossible . . . without individualized inquiries into each claim'") (internal citations omitted); *Cowden v. Parker & Assocs., Inc.*, No. 09-323, 2013 U.S. Dist. LEXIS 72253, at *17–19 (E.D. Ky. May 22, 2013) (rejecting "in light of *Comcast*" plaintiffs' argument that class may be certified by virtue of common questions as to liability even though "damages might be highly individualized").

### C.   Class Treatment Plainly Is Not the Superior Method of Adjudication

A class action is not "superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), because this case involves a small number of sophisticated entities that are fully capable of pursuing claims individually and thus in no need of the class action mechanism.   *Supra* § I.A.4 (explaining why joinder is not impracticable); *see also Georgine v. Amchem Prods., Inc*., 83 F.3d 610, 633 (3d Cir. 1996)

(denying class certification because "[t]his is not a case where the amounts at stake for individuals [are] so small that separate suits would be impracticable") (internal quotation marks omitted), *aff'd sub nom*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Plotnick*, 182 F. Supp. 3d at 590 (noting that class action is "not a superior mechanism where individuals have sufficient incentives to pursue their own legal redress").

Further, the proposed class action is not superior for the additional reason that the individualized inquiries required to address the element of injury-in-fact/impact will predominate. As the First Circuit warned just this week in *Asacol*, "certainly where injury-in-fact is a required element of a claim, as it is in an antitrust action, a class cannot be certified based on an expectation that the defendant will have no opportunity to press at trial genuine challenges to allegations of injury-in-fact." 2018 U.S. App. LEXIS 28920, at *36–37 (citing *New Motor Vehicles*, 522 F.3d at 19 n.18; *Dukes*, 564 U.S. at 367). As shown above, an individualized inquiry regarding injury-in-fact would be required for at least 56% (███████) of the proposed class.

To proceed without this kind of individualized inquiry would strip Defendants of their due process right to present defenses relating to individualized impact and damages. As the First Circuit directed in *Asacol*, "the district court must at the time of certification offer a reasonable and workable plan for how that opportunity [to press at trial genuine challenges to allegations of injury-in-fact] will be provided in a manner that is protective of the defendant's constitutional rights and does not cause individual inquiries to overwhelm common issues." 2018 U.S. App. LEXIS 28920, at *37; *see also Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense."); *see also Dukes*, 564 U.S. at 367 ("[A] class cannot be certified on the premise that [the defendant] will not be entitled to

49

litigate its statutory defenses to individual claims.") (citing 28 U.S.C. § 2072(b)); *Asacol*, 2018 U.S. App. LEXIS 28920, at *25 ("Here, we have more than a statutory defense; rather, we have a challenge to a plaintiff's ability to prove an element of liability.").

Like the plaintiffs in *Asacol*, Ahold here has not enabled the Court to articulate such a plan. Defendants intend to assert a variety of individualized impact and damages inquiries that preclude certification under the teachings of *Asacol*. *Supra* §§ I.A.1, I.A.2, II.A.2, II.A.3, II.B. These important issues cannot be waived away by an aggregate damages model and shunted to an undefined claims administration process. *Asacol* prohibits such an approach. 2018 U.S. App. LEXIS 28920, at *25, *29–32, *36–37.

Plaintiff's claim that certification would prevent "numerous individual suits" and "inconsistent results," Mem. at 35, ignores the fact that the putative class members easily could be joined in a single action, which itself would avoid those consequences. *Supra* § I.A.4. Plaintiff's further claim that a class action would allow "Class members with smaller claims an opportunity for redress they might otherwise be denied" is speculation. Mem. at 35. As noted above, many of these Class members have not hesitated to file putative class action antitrust claims alleging harm from delayed generic entry. *Supra* § I.A.4; *see also* Appendix A; *Asacol*, 2018 U.S. Dist. LEXIS 28920, at *33 (recognizing "there are other tools available to address" as alternatives to class actions).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's Motion for Class Certification.

Dated: October 19, 2018                                    Respectfully submitted,

                                                          */s/ J. Mark Gidley*
                                                          J. Mark Gidley (pro hac vice)

Peter J. Carney (pro hac vice)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

Robert A. Milne (pro hac vice)
Jack E. Pace III (pro hac vice)
Michael J. Gallagher (pro hac vice)
Alison Hanstead (pro hac vice)
Michael E. Hamburger (pro hac vice)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

Lauren M. Papenhausen (pro hac vice)
Katherine Dyson (pro hac vice)
WHITE & CASE LLP
75 State Street, Floor 24
Boston, MA 02109
Telephone: (617) 979-9300
Facsimile: (617) 979 9301

Angela D. Daker (pro hac vice)
WHITE & CASE LLP
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Telephone: (305) 995-5297
Facsimile: (305) 358-5744

*/s/ Nicole J. Benjamin*
John A. Tarantino (#2586)
jtarantino@apslaw.com
Nicole J. Benjamin (#7540)
nbenjamin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Telephone: (401) 274-7200
Facsimile: (401) 751-0604

*Attorneys for Warner Chilcott Co., LLC*
*f/k/a Warner Chilcott Co., Inc., Warner*

51

*Chilcott (US), LLC, Warner Chilcott Sales (US), LLC, Warner Chilcott plc n/k/a Allergan WC Ireland Holdings Ltd., Warner Chilcott Holdings Co. III, Ltd., Warner Chilcott Corp. Warner Chilcott Sales (US), LLC, Warner Chilcott Laboratories Ireland Limited, Watson Laboratories, Inc., and Watson Pharmaceuticals, Inc.*

## Appendix A















## <u>CERTIFICATE OF SERVICE</u>

I, Nicole J. Benjamin, hereby certify that on this 26th day of October 2018, copies of the foregoing redacted public version of Memorandum of Law in Opposition to Direct Purchaser Class Plaintiff's Motion for Class Certification will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Nicole J. Benjamin*
Nicole J. Benjamin
