## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IN RE LOESTRIN 24 FE ANTITRUST LITIGATION | MDL No. 2472<br><br>Master File No.<br>1:13-md-2472-S-PAS |
| THIS DOCUMENT RELATES TO:<br><br>ALL END-PAYOR CLASS ACTIONS | **REDACTED<br>PUBLIC VERSION** |

**END-PAYOR PLAINTIFFS' REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF THEIR MOTION FOR CLASS
CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

I.     EPPS' CLASS DEFINITIONS.................................................................................4

II.    THE ISSUES OF FACT RAISED BY DEFENDANTS SHOULD NOT BE
CONSIDERED AT THE CLASS CERTIFICATION STAGE .............................................8

III.   THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)......9

     A.  The Classes Are Sufficiently Numerous ..........................................................9

     B.  Numerous Questions of Law or Fact are Common to the Class............................ 11

     C.  EPPs Established Typicality Under Rule 23(a)(3) ............................ 12

     D.  EPPs Will Adequately Represent the Classes and No Fundamental Conflicts
Exist Among Members of the Proposed Classes.......................................... 18

IV.   THE PROPOSED CLASSES ARE ASCERTAINABLE ...................................... 22

     A.  The Data-Rich Pharmaceutical Industry Contains Information to Ascertain
Members of the Proposed Classes and Those Excluded from the Classes in a
Manageable and Administratively Feasible Way........................................ 24

     B.  EPPs Properly Include Purchases of All Generic Loestrin 24 and
Minastrin 24 in their Class Definition .......................................... 29

V.    THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED .................................... 31

     A.  Antitrust Impact Will be Proven on a Class Wide Basis and Individualized
Issues Do Not Predominate Over Common Questions ........................................... 31

        1.  Dr. French Establishes Antitrust Impact on a Class-wide Basis ............. 31

        2.  Brand Loyalists Are Excluded from the End-Payor Class and Dr.
French's Damages Calculations and No Individualized Inquiry is
Necessary ........................................................................ 36

        3.  Class Members Who Purchased Minastrin 24 or its Generic
Equivalent Were Injured........................................................ 39

        4.  Free Samples and Coupons Do Not Defeat Predominance ....................... 40

        5.  Flat Co-Pay Consumers Are Excluded From the Class and No
Individualized Inquiry is Required................................................ 42

        6.  Formulary "Variability" and Cost Sharing Among TPPs and
Consumers Do Not Defeat Predominance ...................................... 42

7.  Generic-Only Purchasers Were Injured by Defendants'
Anticompetitive Conduct that Delayed/Prevented Generic Entry ......... 43

8.  Individualized Inquiry Into Complex PBM Agreements is
Unnecessary ......................................................................................... 43

9.  Free Samples, Coupons and Rebates Do Not Defeat Predominance ....... 44

10. Insurers Did Not "Pass On" Alleged Overcharges Through Premiums
or Plan Contributions ........................................................................... 45

B.  A Class Action is the Superior Method of Adjudicating the Classes' Claims
and The Proposed Classes are Manageable ............................................... 46

C.  Insignificant Variations in State Laws Do Not Present a Barrier to Class
Certification and A Class Action is Superior to Multiple Separate
State Actions ........................................................................................ 47

CONCLUSION .......................................................................................... 51

## TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) .................................................................................... 11, 19

*Amgen Inc. v. Conn. Retirement Plans and Trust Funds,*
  568 U.S. 455, 466 (2013) ................................................................................ 8, 17

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.,*
  116 F. Supp. 2d 1159 (C.D. Cal. 2000) ............................................................ 30

*Apple Inc. v. Pepper,*
  No. 17-204 (U.S. October 1, 2018) ................................................................... 24

*Ault v. J.M. Smucker Co.,*
  310 F.R.D. 59 (S.D.N.Y. 2015) ......................................................................... 27

*Bezdek v. Vibram USA Inc.,*
  79 F. Supp. 3d 324 (D. Mass. 2015), *aff'd*, 809 F.3d 78 (1st Cir. 2015) ......................... 23

*Bunker's Glass Co. v. Pilkington PLC,*
  206 Ariz. 9 (2003) .............................................................................................. 45

*Cannon v. Cherry Hill Toyota, Inc.,*
  184 F.R.D. 540 (D.N.J. 1999) ........................................................................... 15

*Clayworth v. Pfizer, Inc.,*
  49 Cal. 4th 758 (2010) ...................................................................................... 45

*DG ex rel. Stricklin v. Devaughn,*
  594 F.3d 1188 (10th Cir. 2010) ........................................................................ 32

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974) .......................................................................................... 8, 17

*FTC v. Mylan Labs, Inc.,*
  62 F. Supp. 2d 25, 39 (D.D.C. 1999) ................................................................ 30

*Garcia-Rubiera v. Calderon,*
  570 F.3d 443 (1st Cir. 2009) .............................................................................. 9

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
  392 U.S. 481 (1968) .......................................................................................... 34, 45

*Harris v. comScore, Inc.,*
  292 F.R.D. 579 (N.D. Ill. 2013) ........................................................................ 48

*Hawaii v. Standard Oil Co.*,
   405 U.S. 251 (1972) ................................................................................................ 34

*Healey v. Murphy*,
   No. CIV. A. 01-11099-NG, 2009 WL 6613209 (D. Mass. Jan. 14, 2009) ................................. 17

*Humphrey v. Philip Morris, Inc.*,
   551 N.W.2d 490 (Minn. 1996) .................................................................................... 45

*Hyde v. Abbott Labs.*,
   123 N.C. App. 572 (Ct. App. 1996) ............................................................................. 45

*In re Aggrenox Antitrust Litig.*,
   No. 3:14-md-2516 (D. Conn. Oct. 21, 2016) ................................................................... 46

*In re Asacol Antitrust Litig.*,
   907 F.3d 42 (1st Cir. 2018) ............................................................................... passim

*In re Bank of Boston Corp. Sec. Litig.*,
   762 F. Supp. 1525 (D. Mass. 1991) ............................................................................. 12

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 297 (E.D. Mich. 2001) ........................................................................ passim

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 07-cv-5944, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ............................................ 8, 17

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
   291 F.R.D. 13 (D. Mass. 2013) .................................................................................. 50

*In re Citric Acid Antitrust Litig.*,
   145 F. Supp. 2d 1152 (N.D. Cal. 2001) ......................................................................... 30

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   691 F.2d 1335 (9th Cir. 1982), *cert. denied*, 464 U.S. 1068 (1984) ........................................ 30

*In re Digital Music Antitrust Litig.*,
   321 F.R.D. 64 (S.D.N.Y. 2017) .................................................................................. 26

*In re Disposable Contact Lens Antitrust Litig.*,
   No. 3:15-md-2626 (M.D. Fla. Dec. 4, 2018) ................................................................. 9, 12

*In re DRAM Antitrust Litig.*,
   No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ............................................ 31

*In re Flonase Antitrust Litig.*,
   284 F.R.D. 207 (E.D. Pa. 2012) ........................................................................... passim

*In re Lidoderm Antitrust Litig.*,
  No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .............................. passim

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ................................................... 15

*In re Namenda Direct Purchaser Antitrust Litigation*,
  331 F. Supp. 3d 152 (S.D.N.Y. 2018) ................................................................................ 30

*In re Nat. Football League Players' Concussion Injury Litig.*,
  307 F.R.D. 351 (E.D. Pa. 2015) ......................................................................................... 19

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  297 F.R.D. 168, 179 (D. Mass. 2013) .......................................................................... passim

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) .......................................................................................... passim

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) ....................................................................................9

*In re PolyMedica Corp. Sec. Litig.*,
  432 F.3d 1 (1st Cir. 2005) .......................................................................................... 8, 17

*In re Polyurethane Foam Antitrust Litig.*,
  314 F.R.D. 226 (N.D. Ohio 2014) ..................................................................................... 48

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004) ................................................................................... 2, 31

*In re Skelaxin (Metaxalone) Antitrust Litig.*
  299 F.R.D. 555 (E.D. Tenn. 2014) .................................................................................... 20

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  No. 1:12-md-2343, 2014 U.S. Dist. LEXIS 66707 (E.D. Tenn. May 15, 2014) ........................ 30

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  No. 14-md-2503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017) ............................................. passim

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) ................................................................................48, 50

*In re Terazosin Hydrochloride*,
  220 F.R.D. 672 (S.D. Fla. 2004) .................................................................................3, 46

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ..................................................................................... 48

*In re TFT–LCD (Flat Panel) Antitrust Litig.,*
    No. M 07-1827, 2012 U.S. Dist. LEXIS 182374 (N.D. Cal. Dec. 26, 2012) ............................ 30

*In re Vitamins Antitrust Litig.,*
    209 F.R.D. 251 (D.D.C. 2002) ................................................................................13, 17

*In re Vitamins Antitrust Litig.,*
    MDL No. 1285, 2001 WL 855463 (D.D.C. July 2, 2001) ........................................ 30

*In re Warfarin Sodium Antitrust Litig.,*
    391 F.3d 516 (3d Cir. 2004)........................................................................................ 48

*Jay Edwards, Inc. v. New England Toyota Distrib. Inc.,*
    708 F.2d 814 (1st Cir. 1983) ........................................................................................6

*Kinney v. Metro Glob. Media, Inc.,*
    No. 99-cv-579, 2002 WL 31015604, at *4 (D.R.I. Aug. 22, 2002) ............................... 12

*Kohen v. Pacific Inv. Mgmt. Co.,*
    571 F.3d 672 (7th Cir. 2009) ..................................................................................... 32

*K-S Pharmacies Inc. v. Abbott Labs.,*
    No. 94-cv-02384, 1996 WL 33323859 (Wis. Cir. Ct. May 17, 1996)......................... 45

*Magalhaes v. Lowe's Home Centers, Inc.,*
    No. CIV.A. 13-10666-DJC, 2014 WL 907675 (D. Mass. Mar. 10, 2014)................... 17

*Matamoros v. Starbucks Corp.,*
    699 F.3d 129 (1st Cir. 2012) ................................................................................19, 23

*McDonough v. Toys R Us, Inc.,*
    638 F. Supp. 2d 461 (E.D. Pa. 2009) ...........................................................................3

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) .......................................................................................9

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.,*
    596 F.2d 573 (3d Cir. 1979)....................................................................................... 30

*Mims v. Stewart Title Guar. Co.,*
    590 F.3d 298 (5th Cir. 2009)...................................................................................... 32

*Mylan Pharm., Inc. v. Warner Chilcott Pub. Co.,*
    No. CIV. 12-3824, 2013 WL 6145117 (E.D. Pa. Nov. 20, 2013)................................ 11

*Natchitoches Parish Hosp. Svc. Dist. v. Tyco Intern. Ltd.,*
    247 F.R.D. 253 (D. Mass. 2008).................................................................................. 12

*Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*,
    533 F.2d 510 (10th Cir. 1976) ........................................................................6

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, PLC,
    No. CIV.A. 04–5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ......................27, 28

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
    323 F.3d 32, 40 (1st Cir. 2003) .................................................................... 23

*Teva Pharm. USA Inc. v. Abbot Labs.*,
    252 F.R.D. 213 (D. Del. 2008) .................................................................3, 31

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................ 12

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ....................................................................8, 17

**Statutes**

42 U.S.C. § 1983 .............................................................................................. 17

D.C. Code § 28–4509 ........................................................................................ 45

Haw. Rev. Stat. § 480-13 .................................................................................. 45

N.D. Cent. Code § 51-08.1-08 .......................................................................... 45

N.M. Stat. Ann. § 57-1-3 ................................................................................... 45

N.Y. Gen. Bus. Law § 340 ................................................................................. 45

Neb. Rev. Stat. § 59-821.01 .............................................................................. 45

Utah Code Ann. § 76-10-3109 ........................................................................... 45

**Other Authorities**

Joshua P. Davis & Eric L. Cramer, *Antitrust, Class Certification, and the Politics of Procedure*,
    17 Geo. Mason L. Rev. 969 (2010) ................................................................ 34

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... passim

**Treatises**

1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002) ........................... 12

1 William B. Rubenstein, Newberg on Class Actions (5th ed.2012)...........................................18, 19

4 Herbert B. Newberg & Alba Conte, Newberg on Class Actions (2d ed.1985) .............................9

## PRELIMINARY STATEMENT

End-Payor Plaintiffs ("EPPs" or "Plaintiffs") demonstrated in their opening brief[1] that the proposed Class meets the criteria of Rule 23 and that members of the proposed Class, the victims of Defendants' anticompetitive conduct, are "the very group that Rule 23(b)(3) was intended to protect." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 23 (1st Cir. 2015). Defendants challenge EPPs' Class definition, arguing it does not meet the criteria of Rule 23. While Plaintiffs do not concede Defendants' arguments, in order to provide the Court with a clear path to class certification that remedies all purported issues Defendants raise, Plaintiffs propose an amended End-Payor Class definition ("EPP Class") and, alternatively, a Class consisting of only third-party payors ("TPPs" or "TPP Class") (together, the "Classes"). *See infra* Section I. Plaintiffs establish that, under either Class definition, the requirements of Rule 23 are satisfied.

*First*, Plaintiffs establish that the Classes satisfy each requirement of Rule 23(a) – numerosity, commonality, typicality and adequacy. Defendants do not seriously challenge any of these elements. *Second*, Plaintiffs establish that the Classes are ascertainable and that they satisfy the requirements of Rule 23(b)(3). Numerous common questions of law or fact will be decided in this case, including: whether Defendants engaged in anticompetitive conduct; whether Defendants had market power; whether Defendants' misconduct resulted in overcharges for indirect purchasers of brand and generic Loestrin 24 Fe ("Loestrin 24") and Minastrin 24 Fe ("Minastrin 24"); and the extent of aggregate damages resulting from that misconduct.[2] In the face of these overwhelming common issues, one of the proposed Classes should be certified. *Nexium*, 777 F.3d at 9.

---

[1] The Memorandum of Law in Support of End-Payor Plaintiffs' Motion for Class Certification, ECF No. 552, is cited herein as "EPP Br.".

[2] *See* Declaration of Michael M. Buchman in Support of End-Payor Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (ECF No. 553) (hereinafter "Buchman Decl."), Ex. A (End-Payor Plaintiffs' Second Amended Consolidated Class Action Complaint ("CAC")) ¶ 294.

