**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |  |
|---|---|---|
| IN RE LOESTRIN 24 FE ANTITRUST LITIGATION | ) ) ) | MDL No. 2472 |
| THIS DOCUMENT RELATES TO: | ) ) ) | C.A. No. 1:13-md-2472-WES-PAS |
| *All End-Payor Class Actions* | ) ) ) | **REDACTED PUBLIC VERSION** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO EXCLUDE THE OPINIONS AND TESTIMONY OF END-PAYOR PLAINTIFFS'
<u>EXPERT DR. GARY L. FRENCH</u>**

## <u>TABLE OF CONTENTS</u>

I.    Dr. French's Highly Aggregated Injury-in-Fact Analysis Is Unreliable And Finds Injury to Third-Party Payors Where There Is None — At Least 25% of All Third-Party Payors Requiring Copays for Loestrin 24 Were Not Injured  (The Tier 3 Plans) ................................................................................................................... 3

    A.    Dr. French Cannot Contest That Plans Applying a Higher, Tier 3 Copay for Loestrin 24 and Minastrin Were Not Injured in the 2009–2013 Period ................ 4

    B.    Dr. French Admits that 25% of Health Plans Requiring Copays Applied a Higher, Tier 3 Copay, Which Means That They Were Not Injured ...................... 8

    C.    Dr. French's New "Maximum Plan Payment" Analysis Cannot Save His Opinions as It Confirms That Common Evidence of Injury-in-Fact Is Absent .... 10

II.    Dr. French Cannot Plug the Gap in His Pricing Data with Speculative Analysis — He Provides No Basis to Calculate Damages Prior to April 2012 (A Period for Which He Has No Data) ............................................................................................... 14

CONCLUSION ..................................................................................................................... 17

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*,
No. 09-40089, 2014 U.S. Dist. LEXIS 175470 (D. Mass. Dec. 19, 2014)............................16

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ...................................................................................................3

*Bowling v. Hasbro, Inc.*,
No. 05-cv-00229, 2008 U.S. Dist. LEXIS 30043
(D.R.I. Mar. 17, 2008) (Smith, J.)...........................................................................................4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..................................................................................................1, 2, 13, 17

*Ed Peters Jewelry Co. v. C & J Jewelry Co.*,
124 F.3d 252 (1st Cir. 1997)...................................................................................................11

*Hartford Ins. Co. v. Gen. Elec.*,
526 F. Supp. 2d 250 (D.R.I. 2007) (Smith, J.).........................................................................9

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018).......................................................................................................4

*In re High-Tech Empl. Antitrust Litig.*,
No. 11-cv-02509, 2014 U.S. Dist. LEXIS 47181 (N.D. Cal. Apr. 4, 2014)...........................17

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008).....................................................................................................1

*In re K-Dur Antitrust Litig.*,
No. 01-1652, 2008 U.S. Dist. LEXIS 71771 (D.N.J. Mar. 27, 2008).......................................6

*In re Plastics Additives Antitrust Litig.*,
No. 03-cv-2038, 2010 U.S. Dist. LEXIS 90135 (E.D. Pa. Aug. 31, 2010) ..............................3

*Irvine v. Murad Skin Research Labs.*,
194 F.3d 313 (1st Cir. 1999)................................................................................................9, 16

*Noveletsky v. Metro. Life Ins. Co.*,
49 F. Supp. 3d 123 (D. Me. 2014) ...........................................................................................4

*Samaan v. St. Joseph Hosp.*,
670 F.3d 21 (1st Cir. 2012).................................................................................................4, 13

*Soldo v. Sandoz Pharms. Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003)......................................................................................10

## MISCELLANEOUS

Federal Rule of Evidence 702...................................................................................................1, 17

The opinion of Indirect Purchaser Plaintiffs' ("IPPs") proposed expert economist, Gary L. French, regarding injury-in-fact as to third-party payors is unreliable and unconnected to the facts. His opinion finds alleged "injury" where there is none.  (Defendants previously moved to exclude Dr. French's opinions during class certification,[1] and each of those grounds for exclusion applies to his unreliable and unsupported merits opinions as well, which Dr. French concedes mirror his class certification opinions.[2])  This motion provides additional grounds for exclusion pursuant to Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*First*, Dr. French's opinion that all third-party payors were injured is unreliable, because he now concedes that at least 25% of health insurance plans using a tiered copay structure required *consumers* to a pay a high (tier 3) copay for Loestrin 24, which in turn meant lower costs for the *health plan*.  Dr. French's own data show that these "tier 3" health plans were uninjured, because their actual costs for Loestrin 24 and Minastrin through 2013 were *less than* their costs would have been for generic Loestrin 24.  That is, the "tier 3" plans would have paid more, not less, if their members had taken generic Loestrin 24 instead of Loestrin 24 or Minastrin.  Dr. French also wrongly analyzes the no-Minastrin health plans. As a result, Dr. French's proposed method of proving impact to the class — comparing the across-the-board average brand Loestrin 24 and Minastrin prices to his estimates of what generic Loestrin 24 pricing would have been — cannot establish that all or nearly all third party payors were injured or damaged, and thus would not assist the trier of fact.  *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311–12 (3d Cir. 2008) (injury-in-fact must be "pro[ved] at trial through evidence that is common to the class rather than

---

[1] Mem. in Supp. of Defs.' Mot. to Exclude Op. and Test. of End-Payor Pls.' Expert Gary L. French (Oct. 19, 2018), ECF No. 583; Reply Mem. in Supp. of Defs.' Mot. to Exclude the Ops. and Test. of End-Payor Pls.' Expert Gary L. French (Dec. 21, 2018), ECF No. 688.