Contrary to Defendants' contention, the First Circuit's recent decision in *Asacol* does not require denial of class certification here.  *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018).[3] In *Asacol*, the First Circuit held that a court must offer a reasonable and workable plan that provides defendants an opportunity to challenge allegations of injury and does not cause individual inquiries to overwhelm common issues.  There is no question that Plaintiffs have offered such a plan in this case.

In discussing (or misconstruing) the elements of Rule 23, Defendants do not, and cannot, make any meaningful effort to distinguish *Nexium* or any of the many other applicable pay-for-delay decisions granting class certification to End-Payors, including *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012); and *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004).  Instead, Defendants misstate the First Circuit's holdings in *Nexium* and *Asacol*, and assert many of the same arguments that the First Circuit expressly rejected in *Nexium*.  In doing so, Defendants create an economic analysis that is wholly disconnected from the legal standards set forth by the First Circuit in those cases, and misconstrue the facts of this case, in an attempt to argue that the reasoning in *Asacol*, based on a different set of facts, should apply here.  As addressed more fully below, none of Defendants' arguments offer a basis for denying Class certification here.

Defendants compound these errors with additional misstatements of law and fact and faulty reasoning.  For example, Defendants repeatedly use the classic straw man fallacy by labeling certain persons and/or entities as "uninjured class members," although they are

---

[3] The *Asacol* decision was issued after Plaintiffs filed their opening brief but prior to the filing of Defendants' brief opposing certification.  As a result, Plaintiffs did not have an opportunity to previously address *Asacol* or brief the purported issues that Defendants raise regarding this case.

expressly *excluded* from the Classes (*e.g.*, brand loyalists and flat co-pay consumers).  Importantly, Defendants also ignore a critical distinction between the facts of this case and *Asacol*.  Plaintiffs here explicitly exclude "brand loyalist" from their End-Payor Class. These brand loyalists, along with other exclusions from the Classes, are defined by reference to objective criteria. To the extent that Plaintiffs must identify brand loyalists, this can be done in a manageable and administratively feasible way that does not require individual inquiry.  Through the opinions offered by Plaintiffs' experts, Myron D. Winkelman, Laura R. Craft, and Eric J. Miller, the record is clear: existing data that covers every brand and generic Loestrin 24 and Minastrin 24 purchase can be obtained from pharmacies and pharmacy benefit managers ("PBMs"), and utilized to identify and exclude proposed Class members in a programmatic manner, as has been done numerous times before, thereby taking the proposed Classes here squarely outside the realm of any of the issues identified by the First Circuit in *Asacol*.[4]  Even if this Court disagrees, however, EPPs have proposed an alternative Class consisting of only TPPs, which is not subject to any of the purported "brand loyalist" concerns.

Defendants likewise ignore the body of well-established law approving the use of aggregate damages and average pricing in virtually identical cases.[5]  Defendants raise the specter of conflicts of interest where none exist, given the common interest of all Class members in proving Defendants' wrongdoing and ensuring full, class-wide recovery.  Defendants also invent or exaggerate immaterial differences among state laws, overlooking the fact the anticompetitive

---

[4] *See* Expert Report of Myron D. Winkelman ("Winkelman Rprt."), Declaration of Laura R. Craft ("Craft Decl."), and Declaration of Eric J. Miller ("Miller Decl."), submitted as Exhibits 1-3, respectively, to the Reply Declaration of Michael M. Buchman in Support of End-Payor Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (hereinafter "Buchman Reply Decl.").

[5] *See, e.g., In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 179 (D. Mass. 2013*), aff'd sub nom. In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015); *Solodyn*, 2017 WL 4621777; *Flonase*, 284 F.R.D. at 232-33; *Lidoderm*, 2017 WL 679367, at *16; *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 348-50 (E.D. Mich. 2001); *Teva Pharm. USA Inc. v. Abbot Labs.*, 252 F.R.D. 213, 231 (D. Del. 2008); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 699 (S.D. Fla. 2004); *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 490 (E.D. Pa. 2009).

conduct alleged here violates *all* of those laws.  Last, Defendants confuse the issues by asking the Court to consider irrelevant merits disputes, including market power issues and but-for generic entry dates, which have no bearing on class certification.  In sum, Defendants have not identified a single, valid justification for depriving members of the proposed Classes of "the only realistic mechanism to vindicate meritorious claims." *Nexium*, 777 F.3d at 23.

Accordingly, Plaintiffs' Motion for Class Certification should be granted.[6]

## I.   EPPS' CLASS DEFINITIONS

As explained in EPPs' opening brief, the Class, as defined in the CAC, satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and should be certified. Nevertheless, to clarify certain points in response to purported issues Defendants raised in their opposition brief, without conceding that they have any merit, EPPs propose the following amended Class definition:

<u>Amended End-Payor Class</u>:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Loestrin 24 Fe and/or its AB-rated generic equivalents in any form, and/or Minastrin 24 Fe and/or its AB-rated generic equivalents in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class" or the "End-Payor Class"), other than for resale, during the period September 1, 2009 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, persons or entities "purchased" Loestrin 24 Fe, Minastrin 24 Fe, or their generic equivalents if they indirectly purchased, paid and/or reimbursed for some or all of the purchase price (the "End-Payor Class").

The following persons or entities are expressly excluded from the proposed End-Payor Class:

> a.   Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

---

[6] Defendants concede that EPPs' counsel have satisfied the Rule 23(g) requirements for appointing lead counsel by not raising this in their brief.

    b.   All federal or state governmental entities, excluding cities, towns or municipalities with self-funded prescription drug plans;

    c.   All persons or entities who purchased Loestrin 24 Fe or its AB-rated generic equivalent, and/or Minastrin 24 Fe or its AB-rated generic equivalent, for purposes of resale or directly from Defendants or their affiliates;

    d.   Fully insured health plans (*i.e.*, Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members);

    e.   Any "flat co-pay" consumers (*i.e.*, consumers who paid the same co-payments amount for brand and generic drugs);

    f.   Any "brand loyalist" consumers who purchased Minastrin 24 after an AB-rated generic equivalent of Minastrin 24 became available and who did not purchase any such AB-rated generic equivalent;

    g.   Pharmacy Benefit Managers; and

    h.   The judges in this case and any members of their immediate families.

***Flat Co-Pay Consumers.*** Flat co-pay consumers are those individuals who pay the same co-pay for brand and generic drugs. Flat co-pay consumers suffer no injury because they pay the same amount for brand and generic drugs, regardless of when the generic comes to market. The flat co-pay consumer definition was amended to clarify this point.

***Brand Loyalists.*** To address Defendants' technical issue regarding brand loyalists, Plaintiffs amend their "brand loyalist" exclusion to include "consumers who purchased Minastrin 24 after an AB-rated generic equivalent of Minastrin 24 became available and who did not purchase any such AB-rated generic equivalent." As explained in more detail in Section IV, *infra*, brand loyalists can be identified in a manageable and administratively feasible way that will not require detailed individual inquiry. In addition, the "brand loyalist" exclusion no longer includes Loestrin 24. This is because, in the actual world, Warner Chilcott, through its anticompetitive product hop, removed brand Loestrin 24 from the market prior to the entry of generic Loestrin 24. As a result, consumers in the actual world did not have the opportunity to switch from brand Loestrin 24 to generic Loestrin 24. Thus, the "brand loyalist" exclusion cannot apply to Loestrin

24 purchasers as a result of Defendants' anticompetitive conduct. And, as recognized under general antitrust principles, a defendant cannot "complain of an uncertainty created by his own wrongdoing." *Jay Edwards, Inc. v. New England Toyota Distrib. Inc.*, 708 F.2d 814, 821 (1st Cir. 1983) (quoting *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 517 (10th Cir. 1976)).[7]

*PBMs.* EPPs have explicitly excluded PBMs from the Amended Class Definition, although it is unnecessary to do so given that PBMs are not End-Payors. *See infra* Sections III.D and IV. To avoid doubt, EPPs specifically exclude PBMs.

If the Court is not inclined to certify the End-Payor Class under the Amended Class Definition, EPPs propose the following alternative class, which is limited to Third-Party Payors ("TPPs"):

TPP Class

> All Third-Party Payor entities ("TPPs") in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Loestrin 24 Fe and/or its AB-rated generic equivalents in any form, and/or Minastrin 24 Fe and/or its AB-rated generic equivalents in any form, for consumption by their members, employees, insureds, participants, or beneficiaries (the "Third Party Payor Class"), other than for resale, during the period September 1, 2009 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, entities "purchased" Loestrin 24 Fe, Minastrin 24 Fe, or their generic equivalents if they indirectly purchased, paid and/or reimbursed for some or all of the purchase price (the "TPP Class").

The following persons or entities are expressly excluded from the proposed TPP Class:

   a.   Defendants and their subsidiaries, or affiliates;

---

[7] In *Asacol*, EPPs conceded that the brand loyalist exclusion was appropriate, even where Defendants' anticompetitive conduct foreclosed the brand and generic from being available at the same time, thereby preventing consumers from demonstrating whether or not they would be loyal to the brand. EPPs here make no such concession.

    b. All federal or state governmental entities, excluding cities, towns or municipalities with self-funded prescription drug plans;

    c. All entities who purchased Loestrin 24 Fe or its AB-rated generic equivalent, and/or Minastrin 24 Fe or its AB-rated generic equivalent, for purposes of resale or directly from Defendants or their affiliates;

    d. Fully insured health plans (*i.e.*, Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members); and

    e. Pharmacy Benefit Managers.

The TPP Class does not contain certain exclusions, which only apply to the proposed Amended End-Payor Class (*e.g.*, flat co-pay consumers; brand loyalist consumers; Defendants' officers, directors, management and employees; the judges in this case).[8]  Defendants incorrectly argue that EPPs are required to identify consumers who are included and who are excluded from the proposed Class (as opposed to proposing a method to do so during allocation) at this stage and that doing so will require individualized inquiry.  EPPs demonstrate herein that this can be done without individualized inquiry.   Nevertheless, the TPP Class definition alleviates the purported concern raised by Defendants.

As explained in detail herein and in EPPs' opening brief, the proposed Class satisfies the criteria of Rule 23.  EPPs proposed alternative TPP Class likewise satisfies the criteria of Rule 23.  EPPs' Motion for Class Certification should be granted.

---

[8] As explained in *Solodyn*, TPPs are not "brand loyalists" since, to fall under that definition, every prescription they purchased, paid for or reimbursed would need to be for a brand drug when a generic version is available.  *Solodyn*, 2017 WL 4621777, at *18 ("an insurer with brand-loyal members is only uninjured here if every one of its members would have been brand-loyal for all Solodyn purchases in each 'but-for' scenario . . . It is highly unlikely, therefore, that institutional payors were uninjured even if some of their members are brand-loyal or purchased the generic during the period in question.").  "Third-party payors, like all antitrust plaintiffs, 'need only suffer damage on one purchase to be injured.'"  *Id.* (quoting *Lidoderm*, 2017 WL 679367, at *20-21); *see also Nexium*, 777 F.3d at 27.  Generic substitution laws, along with TPPs co-pay structures and other incentives that encourage use of generics, make it more likely than not that TPPs are not brand loyalists.

## II.   THE ISSUES OF FACT RAISED BY DEFENDANTS SHOULD NOT BE CONSIDERED AT THE CLASS CERTIFICATION STAGE

As a preliminary matter, Defendants attempt to improperly inject factual arguments into the Court's class certification analysis about but-for generic entry scenarios and market power, which should be rejected.  *See, e.g.,* Def. Br. at 5-10; 22.  These factual disputes are not relevant to the class certification analysis and, therefore, should not be considered at this stage.[9]

As Defendants are aware, the parties' expert reports on merits issues are not due until January 4, 2019.  *See* Interim Case Management Order 14, ECF No. 562.  Dr. French clarified that, for his report, he properly assumed the ██████████████████████████████ ████████████████████████████████████████  French Rprt. ¶ 24.  Dr. French further explained that, ███████████████████████████████████████████████████████████████ ██████████████████  *Id.* ¶ 78.  If later, a different but-for generic Loestrin 24 entry date is determined, Dr. French's ████████████████████████████████████████████████████ ██████████████████████████  *Id.*  Only aggregate damages may change using a different but-for entry data.  *Id.*  But that does not defeat certification.  Further, the factual disputes raised by Defendants concerning the relevant market are the subject of a pending summary judgment motion and have no bearing on class certification.  Thus, they should not be considered here. The Classes satisfy the requirements of Rule 23 and should be certified.

---

[9] *See Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 568 U.S. 455, 466 (2013) (merits questions may only be considered "to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied"); *see also Solodyn*, 2017 WL 4621777, at *6 ("'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage'") (quoting *Amgen*, 568 U.S. at 464-66); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) ("the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir. 2005) (a court should not "allow[] the defendant to turn the class-certification proceeding into an *unwieldy* trial on the merits.") (emphasis in original); *Nexium*, 296 F.R.D. at 58 (D. Mass. 2013) (recognizing that the court "should not engage in a 'full-blown merits analysis'") (quoting *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 24, 2013)).

## III.   THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(a)

### A.  The Classes Are Sufficiently Numerous

Defendants contend that EPPs have not established numerosity under Rule 23(a)(1).  Def. Br. at 20.  Defendants argue that Plaintiffs' reliance on the fact that ██████████ prescriptions" for Loestrin 24 and Minastrin 24 were filled during the Class Period (EPP Br. at 13 (citing French Rprt. ¶¶ 44, 48)) asks the Court to "presume numerosity."  Def. Br. at 20.  Defendants' contention should be rejected because it is illogical and based upon a misinterpretation of law. EPPs adequately established that both proposed Classes are sufficiently numerous, as did End-Payors in numerous other similar cases.[10]

As explained in EPPs' opening brief, the numerosity requirement is generally satisfied by a proposed class consisting of forty or more members.  EPP Br. at 13 (citing *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009)).[11]  "A finding of numerosity may be supported by common sense assumptions, and it is especially appropriate in antitrust actions brought under Rule 23(b)(3)."  *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998) (citing 4 Newberg on Class Actions § 18.03 n.17 (2d ed.1985)).