[2] Ex. 1, Merits Rpt. of Gary L. French, Ph.D. Regarding Impact and Damages to End-Payor Pls. ¶¶ 12 (Jan. 4, 2019) ("French Merits Rpt.").

individual to its members"). Accordingly, Dr. French's proposed injury-in-fact opinion is unreliable and inadmissible. *Daubert*, 509 U.S. at 591.

*Second*, Dr. French's opinion also is unreliable because he now claims that, in order to assess injury-in-fact, it is "more important" to look at the "maximum payment" for Loestrin 24 and Minastrin made by a health plan in a particular year, rather than average payments, because a health plan class member "is injured if it paid more than it would have in the but-for world on at least one transaction."[3] Dr. French's new "maximum payment" analysis, unveiled only after the class certification hearing, actually underscores the absence of common evidence of injury. As Dr. French has admitted, an analysis of maximum payments by a health plan "requires an individualized inquiry into a plan's specific data,"[4] not common proof. In fact, Dr. French admits that the sample of health plans he used for his "maximum payment analysis" is not representative, testifying that "if you took another sample" of health plans as many as "100 percent" could be uninjured.[5] Dr. French's decision to distance himself from his original proposed means of proving impact — and now stress "the importance of analyzing the maximum plan payment instead of the average plan payment"[6] — confirms that the average payment analyses he has offered are not common evidence of impact to the proposed classes and thus are inadmissible.

*Lastly*, regarding damages, Dr. French cannot avoid the fact that he has no price information for the pre-April 2012 period, which renders his damages calculation for that period speculative. Dr. French's new alternative proposal for estimating those prices, unveiled in his *sixth*

---

[3] Ex. 2, Merits Reply Rpt. of Gary L. French, Ph.D. Regarding Impact and Damages to End-Payor Pls. ¶ 90 (Mar. 12, 2019) ("French Merits Reply Rpt.").

[4] Ex. 3, Videotaped Dep. of Gary L. French, Ph.D. 202:13–203:1 (Mar. 21, 2019) ("French Mar. 21, 2019 Dep.").

[5] *Id.* at 203:2–11.

[6] French Merits Reply Rpt. ¶ 91.

*expert report* (his March 12, 2019 merits reply report), is just as speculative.   Moreover, Defendants identified Dr. French's disqualifying gap in pricing data after his first expert report on class certification, yet Dr. French withheld this new alternative proposal until his merits reply report in March 2019, when he knew Defendants would have no opportunity to respond. Therefore, Dr. French's new analysis should be excluded both because it is speculative and because it is untimely.

**I.      Dr. French's Highly Aggregated Injury-in-Fact Analysis Is Unreliable And Finds Injury to Third-Party Payors Where There Is None — At Least 25% of All Third-Party Payors Requiring Copays for Loestrin 24 Were Not Injured  (The Tier 3 Plans)**

Expert discovery subsequent to the class certification hearing confirms that a substantial number of proposed third-party payor class members were uninjured because they paid *less* for Loestrin 24 and Minastrin than they would have paid for generic Loestrin 24 in Dr. French's but-for world — that is to say, they suffered no "overcharge."  This unrefuted evidence shows that Dr. French's opinion that injury-in-fact to third-party payors can be proved through common evidence is unreliable.

An expert cannot discharge his obligation under *Daubert* by simply asserting that injury-in-fact (also known as "antitrust impact") would be class-wide in nature where the evidence reveals that a substantial number of class members would not have been impacted.  *See, e.g.*, *Blades v. Monsanto Co*., 400 F.3d 562, 570 (8th Cir. 2005); *In re Plastics Additives Antitrust Litig*., No. 03-cv-2038, 2010 U.S. Dist. LEXIS 90135, at *71–72 (E.D. Pa. Aug. 31, 2010) (finding expert analysis unreliable to demonstrate common impact where "unrefuted evidence shows that some class members suffered impact while others did not").  Indeed, Dr. French is left with the "fatal gap in the evidence" that the First Circuit has described that defeats a finding of class-wide impact

and damages.  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018).

Dr. French cannot save his unsupported opinion by offering a brand new "maximum payment" analysis, because that analysis ***actually refutes*** Dr. French's opinion that there is common evidence of injury-in-fact for at least two reasons: (1) it confirms that an individualized, *plan-by-plan evaluation* is required to determine a plan's maximum payment, which by definition defeats any argument that common evidence alone shows injury-in-fact to all class members; and (2) Dr. French concedes his sample of health plans is not representative and that a different sample might show "100% of plans" were uninjured, further underscoring the individualized nature of a maximum payment analysis.  French Mar. 21, 2019 Dep. at 203:7–16.