Defendants erroneously contend that the number of prescriptions for Loestrin 24 and Minastrin 24 "says nothing" about the number of proposed Class members.  This defies basic logic.  Common sense assumptions and basic calculations demonstrate that ██████████

---

[10] *See, e.g., *Order Granting Motion to Certify Class at 117, *In re Disposable Contact Lens Antitrust Litig.*, No. 3:15-md-2626 (M.D. Fla. Dec. 4, 2018) (ECF No. 940) (numerosity satisfied based on expert's observation that 41 million Americans wear disposable contact lenses); *Solodyn*, 2017 WL 4621777, at *12 n.12 (numerosity satisfied where plaintiffs established that "millions of prescriptions are estimated to be involved"); *Flonase*, 284 F.R.D. at 217; *Cardizem*, 200 F.R.D. at 334-35 (numerosity satisfied where plaintiffs indicated that 13 million prescriptions for Cardizem CD were filled in one year).  The fact that defendants often concede rather than contest numerosity in these cases shows that Defendants here take an unreasonable position regarding this basic element of Rule 23.

[11] *See also Nexium*, 296 F.R.D. at 51; *Solodyn*, 2017 WL 4621777, at *4.  EPPs "'need not make that showing to a degree of absolute certainty.'"  *Nexium*, 777 F.3d at 27 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012)).

prescriptions written for Loestrin 24 and Minastrin 24, throughout the Class Period, even when spread across the United States, will clearly cover at least 40 consumers and/or TPP Class members. *Solodyn*, 2017 WL 4621777, at *12 n.12 (certifying class where "millions of prescriptions are estimated to be involved . . . establishing impracticability of joinder here.").

Even putting aside this logical conclusion, EPPs' position is also supported by expert testimony. Performing basic calculations, EPPs' expert, Ms. Laura R. Craft of OnPoint Analytics, Inc., explains that, in 2010 alone, the ████████ prescriptions of Loestrin 24 Fe filled in the United States amounted to ██████ prescriptions per month, which covered at least ██████ patients. Craft Decl. ¶ 27. In addition, at least 40 TPPs are proposed Class members. In 2012 alone, there were approximately █████ employer-sponsored health plans in the United States. Craft Decl. ¶ 28. Therefore, common sense dictates that the number of TPPs exceed 40 throughout the class period.

Defendants resort to quoting the First Circuit's *Nexium* decision out of context to assert that "individual prescriptions [are] 'not a proxy for individual consumers." Def. Br. at 20 (quoting *Nexium*, 777 F.3d at 27-28). However, the cited is related to the First Circuit's *rejection* of the defendants' argument that the presence of uninjured class members defeated predominance. *Nexium*, 777 F.3d at 27-28 ("defendants incorrectly treat individual prescriptions of Nexium as a proxy for individual consumers."). The *Nexium* defendants sought to inflate the number of purported uninjured class members by arguing that the percentage of Nexium prescriptions with no overcharge was equal to the percentage of uninjured consumers. Here, EPPs do not apply faulty logic to contend that the number of prescriptions for Loestrin 24 and Minastrin 24 equal the number of consumers. Instead, EPPs have demonstrated that, applying basic calculations, there are *at least* 40 members of the Classes over the Class Period.

Moreover, the case cited by Defendants, *Mylan Pharm., Inc. v. Warner Chilcott Pub. Co.*, No. CIV. 12-3824, 2013 WL 6145117 (E.D. Pa. Nov. 20, 2013), is inapposite.  In *Mylan*, the Eastern District of Pennsylvania found that the plaintiffs did not demonstrate numerosity because they only pointed to speculative data regarding the number of prescriptions filled and health plans in a single month of the class period.  In contrast, ███ ████████████████████████████████████ ████████████████████████████████████████████.  Craft Decl. ¶¶ 27-28.  Moreover, Defendants neither dispute that millions of prescriptions for Loestrin 24 and Minastrin 24 were filled during the Class Period nor provide evidence sufficient to rebut EPPs' showing of numerosity.  *Nexium*, 777 F.3d at 27.  To the contrary, Defendants own documents tout ███ ████████████████████████████████████ thereby demonstrating numerosity.[12]

EPPs clearly demonstrate that the Classes are sufficiently numerous.  Accordingly, EPPs have satisfied the numerosity requirement under Rule 23(a)(1).

## B.  Numerous Questions of Law or Fact are Common to the Class

Defendants contend that individual issues on both liability and damages "'swamp' issues common to the proposed class," citing to the Rule 23(b)(3) portion of their brief.  *See* Def. Br. at 20.  Defendants' attempt to apply a heightened commonality standard under Rule 23(a)(2) should be rejected.[13]

Rule 23's "questions of law or fact common to the class" requirement does not mandate that *all* questions be common to the class. Fed. R. Civ. P. 23(a)(2); EPP Br. at 14.  To the contrary, "[e]ven a *single common question* can suffice to show commonality under Rule 23(a)(2)," as

---

[12] *See* Buchman Reply Decl., Exs. 4-7 (Exhibit 4 to Deposition of Dr. Sumanth Addanki; and excerpts of WCL0534287; WCL0551167; and WCL1393071) ████████████████████████████████████

[13] *See Disposable Contact Lens*, ECF No. 940 at 119 ("This part of [Rule 23] 'does not require that all the questions of law and fact raised by the dispute be common, . . . or that the common questions of law or fact 'predominate' over individual issues.") (internal citation and quotations omitted); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), (recognizing that the "commonality requirement" is less demanding than the "predominance" requirement).

recognized by the Supreme Court previously, and a court in this Circuit more recently when certifying a similar proposed class of End-Payors in a pay-for-delay case. *Solodyn*, 2017 WL 4621777, at *12 n.12 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011)) (emphasis added). Where, as here, common questions of law and/or fact relate to Defendants' anticompetitive conduct, Rule 23(a)(2) is satisfied. *Id.* (commonality satisfied where "claims all stem from the same alleged anticompetitive conduct").[14]   Here, EPPs demonstrate that key questions of law or fact, many of which relate to Defendants' anticompetitive conduct, are common to the Classes.[15]   EPP Br. at 14–15 (citing CAC ¶ 294).[16]   Defendants do not contest this nor do they cite case law to the contrary. *See* Def. Br. at 20. Accordingly, the Court should find that EPPs have satisfied the commonality requirement with respect to both Classes.

### C. EPPs Established Typicality Under Rule 23(a)(3)

Defendants contend that EPPs did not establish typicality under Rule 23(a)(3). Def. Br. at 21. Typicality is satisfied where a plaintiff's injuries "arise from the same events or course of conduct as do the injuries that form the basis of the class claims" and a plaintiff's claims "are based on the same legal theory" as the Class claims.[17]   "Specifically in the antitrust context, typicality will be established by plaintiffs and all class members alleging the same antitrust violations by

---

[14] *See also Disposable Contact Lens*, ECF No. 940 at 121 (recognizing that in the antitrust context the allegations "by their very nature involve common questions of law or fact."); *Natchitoches Parish Hosp. Svc. Dist. v. Tyco Intern. Ltd.*, 247 F.R.D. 253, 264 (D. Mass. 2008) ("the existence of an alleged conspiracy or monopoly is a common issue that will satisfy the Rule 23(a)(2) prerequisite.") (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 3.10 (4th ed. 2002)).

[15] EPP Br. at 14–15 (citing CAC ¶ 294) ("key questions of law and/or fact that are common to the Class include, *inter alia*: a. whether Defendants conspired to suppress generic competition to Loestrin 24 Fe; b. whether Defendants Warner Chilcott and Watson entered into an unlawful agreement in restraint of trade; . . . q. whether, and to what extent, Defendants' conduct caused antitrust injury (i.e., overcharges) to Plaintiffs and the members of the Class; and r. the *quantum* of aggregate overcharge damages to the Class).

[16] As detailed in EPPs' opening brief and Section V. below, these questions of law or fact predominate over any questions affecting individual Class members.

[17] *Kinney v. Metro Glob. Media, Inc.*, No. 99-cv-579, 2002 WL 31015604, at *4 (D.R.I. Aug. 22, 2002) (quoting *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1532 (D. Mass. 1991)); Fed. R. Civ. P. 23(a)(3).

defendants." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (internal citations and quotation marks omitted). Here, Defendants do not challenge that: (i) EPPs' injury (supracompetitive prices) arises from the same events or course of conduct (Defendants' anticompetitive conduct) as do the injuries that form the basis for the Classes' claims; and (ii) EPPs' claims are based on the same legal theories (unlawful restraint of trade and monopolization) as the claims of the Classes. EPP Br. at 16. Instead, Defendants make the unsupported contentions that: (i) there are "substantial" differences among the state laws at issue; (ii) the claims of named Plaintiff City of Providence, Rhode Island ("Providence") are not typical of an invented "municipal" class, which EPPs do not even seek to certify; and (iii) the named Plaintiffs Ms. Loy and Ms. Alexander are atypical of other members of the End-Payor Class due to Defendants' own anticompetitive conduct and irrelevant facts concerning Loestrin 24's indications. Defendants' arguments should be rejected.

**Minor Variations Among State Laws Do Not Defeat Typicality.** It is well recognized that the elements of each state law are substantially similar.[18] The fact that EPPs' claims are based on the laws of various states does not defeat typicality. In addition, Defendants are incorrect that EPPs did not follow an "instruction" to "delve into" the specifics of the relevant state statutes in order to establish typicality. Def. Br. at 21. To the contrary, EPPs make clear that each EPPs' injury (supracompetitive prices) arises from the same course of conduct and that

---

[18] EPP Br. at 16-17 (citing Buchman Decl. Ex. C, which compares the similarities among the relevant antitrust and consumer protection statutes in this case); *Asacol*, 907 F.3d at 49 (stating that "success on the claim under one state's law will more or less dictate success under another state's law" in a monopolization case involving a similar liability theory); *Flonase*, 284 F.R.D. at 217-18 (End-Payor's state law claims are typical because the "state law claims for monopolization, [unfair and deceptive trade practices], and unjust enrichment arise from an identical course of conduct" by the defendant"); EPP's Brief in Opposition to Defendants' Motion to Dismiss (ECF No. 205) at Section XI (describing the similarities among state unjust enrichment laws; *see also Solodyn*, 2017 WL 4621777, at *20 (certifying End-Payor class and recognizing that plaintiffs compilation of state laws at issue, similar to the chart EPPs provided here, "highlighted the substantial similarities in the language among states and between state and federal antitrust provisions").

their claims are based on the same legal theories as the members of the proposed Classes – *e.g.*, Defendants' scheme to delay entry of generic Loestrin 24 and Minsastrin 24.  The relevant state laws, which allow End-Payors to seek damages for the anticompetitive conduct at issue here (unlawful restraint of trade and monopolization), share the same essential characteristics.  *See* EPP Br. at 16-17 (citing Buchman Decl. Ex. C); *id.* at 17 n.26.[19]  In light of these similarities, no "highly fact-specific" or "individualized determinations" are necessary to establish Defendants' liability to each member of the Classes.  Def. Br. at 21.  Recognizing this, courts regularly certify End-Payor class actions alleging similar antitrust and consumer protection claims under the laws of multiple states.[20]  Accordingly, EPPs have established typicality.

> **Providence Does Not Seek to Represent a Class of "Municipal" Class Members.**

Defendants contend that Providence did not "show it can adequately represent all municipalities." Def. Br. at 21.  Once again, Defendants employ a straw man argument by ignoring that EPPs do not seek to certify a "municipal class" of which Providence would be a class representative. Providence, as with other class members, is an End-Payor of pharmaceutical drugs, including Loestrin, Minastrin and their AB-rated generic equivalents.  Providence purchases, pays or provides reimbursement for its members' prescription drug purchases through its self-funded drug benefit plan.  CAC ¶ 15.  Providence's injuries (overpayment for purchases of Loestrin 24 and Minastrin) arise from the overarching scheme of the Defendants, and "the same unlawful conduct was directed at or affected both [Providence] and the members of the putative class . . . irrespective of varying fact patterns that may underlie individual claims."  *Cannon v. Cherry Hill*

---

[19] *See also Solodyn*, 2017 WL 4621777, at *20 (in finding predominance satisfied, recognizing that "[i]ssues regarding state law variations regarding damages, for instance, are not sufficiently material to defeat class certification. Rather, to the extent these damages questions or other issues are significant, they may be addressed at summary judgment and/or accommodated on a special verdict form . . . .").

[20] *Solodyn*, 2017 WL 4621777, at *12 n.12 (certifying end-payor class and finding the typicality requirement satisfied where plaintiffs asserted that "the putative EPP representatives' claims arise from the same unlawful conduct by the Defendants as absent class members and they suffered the same injury in the form of overpayments[.]").

*Toyota, Inc.*, 184 F.R.D. 540, 544 (D.N.J. 1999).  Courts in similar pay-for-delay cases have reached the same conclusion in certifying classes that both include and appoint the City of Providence as a Class Representative on behalf of near-identical Classes.  *See, e.g.*, *Solodyn*, 2017 WL 4621777, at n.12 (typicality satisfied where "EPP representatives' claims [including Providence] arise from the same unlawful conduct by the Defendants as absent class members and they suffered the same injury in the form of overpayments"); *Lidoderm*, 2017 WL 679367 (certifying End-Payor class).

The case cited by Defendants, *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ("*LIB*"), is inapposite.  *First*, *LIB*, unlike this case, was brought by indirect purchasers of electronic products who specifically asserted their claims on behalf of either a proposed nationwide class of municipal governments or managerial state-specific governmental subclasses.  *Id.* at *16.  *Second*, *LIB* was a motion to dismiss decision which addressed the defendants' argument that the indirect purchaser plaintiffs, including California governmental entities, consumers and businesses, did not have Article III standing to assert claims on behalf of the proposed governmental class and subclasses.  *Id.*   Defendants misquote *LIB* to incorrectly imply that "'sensitive issues" exist with municipal government plaintiffs, even though the *LIB* Court did not find that concrete issues existed.  Def. Br. at 22 (quoting *LIB*, 2014 WL 4955377 at *18).  Instead, the *LIB* court was referencing that the plaintiffs merely proposed government subclasses "to handle any issues that come up" without specifying what those "issues" were.  *LIB*, 2014 WL 4955377 at *18.  Defendants merely speculate that there could be "issues" here, based only on *LIB*, without meeting their burden of establishing that issues actually exist that defeat typicality.

As explained above, Providence's claims and those of the End-Payor Class and TPP Class arise from Defendants' anticompetitive scheme, Providence and members of the Classes assert

the *same* legal theories (restraint of trade and monopolization), and Providence suffered the *same* injury as other Class members (overcharge damages).   Thus, Providence's claims are typical. Other federal courts have reached the same conclusion when appointing Providence as a representative of End-Payor classes in other pay-for-delay cases.   Accordingly, the typicality requirement is easily satisfied.