Because Dr. French ignores unrefuted evidence regarding the substantial number of uninjured third-party payers, his injury-in-fact opinion is unreliable and does not fit the facts of the case.  *See, e.g.*, *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012) ("If perscrutation reveals 'that there is simply too great an analytical gap between the data and the opinion proffered,' the expert's testimony should be excluded." (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))); *Bowling v. Hasbro, Inc.*, No. 05-cv-00229, 2008 U.S. Dist. LEXIS 30043, at *17 (D.R.I. Mar. 17, 2008) (Smith, J.) (excluding expert testimony where expert failed "to tie his opinions to facts or data"); *Noveletsky v. Metro. Life Ins. Co.*, 49 F. Supp. 3d 123, 145, 153 (D. Me. 2014) (finding expert testimony inadmissible where it did not "fit the facts of the case").

### A.    Dr. French Cannot Contest That Plans Applying a Higher, Tier 3 Copay for Loestrin 24 and Minastrin Were Not Injured in the 2009–2013 Period

**1. Dr. French's own data show that certain third-party payors (tier 3 plans) were not injured**.  Dr. James Hughes (Defendants' expert) used Dr. French's own data to show that a substantial number of third-party payors — specifically third-party payors that required a tier 3 (high) copay from consumers — were uninjured in each year from 2009 to 2013 because their

actual payments for Loestrin 24 were *less than* what they would have paid for generic Loestrin 24 in Dr. French's but-for world.  Ex. 4, Merits Rpt. of James W. Hughes ¶ 26–27 (Feb. 14, 2019) ("Hughes Merits Rpt."); *id.* at Exhibits 4.A & 4.B.  Dr. Hughes's analysis was simple:  he identified a group of health plans that required consumers to pay a tier 3 copay, which lowered the amount of the prescription cost paid by the health plan, and then calculated these plans' payments using Dr. French's own estimated actual and but-for prices, demonstrating that these plans paid less for the brand than they would have for the generic.[7]

**Exhibit 4.B**
**Third-party payors are uninjured because they pay less for brand Loestrin 24 or Minastrin 24 than generic Loestrin 24 based on Dr. French's prices**
**Sep 2009 - Dec 2013**

| | Generic Loestrin 24 | | | Branded Loestrin 24 / Minastrin 24 | | |
|---|---|---|---|---|---|---|
| Year | Dr. French's Pharmacy Price[1] [A] | Tier 1 Copay[2] [B] | Plan Cost[3] [C] | Dr. French's Pharmacy Price[4] [D] | Tier 3 Copay[5] [E] | Plan Cost[6] [F] |
| 2009[7] | $51.87 | $10.00 | **$41.87** | $78.56 | $46.00 | **$32.56** |
| 2010 | $49.08 | $11.00 | **$38.08** | $78.56 | $49.00 | **$29.56** |
| 2011 | $48.30 | $10.00 | **$38.30** | $78.56 | $49.00 | **$29.56** |
| 2012 | $48.19 | $10.00 | **$38.19** | $80.61 | $51.00 | **$29.61** |
| 2013 | $48.19 | $10.00 | **$38.19** | $87.69 | $52.00 | **$35.69** |

| Plans pay less for Warner Chilcott products than for generic Loestrin 24 | |
|---|---|
| 2009 | -$9.30 |
| 2010 | -$8.52 |
| 2011 | -$8.74 |
| 2012 | -$8.58 |
| 2013 | -$2.50 |

---

[7] Dr. Hughes took the total actual pharmacy price for the brand from Dr. French's backup data.  Hughes Merits Rpt. Ex. 4.B nn.1, 4, A.  Dr. Hughes allocated the total actual payment for the brand to consumers and tier 3 plans using data from the Kaiser Family Foundation, a source specifically relied upon by Dr. French.  *See* Hughes Merits Rpt. Ex. 4.B, n.B; French Merits Rpt ¶ 106; *id.* at App. B.  Dr. Hughes followed a similar approach for the but-for payments for generic Loestrin 24, using Dr. French's but-for pharmacy prices and the Kaiser data regarding tier 3 copayments to allocate the price for but-for generic Loestrin 24 to consumers and tier 3 health plans.  Hughes Merits Rpt. Ex. 4.B n.1.  Dr. Hughes even removed the price reduction benefits of coupon and rebate adjustments in response to criticisms by Dr. French, despite the fact that Dr. French previously admitted rebates and coupons should be reflected in the average brand price when assessing impact.  Hughes Merits Rpt. Ex. 4.B.  Dr. Hughes presented this same analysis at the class certification hearing.  Ex. 5, Class Cert. Hearing DDX701 at slides 7–12; Ex. 6 Feb. 13, 2019 Class Cert. Hr'g Tr. 164:17–172:6.

5

**2. Dr. French does not provide an alternative calculation of tier 3 health plan payments**. Dr. French concedes that he does not provide an alternative calculation focusing solely on health plans using tier 3 copays for Loestrin 24.  French Mar. 21, 2019 Dep. 167:13–21 ("Q. [Y]ou didn't calculate . . . an average plan payment for Loestrin 24 for plans that had Loestrin 24 on tier 3, right?  With a higher copay.  A.  *I didn't do anything by tier* in that."); *id.* at 164:14–165:7 (emphasis added).