       **The Consumer Class Representatives' Claims are Typical.**   Defendants first contend that Ms. Loy and Ms. Alexander, "are not typical of other patients in the class" because they ███ ███████████████████████ Def. Br. at 22.   Defendants' argument should be rejected because it is based on the illogical and unsupported presumption that Ms. Loy and Ms. Alexander ███████████████████████████ To the contrary, ███████████████████████ ███████████████████████████████████ Ms. Loy and Ms. Alexander, ███████████████████████ For example, Ms. Loy, as with other End-Payor Class members, testified that ██████████████████████████████████████████ ███████████████████████████ Buchman Reply Decl., Ex. 8 (Loy Tr.) at 68:10-12; 89:10-21; 189:2-18.   This was due to Defendants' anticompetitive conduct.   CAC ¶¶ 244-276, 287.   Therefore, Defendants cannot ███████████████████████████[21] and atypical due to *Defendants'* anticompetitive conduct.   Ms. Loy and Ms. Alexander both testified that ████████████████████████████████████████ Buchman Reply Decl., Ex. 8 (Loy Tr.) at 149:18-151:20, 188:2-20; Ex. 9 (Alexander Tr.) at 115:21-116:8. Thus, their claims are typical of those of the End-Payor Class.

       Defendants next argue that Ms. Loy and Ms. Alexander's claims are atypical because they ████████████████████████████████████████ Def. Br. at 22.   That

---

[21] EPPs define "brand loyalists" to include those who purchased brand Minastrin 24 after generic Minastrin 24 entered the market. ██████████████████████████████████████

is irrelevant.  The fact of a purchase is the critical element to establish typicality.  Defendants

further contend, without support, that ███████████████████████████████████████████

███████████████ and EPPs' alleged harm is █████████████████[22] to somehow imply that

Ms. Loy and Ms. Alexander's claims do not "share the 'same essential characteristics as the

claims' of most class members."  Def. Br. at 22 (quoting *Magalhaes v. Lowe's Home Centers, Inc.*,

No. CIV.A. 13-10666-DJC, 2014 WL 907675, at *6 (D. Mass. Mar. 10, 2014)).[23]  This conflates

market power and class certification issues.  Again, ██████████Ms. Loy, Ms. Alexander, and

other members of the proposed End-Payor Class ███████████████████████is irrelevant to

_____

[22] Defendants' attempt to interject irrelevant merits disputes concerning the market power (Def. Br. at 22) into the typicality analysis is improper and should be rejected.  *See Solodyn*, 2017 WL 4621777, at *6 ("'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage'") (quoting *Amgen*, 568 U.S. at 464-66, *see also Amgen*, 568 U.S. at 466 (merits questions may only be considered "to the extent []that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied"); *Waste Mgmt. v. Mowbray*, 208 F.3d at 298 ("the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. at 178); *PolyMedica*, 432 F.3d at 17 (a court should not "allow[] the defendant to turn the class-certification proceeding into an *unwieldy* trial on the merits.") (emphasis in original); and *Nexium*, 296 F.R.D. at 58 (D. Mass. 2013) (recognizing that the court "should not engage in a 'full-blown merits analysis'") (quoting *CRT*, 2013 WL 5391159, at *5).

[23] *Magalhaes* is inapposite.  It was not an antitrust case.  The plaintiff's claims in *Magalhaes* were based on Lowe's Home Center, Inc.'s alleged misclassification of installers as independent contractors. The court found that typicality was not satisfied where the scope of the named plaintiff's installation work differed from that of proposed class members. 2014 WL 907675 at *7.  Here, no such differences among named Plaintiffs and proposed Class members are relevant to the claims in this action.

The other case cited by Defendants, *Healey v. Murphy*, is also inapposite as it dealt with an entirely different factual scenario and different legal claims. Def. Br. at 21 (citing *Healey v. Murphy*, No. CIV. A. 01-11099-NG, 2009 WL 6613209 (D. Mass. Jan. 14, 2009)).  In *Healy*, the named plaintiff, who had been released from a treatment center for sexually dangerous persons, brought civil rights claims under 42 U.S.C. § 1983 against the center and others challenging the conditions of confinement and adequacy of the treatment. *Id.* at *1.  The court, in recommending denial of plaintiff's class certification motion, found typicality lacking because the interest of the named plaintiff, who had been released from the center, were "at odds" with the interests of members of the proposed class, which included persons currently detained or committed at the center. *Id.* at *10.  The court also found typicality lacking because "important factual differences will arise" between class members, including, *inter alia*, the conditions they experienced and the treatment they received at the center. Again, here, Defendants have established no similar differences among the named Plaintiffs and proposed Class members that would defeat typicality.  In this antitrust case, "typicality will be established by plaintiffs and all class members alleging the same antitrust violations by defendants." *Vitamins*, 209 F.R.D. at 260 (D.D.C. 2002) (internal citations and quotation marks omitted).

their claims.  The fact that they were overcharged for their purchases is the critical element to establish typicality.  As with the other End-Payor Class members, Ms. Loy and Ms. Alexander suffered injury in the form of overcharge damages for the drugs at issue. *See Solodyn*, 2017 WL 4621777, at n.12.  Thus, Defendants have shown no relevant differences between Ms. Loy and Ms. Alexander that defeat typicality.

The typicality requirement of Rule 23(a) is satisfied and EPPs' class certification motion should be granted.

### D. EPPs Will Adequately Represent the Classes and No Fundamental Conflicts Exist Among Members of the Proposed Classes

Defendants contend that the named EPPs are not adequate representatives of the proposed Classes based on a speculative argument that "substantial conflict" may exist between members of the proposed Classes.  Def. Br. at 22-23.  Defendants' argument is based, in part, on the contention that members of the proposed Classes, along with non-members, purportedly share the cost of drugs and "may assert competing claims for the same 'overcharge.'"  *Id.* at 23. Defendants' speculative argument that a conflict exists should be rejected.  *Solodyn*, 2017 WL 4621777, at *12 ("[S]peculative conflict should be disregarded at the class certification stage.").[24] Because the purchase data provided by TPPs, PBMs or pharmacies sets forth the amount that each party to the transaction paid, there will be no "competing claims" for the same overcharge as Defendants' erroneously contend.

Minor distinctions between EPPs and Class members does not render them inadequate representatives.  *Solodyn*, 2017 WL 4621777, at *12 (quoting *Matamoros v. Starbucks Corp.*, 699

---

[24] *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 337 (E.D. Mich. 2001) ("A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit.") (citation omitted); *see also* Newberg on Class Actions § 3:58 (5th ed.) ("Conflicts that are merely speculative or hypothetical will not affect the adequacy inquiry.  A conflict must be manifest at the time of certification rather than dependent on some future event or turn in the litigation that might never occur.").

F.3d 129, 138 (1st Cir. 2012)) ("'[P]erfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable.'"). The adequacy inquiry "focuses on conflicts that are 'fundamental to the suit and that go to the heart of the litigation." *Id.* (citing *Matamoros*, 699 F.3d at 138); 1 William B. Rubenstein, Newberg on Class Actions § 3:58 (5th ed.2012). A fundamental conflict may exist where, for example, "by maximizing their own interests, the putative representatives would necessarily undercut the interests of another portion of the class." *In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 376 (E.D. Pa. 2015) (quoting Newberg on Class Actions § 3:58 (5th ed.)).[25] Defendants have not shown a fundamental conflict here because there is none. EPPs satisfy the adequacy requirement of Rule 23.

*First*, Defendants incorrectly contend that PBMs are members of the proposed Classes who "share" in the cost of drugs, but who are not "represented by a named [EPP]." Def. Br. at 23 (citing Hughes Rprt. ¶ 218-22).[26] Defendants only cite Dr. Hughes as support for this. *Id.* Dr. Hughes provides no support, let alone record evidence, for his conclusory opinion that ███████ ████████████████████████████████████████████████████ Hughes Rprt. at 217. To the contrary, PBMs are not members of the Class because they are not End-Payors – they do not indirectly purchase, pay and/or provide reimbursement for some or all of the purchase price for Loestrin

---

[25] That was the precise conflict that arose among members of the proposed settlement class in *Amchem*, 521 U.S. 591 cited by Defendants. Def. Br. at 23. *Amchem* is distinguishable. In *Amchem*, the court found that a proposed settlement class did not contain the structural assurance required for a class containing diverse groups, which included individuals who were either: (i) injured by asbestos; or (ii) only exposed to asbestos. The court explained that the two groups had competing interests, the former had the goal of immediate payments and the latter sought to ensure a protected fund for the future. *Id.* at 626. Here, no two "subgroups" with diverging interests similar to those in *Amchem* exist that would create a fundamental conflict and defeat adequacy. The named EPPs and the proposed Class members all have the same interest in proving liability and recovering the full amount of damages, which do not conflict. *See Nexium*, 297 F.R.D. at 173 ("alignment of incentives" between TPPs and consumers established by fact that all end-payors paid overcharges for the same product); *see also Cardizem*, 200 F.R.D. at 337 (all end-payors had "the same interest in maximizing the aggregate amount of classwide damages").

[26] Although PBMs are not End-Payors, for the avoidance of doubt, EPPs specifically excluded PBMs from the Class definitions.

24, Minastrin 24, and/or their AB-rated generic equivalents.  Moreover, PBMs do not buy

pharmaceuticals for consumption by themselves, their families, or their members, employees,

insureds, participants, or beneficiaries, other than for resale.  Indeed, five of the largest PBMs

have previously provided declarations in similar pay-for-delay cases, and submitted the same in

this case, confirming that they are not members of the proposed Classes.[27]  Plaintiffs' expert, Mr.

Myron D. Winkelman, ████████████████████████████████████████████████████████

████████████████████████████████.  Winkelman Rprt. ¶ 46-56.  ████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████████.  Id. ¶ 45.  ██████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

████████.  Winkelman Rprt. ¶ 46-50; see Nexium, 297 F.R.D. at 179 (finding that PBMs are

"'mere conduits' for TPP payments to pharmacies, and as financial intermediaries, are not a part

of the putative class).[28]  Moreover, contrary to Dr. Hughes' contention, ███████████████████

█████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  Winkelman Rprt. ¶ 53 (citing

██████████████████████████████████████████████████████  Therefore, no named EPP

is required to "represent" PBMs and no "substantial conflict" exists among members of the

Classes.[29]  Thus, Defendants' speculation that conflicts exist should be rejected.

---

[27] See Buchman Reply Decl., Exs. 10-14 (Declaration of Steven Schaper of Caremark, L.L.C., March 28, 2018; Declaration of Tom Henry of Express Scripts, Inc., March 27, 2018; Declaration of Robert Lahman of OptumRX, March 28, 2018; Declaration of Kyle Brua of Prime Therapeutics LLC, March 28, 2018; and Revised Declaration of Jonathan Stocker of Prime Therapeutics, April 3, 2018).

[28] See also Winkelman Decl. ¶ 51 (quoting █████████████████████████████████████
███████████████████████████████████████████████████████

[29] Defendants' reliance on In re Skelaxin (Metaxalone) Antitrust Litig. 299 F.R.D. 555 (E.D. Tenn. 2014) is misplaced.  In Skelaxin, unlike here, PBMs were included in the proposed class definition and the plaintiffs and their expert conceded that PBMs bore some "price risk" for pharmaceutical transactions. The court found that conflicts among PBMs and other payors precluded a finding of adequacy because each transaction would involve potential class members with divergent interests regarding who paid the overcharge in the transaction.  As demonstrated by EPPs' expert Mr. Winkelman, PBMs bear no such

*Second*, Defendants speculative contention that TPP and consumer Class members are "chasing the same dollar of overcharge" and that purported "issues" relating to damages allocation exist should be rejected. Def. Br. at 23. Defendants' argument implies, without support, that TPPs and consumers somehow pay the same portion of the price of a prescription drug. *Id.* However, such "[h]ypothetical conflicts, particularly regarding damages allocation, are insufficient to defeat a showing of adequacy under Rule 23(a)(4)." *Solodyn*, 2017 WL 4621777, at *13. To the contrary, the record evidence reflects that data obtained from PBMs and pharmacies track the amount of each purchase that is paid by the TPP and by the consumer.[30] As a result, TPPs and consumers are not "chasing the same dollar overcharge" and the damages can easily be apportioned among them based on available data. Even if Defendants were right, which they are not, they have not shown that this purported conflict relating to damages allocation "would permeate the *aggregate* damages calculation." *Lidoderm*, 2017 WL 679367, at *26; *see also Nexium*, 297 F.R.D. at 173 ("[P]otential issues with the damages allocation are but weak indicators of existing conflicts of interest between the named representative plaintiffs and the remaining class members.").

*Third*, no fundamental conflict exists between the named TPP and consumer EPPs and Class members. Their incentives are aligned because "all putative members seek to show that they were injured in the same way—overcharges—through the same illegal conduct by Defendants. *Solodyn*, 2017 WL 4621777, at *12. Courts in similar pay-for-delay cases have found that "[t]his alignment of incentives is generally sufficient to overcome a challenge on conflict of interest grounds." *Id.* (citing *Lidoderm*, 2017 WL 679367, at *26-27; *Nexium*, 297 F.R.D. at 172;

___
price risk. In this case, damages will be apportioned among End-Payor members of one of the proposed Classes and there will be no need for each class member to offer proof to show that other Class members should not receive damages. *See Lidoderm*, 2017 WL 679367, at *26 n.38 (distinguishing *Skelaxin* and finding that end-payors satisfied the adequacy requirement of Rule 23(a)(4)).

[30] *See* Craft Decl. ¶ 13; Winkelman Rprt. ¶ 27; Miller Decl. ¶¶ 5, 6, 16

and *Cardizem*, 200 F.R.D. at 337).  It is irrelevant, as Defendants contend (Def. Br. at 23), that  because her incentives are still aligned with those of the End-Payor class.

shares the interests of other members of the proposed End-Payor Class in establishing that Defendants' overall anticompetitive scheme was unlawful.  will not have a competing interest with other proposed Class members in connection with her claim for overcharges on her purchases, and Defendants do not, and cannot, establish that such a competing interest exists.  *Nexium*, 297 F.R.D. at 172 ("A showing of an alignment of incentives between the class and the class representatives can sufficiently overcome a challenge on conflict of interest grounds.").  Further, and contrary to Defendants' contention (Def. Br. at 24), who are excluded from the End-Payor Class.  *See supra* Section I.  Thus, no "fundamental conflict" exists between and members of the proposed End-Payor Class.