Instead, Dr. French contends that actual and but-for prices should be calculated for consumers and health plans by applying an overall average across all plans, *regardless of whether a plan applied a tier 3 copay* to Loestrin 24 or Minastrin purchases.  French Mar. 21, 2019 Dep. 163:17–165:7 (conceding he calculated "average consumer contributions as a share of the total claim price" and he and his team "weren't looking at the tiers at all").  But this approach does not show injury-in-fact.  Rather, Dr. French's average hides the subgroup that paid less, the health plans applying a tier 3 copay, by combining them with all other plans.[8]  Dr. French's injury-in-fact analyses — comparing average brand payments to average generic payments — have been rejected in the past precisely because they hide differences among important subgroups and mask that members of the class were uninjured.  *See, e.g.*, *In re K-Dur Antitrust Litig.*, No. 01-1652, 2008 U.S. Dist. LEXIS 71771, at *49 (D.N.J. Mar. 27, 2008) (rejecting Dr. French's aggregated impact analysis where evidence showed "variable co-pays" resulted in some third-party payor class members paying less for brand than they would have paid for generic); Mem. in Supp. of Defs.'

---

[8] As Defendants have shown in their summary judgment briefing, it is not surprising that a large number of health plans would place Loestrin 24 and Minastrin on a higher tier requiring a greater consumer copay.  Unlike Warner Chilcott's large competitors like ███████████, who regularly offered large rebates to the insurance companies in exchange for formulary placement, Warner Chilcott gave discounts directly to patients in the form of coupons.  Stmt. Undisputed Fact in Supp. of Defs.' Mot. For S.J. Due to Lack of Market Power ¶¶ 145, 151, 165, ECF No. 533.

Mot. to Exclude Op. and Test. of End-Payor Pls.' Expert Gary L. French, at 8 (Oct. 19, 2018), ECF No. 583.

Here, Dr. French concedes the obvious — a third-party payor that placed Loestrin 24 or Minastrin on tier 2 pays more of the drug's price than a third-party payor that placed Loestrin 24 or Minastrin on tier 3.[9]  This is because, as Dr. French testified, the "higher the consumer contribution, the lower the plan payment."  French Mar. 21, 2019 Dep. 168:15–20.  Thus, by using an overall average to allocate the cost of Loestrin 24 between consumers and third-party payors, Dr. French concedes that his approach yields an average plan payment that is higher than the average plan payment that would result from focusing only on tier 3 plans.[10]  Dr. French's overall average analysis thus does not address Dr. Hughes's analysis, which focuses solely on tier 3 plans that are uninjured.  *Id.* at 164:14–21.

**3.  No-Minastrin Plans: Dr. French's own analysis shows that many health insurance plans did not even cover Minastrin once Loestrin 24 was withdrawn and thus were not injured in the 2014–2017 period either.**  Dr. French cannot avoid the fact that many *uninjured* "tier 3" third-party payors are included in IPPs' proposed class by claiming that these plans were injured in later years (2014–2017) when they would have paid for Minastrin (Loestrin 24 no longer manufactured).  French Merits Reply Rpt. ¶ 84.  But, Dr. French's position ignores the data in his reports, which showed that ***43% (29 out of 67) of Fortune 500 health plans in the OptumHealth***

---

[9] French Mar. 21, 2019 Dep. 168:15–20 ("Q.  So to the extent that a plan had Loestrin on tier 3 and a higher consumer copayment, that would mean in your plan allocation, the plan payment would be lower, right? A.  Yeah, the higher the consumer contribution, the lower the plan payment.").

[10] French Mar. 21, 2019 Dep. 174:2–9 ("Q.  And if you averaged all the tier 2 and tier 3 copayments together, you'd end up with an average that would be lower than the average of tier 3 copayments, if you just averaged the tier 3 copayments separately, is that right?  A.  Well, it's just as the tier 2 would be lower than the combined one, yes, but that's the average.").

***dataset had no transactions for Minastrin or Loestrin 24 during the 2014–2017 period.***[11]  Dr. French concedes that a third-party payor is not injured in a year in which it has no reimbursement transactions for Loestrin 24 or Minastrin.  French Mar. 21, 2019 Dep. 144:13–20 (Q.  "In a particular year, [if] a third-party payor had no transactions for Minastrin, by definition, they wouldn't have any injury on any Minastrin overcharges, right, in that year. . . .  A.  They wouldn't even be a class member in that year.").  Dr. French's own data thus confirm that almost half of the large plans he reviewed were not injured during the 2014–2017 period.

**B.     Dr. French Admits that 25% of Health Plans Requiring Copays Applied a Higher, Tier 3 Copay, Which Means That They Were Not Injured**

Dr. French initially contended that tier 3 does not "represent the typical formulary position" for a branded drug before a generic is available.  Ex. 7, Sur-Reply Rpt. of Gary L. French, Ph.D. Regarding Impact and Damages to End-Payor Pls. (Feb. 1, 2019) ("French Sur-Reply Rpt.") ¶ 83. However, in his post-class certification submission, Dr. French reversed course.  Using the same MMIT data Defendants' expert Dr. Hughes uses,[12] Dr. French now concedes that 25% of plans requiring copays applied a tier 3 copay to Loestrin 24 in the 2009–2013 period.  Ex. 8, Supp'l Decl. of Gary L. French, Ph.D. ¶ 4 (Feb. 22, 2019) ("French Supp'l Decl."); French Merits Reply Rpt. ¶ 83; French Mar. 21, 2019 Dep. 185:13–18 ("Q.  As you report in Paragraph 4 of your