Accordingly, EPPs have established adequacy under Rule 23(a)(4) and their motion for class certification should be granted.

## IV.    THE PROPOSED CLASSES ARE ASCERTAINABLE

As in *Nexium*, here, the Class definitions are based on objective criteria – purchases of Loestrin 24, Minastrin 24 and their AB-rated generic equivalents, not for resale, during the Class Period – that permit a determination of who is included in proposed Classes.  Nothing more is required to demonstrate ascertainability.  *Nexium*, 777 F.3d at 19 (class definition satisfied this criterion "by being defined in terms of purchasers of Nexium during the class period (with some

exceptions that also satisfy objective standards).").[31]  Defendants appear to concede that EPPs have shown that the Classes are readily ascertainable based on objective criteria.  But Defendants instead contend that EPPs did not demonstrate ascertainability because they purportedly: (i) do not provide an administratively feasible method for determining who is in or who is excluded from the proposed Classes that protects Defendants' Seventh Amendment and due process rights; and (ii) seek to "inflate" the Class size because the Class includes purchasers of generic drugs not sold by a Defendant.  Def. Br. at 12-19.  Defendants' arguments should be rejected.

The First Circuit in *Nexium* did not hold that EPPs are required to identify each member of the Class at the class certification stage.  *Nexium* requires only that Plaintiffs proffer a common test or methodology for doing so.  *Nexium*, 777 F.3d at 24 n.20.  This requirement ensures that, "[a]t the class certification stage, the court [is] satisfied that, prior to judgment, *it will be possible* to establish a mechanism for distinguishing the injured from the uninjured class members."  *Id.* at 19 (emphasis added).  Defendants here, like the defendants in *Nexium*, "have merely speculated that a mechanism for exclusion cannot be developed later.  This is not enough to overcome plaintiffs' case for having met the requirements of Rule 23."  *Id.* (citing *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)).

Unlike in *Asacol*, upon which Defendants rely, the End-Payor Class definition here explicitly excludes brand loyalists, among others who were not injured.  Thus, there is no need to "distinguish injured from the uninjured Class members," as Defendants posit, because brand loyalists are not "uninjured Class members."  *See supra*. Section I.  "In *Nexium*, the First Circuit explained that the putative class need not propose the specific mechanism to exclude uninjured consumers at the time of class certification, as long as a court is confident that such a mechanism

---

[31] *See also Matamoros*, 699 F.3d at 139 and *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 337 n.11 (D. Mass. 2015), *aff'd*, 809 F.3d 78 (1st Cir. 2015).

does exist." *Solodyn*, 2017 WL 4621777, at *16 (citing *Nexium*, 777 F.3d at 19-20).  Moreover,

unlike in *Asacol*, Plaintiffs here have proffered the opinion of Ms. Craft, ███████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████. *See* Craft Decl. at ¶ 17-24.

Thus, EPPs have established ascertainability.

A. **The Data-Rich Pharmaceutical Industry Contains Information to Ascertain Members of the Proposed Classes and Those Excluded from the Classes in a Manageable and Administratively Feasible Way**

Defendants' expert Dr. Hughes' statement that ███████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████. Hughes Rprt. at 8, 50.  As

explained by EPPs' expert, Laura Craft, ████████████████████████████████

█████████████████████████████Craft Decl. ¶ 5.  As Ms. Craft states:

> The pharmaceutical industry is one of the most heavily regulated, reported and tracked industries in the world. More point of sale data is collected, electronically stored, and tracked for products in this industry than for virtually any other product type or class – with the possible exception of hazardous materials and explosives . . . [B]oth the extensive and detailed data [are] available for prescription drug sales and the basic technological capabilities to match transactions using record linkage algorithms and other tools . . . Because these records are more detailed and precise than in virtually any other consumer purchasing market, they provide an unusually good basis for ascertaining class membership.

*Id.*[32]  Dr. Hughes' █████████████████████████████████████████████████

██████████████████████████████. *Id.*; *see also* Hughes Rprt. ¶ 93 n.109.  Courts,

---

[32] Recently, 30 state Attorneys General in an *amici curie* brief described the abundance of usable electronic sales data in the context of consumer goods: "[T]he volume and usability of available data have exploded since the 1970s.  Distributors and other resellers often retain detailed sales data in a digitized format.  That data allows economists to avoid speculation and control for potentially independent variables to show a reasonable probability that a given price increase to end users resulted from an anticompetitive overcharge by manufacturers."  Brief for Texas, Iowa, and 29 Other States as *Amici Curiae* in Support of Respondents at 14, *Apple Inc. v. Pepper*, No. 17-204 (U.S. October 1, 2018) (2018 WL 4808836, at *14).

including at least one federal court in this Circuit, have recognized the availability of prescription drug data that can be used to ascertain End-Payor classes.[33]



.[34]  *Id.* ¶ 8; Miller Decl. ¶¶ 4–5.[35]

Ms. Craft

Craft Decl. ¶¶ 6, 15.

***Class Members.***  Ms. Craft

es.  Craft Decl. ¶ 13.  This data

*Id.* ¶ 13; *see also* Winkelman Rprt. ¶ 27 (

)); Miller Decl. ¶¶ 5; 6.  In addition, pharmacies have "pharmacy logs," which

---

[33] *See, e.g., Solodyn*, 2017 WL 4621777, at *13-14 (recognizing that it is administratively feasible to ascertain end-payor class membership in the pharmaceutical industry given that data is collected and maintained at every transaction level); *Lidoderm*, 2017 WL 679367, at *29 n.41 (finding that end-payor plaintiffs' expert's opinion that pharmacy and PBM records existed and were available supported ascertainability).

[34]

Winkelman Rprt. ¶ 22.                                                                                                  .

Craft Decl. ¶ 14.  That EPPs have obtained documents from pharmacies and PBMs to produce in this case and that PBMs have sat for depositions and produced documents in this case further supports EPPs' assertions that prescription drug records are available to satisfy ascertainability.

[35]                                                                                  .  *Id.* ¶¶ 7, 8, 15; *see also* Winkelman Rprt. ¶¶ 30-31, 42.  Thus, this data can be                                          Winkelman Rprt. ¶42; *see also* Craft Decl. ¶ 15.

████████████████████████████████████████████████████████████████

Craft Decl. ¶ 14; Winkelman Rprt. ¶ 40; Miller Decl. ¶¶ 7–8.

EPPs' expert Eric J. Miller of A.B. Data, Ltd. also provides real-world examples where class members have been identified in indirect purchaser pharmaceutical cases ████████ ████████████████████████████████████████████████████ Miller Decl. ¶¶ 3, 9 (explaining that ████████████████████████████████████████████████████████ ████████████████████████████████████████ ¶¶ 12–15.  In addition, Mr. Miller explains how subpoenas sent to PBMs and pharmacies in a recent case requested specific NDC codes for the drugs at issue and targeted electronic data fields to obtain the appropriate data.  Miller Decl. ¶ 16.  Based on this information, ██████████████████████████ ████████████████████████████████████ Miller Decl. ¶ 15.

Contrary to Defendants' argument, it is not necessary to ████████████████████ ████████████████ (Def. Br. at 12–13) given that PBMs are not End-Payors of prescription drugs and have expressly disavowed any claim that they are End-Payors or insurers.[36]  Accordingly, PBMs are not members of the proposed Classes, and are instead explicitly excluded from the Classes.[37]

EPPs also propose a feasible methodology to identify brand loyalists, flat co-pay consumers and fully-insured health plans, which are specifically excluded from the Classes.[38]  Def.

---

[36] *See* Buchman Reply Decl. Exs.10–14 (PBM Declarations).

[37] ████████████████████████████████████████████████████████ Craft Decl. ¶ 21.

[38] The cases cited by Defendants are inapposite.  In *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64 (S.D.N.Y. 2017), the court rejected plaintiffs' expert's statement that digital service providers ("DSPs") retained records of music download sales because the expert was not "qualified in the data retention policies of DSPs, and there are no objective criteria that would allow the court to infer that DSPs retain transaction data" for digital music.  *Id.* at 90.  To the contrary, here, the PBMs declarations demonstrate that this data is maintained and EPPs' experts ████████████████████ *See, e.g.*, Craft Decl. ¶¶ 2-3, 6; Winkelman Rprt. ¶¶ 1-7; Miller Decl. ¶ 2.

Br. at 13-17.  In her declaration, Ms. Craft ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████  *See* Craft Decl. ¶¶ 16-24.   Defendants imply that the need to look at any

claims data defeats ascertainability.  Def. Br. at 13.[39]  That is not the case where, as here, the

types of electronic claims data and other information available can be used to programmatically

identify those who are included and excluded from the Classes.  Ms. Craft makes clear ████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. Craft Decl. ¶ 12

█████████████████████████████████████████████████████████████████████████

and ¶¶ 16, 20, 24.  For example:

- **Brand Loyalists.**  As stated above, EPPs amended the End-Payor Class definition to clarify that "brand loyalists" consumers include those who purchased Minastrin 24 and did not purchase generic Minastrin 24 when it became available.  EPPs ████████ ██████████████████████████████████████████ Craft Decl. ¶ 24.  Ms. Craft explains that ███████████████████████████████████████████ ███ *Id.* ██████████████████████████████████████████████ ███████████████████████████████████████████████████. *Id.*  Thus, there is no need to perform an inquiry into individual "patient preferences" to identify brand loyalists in the but-for world.  Def. Br. at 14.  The brand loyalist exclusion in the End-Payor Class definition permits brand loyalists in the real world to be identified and excluded.[40]

---

[39]  *Ault v. J.M. Smucker Co.*, 310 F.R.D. 59 (S.D.N.Y. 2015), also cited by Defendants (Def. Br. at 16) is irrelevant.  In that case, the court denied certification to a class of cooking oil purchasers where the plaintiff merely asserted that class members could be identified from retailer records, without elaborating on how it was administratively feasible to identify them, and improperly asserted that self-identification was a feasible method for identifying members without explaining how it would be performed or authenticated.  *Id.* at 64.  EPPs here establish that the records both exist and can be utilized in an administratively feasible manner to identify members of the Classes and those excluded from the Classes.

[39]  In addition, that ███████████████████████████████████████ That witness is not an expert witness and her testimony does not establish that there is "no way" to determine whether a member of the End-Payor Class bought both Loestrin 24 and generic Loestrin 24.  Moreover, Defendants' contention is belied by the fact that, due to Defendant Warner Chilcott's anticompetitive product hop, ██████████ ███████████████████████████████ French Rprt. ¶ 68.

[40]  The case cited by Defendants, *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline*, PLC, No. CIV.A. 04–5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) (what Defendants

27

In light of EPPs' proposed methodology for identifying brand loyalists and excluding them from the End-Payor Class, there is no "mis-match," as Defendants contend, between EPPs' liability theory and damages calculation, which does not "calculate damages for persons who would have purchased generic Loestrin 24, even if they never did so." Def. Br. at 14. The damages calculation is based on actual purchases by End-Payor Class members and does not include brand loyalists.[41]

- **Flat Co-Pay Consumers.** . Craft Decl. ¶ 23.[42] *Id.* Flat co-pay consumers can be identified by *Id.* Thus, EPPs propose a feasible methodology for identifying flat co-pay consumers and excluding them from the End-Payor Class.

That certain consumers did not pay a co-pay for Loestrin 24, Minastrin 24 or their generic equivalents due to the Affordable Care Act is irrelevant. Def. Br. at 15-16. Since these consumers did not pay for the drugs at issue, they are not included in the End-Payor Class. Nevertheless, if a TPP did provide co-pay free coverage for the drugs at issue, this is a and, thus it may not be necessary to search available data for consumer purchases. *Id.*

- **Fully-Insured Health Plans.** A database of publicly available information Craft Decl. ¶ 20. Annual public reports to Congress, using information from employer-sponsored health plans, *Id.* Thus, fully-insured health plans can be identified and excluded from the Classes. EPPs propose a feasible methodology for identifying fully-insured health plans and excluding them from the proposed End-Payor Class and TPP Class.

cite as *Wellbutrin SR*), is distinguishable. In *Wellbutrin SR*, brand loyalists were not explicitly excluded from the proposed class. *Id.* at *2. Moreover, unlike the plaintiffs in *Wellbutrin SR*, EPPs here put forth a method for identifying brand loyalists that is amply supported by record evidence and expert testimony, and that would not require an inquiry into "'individual circumstances [or] attitudes toward generic versus branded drug purchases.'" Def. Br. at 14 (quoting *Wellbutrin XR*, 2010 WL 3855552, at *25). Further, the portion of the *Wellbutrin* decision cited by Defendants concerned whether the plaintiffs demonstrated that they could use common proof to show class-wide impact, not ascertainability.

[41] . Craft Decl. ¶ 24.

[42] As stated above, Defendants and Dr. Hughes' *See* Def. Br. at 15.

In light of the above, contrary to Defendants' contention, no individual inquiry or proof, such as declarations or affidavits, is necessary to identify Class members or those excluded from the Classes. *Id.* ¶ 16; Def. Br. at 15, 17 (citing *Asacol*).  Therefore, EPPs' administratively feasible method for identifying and distinguishing members of the Classes from those excluded from the Classes protects and will not implicate Defendants' Seventh Amendment and due process rights. Data will be used to identify and exclude class members, prior to any trial, thus providing Defendants with an opportunity to contest the membership of any particular individual or entity in the Class, without resort to the type of individual proof that the Court appeared to reject in *Asacol.*

Accordingly, EPPs have established a feasible methodology for identifying members of the Classes and those excluded from the Classes, and have satisfied the ascertainability requirement.[43]

## B. EPPs Properly Include Purchases of All Generic Loestrin 24 and Minastrin 24 in their Class Definition

Defendants argue that EPPs' class definition improperly includes generic Loestrin 24 and Minastrin 24 purchases, regardless of whether those generics were manufactured by a Defendant in this case. Def. Br. at 17.  Defendants' argument should be rejected.  *First*, EPPs class definition is similar to the class definition of numerous other certified End-Payor classes in similar pharmaceutical antitrust cases.  *See, e.g., Solodyn*, 2017 WL 4621777.  *Second*, whether a Defendant is liable for overcharges paid by Class members is not ripe at the class certification stage.  This is supported by the fact that none of the cases cited by Defendants address liability for so-called "umbrella damages" at the class certification stage and do not concern

---

[43] Defendants speculate that "[a]ny adjustments to the class, if allowed, would raise additional ascertainability problems." Def. Br. at 16 n.16. To the contrary, if the Court does find that any category of Class members or those excluded from the Class may raise any ascertainability concerns, the Class definition can be modified.  Defendants simply do not explain what "problems" may arise.

ascertainability.[44]  Moreover, as Defendants recognize, the First Circuit has not yet considered umbrella damage theories.  Def. Br. at 18.  EPPs will demonstrate at the merits stage of this case that Defendants' unlawful anticompetitive conduct caused artificially inflated prices for all generics, not only those manufactured by the Defendants.