---

[11] French Merits Reply Rpt. Table 11; French Mar. 21, 2019 Dep. 198:3–14 ("Q.  Then [the number of plans] increases further . . . after 2013, you're up to . . . 29 of the 67 plans have no transactions, and thus, no injury in those years for those products, right?  A.  Yes.  Q.  That's 29 out of 67, that's roughly 40 percent with no injury in those years, right?  A.  It could be that they don't cover Minastrin in the later years – it could be that they don't cover Minastrin in the later years after the ACA went into effect.").

[12] *See* Hughes Merits Rpt. Ex. 3 (analyzing data from Managed Markets Insight & Technology ("MMIT"), an industry data source for information regarding the copay tiers applied to drugs by health plans).  Dr. Hughes presented the same analysis at the class certification hearing.  Class Cert. Hearing DDX701 at slide 9; Feb. 13, 2019 Class Cert. Hr'g Tr. 166:11–167:21.

supplemental report, your analysis showed that 25 percent of health plans on a weighted average basis in the MMIT dataset covered Loestrin 24 in tier 3; is that right?  A.  Yes.").

In an effort to salvage his class-wide impact opinion and avoid his concession regarding the common use of tier 3 cost sharing for Loestrin 24, Dr. French claims that a third-party payor may have one health plan with Loestrin 24 on tier 3 and another with Loestrin on tier 2, such that the third-party payor likely would be "injured" on its tier 2 health plan even if it were not injured in its tier 3 plan.  French Merits Reply Rpt. ¶ 84.  But Dr. French identifies no third-party payor fitting his speculative hypothetical, provides no support for this opinion, and concedes that he took no steps to investigate the extent to which third-party payors in the proposed class had more than one health plan.[13]  In fact, even if a third-party payor provided multiple health plans, the third-party payor easily could include Loestrin 24 on the same tier across multiple plans.  Dr. French does not offer a single example — or any data — to the contrary.[14]

Courts routinely reject such *ipse dixit* by experts as unfounded speculation.  *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *Irvine v. Murad Skin Research Labs.*, 194 F.3d 313, 321 (1st Cir. 1999) ("Absent adequate factual data to support the expert's conclusions his testimony was unreliable."); *Hartford Ins. Co. v. Gen. Elec.*, 526 F. Supp. 2d 250, 252 (D.R.I. 2007) (Smith, J.)  ("Expert

---

[13] French Mar. 21, 2019 Dep. 136:6–13 ("Q.  Did you examine on average how many plans a [third-party payor] has?  A.  No.  Q.  Did you look at any data showing how many third-party payors in the United States offer only one plan?  A.  No."); *id.* at 136:18–19 ("I didn't explore [how many third-party payors in the United States offer only one plan], so I wouldn't want to hazard a guess.").

[14] *Id.* at 136:22–137:15 ("Q. . . . For a third-party payor like an employer, even if they had more than one plan, did you evaluate whether the pharmacy benefits differed across those plans?  A.  No.  Q.  So you don't know, one way or the other, where an employer has more than one plan, whether the employer in both plans has Loestrin 24 on the same tier in its formulary, right?  A.  I didn't look into that . . . .").

testimony must be shown to be based on more than the subjective belief or unsupported speculation of the expert."); *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 563 (W.D. Pa. 2003) (excluding opinion where expert "fail[ed] to present reliable scientific evidence" and reasoning that the court "is not required to simply take the expert's word for it").

In short, Dr. French's own analysis of the MMIT data set confirms that a substantial number — 25% — of third-party payors using copays required a tier 3 copay for Loestrin 24 during the 2009–2013 period and thus were likely uninjured.

### C. Dr. French's New "Maximum Plan Payment" Analysis Cannot Save His Opinions as It Confirms That Common Evidence of Injury-in-Fact Is Absent

In response to the evidence showing that at least 25% of health plans using copays are likely uninjured using Dr. French's average price analysis, Dr. French's post-class certification hearing reports propose a new "maximum plan payment" analysis.  French Supp'l Decl. ¶ 12 ("Because a [third-party payor] Class member is injured if it paid more than it would have in the but-for world on at least one transaction, the maximum plan payment is more important than the average plan payment when assessing injury."); French Merits Reply Rpt. ¶ 90 (same).  According to Dr. French, his maximum plan payment analysis shows that 66 of the 67 plans in the OptumHealth data satisfy his new test.  French Supp'l Decl. ¶ 15.  Dr. French asserts that these data "support[] my conclusion that all or nearly all [third-party payor] class member were injured by defendants conduct."  French Supp'l Decl. ¶ 16.

But Dr. French's concessions at his deposition show that his new maximum plan payment analysis actually refutes his opinion regarding class-wide evidence of injury-in-fact.

**1. Dr. French concedes that his maximum plan payment analysis requires an individualized inquiry**.  First, Dr. French agrees that his maximum plan payment analysis requires a review of actual payments made by each third-party payor, which he admits "requires an

10

individualized inquiry into a plan's specific data." French Mar. 21, 2019 Dep. 202:13–203:1.  This admission alone confirms the absence of common evidence of injury-in-fact.