Further, even if purchases from non-Defendants are excluded from the Classes, this does not create "insurmountable ascertainability issues."  Def. Br. 19.  Although Defendants are supposedly aware of "no data" that will show: (i) the manufacturer of each purchaser's generic Loestrin 24 or Minastrin 24; and (ii) those who purchased those drugs, that information will be contained in PBM and pharmacy records.  Therefore, there will be no need to conduct individualized inquiries.  To the extent that it is determined at a later stage in this proceeding that Defendants are not liable for damages resulting from delayed generic entry, EPPs' damages calculations can be adjusted.

Accordingly, EPPs have satisfied the ascertainability requirement and their motion for class certification should be granted.

---

[44] *See, e.g., Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573 (3d Cir. 1979) (summary judgment); *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152 (N.D. Cal. 2001) (post-trial settlement allocation where the only non-settling manufacturer was found not liable at trial); *In re Vitamins Antitrust Litig.*, MDL No. 1285, 2001 WL 855463 (D.D.C. July 2, 2001) (summary judgment and dismissing plaintiffs' claims on *Illinois Brick* standing grounds because plaintiffs purchased from non-defendant suppliers who purchased the products at issue from defendants); *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159 (C.D. Cal. 2000) (summary judgment); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2012 U.S. Dist. LEXIS 182374 (N.D. Cal. Dec. 26, 2012) (summary judgment); *FTC v. Mylan Labs, Inc.*, 62 F. Supp. 2d 25, 39 (D.D.C. 1999) (motion to dismiss); *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335 (9th Cir. 1982), *cert. denied*, 464 U.S. 1068 (1984) (motion to dismiss); *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-md-2343, 2014 U.S. Dist. LEXIS 66707 (E.D. Tenn. May 15, 2014) (motions *in limine*).  *Skelaxin* involved motions *in limine* in connection with a damages trial, not class certification.  The court's conclusion in *Skelaxin*, that "the relationship between fewer generic manufacturers and higher generic prices is 'too speculative' to estimate the alleged overcharge," was recently rejected by the Southern District of New York when certifying a class of direct purchasers in *In re Namenda Direct Purchaser Antitrust Litigation*, 331 F. Supp. 3d 152, 213 (S.D.N.Y. 2018).

## V.    THE REQUIREMENTS OF RULE 23(b)(3) ARE SATISFIED

### A.    Antitrust Impact Will be Proven on a Class Wide Basis and Individualized Issues Do Not Predominate Over Common Questions

Defendants claim that EPPs have not satisfied Rule 23(b)(3)'s predominance requirement. Def. Br. at 24.  Defendants attempt to fabricate "individualized issues" that they claim overwhelm common questions and make the unsupported argument that EPPs do not provide common proof of antitrust impact.  Def. Br. at 25.  For the reasons explained below, these arguments should be rejected.  EPPs have satisfied the requirements of Rule 23(b)(3).

### 1.    Dr. French Establishes Antitrust Impact on a Class-wide Basis

Defendants make the unsupported contention that EPPs' expert, Dr. French, merely "presumes" rather than establishes common impact.  Def. Br. at 26.  To the contrary, Dr. French demonstrates, based on Class-wide evidence (*e.g.*, Defendants' own documents, academic and industry studies, and market data), that all members of both Classes paid more for brand and generic Loestrin 24 and Minastrin 24 in the actual world than they would have paid in a fully competitive, but-for world.  French Rprt. ¶¶ 33-98; Buchman Reply Decl. Ex. 15 (Reply Report of Gary L. French, Ph.D.) (hereinafter "French Reply Rprt.") ¶¶ 17, 42, 46, 32.  This approach has been approved as a plausible methodology for demonstrating class wide harm in numerous End-Payor antitrust cases.[45]

Similar to the defendants in *Nexium* and *Asacol*, Defendants here focus their impact-related arguments on discrete categories of non-purchaser entities (*e.g.*, PBMs) and "atypical" purchasers (*e.g.*, brand loyalists) that they claim are "uninjured class members."  *Nexium*, 777 F.3d at 26.  However, Defendants ignore that these persons and entities are not members of the

---

[45] *See, e.g.*, *Nexium*, 777 F.3d at 26; *Lidoderm*, 2017 WL 679367 at *10; *Flonase*, 284 F.R.D. at 221; *Relafen*, 221 F.R.D. at 276; *Cardizem*, 200 F.R.D. at 340-42; *Teva. v. Abbot Labs.*, 252 F.R.D. at 229-30; *In re DRAM Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006).

proposed Classes at all, let alone "uninjured" Class members. Instead, they are explicitly excluded from the proposed Classes. *See* Section I *supra*. Accordingly, ██████████████████ ████████████████████████████████████████████████████ French Reply Rprt. Sections V, VI. Further, as explained in Section IV, *supra*, a sound, manageable mechanism exists to identify excluded persons and entities.

It is Defendants' position, in essence, that EPPs' must specifically identify, examine and exclude each "atypical" person and entity that is a non-member of the proposed Classes or else EPPs cannot demonstrate Class-wide impact. In making this argument and attempting to calculate the purported number of atypical Class members in each category, Defendants commit several fundamental errors of law and rely on Dr. Hughes' ████████████████████ ██████████████████████████████████████. Def. Br. at Section III; Hughes Rprt. at Section V.

*First*, Defendants incorrectly assume that the presence of some uninjured Class members defeats certification. That is not the law. The presence of a *de minimus* number of uninjured class members will not defeat class certification. *Nexium*, 777 F.3d at 25; *see also Lidoderm*, 2017 WL 679367, at *20.[46] *Asacol* did not change that. As the First Circuit has recognized, "excluding all uninjured class members at the certification stage is almost impossible in many cases[.]" *Nexium*, 777 F.3d at 22. "At worst the inclusion of some uninjured class members is inefficient, but this is counterbalanced by the overall efficiency of the class action mechanism." *Id.* Notably, Defendants have not shown that any TPP Class member was uninjured here, and they present

---

[46] *See also Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class will often include persons who have not been injured by the defendant's conduct," and "[s]uch a possibility or indeed inevitability" does not preclude certification); *accord DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009); *Flonase*, 284 F.R.D. at 226-27.

only erroneous assumptions and speculative calculations in an attempt to identify more than a *de minimis* number of uninjured consumers and to avoid liability to End-Payors in this case.

Nevertheless, as in *Nexium*, this Court need not reach the issue since Defendants have not adequately demonstrated that there is more than a *de minimis* number of uninjured class members here. Even if Defendants had, however, the factors the *Nexium* Court relied on in concluding that having a *de minimis* number of uninjured class members is permissible are satisfied here: (i) EPPs ████████████████████████████████████████████████████

████████████████████████████ (ii) the Classes are defined using objective criteria (*see* discussion in Section IV); and (iii) only injured parties will recover at the allocation stage. *Nexium*, 777 F.3d at 18-19. Dr. French makes clear that all members of the proposed End-Payor Class and TPP Class were injured and that antitrust impact can be established for both Classes based on Class-wide evidence. French Reply Rprt. Sections III, V, VI.

*Second*, Defendants misstate EPPs' burden at class certification, which was not altered by the First Circuit's decision in *Asacol*. At the class certification stage, EPPs are *not* required to: (i) establish the fact of injury and extent of individual Class members' damages; (ii) "test" their models on an individual level; or (iii) show that individual damages can be calculated and uninjured Class members (or non-members) identified. *See, e.g.*, Def. Br. at 25-50; Hughes Rprt. at 83.[47]

Rather, "[a]t the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the

---

[47] To the extent the Court is concerned that any particular category of End-Payors not already excluded from the proposed Classes may be problematic, the Class definition(s) can easily be modified to exclude those individuals or entities, just as brand loyalists, flat co-pay consumers and fully-insured plans are excluded here. *See, e.g.*, *Flonase*, 284 F.R.D. at 230-31. As discussed herein, Dr. French's damages model already excludes transactions in which there was no injury and would not need to be modified if additional groups are excluded from the proposed Classes.

uninjured class members" and to apportion damages among the injured class members. *Nexium*, 777 F.3d at 19-21 (emphasis added).[48]  Contrary to Defendants' contention, details of individual purchases, purchasers or plans, although they may be relevant to calculating individual damages at the allocation stage, are not relevant to whether a class can be certified. *Lidoderm*, 2017 WL 679367, at *23 n.33.

*Fourth*, Defendants conflate the question of impact or antitrust injury with individual damages.  Antitrust injury occurs "the moment the purchaser incurs an overcharge, whether or not that injury is later offset," by, for example, a rebate.  *Nexium*, 777 F.3d at 27, 28 n.23.[49]  Moreover, impact is established if a purchaser paid an overcharge for a single purchase, even if that same purchaser received a benefit or was undamaged in other transactions because of coupons or other discounts.  *Id.* at 27. ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████.

*Fifth*, Defendants confuse numbers of transactions, prescriptions and consumers with Class members, thereby inflating their estimates of purported uninjured Class members.  An overcharge on a single transaction is sufficient to establish antitrust injury, even if the same Class member was not injured on another transaction.  *Nexium*, 777 F.3d at 27-28.  Here, the overwhelming majority of the Class completed more than one transaction (likely most TPPs,

---

[48] *See also Lidoderm*, 2017 WL 679367, at *1 (the fact that there may ultimately "be a need to conduct individualized analysis to determine which plaintiffs were injured and how much in damages they should receive" does not defeat class certification).

[49] *See also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 254 n.14 (1972) ("[C]ourts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss . . . ."); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) ("'A person whose property is diminished by a payment of money wrongfully induced is injured in his property.'"); Joshua P. Davis & Eric L. Cramer, *Antitrust, Class Certification, and the Politics of Procedure*, 17 Geo. Mason L. Rev. 969, 984–85 (2010) ("Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show—as a legal and factual matter—impact or 'fact of damage.'" (footnote omitted)).

who reimbursed multiple insureds and consumers who filled more than one prescription for the drugs at issue, which are maintenance drugs), and all members of the proposed Classes were injured on at least one of those transactions.  To be clear, injured consumers include those who: (i) used coupons on some transactions but not others; (ii) participated in coupon programs that did not eliminate the entire overcharge on all transactions; (iii) received a free sample from their physician but at another time purchased Loestrin 24, Minastrin 24, and/or their generic equivalents; (iv) purchased Loestrin 24, Minastrin 24, and/or their generic equivalents at least once before reaching an out-of-pocket maximum or to satisfy a deductible; (v) purchased a mix of brand and generic Loestrin 24 and/or Minastrin 24 in the actual world; and/or (vi) would have purchased a mix of brand and generic Loestrin 24 and/or Minastrin 24 in the but-for world.

The proposed End-Payor Class includes both consumers and TPPs (*e.g.*, insurers and health plans).  In the case of insured consumers, the fact that a consumer may not have paid an overcharge for a prescription (for example, because the consumer had no co-pay) does not mean that the *TPP* did not pay an overcharge for that same prescription.  For these reasons, many of Defendants' estimates, ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ are speculative, misleading and ultimately meaningless.  *See, e.g.*, Hughes Rprt., Table 1.  The correct inquiry, which Defendants do not undertake, is what percentage of the Classes did not suffer any injury in any transaction.  As French demonstrates, all members of the Classes were injured. French Rprt. ¶¶ 28, 32, 45, 95; French Reply Rprt. Sections III, V, VI.

*Finally*, Defendants inflate their "uninjured Class member" estimates.  Defendants improperly deem certain consumers "uninjured class members" if they did not pay for a Loestrin 24 or Minastrin 24 prescription because they either received free samples or were not required to pay a co-pay.  These consumers are not Class members in connection with these prescriptions,

but they are *with respect to other prescriptions* for these maintenance drugs for which they may have suffered an overcharge.  Defendants also fail to account for substantial overlap that likely exists among their various categories of "uninjured Class members," such as brand loyal consumers and consumers who used coupons (which only applied to brand purchases).

As explained below, once Defendants' misstatements and errors are corrected and the proper standards applied, Defendants' arguments ultimately fail. It is clear that "individualized issues" do not defeat predominance in this case and there is not more than a *de minimus* number of uninjured Class members.

### 2. Brand Loyalists Are Excluded from the End-Payor Class and Dr. French's Damages Calculations and No Individualized Inquiry is Necessary

Defendants make the unsupported arguments that a substantial number of "brand loyalists" cannot be excluded from the Classes or damages model without individualized inquiry and that EPPs propose no methodology for excluding brand loyalists.  Def. Br. at 28.  Defendants are incorrect.  *First*, no individualized inquiry is necessary here. ███████████████████████

████████████████████████████████████ *See supra* Section IV; Craft Decl.  ¶¶ 24–25.  *Second*, Dr. French's ████████████████████████ ████████ without the need for individualized inquiry.  French Rprt. ¶¶ 82, 86; French Reply Rprt. ¶ 71–73.  Dr. French's █████████████████████████████████ *Id.*

Defendants' contention that "the percentage of uninjured Loestrin 24 purchasers is likely far greater than in *Asacol*" both misleads the Court regarding the composition of the Classes and the facts in *Asacol*.  Def. Br. at 29.  Here, unlike in *Asacol*, Plaintiffs do not concede that Loestrin 24 Fe "brand loyalists" should be excluded from the class definition.  In the actual world, Warner Chilcott, through its anticompetitive product hop, removed brand Loestrin 24 from the market, prior to the entry of generic Loestrin 24.  As a result, consumers in the actual world did not have the opportunity to switch from brand Loestrin 24 to generic Loestrin 24.  Thus, the "brand

loyalist" exclusion cannot apply to Loestrin 24 purchasers as a result of Defendants' anticompetitive conduct. Defendants cannot both create an evidentiary hole through their anticompetitive conduct and require Plaintiffs to identify, by name, individuals who would not have been impacted by their scheme, particularly whereas here, they do so only in an attempt to argue that their self-created loophole defeats certification. As recognized under general antitrust principles, a defendant cannot "complain of an uncertainty created by his own wrongdoing." *Jay Edwards, Inc. v. New England Toyota Distrib. Inc.*, 708 F.2d 814, 821 (1st Cir. 1983) (quoting *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 517 (10th Cir. 1976).[50] To be clear, ███████████████████████████████████████████████████████████

███████████████ This conservative approach ████████████████████████████████

████████████████████████████████████████████████████████ French Reply

Rprt. ¶ 73.[51] ██████████████████████████████████████████████████████████

████████████████████████████████████ *Id.*[52] If Defendants intend to dispute these characteristics of the but-for world, they may do so on the merits, not at class certification. Moreover, to the extent there is any uncertainty as to the percentage of the Class that would have remained "brand loyal," Defendants' own anticompetitive behavior caused such uncertainty

---

[50] *See also, e.g., J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (citations omitted) ("Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such as *Bigelow*, that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.")