**2. Dr. French concedes that his sample of large health plans is not representative and that a different sample might show 100% of plans were uninjured**.  Second, Dr. French concedes that his maximum payment analysis does not use a representative sample of potential class members, which makes sense because it is an individualized inquiry.  Dr. French's maximum payment analysis examined only OptumHealth data for 67 large health plans among Fortune 500 companies.  Dr. French admits that he did not analyze the maximum payments for any smaller plans with fewer members (French Mar. 21, 2019 Dep. 199:11–15), despite the fact that he would expect a plan with a smaller number of plan members to have fewer transactions for Loestrin 24/Minastrin (*id.* at 199:16–200:4).  Critically, Dr. French admits that the number of uninjured plans "could be 100 percent, if you took another sample."  French Mar. 21, 2019 Dep. 203:2–11.  This concession further shows that a maximum payment analysis to determine injury-in-fact requires an individualized inquiry.

**3. Dr. French's maximum plan payment analysis calculations are fatally flawed in any event**.  Even if Dr. French's maximum plan payment analysis were relevant to the broader set of proposed third-party payor class members (and it is not), Dr. French's approach includes at least four flaws that render his results unreliable.  *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 261 (1st Cir. 1997) (excluding expert testimony where there was "no demonstration that the [expert's] appraisal rested on a reliable methodological foundation" and the methodology did not take into account key facts (internal citation and quotations omitted)).

*First*, Dr. French compares apples and oranges.  He compares an actual price paid on an individual transaction with the average but-for generic Loestrin 24 price he calculates.  Dr. French

11

admits that what each plan pays for brand and generic drugs varies depending on the cost allocation among the insurer, its pharmacy benefit manager ("PBM"), and pharmacy, and whether the claim is for a mail order or retail purchase. *Id.* at 175:21–180:1, 235:9–15. Thus, but-for prices paid by third-party payors likely vary substantially, and using an average but-for price ignores that variation. *Id.* at 174:12–19, 179:5–180:1.

*Second*, Dr. French failed to analyze the circumstances surrounding the maximum payments he found, such as whether the third-party payor placed Loestrin 24 on tier 2 or tier 3, whether the third-party payor paid a larger share of the price because the patient reached an out of pocket maximum, or whether the third-party payor was required to bear a higher portion of the cost for some other unique reason that could not be applied generally to other third-party payors. *Id.* at 164:14–21, 224:21–225:13. He thus has no basis for projecting his results to other third-party payors.

*Third*, Dr. French could not determine whether the maximum plan payment was for a prescription filled by a brand loyalist, in which case the third-party payor would not be injured on that maximum payment in the but-for world. *Id.* at 225:14–226:6, 228:22–229:8.

*Fourth*, Dr. French failed to include rebates, which would lower the maximum price paid by the insurer. Dr. French admits that the "correct pharmacy price" must account for rebates (French Sur-Reply Rpt. ¶ 84), yet he did not lower the maximum payments he examined to include the per-prescription rebates that third-party payors received from PBMs, or the benefit of any Warner Chilcott rebates third-party payors received. French Mar. 21, 2019 Dep. 205:17–206:12.[15] But Dr. French agreed that rebates earned by a third-party payor on a Loestrin 24 transaction may

---

[15] The OptumHealth data used for the maximum payments contains raw claims data, which does not account for rebates. Hughes Sur-Reply Rpt. ¶ 41, n.35.

12

bring some maximum payments ***below*** his but-for generic price.  *Id.* at 206:19–207:7, 214:15–215:16.  This is not surprising, because PBMs often offer rebate guarantees per prescription between \$10–20, and in some instances higher.[16]  Dr. French's own results show that many of the 67 plans he studied had maximum brand payments within ███ of his but-for generic price, and thus they are likely uninjured if one accounts for those rebates.  French Merits Reply Rpt. Fig. 5.

*   *   *   *   *

To summarize, tier 3 plans (25% of all plans that used copays) paid less in the actual world for Loestrin 24 than they would have paid for generic Loestrin 24 in Dr. French's but-for world in the 2009–2013 period, and consequently were uninjured.  Moreover, Dr. French's only real response to this showing, his new maximum payment analysis, confirms the need for an individualized inquiry to determine whether a tier 3 plan was injured or uninjured.  Dr. French's opinion regarding common evidence of injury-in-fact as to third-party payors thus is unreliable, ignores the facts of the case, and should be excluded.  *See Daubert*, 509 U.S. at 597  ("[T]he Rules of Evidence—especially Rule 702—[]assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); *Samaan*, 670 F.3d at 34 (excluding expert testimony where the "methods [the expert] employed and the data he presented were simply too distant from the conclusion he drew" such that expert's analyses were not an "adequate fit" to opinions presented).

---

[16] *See, e.g.*, Hughes Sur-Reply Rpt., at Ex. 8 (showing PBM rebate guarantees ranging from \$5.95 to \$29.36 per brand claim).