[51] Dr. French explains that ███████████████████████████████████████████████ ██████████████████████ *See* French Reply Rprt. Section IV.C.

[52] The brand loyalists excluded from Dr. French's ██████████████████████████ ██████████████████ To the extent that the Court does accept Defendants' characterization of these brand loyalists as "uninjured class members," this low number of brand loyalists is *de minimus*.

37

and cannot be used to assail EPPs' damages calculations.[53]  As to Minastin 24, both the proposed EPP class definition and the damages calculation excludes "brand loyalists."  And EPPs have demonstrated, through Ms. Craft, that the data can be used to programmatically identify and exclude Minastrin brand-only purchasers.

Defendants appear to conveniently miss the point that brand loyalists are specifically *excluded* from the End-Payor Class definition.  Thus, brand loyalists are not "uninjured" Class members because they are *not Class members at all.*  To address brand loyalists, Dr. French

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████  *Id.*

Defendants misinterpret the phrase "brand loyalist" to inflate the number of purported uninjured class members.  Defendants and Dr. Hughes claim that consumers who purchased Loestrin 24, but never purchased generic Loestrin 24, should be excluded from the class because they are purportedly "brand loyalists."  Def. Br. 28; Hughes Rprt., Table 1.  As demonstrated above, this is incorrect.  The defining characteristic of a brand loyalist is ████████████

██████████████████████████████████  French Reply Rprt. ¶ 71.

Based on Dr. Hughes' ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.  Def. Br. at 29 (citing Hughes Rprt. ¶¶ 132, 152); French Reply Rprt. ¶ 72 (citing Hughes Rprt., Table 1). Defendants' and Dr. Hughes' assumptions regarding brand loyalists also ignore the fact that

---

[53] *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("[T]he wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and its amount, supported by the evidence, because [the estimate] is not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.") (internal citation omitted); *see also In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 49-50 (1st Cir. 2013) ("[T]he factfinder is afforded a greater deal of freedom to estimate damages where the defendant, as here, has created the risk of uncertainty."); *Relafen*, 221 F.R.D. at 272.

Defendant Warner Chilcott, through its anticompetitive product hop to Minastrin, withdrew Loestrin 24 from the market *before* generic Loestrin 24 Fe was available, thereby preventing class members from switching to the generic.  To the extent any EPP did not purchase generic Loestrin 24 (Def. Br. at 29), there is no basis to assume the EPP would not have purchased, paid or provided reimbursement for generic Loestrin 24 had it been available.  French Reply Rprt. ¶ 72; *see also supra* ████████████████████████████████

EPPs have excluded Minastrin brand loyalists from the aggregate damages calculation using Class-wide data and brand loyalists can be identified using administratively feasible methods.  *See supra* Section IV.  Therefore, Defendants have not demonstrated that "'any class member may be uninjured" or that individualized proof of impact is necessary to determine class membership "for virtually every" member of the Classes.  Def. Br. at 29 (quoting *Asacol*, 907 F.3d at 53 and citing 61 (Barron, C.J., concurring)).

Accordingly, individual issues do not predominate, and class certification should be granted.

### 3. Class Members Who Purchased Minastrin 24 or its Generic Equivalent Were Injured

Defendants improperly assume, based on a variety of vague data and hypothetical scenarios, that certain patients must have "chosen" and "preferred" to take Minastrin 24 over a less expensive Loestrin 24.  Def. Br. at 31-33.  Defendants point to no evidence showing that individuals who took Minastrin 24 after Warner Chilcott engaged in its anticompetitive product hop would have forgone the economically rational choice to  purchase a lower priced generic of essentially the same drug (Loestrin 24) if that option had been available.  French Reply Rprt. ¶ 89.  Once again, any uncertainty stemming from Defendants' unlawful conduct cannot be used

to challenge EPPs' damages model.[54]   Moreover, Defendants incorrectly contend that these Minastrin purchasers would not have been injured on their Minastrin 24 purchases. ████

████████████████████████████████████████████████████████████

████████████████████████████████ French Reply Rprt. ¶ 90.

Further, no individualized inquiry is required to identify Class members who purchased Minastrin 24.  Purchasers of Minastrin 24 can be identified using available pharmaceutical data. Therefore, the hypothetical individuals referenced by Defendants do not need to be "excluded" from the Classes.  Using Class-wide data, Dr. French establishes that purchasers of Minastrin 24 paid more than they would have in a competitive market.  French Reply Rprt. ¶ 46.

Defendants' merely speculate that "uninjured" consumers "would have taken a product other than generic Loestrin 24 in the but-for world," and that Warner Chilcott may not have continued to promote brand Loestrin 24 in the but-for world.  Def. Br. at 34–35.[55]  These issues have no bearing on the class certification analysis.  French Reply Rprt. Sections V.D, V.E. Defendants' conjecture on these topics, in an attempt to create individualized issues where none exist, cannot defeat predominance.

Accordingly, EPPs have demonstrated that common issues predominate, and class certification should be granted.

### 4.   Free Samples and Coupons Do Not Defeat Predominance

Defendants contend that EPPs have not established impact to patients who used free samples or coupons.  Def. Br. at 35.

---

[54] *See Bigelow*, 327 U.S. at 265; *Neurontin*, 712 F.3d at 49–50; *Relafen*, 221 F.R.D. at 272.
[55] Moreover, EPPs need not at this stage prove their but-for theories regarding Warner Chilcott's launch of Minastrin.  Def. Br. at 33.  Defendants' argument that Dr. French disregarded relevant data concerning the launch of Minastrin should be rejected.

*Free Samples.* EPPs need not establish impact for individuals who received free samples. A condition precedent to being a Class member is that an individual purchased, paid or provided reimbursement for a drug at issue. Those who received free samples did not purchase, pay or provide reimbursement for anything. Thus, they do not fall under the End-Payor Class definition. In addition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *See, e.g.,* French Reply Rprt. ¶ 77 ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

Using the number of free samples over the Class Period, Defendants improperly seek to inflate the number of purportedly uninjured class members. The First Circuit in *Nexium* rejected a similar attempt by the defendants to improperly conflate the percentage of prescriptions with the percentage of consumers since "a class member may fill one prescription with an overcharge and another with no overcharge." *Nexium*, 777 F.3d at 28. Moreover, contrary to Defendants' contention, EPPs need not identify "free sample users" or which of them were "uninjured." Def. Br. at 37. EPPs acknowledge that free sample users are not injured with respect to those samples. In sum, free samples do not affect Class-wide damages and Defendants and Dr. Hughes' attempts

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ French Reply Rprt. ¶ 70, Sections IV.A. and V.I.; *see also Nexium*, 777 F.3d at 28.

*Coupons.* Consumers who used coupons to lower their cost for Loestrin 24 or Minastrin 24 were still injured. French Reply Rprt. Section V.H. Dr. French explains that: ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Moreover, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

value of those coupons into his Class-wide damages analysis.  *Id.* ¶ 104; Winkelman Rprt. ¶¶ 34–37; *see also Solodyn*, 2017 WL 4621777, at *15.

Accordingly, individualized issues do not predominate regarding free samples and coupons.

### 5.  Flat Co-Pay Consumers Are Excluded From the Class and No Individualized Inquiry is Required

Defendants contend that EPPs cannot exclude "flat co-pay" consumers from the proposed End-Payor Class.  Def. Br. at 37.  As stated above, flat co-pay consumers can be identified using an administratively feasible methodology and no individualized inquiry is necessary.  *See supra* Section IV.  Moreover, as Dr. French explains, ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████ French Reply Rprt. ¶ 93.  Accordingly, individualized issues do not predominate with regard to flat co-pays.  *See Solodyn*, 2017 WL 4621777, at *17.

### 6.  Formulary "Variability" and Cost Sharing Among TPPs and Consumers Do Not Defeat Predominance

Defendants contend that Dr. French should have analyzed: (i) how costs for prescription drugs are shared among patients, health insurers, and undefined "other payors;" and (ii) how cost sharing varies among plans and over time.  Def. Br. at 38.  As discussed *supra* Sections I, III.D, and IV, PBMs are not End-Payors and, therefore, are not members of either Class.  EPPs also agree that individuals who paid nothing for Loestrin 24 or Minastrin 24 (*e.g.*, those who received free samples) suffered no injury.  Def. Br. at 39.  They are also not members of either proposed Class.[56]

---

[56] For example, if a consumer does not pay a co-pay at the pharmacy for the drug at issue, due to, *inter alia*, free samples, the Affordable Care Act or reaching an out-of-pocket maximum, that consumer is not part of the End-Payor Class for that transaction.  Thus, the consumer in that scenario would be excluded from the Class for that transaction and would not be seeking any overcharge damages.  As a

Defendants merely speculate and do not establish how, in light of varying co-pays or plan designs, there are uninjured Class members here.  Def. Br. at 39.  Sheer speculation cannot defeat class certification.  *Nexium*, 777 F.3d at 31.  That both a TPP and consumer may cover a portion of a prescription drug and may each experience an overcharge is irrelevant.  Further, Dr. French provides ████████████████████████████████████████████ French Reply Rprt. Table 4, Table 6. Therefore, no individualized inquiry is necessary to determine aggregate damages experienced by consumers and TPPs.  Whether and how much a TPP and consumer paid towards a particular transaction may impact the allocation of damages, but does not establish that individual issues predominate.

### 7.  Generic-Only Purchasers Were Injured by Defendants' Anticompetitive Conduct that Delayed/Prevented Generic Entry

Defendants contend that purchasers of only generic Loestrin 24 and Minastrin 24 were not injured by any delay and that Dr. French provides no method for showing impact to generic purchasers.  Def. Br. at 40.  To the contrary, Dr. French demonstrates that the price of generic Loestrin 24 and Minastrin 24 were higher in the actual world than they would have been in the but-for world due to Defendants' anticompetitive scheme to prevent or delay generic entry.  French Reply Rprt. ¶¶ 17, 42, 46, 132.  Thus, Defendants' assumption that there was no injury with respect to any of the generic prescriptions filled during the Class Period should be rejected.

### 8.  Individualized Inquiry Into Complex PBM Agreements is Unnecessary

Defendants incorrectly argue that PBMs may be Class members and that examination of their retail pharmacy contracts, health plan contracts and related payment data is required to determine whether they are Class members.  Def. Br. at 41-42.  As discussed *supra* Section I, III.D, and IV, PBMs are not members of either Class because they are not End-Payors of

---

result, Dr. French did not need to account for the ACA in his impact analysis, contrary to Defendants' contention.  Def. Br. at 40.

prescription drugs.[57]  EPPs explicitly exclude PBMs from their Class definitions.  Therefore, no

individualized inquiry into PBMs is necessary.  This case is distinguishable from *Skelaxin*, 299

F.R.D. 555, where PBMs were *included* in the proposed class and plaintiffs' expert opined that

PBMs bore some "price risk" for pharmaceutical transactions.  *See supra*, Section III.D.  As

demonstrated in Section III.D, *supra*, PBMs bear no such price risk.  Accordingly, EPPs satisfy

the predominance requirement.

### 9.   Free Samples, Coupons and Rebates Do Not Defeat Predominance

Defendants erroneously contend that ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████    Def. Br. at 43 (citing Hughes Rprt. ¶ 116) and 46 (citing Hughes Rprt. ¶ 127).

*First*, as explained above, free samples are not included in the Class definition because, by their

very nature, no person or entity purchases, pays or provides reimbursement for a drug when a

free sample is given.  Thus, free samples cannot reduce the aggregate damages calculation.

*Second*, Dr. French's ████████████████████████████████    French Rprt. ¶ 36

████████████████████████████████████████████████████████████    Nevertheless,

████████████████████████████████████████████████████████████████████████

██████████████.  Def. Br. at 43 (citing Hughes Rprt. ¶ 126 & Ex. 8.C.).  Defendants conflate

the question of impact or antitrust injury with individual damages.  Antitrust injury occurs when

a TPP incurs an overcharge, regardless of whether that TPP later receives a rebate.  *Nexium*,

777 F.3d at 27, 28 n.23.  Rebates are not "damage setoff[s] and do not affect the fact of injury."

*Id.*  Nevertheless, Defendants and Dr. Hughes ██████████████████████████████████

████████████████████.  Defendants also argue that "many insurers were uninjured" due

---

[57] *See* Buchman Decl. Exs. 10-14 (PBM declarations).

to rebates and samples.  For a TPP to have no damages, that TPP would have to receive sufficient rebates to completely offset the entirety of the overcharge paid by the TPP on every transaction.  Defendants have not shown that this was the case for any TPP.[58]

*Third*, Dr. French's damages calculations account for coupons.  The use of coupons by some individuals on some transactions does not change the impact analysis.  Impact is established if a purchaser paid an overcharge for a single purchase, even if that same purchaser received a benefit or was undamaged in other transactions because of a coupon or other discount.  *Id.* at 27.

Arguments concerning net or offsetting benefits relate only to the *quantum* of individual damages, not the *fact of injury*.  *Cardizem*, 200 F.R.D. at 317.  Defendants' arguments here do not demonstrate that individualized issues predominate with regard to "price concessions."  Thus, the predominance requirement is satisfied.