II.     **Dr. French Cannot Plug the Gap in His Pricing Data with Speculative Analysis — He Provides No Basis to Calculate Damages Prior to April 2012 (A Period for Which He Has No Data)**

Dr. French relies on pricing data from an industry source to calculate certain prices and generates "overcharges" in his damages model, but he does not have such data for sales prior to April 2012.  Dr. French cannot fill this gap with an unreliable and unsupported assumption, nor can he fill that gap with a new, untimely analysis he offers using a different data source.  His pre-April 2012 damages calculations thus are unreliable, untimely, and should be excluded.

**Dr. French has no IQVIA pricing data prior to April 2012**.  Dr. French uses data from IQVIA National Prescription Audit (NPA) as a key input for his damages model, but he has no IQVIA pricing data prior to April 2012.[17]  To approximate alleged damages, Dr. French calculates an average but-for generic Loestrin 24 retail price purportedly to estimate what would have happened if generic Loestrin 24 been introduced in September 2009.[18]  Dr. French calculates per unit "overcharges" by determining the difference between his but-for generic Loestrin 24 retail price and the actual retail prices of Loestrin 24, Minastrin, generic Loestrin 24, and generic Minastrin.  French Merits Rpt. ¶ 185.  Dr. French then multiplies these "overcharges" by what he claims is the but-for unit volume of generic Loestrin 24.  *Id.* ¶ 186.  Dr. French relies solely on the IQVIA data to calculate his but-for generic retail price, the actual average retail drug prices, and the number of units dispensed.  *Id.* at ¶¶ 178–79.  However, as Dr. French admits, IPPs did not seek the IQVIA data until 2018, five years after filing this lawsuit.  French Mar. 21, 2019 Dep.

---

[17] IQVIA provides monthly data aggregated nationwide.  French Merits Rpt. ¶ 50.

[18] Dr. French determines the price ratio between branded Minastrin and generic Minastrin in its first month of entry and each additional month thereafter.  He then applies those ratios to the actual Loestrin 24 retail price to estimate a but-for generic Loestrin 24 price.  French Merits Rpt. ¶¶ 179, 184.

93:13–94:16.  By that time, IQVIA was able to provide pricing data only back to April 2012.[19]  *Id.* at 94:17–95:1; French Merits Reply Rpt. ¶ 52, n.51.  Dr. French consequently has no IQVIA pricing data for the September 2009 to April 2012 time period.  French Merits Reply Rpt. ¶ 10.

**Dr. French's assumption that the pre-April 2012 price of Loestrin 24 remained constant is unreliable.**  Without IQVIA pricing data prior to April of 2012, Dr. French takes the "actual" price for Loestrin 24 in the IQVIA data for April 2012 and assumes that same price for each month in the period prior to April 2012.  French Merits Reply Rpt. ¶ 12 ("For purposes of calculating Class-wide damages, the April 2012 retail price is applied to the months from September 2009 until March 2012."); French Merits Rpt. Table 2A, Column 12.  Dr. French provides no justification for this assumption, which he admits is a "data limitation."  French Mar. 21, 2019 Dep. 98:12–21; Ex. 9, Videotaped Dep. of Gary L. French 198:22–201:5 (Sept. 7, 2018).  To the contrary, as reflected in Dr. French's reports, Loestrin 24 prices in the IQVIA data were not constant over time, ranging from $2.81 in April of 2012 to $3.20 in July of 2013, when Warner Chilcott stopped manufacturing Loestrin.   French Merits Rpt. Table 2A.

**Dr. French's estimate of pre-April 2012 Loestrin 24 prices using different data, from OptumHealth, is unreliable.**  After four reports and a declaration, Dr. French for the first time attempts to calculate an average retail price for Loestrin 24 pre-April 2012 in his Merits Reply Report.  To do so, Dr. French uses OptumHealth claims data "indirectly" to "estimate what IQVIA prices for those earlier periods [i.e., pre-April 2012] would be."  French Mar. 21, 2019 Dep. 97:22–98:7.  But this indirect estimate is flawed for several reasons.

---

[19] IQVIA only provides six years' of pricing data from the date it is requested.  French Mar. 21, 2019 Dep. 94:17–95:1.

*First*, Dr. French has conceded that the OptumHealth data set is not a reliable source for the nationwide retail price data he needs for his damages calculations — that is why he had not used it for this purpose previously.  French Mar. 21, 2019 Dep. at 97:5–16.  The OptumHealth data is not a nationwide audit of retail prices.  Instead, the focus of the data set is paid claims from individuals with insurance through a subset of Fortune 500 companies.  Hughes Rpt. ¶ 94 n. 109.  As Dr. French explained, the OptumHealth data set is "much less comprehensive" and "considerably smaller" than the IQVIA data.  French Mar. 21, 2019 Dep. 97:5–16; 100:15–18.