### 10. Insurers Did Not "Pass On" Alleged Overcharges Through Premiums or Plan Contributions

Defendants attempt to revive the oft-rejected argument that TPPs recoup or pass on[59] overcharges by raising plan contributions.  Def. Br. at 47.  Any contribution increase does not affect the fact of injury, which occurs the moment an overcharge is paid.  *Nexium*, 777 F.3d at 28

---

[58] Defendants and Dr. Hughes also attempt to analyze specific EPPs in an attempt to create individualized issues.  *First*, as explained by Dr. French, ███████████████████████████ ███████████  French Reply Rprt. Section VI.E.  *Second*, any differences noted among these EPPs do not demonstrate that individualized issues predominate and that the TPP Class was not injured.  Def. Br. at 46; *see* French Reply Rprt. Section VI.E.

[59] To the extent Defendants are attempting to assert a "pass-through" defense, that defense is barred under federal law by the Supreme Court's decision in *Hanover Shoe*, 392 U.S. at 487-93.  Some states have expressly adopted *Hanover Shoe*.  *See, e.g., Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010); *State by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 497 (Minn. 1996); *K-S Pharmacies Inc. v. Abbott Labs.*, No. 94-cv-02384, 1996 WL 33323859, at *12 (Wis. Cir. Ct. May 17, 1996); *Hyde v. Abbott Labs.*, 123 N.C. App. 572, 579 (Ct. App. 1996).  Others have restricted application of the "pass-through" defense to the chain of distribution.  *See* Haw. Rev. Stat. § 480-13; N.M. Stat. Ann. § 57-1-3; N.Y. Gen. Bus. Law § 340(6); Neb. Rev. Stat. § 59-821.01; N.D. Cent. Code § 51-08.1-08; Utah Code Ann. § 76-10-3109(6); D.C. Code § 28-4509(b); *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 18 (2003) (*dictum* suggesting the allowance of a pass-through defense to avoid duplicative damages awards from competing groups of plaintiffs within the chain of distribution).

n.23; *Lidoderm*, 2017 WL 679367, at *22-23.  Plan contributions are set using aggregate, not

drug-specific, information to predict aggregate future claims.  Defendants provide no evidence

establishing that plan contributions are adjusted based on ███████████████████████████

████████████████████████████████████████████████  French Reply Rprt.

¶ 147.  Thus, Dr. Hughes' ████████████ is inapplicable.  French Reply Rprt. Section VI.F.[60]

    In light of the foregoing, Dr. French's aggregate damages model is appropriate and not

defective as Defendants contend.  Def. Br. at 48.  Moreover, Defendants have not established that

concrete and relevant individualized issues predominate over common issues.  Accordingly, EPPs

have satisfied the predominance requirement of Rule 23(b)(3).

### B.  A Class Action is the Superior Method of Adjudicating the Classes' Claims and The Proposed Classes are Manageable

    Defendants argue that a class action is not the superior method for adjudicating the End-

Payor Class' claims because there is purportedly no manageable way to exclude flat co-pay

consumers and brand loyalists and doing so would require individualized inquiry as to every

potential member of the Class.  Def. Br. at 49-50.  To the contrary, unlike *Asacol*, this is not "a

case in which any class member may be uninjured" and the need to identify uninjured class

members predominates and renders an adjudication unmanageable.  *Asacol*, 907 F.3d at 53-54.

    *First*, as EPPs explain herein, no members of the proposed Classes were uninjured.  Unlike

in *Asacol*, where no generic Asacol came to the market and brand loyalists were not carved out of

the class definition, here, Minastrin brand loyalists are explicitly excluded from the End-Payor

Class.   In addition, flat co-pay consumers, and other categories of purchasers who suffered no

---

[60]  *See also Terazosin*, 220 F.R.D. at 680 (no evidence TPPs take cost of individual drugs into account in setting premiums); Buchman Reply Decl., Ex. 16 (Transcript of Oral Argument at 79-86, *In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516 (D. Conn. Oct. 21, 2016) (ECF No. 586) ("The price of Aggrenox is a piece of sand, a grain of sand on the beach in terms of setting premiums . . . when you have hundreds of thousands of drugs, the idea that any one of them is driving the premium is nonsensical.").

injury on a transaction, are likewise explicitly excluded from both the End-Payor Class and TPP Class.   Dr. French ███████████████████████████████████████████████████████

███████████████████████ to ensure that Defendants do not pay for damages that they do not cause. *Lidoderm*, 2017 WL 679367, at *24.   Therefore, contrary to Defendants and Dr. Hughes' contention, ████████████████████████████████████████████████████████████████

███████ Def. Br. at 50 (citing Hughes Rprt., Table 1).

*Second*, to the extent that the excluded flat co-pay consumers, brand loyalists and other persons and/or entities excluded from the Classes must be identified, EPPs' experts demonstrate that this can be done in a manageable and administratively feasible way using electronic databases containing pharmaceutical purchase data.   *See supra* Section IV.   As a result, no "individualized inquiry as to every potential class member" is necessary here.   Def. Br. at 50. Moreover, because there are no individualized issues, there is no concern about Defendants preserving their right to challenge liability for excluded Class members.   Def. Br. at 50.   Thus, Defendants conclusory statement that the class is not manageable because Defendants supposedly plan to challenge any affidavits or other individualized evidence that is offered to prove injury of any proposed Class member should be rejected.   Def. Br. at 50-51.

Defendants' specific arguments regarding manageability do not apply to EPPs' proposed TPP Class given that the flat co-pay consumers and brand loyalists are only at issue with regard to the End-Payor Class.   Thus, if this Court is inclined not to certify the End-Payor Class, in the alternative, EPPs' respectfully request that the Court certify the TPP Class.   Accordingly, EPPs' motion for class certification should be granted.

### C.   Insignificant Variations in State Laws Do Not Present a Barrier to Class Certification and A Class Action is Superior to Multiple Separate State Actions

Defendants contend that a class action is not the superior method for resolving EPPs' claims based upon purported "variations" among the state antitrust, consumer protection and

unjust enrichment laws at issue here.  *See* Def. Br. at 51-52.[61]  Variations among the relevant

state laws, to the extent they exist, are insignificant and manageable and, therefore, do not pose

a barrier to class certification.[62]  Recognizing this, federal courts, including courts in this Circuit,

routinely certify classes in similar cases involving indirect purchasers' claims of anticompetitive

conduct under the laws of multiple states.[63]  What is significant is that proof of anticompetitive

conduct in this case establishes a violation of each state's laws.  EPPs demonstrate that the core

elements of their claims are the same.  *See* EPP Br. at 16-17, 17 n.26 (citing Buchman Decl. Ex.

3); *Id.* at 17 n.26 (citing *Flonase*, wherein the court certified an end-payor class bringing antitrust,

consumer protection and unjust enrichment claims).[64]  Thus, "[t]he differences in the applicable

state laws identified by defendants do not appear to be material or even significant" and,

therefore, do not defeat certification.  *Lidoderm*, 2017 WL 679367, at *27.  In *Solodyn*, Judge

Denise J. Casper of the District of Massachusetts recently found that "state law variations

---

[61] To address Defendants' argument regarding unjust enrichment and restitution (*see, e.g.*, Def. Br. at 63), ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ French Reply Rprt. Section VII.

[62] Indeed, Congress has tasked the federal courts with adjudicating this type of complex, multidistrict class action.  Prior to enactment of the Class Action Fairness Act ("CAFA"), defendants in complex antitrust class actions complained of having to defend multiple, separate state court cases concerning the same conduct.  As a result of heavy lobbying by business interests, CAFA now brings those claims into federal court, and the multi-district litigation process brings them into one forum. Defendants now argue that these class actions cannot be certified because they consolidate claims under multiple states' laws.  If this argument was accepted, the result would be that multidistrict class actions would not be litigated anywhere.

[63] *Solodyn*, 2017 WL 4621777, at *19-*20 (recognizing that "courts in this Circuit and elsewhere have certified classes in antitrust actions like this one despite the need to apply numerous states' laws"); *Nexium*, 297 F.R.D. at 176 (certifying class where twenty-six state laws were at issue); *see also Lidoderm*, 2017 WL 679367, at *27 (variances in state laws did not bar class certification under Rule 23(b)(3)); *Flonase*, 284 F.R.D. at 219; *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 608 (N.D. Cal. 2010); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 292 (N.D. Ohio 2014) ("[C]ourts rarely deny certification simply because the class spans many states and asserts state-law claims.").

[64] *Harris v. comScore, Inc.*, 292 F.R.D. 579, 583-84 (N.D. Ill. 2013), cited by Defendants, is inapposite.  Unlike here, the plaintiffs in *Harris* did not bring claims based on anticompetitive conduct. Instead, they brought claims against an analytics company that collected data on consumers' internet usage in violation of privacy laws, as well as an unjust enrichment claim.  The court found that those unjust enrichment claims could not be brought on behalf of a nationwide class action.

regarding damages, for instance, are not sufficiently material to defeat class certification."  2017 WL 4621777, at *20.  An examination of Defendants' brief demonstrates that the purported "issues" identified by Defendants do not exist or are minor, irrelevant, and/or easily manageable. *See* Def. Br. at 51-52.  This is further explained in EPPs' memorandum of law filed in opposition to Defendants' Renewed Motion to Dismiss.[65]

Even so, differences in applicable state laws "can be readily accommodated on a special verdict form or through other mechanisms routinely employed in complex litigations like this one." *Lidoderm*, 2017 WL 679367, at *27; *see also Solodyn*, 2017 WL 4621777, at *20.  EPPs' trial plan, modeled in part on the trial plan submitted by the end-purchaser plaintiffs in *Nexium* and *Solodyn*, allows for grouping of common elements and a special verdict form to allow the jury to decide any state-specific issues, such as multiple damages or additional defenses.  *See* Buchman Decl. (Proposed Trial Plan) Ex. 5.[66]  Other issues will be addressed by the Court as a matter of law in pre- or post-trial rulings (*e.g.*, the interpretation of statutory language; retroactivity of statutes; and issues that are within the Court's discretion).  Moreover, ██████████████████ ███████████████  *See* French Rprt. Tables 5 and 6, Appx. D; French Reply Rprt. Tables 4 and 6, Appx. D.  Thus, any necessary state-specific adjustments or multiples can be readily applied.

---

[65]   ECF No. 613 Sections II and IV; *see also* Buchman Decl. Ex. 3 (listing relevant antitrust and consumer protection statutes and the cases describing their similarities); EPP's Brief in Opposition to Defendants' Motion to Dismiss (ECF No. 205) at Section XI (similarities among state unjust enrichment laws).

[66]   *See also Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 20 (D. Mass. 2010) (analyzing thirty-four states' laws and concluding that the court would manage trial proceedings by presenting the jury with a core claim composed of the elements common to all jurisdictions, plus special questions targeting any additional elements added by individual jurisdictions).  As stated in the Proposed Trial Plan, EPPs "reserve the right to suggest changes to this Trial Management Plan in advance of trial in light of the completion of discovery, reports from experts, changes in the law, and/or orders entered by the Court." Buchman Decl. Ex. 5.

Furthermore and contrary to Defendants' contention (Def. Br. at 51), minor variances in state laws do not render a class action an inferior method for resolving EPPs' claims. *Nexium*, 297 F.R.D. at 176 (finding that variances in state laws did not bar class certification under Rule 23(b)(3)). There is little question that a centralized class action is a superior use of judicial resources than the alternatives: numerous individual lawsuits or multiple state actions asserting the same allegations against the same Defendants. *See, e.g.*, *SRAM*, 264 F.R.D. at 615 ("What would be unmanageable is the institution of countless individual lawsuits with the same facts and legal issues."). Defendants' speculative argument that jurors may be confused about the laws of multiple states is unfounded. Courts, including courts in this Circuit, have certified multi-state End-Payor classes. *See, e.g.*, *Solodyn*, 2017 WL 4621777, at *20; *Nexium*, 297 F.R.D. at 175-76.[67] Defendants' contentions are surprising given that they acknowledged the benefits of consolidating these actions before the Judicial Panel on Multi-District Litigation, including conservation of the resources of the parties and the courts and avoidance of inconsistent rulings.[68]

To the extent there are minor variations among applicable state laws, these variations do not predominate over the core elements of EPPs' claims – whether Defendants engaged in anticompetitive conduct; whether that conduct resulted in EPPs paying artificially inflated prices; and the aggregate damages suffered by the Class. Accordingly, Defendants' argument that purported variations among the applicable state laws should defeat certification is unavailing and should be rejected, as it has been in multiple similar cases. *See, e.g.*, *Nexium*, 297 F.R.D. at 175-76; *Solodyn*, 2017 WL 4621777, at *20; *Lidoderm*, 2017 WL 679367, at *27.

---

[67] The cases cited by Defendants are inapposite. *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 291 F.R.D. 13 (D. Mass. 2013), plaintiffs alleged that defendants unlawfully promoted drugs for off-label use. In that case, the court determined that the law of the plaintiffs' home states applied and that a class action applying the law of many states to plaintiffs' claims would be unmanageable.

[68] Defendants' Mem. of Law in Support of Their Motion for Transfer and Coordination, ECF No. 1-1, at 7.

## CONCLUSION

For the foregoing reasons, EPPs respectfully request that their Motion for Class Certification be granted and that the Court certify the End-Payor Class or, in the alternative, the TPP Class.

Dated: December 7, 2018

Respectfully submitted,

**MOTLEY RICE LLC**

By: */s/ Michael M. Buchman*

Michael M. Buchman
Michelle C. Clerkin
600 Third Avenue, Suite 2101
New York, NY 10016
(212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400
mmiller@millerlawllc.com
lfanning@millerlawllc.com

Steve D. Shadowen
Matthew C. Weiner
**HILLIARD & SHADOWEN LLP**
219 Congress Ave.
Suite 1325
Austin, TX 78701
(855) 344-3298
steve@hilliardshadowenlaw.com
matt@hilliardshadowenlaw.com

Sharon K. Robertson

Donna M. Evans
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
srobertson@cohenmilstein.com
devans@cohenmilstein.com

*Interim Co-Lead Counsel for the Proposed End-Payor Class*

Donald A. Migliori
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
dmigliori@motleyrice.com

*Interim Liaison Counsel for the Proposed End-Payor Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 7, 2018, a true copy of the foregoing document was served on all counsel of record by electronically filing the document with the Court's CM/ECF system.

*/s/ Michael M. Buchman*

Michael M. Buchman