*Second*, Dr. French also admits that he cannot simply take the prices in the OptumHealth data and then use them for the gap period.  Rather, he uses the OptumHealth data only "indirectly" to estimate what IQVIA prices "would be."  French Mar. 21, 2019 Dep. 97:22–98:7.  He does this by inflating the OptumHealth prices by ▮▮▮.  French Merits Reply Rpt. ¶ 13.  But Dr. French provides no credible or reliable support for his "indirect" use of OptumHealth data (which not surprisingly inflates IPPs' estimated damages).[20]  In fact, in the limited price comparison he conducts, Dr. French finds substantial, unexplained variability between the two data sets.  The monthly prices in the IQVIA data are higher than the OptumHealth prices by a range of between ▮▮▮ and ▮▮▮.  Ex. 10, French Backup, "Tables and Figures Merits Reply.xlsx" at tab "L24 Price Calculation Using Opt."  Dr. French is unable to explain this important anomaly, making his use of inflated OptumHealth prices unreliable as a reference for nationwide average prices.[21]  *See Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc.*, No. 09-40089, 2014 U.S. Dist. LEXIS

---

[20] Dr. French's "indirect" use of OptumHealth prices increases his overall damages estimates for the End Payor Class by more than ▮▮▮ and for the Third-party Payor Class by more than ▮▮▮.  French Merits Rpt. ¶ 17.

[21] French Mar. 21, 2019 Dep. 99:7–15 ("Q.  [W]hat's driving that difference [in IQVIA and OptumHealth price]?  I don't know with certainty.  I can surmise what might be driving it.  Q.  In your report, do you have any explanation as to why there's that ▮▮▮▮▮ difference?  A.  I don't think I discussed the reasons for the difference in my report.").

175470, at *37 (D. Mass. Dec. 19, 2014) (excluding analysis that combined studies that "do not measure data in the same way").  Dr. French thus has no basis for estimating damages prior to April 2012, which means that his damages estimate for that period should be excluded.  *See, e.g.*, *Irvine*, 194 F.3d at 321 (excluding damages estimate where it lacked "adequate factual data to support the expert's conclusions").

**Dr. French's estimate of pre-April 2012 Loestrin 24 prices using the OptumHealth data should be excluded as untimely.**  IPPs' and Dr. French's tactical decision to disclose this estimate for the first time in the French Merits Reply Report — after Defendants had repeatedly criticized Dr. French for simply assuming Loestrin 24's price before April 2012[22] — renders the analysis untimely and in violation of Rule 26(a)(2)(B).  *See, e.g.*, *In re High-Tech Empl. Antitrust Litig.*, No. 11-cv-02509, 2014 U.S. Dist. LEXIS 47181, at *42–48 (N.D. Cal. Apr. 4, 2014) ("Dr. Leamer knew about this criticism long before . . . and thus had four reports *before* . . . [his] reply report in which he could have set forth his theory . . . .  Dr. Leamer's theory is untimely disclosed because he could have and should have included this theory in his opening merits report to allow Defendants the opportunity to respond.").

## CONCLUSION

For the foregoing reasons, including the arguments in Defendants' prior motion to exclude Dr. French's opinions which are incorporated herein by reference, this Court should exclude the expert reports and testimony of Dr. Gary French pursuant to Federal Rule of Evidence 702 and *Daubert*.

---

[22] Defs.' Mem. of Law In Opp. to End-Payor Pls.' Mot. for Class Cert. and Supp. of Defs.' Renewed Motion to Dismiss and Mot. for Judgment on Pleadings 49 (Oct. 19, 2018), ECF No. 574-02; Sur-Reply Expert Rep. of James W. Hughes ¶ 42 (Jan. 18, 2019) (Appendix B to Hughes Merits Rpt.).

17

Dated: May 17, 2019

Respectfully submitted,

*/s/ J. Mark Gidley*
J. Mark Gidley (pro hac vice)
Peter J. Carney (pro hac vice)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

Robert A. Milne (pro hac vice)
Jack E. Pace III (pro hac vice)
Michael J. Gallagher (pro hac vice)
Alison Hanstead (pro hac vice)
Michael E. Hamburger (pro hac vice)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

Lauren M. Papenhausen (pro hac vice)
Katherine Dyson (pro hac vice)
WHITE & CASE LLP
75 State Street, Floor 24
Boston, MA 02109
Telephone: (617) 979-9300
Facsimile: (617) 979 9301

Angela D. Daker (pro hac vice)
WHITE & CASE LLP
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
Telephone: (305) 995-5297
Facsimile: (305) 358-5744

*/s/ Nicole J. Benjamin*
John A. Tarantino (#2586)
jtarantino@apslaw.com
Nicole J. Benjamin (#7540)
nbenjamin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Telephone: (401) 274-7200

Facsimile: (401) 751-0604

*Attorneys for Warner Chilcott Co., LLC f/k/a Warner Chilcott Co., Inc., Warner Chilcott (US), LLC, Warner Chilcott Sales (US), LLC, Warner Chilcott plc n/k/a Allergan WC Ireland Holdings Ltd., Warner Chilcott Holdings Co. III, Ltd., Warner Chilcott Corp. Warner Chilcott Sales (US), LLC, Warner Chilcott Laboratories Ireland Limited, Watson Laboratories, Inc., and Watson Pharmaceuticals, Inc.*

19

## <u>CERTIFICATE OF SERVICE</u>

I, Nicole J. Benjamin, hereby certify that on this 31st day of May 2019, copies of the foregoing redacted public version of Memorandum of Law in Support of Defendants' Motion to Exclude the Opinions and Testimony of End-Payor Plaintiffs' Expert Dr. Gary L. French will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Nicole J. Benjamin*
Nicole J. Benjamin