UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                              )
IN RE LOESTRIN 24 FE          ) MDL No. 13-2472
ANTITRUST LITIGATION          )
                              ) Master File No. 1:13-md-2472-WES-PAS
                              )
THIS DOCUMENT RELATES TO:     )
ALL END-PAYOR CLASS           )
ACTIONS                       )
_____)
```

**MEMORANDUM OF DECISION ON CLASS CERTIFICATION AND
ORDER REGARDING MOTIONS TO EXCLUDE CERTAIN EXPERT OPINIONS AND
DEFENDANTS' RENEWED MOTION TO DISMISS**

WILLIAM E. SMITH, Chief Judge.

In this putative class action, the End-Payor Plaintiffs ("EPPs") allege that Defendants Warner Chilcott (US), LLC, Warner Chilcott Sales (US), LLC, Warner Chilcott Company, LLC, Warner Chilcott plc, and Warner Chilcott Limited (collectively, "Warner Chilcott") and Defendants Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc. (together, "Watson"[1], and collectively, with Warner Chilcott, "Defendants") violated state and federal law through a series of actions intended to delay and suppress generic competition for the oral contraceptive Loestrin 24 Fe ("Loestrin 24").[2]   The EPPs moved for class certification.   See generally

---

[1] Warner Chilcott and Watson are part of the multinational corporation Allergan plc.   See End-Payor Pls.' Second Am. Consolidated Class Action Compl. ("EPP Compl.") ¶ 27, ECF No. 169.

[2] Loestrin 24 is an oral contraceptive with 24 tablets containing 1 mg norethindrone acetate and 20 mcg ethinyl estradiol and 4 iron placebo tablets.   EPP Compl. ¶ 116.

EPPs' Mot. for Class Certification and Appointment of Class Counsel, ECF No. 526; Mem. of Law in Supp. of EPPs' Mot. for Class Certification and Appointment of Counsel ("EPPs' Mot. for Class Certification"), ECF No. 528-1.  In order to allow sufficient time for notice to the class prior to trial, which is slated to commence on January 6, 2020, the Court – having found the prerequisites of Rule 23 fully satisfied – issued an Order dated September 17, 2019, granting in part and denying in part the EPPs' Motion for Class Certification, promising an opinion explaining the Order.[3]  See ECF No. 1226.  This Memorandum serves that purpose.

In addition to explaining the reasoning underlying the Order on the EPPs' Motion for Class Certification, for the reasons set forth below, Defendants' Renewed Motion to Dismiss and Motion for Judgment on the Pleadings as to Claims in EPPs' Second Amended Consolidated Class Action Complaint, ECF No. 576, is GRANTED IN PART and DENIED IN PART; Defendants' Motion to Exclude the Opinion and Testimony of EPPs' Expert Gary L. French, Ph.D., ECF No. 575, is DENIED; EPPs' Motion to Exclude the Opinions and Testimony of James W. Hughes, Ph.D. ("EPPs' Mot. to Exclude Hughes"), ECF No. 634, is GRANTED IN PART AND DENIED IN PART; Defendants' Motion to Exclude the Opinions and Testimony of EPPs' Experts Eric Miller,

---

[3] The Order on Class Certification, ECF No. 1226, and the class definition set forth therein, was amended by a subsequent order, see ECF No. 1239.

Laura Craft, and Myron Winkelman, ECF No. 698, is GRANTED IN PART AND DENIED IN PART; and the EPPs' Motion to Exclude the Opinions and Testimony of Mr. Timothy E. Kosty and Dr. Bruce A. Strombom ("EPPs' Mot. to Exclude Kosty and Strombom"), ECF No. 733, is DENIED.

## I.   Background

The Court constrains its recitation of the factual and procedural background to that relevant to the EPPs' Motion for Class Certification.[4]

The EPPs are health and welfare benefit plans, health and welfare benefit funds, and employee benefit welfare funds (collectively, the "Third-Party Payors" or the "TPPs") and consumers who purchased, paid for, and/or provided reimbursement for Loestrin 24 and Minastrin 24 ("Minastrin") and/or their AB-rated generic equivalents.[5]   End-Payor Pls.' Second Am. Consolidated Class Action Compl. ("EPP Compl.") ¶¶ 15-26, ECF No. 169.   They allege that, in the first instance, Warner Chilcott committed fraud on the Patent and Trademark Office in enforcing the patent for Loestrin 24 and filing sham litigation against

_____

[4] The curious reader may refer to In re Loestrin 24 Fe Antitrust Litig., 261 F. Supp. 3d 307, 314-25 (D.R.I. 2017) ("Loestrin I"), to put more flesh on the bones of the following summary.

[5] The Court uses "generic equivalents" as shorthand for "AB-rated generic equivalents" throughout.

potential generic competitors.  In re Loestrin 24 Fe Antitrust Litig., 261 F. Supp. 3d 307, 318-21 (D.R.I. 2017) ("Loestrin I"). The EPPs further allege that Warner Chilcott then settled its sham patent lawsuits against Watson and Lupin Pharmaceuticals, Inc. and/or Lupin Ltd. ("Lupin") by making large and unjustified payments in exchange for their agreement to stay out of the Loestrin 24 market.  Id. at 321-23.[6]  Before generic entry was set to occur, Warner Chilcott introduced a new drug, Minastrin (a chewable version of Loestrin 24 with added sweetener on reminder days), to erode the brand Loestrin 24 prescription base before generic entry.  Id. at 323-24.  This alleged product hop allowed Warner Chilcott to retain branded sales (in Minastrin) once generic Loestrin 24 entered and state automatic substitution laws kicked in.  Id.

The above order of events has consequences for the Court's ability to assess – as antitrust law requires – what the world would have looked like but for Defendants' alleged anticompetitive conduct.[7]  Because, the EPPs say, Defendants executed the product

---

[6] The EPPs have reached a settlement with Lupin that is pending approval of the Court.  EPPs' Mot. for Prelim. Approval of Class Action Settlement with Lupin Ltd. and Lupin Pharms., Inc., ECF No. 1122.  The Direct Purchaser Plaintiffs ("DPPs"), the Retailers, and the EPPs have all filed a notice indicating that they do not intend to pursue any arguments that Defendants' conduct delayed the introduction of Lupin's generic Loestrin 24.  See ECF No. 1208.

[7] Reference to the "but-for world" throughout this decision connotes the hypothetical world in which Defendants did not engage

hop and pulled brand Loestrin 24 from the market before automatic substitution laws took effect, there is a dearth of evidence reflecting how the market would have responded to generic entry in a but-for world.  This paucity of evidence means that the EPPs and Defendants, and their respective experts, do not agree on which methodology best constructs the contours of the but-for world.

Complicating things further, after the EPPs filed their Motion for Class Certification, the First Circuit issued its opinion in In re Asacol Antitrust Litigation, 907 F.3d 42 (1st Cir. 2018) ("Asacol").  That decision makes plain in this Circuit what may have been unclear before:  in order to prevail on its motion for class certification, the class action plaintiff must provide a plan to identify and remove any uninjured entities and/or persons from the class in a manner that is both administratively feasible and protective of the defendant's Seventh Amendment and due process rights.  Id. at 52.  In a case like this one, where the parties do not dispute that there is some percentage of uninjured consumers who would have purchased a more expensive brand product over a less expensive generic in the but-for world, this task proves impossible with respect to any class containing individual consumers.

_____

in any of the anticompetitive conduct alleged by the EPPs.

## II.  Discussion

### A.  Defendants' Renewed Motion to Dismiss and For Judgment on the Pleadings

Only a direct purchaser – and not others further down the chain of distribution – that incurred overcharges from an antitrust violation may recover damages under federal antitrust law. Illinois Brick Co. v. Illinois, 431 U.S. 720, 746-47 (1977).  This "indirect-purchaser rule", however, does not bar indirect purchasers from bringing claims under state law where states otherwise recognize such a cause of action, either through Illinois Brick-repealer laws or otherwise.  California v. ARC America Corp., 490 U.S. 93, 103 (1989).  The EPPs lodge their claims under the laws of forty-eight states, Puerto Rico, and the District of Columbia.[8]  See generally Appendix A, Notice of Submission in Resp. to Court's Sept. 17, 2019 Order ("EPP State Law Claims Chart"), ECF No. 1231-1; EPP Compl.  Defendants moved to dismiss all of the EPPs' state law claims in their Motion to Dismiss the EPPs' Second Amended Complaint.  See Defs.' Mot. to Dismiss All Claims in All Pls.' May 9, 2016 Compls. 131-75 ("Defs.' Mot. to Dismiss"), ECF No. 192.  The Court deferred ruling on these state-specific issues until class certification, Loestrin I, 261 F. Supp. 3d at 359-61, and Defendants have filed a Renewed Motion to Dismiss.  See

---

[8] The Court uses the word "state" throughout this decision to refer more broadly to states, the District of Columbia, and Puerto Rico.

<u>generally</u> Defs.' Mem. of Law in Opp'n to EPPs' Mot. for Class Certification and in Supp. of Defs.' Renewed Mot. to Dismiss and Mot. for J. on the Pleadings ("Defs.' Renewed Mot. to Dismiss"), ECF No. 574-2.

### 1.  Article III Standing[9]

Defendants assert that the named TPPs[10] do not have Article III standing to bring claims on behalf of TPPs injured in states other than those in which the named TPPs were injured.  <u>Id.</u> at 4, 52-53.  Remarkably, Defendants pursue this argument despite the First Circuit's recent holding to the contrary in <u>Asacol</u>.  See <u>id.</u> at 53 (acknowledging that the First Circuit recently rejected this argument in <u>Asacol</u> but arguing the court did not address all controlling Supreme Court precedent (citing <u>Asacol</u>, 907 F.3d at 42)).  Because this Court is bound by the decisions of the First Circuit, absent intervening Supreme Court precedent, it is clear the EPP class representatives must demonstrate that they have "the

---

[9] In response to deposition testimony that the A.F. of L. - A.G.C. Building Trades Welfare Plan ("A.F. of L.") had paid nothing for brand Loestrin 24 and Minastrin at the time the EPP Complaint was filed, the EPPs submit that the A.F. of L. is "amenable to no longer pursuing its claims as a named Plaintiff in this case". EPPs' Mem. in Opp'n to Defs.' Renewed Mot. to Dismiss and Mot. for J. on the Pleadings 23 n.25, ECF No. 613; <u>see also</u> Defs.' Renewed Mot. to Dismiss 66.  Accordingly, the Court dismisses the A.F. of L. as a named plaintiff in this suit.

[10] As discussed in detail below, the Court certifies only a TPP class, and so, does not address whether the named consumer plaintiffs have Article III standing to bring claims on behalf of others.

necessary stake in litigating conduct . . . to which [the named plaintiffs] ha[ve] not been subject" in order to establish that they have standing in other jurisdictions.[11]  Asacol, 907 F.3d at 48 (quoting Blum v. Yaretsky, 457 U.S. 991, 999 (1982)).  And as long as they satisfy that requirement, which they do, they have standing to "litigate as class representatives materially identical claims by other persons under the same laws under which [their] claims arise."  Id. at 47.

Defendants further contend that the TPPs may only establish injury in the states in which they are headquartered and not in the states in which they provided reimbursement for the drugs at issue.  Defs.' Renewed Mot. to Dismiss 54 (conceding standing in states where the named TPPs are headquartered).  The Court is not persuaded and holds that the named TPPs allege injury, and thus have standing, in states where they purchased the drugs at issue and/or reimbursed their members for purchases of the drugs at issue.  See In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014) ("Niaspan") (holding that named indirect purchaser plaintiffs may bring suit "under the laws of states in

---

[11] Defendant Warner Chilcott was also a defendant in Asacol. The argument they make here challenging standing would have been better made directly to the First Circuit in a petition for panel rehearing or rehearing en banc.  The Court understands such a request was not made in Asacol, and thus Defendants have made their bed for this litigation.  The Court is confident the First Circuit vigorously examined this issue in reaching its conclusion in Asacol, even if it did not cite each case Defendants reference.

which they reside or in which they either purchased or made reimbursements for [the drug]"); <u>In re Flonase Antitrust Litig.</u>, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) ("<u>Flonase</u>") ("Plaintiffs suffered injury and have standing in states where they purchased a drug or reimbursed their members for purchases of a drug.");[12] <u>In re Wellbutrin XL Antitrust Litig.</u>, 260 F.R.D. 143, 157 (E.D. Pa. 2009) ("<u>Wellbutrin XL</u>") (holding that indirect purchaser plaintiffs had standing to bring claims under the laws of the state where "plaintiffs themselves are located" and "their members made purchases of" the drug). But see <u>In re K-Dur Antitrust Litig.</u>, No. CIV.A. 01-1652(JAG), 2008 WL 2660783, at *5 (D.N.J. Mar. 19, 2008) (holding that, where TPPs were "not suing derivatively for alleged injury to their members" but instead "asserting claims on their own behalf", choice of law principles dictate that the law of the states where the TPPs have their principal place of business

---

[12] <u>Niaspan</u> and <u>Flonase</u> are distinguishable from <u>Asacol</u> in that they hold that named plaintiffs may <u>only</u> pursue claims in the states in which they reside or provided reimbursements. <u>See, e.g.</u>, <u>Niaspan</u>, 42 F. Supp. 3d at 758; <u>Flonase</u>, 692 F. Supp. 2d at 533. <u>Asacol</u> controls the Court's inquiry here. Moreover, Defendants get no traction with their argument that, applying choice-of-law principles, the EPPs are limited to recovering only under the laws of the six states in which the TPPs are headquartered. This argument has been rejected by the majority of courts to address it. <u>See, e.g.</u>, <u>In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.</u>, 64 F. Supp. 3d 665, 694-95 (E.D. Pa. 2014), <u>on reconsideration in part</u> 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) (citing <u>King Drug Co. of Florence, Inc. v. Cephalon, Inc.</u>, 702 F. Supp. 2d 514, 538 (E.D. Pa. 2010); <u>Wellbutrin XL</u>, 260 F.R.D. at 156-57).

governs the claims).  The named TPPs are headquartered and/or purchased, paid for, and/or provided reimbursement for the drugs at issue in the following states:   California, Connecticut, Delaware, the District of Columbia, Florida, Illinois, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, and Virginia.  EPP Compl. ¶¶ 15-23.  They propose a class of purchasers in 49 states.  See EPP State Law Claims Chart.  Specifically, they bring antitrust claims under the laws of 28 states; unfair or unconscionable acts and practices claims under the laws of 17 states; and unjust enrichment claims under the laws of 49 states.  Id.

Defendants argue that, even under Asacol's "sufficient personal stake" or "substantial stake" test, the named TPPs lack standing to bring (1) antitrust claims under the laws of the District of Columbia, Hawaii, Mississippi, Nevada, New York, Oregon, Tennessee, and West Virginia; (2) consumer protection claims under the laws of the District of Columbia, Michigan, Nevada, New Mexico, New York, Rhode Island, Tennessee, and West Virginia; and (3) claims for enhanced or treble damages under the laws of Arizona, New Hampshire, New Mexico, North Dakota, the antitrust laws of Iowa and Michigan, or the consumer protection

laws of Massachusetts, Missouri, and Tennessee.[13]  Defs.' Renewed Mot. to Dismiss 61; Defs.' Reply in Supp. of the Renewed Mot. to Dismiss and Mot. for J. on the Pleadings ("Defs.' Reply to Mot. to Dismiss") 6, ECF No. 665-1.

First, the named TPPs have Article III standing to bring antitrust claims under the laws of the District of Columbia, Hawaii, Mississippi, Nevada, New York, Oregon, Tennessee, and West Virginia.  While these states may require the named Plaintiffs to demonstrate that Defendants' conduct had intrastate effect, the named TPPs also have a personal stake in doing so because they are headquartered and/or purchased, paid for, and/or provided reimbursement for the drugs at issue in the District of Columbia, Nevada, and New York, see EPP Compl. ¶¶ 15-23, which under Defendants' own estimation, share this requirement.  Moreover, as discussed further below, the EPPs' Complaint alleges nationwide antitrust violations, the antitrust impact of which was felt within each state.  With these allegations in hand, the effect on intrastate commerce cannot seriously be disputed.  See Asacol, 907

---

[13] The Court does not address whether the named EPPs have standing to bring antitrust claims in Massachusetts, or consumer protection claims in Kansas, Iowa, Maine, Utah, Missouri, and Vermont, because the EPPs are not pursuing these claims.  See EPP State Law Claims Chart.  While some of the EPPs' other state law claims are dismissed for failure to state a claim, as explained below, "an Article III court ordinarily must be sure of its own jurisdiction before getting to the merits."  Ortiz v. Fibreboard Corp., 527 U.S. 815, 816 (1999) (citing Steel Co. v. Citizens For a Better Environment, 523 U.S. 83, 88-89 (1989)).

F.3d at 50 ("Warner, though, makes no showing that an effect on intrastate commerce will even be a disputed issue.").

Second, the named TPPs have "a substantial stake in proving up a case that is, as a practical matter, unreliably distinguishable from proving willfulness", Asacol, 907 F.3d at 50, under the consumer protection laws of the District of Columbia, Michigan, Nevada, New Mexico, New York, Rhode Island, Tennessee, and West Virginia, because the named TPPs are alleged to be headquartered and/or purchased, paid for, and/or provided reimbursement for the drugs at issue in each of these states save New Mexico, Tennessee, and West Virginia.

Third, the named TPPs also have standing to bring enhanced or treble damages under various state laws. See Defs.' Renewed Mot. to Dismiss 61 (arguing the named EPPs do not have standing to bring these claims); see also Appendix B, Defs.' Renewed Mot. to Dismiss (detailing the statutes under which the EPPs may be entitled to enhanced or treble damages). The named TPPs have a substantial interest in establishing that Defendants "flagrant[ly]" or "willfully" violated the law, as they pursue their own claim under Michigan antitrust law, which provides that a jury may award up to treble damages for a "flagrant" violation. Mich. Comp. Laws § 445.778; see also Ariz. Rev. Stat. § 44-1408(B) (treble damages for "flagrant" violation); N.H. Rev. Stat. Ann. § 356:11(II) (up to treble damages for "willful or flagrant" violation); N.M. Stat.

12

Ann. § 57-1-3(A)(treble damages "if the facts so justify"); N.D. Cent. Code § 51-08.1-08(2) (treble damages for a "flagrant" violation); Mass. Gen. Laws ch. 93A, § 9(3), 11 (treble damages for "willful or knowing" violation); Tenn. Code Ann. § 47-18-109(3)(treble damages for "willful or knowing" violations); Iowa Code § 553.12 (court may award "twice the actual damages").[14]

Defendants do not attempt to apply the Asacol "substantial stake" test to the EPPs' unjust enrichment claims – instead spilling much ink rearguing Asacol and staking out their position that the EPPs waived their unjust enrichment claims. See generally Defs.' Renewed Mot. to Dismiss; Defs.' Reply to Renewed Mot. to Dismiss. In any event, the Court concludes that the named TPPs have a "substantial stake" in litigating the unjust enrichment claims under the laws of all jurisdictions in which they are asserted. While several of the TPPs' unjust enrichment claims under various state laws are dismissed below for failure to state a claim, the named TPPs have a substantial stake in pursuing each claim, given the similarity of the well-rehearsed elements of an unjust enrichment claim under the laws of each state. See In re

---

[14] The EPPs have Article III standing to bring antitrust claims in the District of Columbia, Nevada, New York, enhanced or treble damages under the antitrust laws of Michigan and the consumer protection laws of Massachusetts, because they are headquartered or purchased, paid for, and/or provided reimbursement for the drugs at issue in those states. See Asacol, 907 F.3d at 47 (concluding that named plaintiffs have standing to bring claims under the state laws in which they purchased the drugs at issue).

Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., 64 F. Supp. 3d 665, 703 (E.D. Pa. 2014) ("Suboxone"), on reconsideration in part 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) ("While it is true that the elements of unjust enrichment vary state by state, 'almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit.'" (quoting Flonase, 692 F. Supp. 2d at 541)).

In sum, the named TPPs have Article III standing under the laws of the states in which they press their claims. See generally EPP State Law Claims Chart.

### 2. State-Specific Issues[15]

#### a. Whether Illinois Brick Bars Suit in Eight Jurisdictions

Defendants contend that Illinois Brick bars the EPPs' claims under the laws of eight states (viz., Idaho, Illinois, Massachusetts, Missouri, Montana, Puerto Rico, Rhode Island, and Utah). Defs.' Renewed Mot. to Dismiss 62-65. The EPPs disagree.

---

[15] The Court has considered all arguments set forth in Defendants' Motion to Dismiss, ECF No. 192, Defendants' Renewed Motion to Dismiss, ECF No. 574-2, and replies thereto. The Court rejects, without further discussion, various arguments Defendants presented in their Motion to Dismiss. See, e.g., Defs.' Mot. to Dismiss 153, 164 (arguing, for example, that Hawaii's consumer protection statute has a pre-suit notice requirement and Nevada's consumer protection statute only provides enforcement for elderly and disabled persons).

EPPs' Mem. Of Law in Opp'n to Defs.' Renewed Mot. to Dismiss & Mot. for J. on the Pleadings ("EPPs' Opp'n to Renewed Mot. to Dismiss") 10-21.

Illinois.  Defendants contend that the Illinois Antitrust Act bars indirect purchaser class actions and that Illinois does not permit indirect purchasers to bring suit under its Consumer Fraud and Deceptive Business Practices Act as an "end-run" around the Illinois Antitrust Act.  Defs.' Renewed Mot. to Dismiss 63.  The Court agrees.

The Illinois Antitrust Act provides that

> No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages. . . . Provided further that no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae as provided in this subsection.

740 Ill. Comp. Stat. 10/7 (2010).  To sort this out, both parties invoke the United States Supreme Court's decision in Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010).[16]  In Shady Grove, the Supreme Court considered a New

---

[16] Justice Stevens's concurrence in Shady Grove is largely considered the controlling opinion.  See In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 408-09 (D. Mass. 2013) ("Nexium I"); see also In re Trilegiant Corp., Inc., 11 F. Supp. 3d 82, 116-18 (D. Conn. 2014) (collecting cases).  The EPPs maintain that Justice Scalia's opinion should instead control.  See EPPs' Opp'n to Renewed Mot. to Dismiss 12, 13 n.14; see also In re Aggrenox Antitrust Litig., No. 3:14-MD-2516 (SRU), 2016 WL 4204478, at *5-6 (D. Conn. Aug. 9, 2016) ("Aggrenox II").

York law that barred class action suits seeking recovery of a "penalty" or statutory minimum damages. 559 U.S. at 396. The law in question was contained within a section of New York procedural law governing class certification. Id. at 396 n.1; see also id. at 416 ((Stevens, J., concurring in part and concurring in the judgment) ("The New York law at issue . . . is a procedural rule that is not part of New York's substantive law.")). The plurality reasoned that federal procedural rules apply in federal courts, and where state laws conflict with Rule 23, federal law preempts state law. Id. at 409. Justice Stevens reasoned that "[a] federal rule . . . cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right." Shady Grove, 559 U.S. at 423 (Stevens, J., concurring in part and concurring in the judgment). In other words, a federal rule may not operate to "effectively abridge[], enlarge[], or modif[y] a state-created right or remedy . . . ." Id. at 422.

Interpreting Shady Grove, the First Circuit has explained that, "[i]n getting at the potential rub in the relationship between a Federal Rule of Procedure and the state law, courts now ask if the federal rule is 'sufficiently broad to control the issue before the court.'" Godin v. Schencks, 629 F.3d 79, 86 (1st Cir. 2010) (quoting Shady Grove, 559 U.S. at 421) (Stevens, J.,

16

concurring in part and concurring in the judgment)).  If the federal rule is sufficiently broad to control the issue, the "rule must be given effect despite the existence of competing state law so long as the rule complies with the Rules Enabling Act."  Id. If it is not so broad, state law controls.  Id.  That said, a federal court may decline to apply state law if doing so would further the central objectives of Erie: "discouragement of forum-shopping and avoidance of inequitable administration of the laws." Id. (quoting Hanna v. Plumer, 380 U.S. 460, 468 (1965)).

This Court is not the first in this Circuit to consider the applicability of Shady Grove to the Illinois Antitrust Act.  See, e.g., In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 408-09 (D. Mass. 2013) ("Nexium I"); In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. CV 14-MD-02503-DJC, 2015 WL 5458570, at *16-17 (D. Mass. Sept. 16, 2015) ("Solodyn I").  The Nexium and Solodyn courts noted that the Illinois Antitrust Act appears in the state's substantive antitrust statute, not in any generally applicable procedural law.  Solodyn I, 2015 WL 5458570, at *16-17 (citing Nexium I, 968 F. Supp. 2d at 408-09).  This Court joins the Nexium and Solodyn courts in concluding that Rule 23 does not preempt Illinois antitrust law because it would be "an application of a federal rule that effectively abridges, enlarges, or modifies a state-created right or remedy."  Shady Grove, 559 U.S. at 422 (Stevens, J., concurring

17

in part and concurring in the judgment).  Accordingly, the Court dismisses for lack of standing the EPPs' claims under the Illinois Antitrust Statute.

Defendants also argue that the EPPs do not have standing to bring claims under the Illinois Consumer Fraud and Deceptive Business Practices Act because it would allow an "end run" around the class action ban in the Illinois Antitrust Act.  Defs.' Renewed Mot. to Dismiss 63.  The Illinois Consumer Fraud and Deceptive Business Practices Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."  815 Ill. Comp. Stat. 505/2.  The Illinois Supreme Court has held that this statute was not intended to be "an additional antitrust enforcement mechanism[,]" but instead, "[t]he language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others."  Laughlin v. Evanston Hosp., 550 N.E.2d 986, 993 (Ill. 1990).  And so, this Court joins the majority of other courts in concluding that the EPPs do not have standing to maintain what is in essence an antitrust claim by another name under the Illinois Consumer Fraud and Deceptive Business Practices Act.  See, e.g., Solodyn I, 2015 WL 5458570, at *16-17; In re Aggrenox Antitrust Litig., No. 3:14-MD-2516(SRU), 2016 WL 4204478, at *6-7 (D. Conn. Aug. 9, 2016) ("Aggrenox II");

18

In re Lipitor Antitrust Litig., 336 F. Supp. 3d 395, 422 (D.N.J. 2018)("Lipitor"); Wellbutrin XL, 260 F.R.D. at 162.

Massachusetts.   Section 11 of the Massachusetts Consumer Protection Act ("MCPA") confers standing to any person "who engages in the conduct of any trade or commerce . . . ." Mass. Gen. Laws. ch. 93A, § 11.  Section 9, in turn, confers standing to any person "other than a person entitled to bring action under section eleven."  Mass. Gen. Laws. ch. 93A, § 9.  Whether the TPPs bring their claims under Section 9 or 11 matters because Massachusetts courts apply the Illinois Brick indirect-purchaser rule to Section 11, but not to Section 9.  See Ciardi v. F. Hoffmann-La Roche, Ltd., 762 N.E.2d 303, 308, 311 (Mass. 2002) (noting that the "the rule of law established in Illinois Brick" applies to the Massachusetts Antitrust Act, and that Section 11 of the MCPA "includes a specific provision that in any action brought under that section, the court shall be guided in its interpretation of unfair methods of competition by the provisions of the Antitrust Act"); Aggrenox II, 2016 WL 4204478, at *8 (citations omitted) (same).

Sections 9 and 11 have been construed by many courts as binary – the former conferring standing to consumers and the latter conferring standing to businesses.  See, e.g., Cont'l Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000) ("[S]ection 11 affords no relief to consumers and, conversely, section 9 affords no relief

19

to persons engaged in trade or commerce."); <u>Aggrenox II</u>, 2016 WL 4204478, at *8 ("[T]hose provisions are naturally construed to make section nine exclusively applicable to consumers and section eleven exclusively applicable to business entities.").  At least one court, alternatively, has held that non-profit union benefit funds could bring claims under section 9 of the MCPA because they were "not motivated by the desire to make money from the drugs and were acting within their core mission."  <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 491 F. Supp. 2d 20, 82 (D. Mass. 2007), <u>aff'd on other grounds by</u>, 582 F.3d 156 (1st Cir. 2009); <u>see also</u> <u>Frullo v. Landenberger</u>, 814 N.E.2d 1105, 1112 (Mass. App. Ct. 2004) ("Thus, any transaction in which the plaintiff is motivated by business considerations gives rise to claims only under the statute's business section.").  This Court concludes that the TPPs have failed to plead a claim for relief under Section 9 of the MCPA because, even if some or all of the TPPs are non-profits, they are "motivated by business considerations" nonetheless.  <u>See</u> <u>Frullo</u>, 814 N.E.2d at 1112.  Accordingly, the TPPs do not have standing to bring claims under the MCPA and those claims are dismissed.

     <u>Idaho, Missouri, and Montana</u>.  Defendants challenge the EPPs' standing to bring claims under the antitrust and consumer protection laws of Missouri and Montana, as well as the EPPs' claims under Idaho antitrust law.  Defs.' Renewed Mot. to Dismiss

63-64. The EPPs no longer press these claims, so they are dismissed. See EPP State Law Claims Chart 2.

Puerto Rico. This Court joins the majority of courts in concluding that the EPPs do not have standing to bring antitrust claims under Puerto Rico law. See, e.g., Solodyn I, 2015 WL 5458570, at *15; In re Aggrenox Antitrust Litig., 94 F. Supp. 3d 224, 252 (D. Conn. 2015) ("Aggrenox I"); In re TFT-LCD (Flat Panel) Antitrust Litig., 599 F. Supp. 2d 1179, 1188 (N.D. Cal. 2009) ("TFT-LCD II"); Nexium I, 968 F. Supp. 2d at 409-10. Puerto Rico has not passed an Illinois Brick-repealer statute, and its antitrust law is interpreted in lockstep with the parallel federal law. Aggrenox I, 94 F. Supp. 3d at 252 (quoting Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745, 754 (1st Cir. 1994)). Accordingly, the Court dismisses the EPPs' claims under Puerto Rico antitrust law.

Rhode Island. Defendants argue that the EPPs do not have standing to bring their antitrust or consumer protection claims under Rhode Island law. Defs.' Renewed Mot. to Dismiss 64-65. With respect to the Rhode Island antitrust claim, the General Assembly passed an Illinois Brick-repealer statute, effective July 15, 2013, which expressly conveys standing to indirect purchasers. R.I. Gen. Laws § 6-36-7(d). The Court holds that the statute is "presumed to apply only prospectively, absent evidence of legislative intent to the contrary." Solodyn I, 2015 WL 5458570,

at *15 (quoting Niaspan, 42 F. Supp. 3d at 759; citing Hydro-Mfg., Inc. v. Kayser-Roth Corp., 640 A.2d 950, 954 (R.I. 1994)). Therefore, the EPPs' recovery under the Rhode Island Antitrust Act is limited to damages incurred after July 15, 2013.

Defendants also challenge the TPPs' standing to bring claims under the Rhode Island Deceptive Trade Practices Act because, Defendants say, the TPPs are not consumers as defined by the statute.  Defs.' Renewed Mot. to Dismiss 65.  The statute provides that "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes" may bring a suit for damages.  R.I. Gen. Laws § 6-13.1-5.2.  The statute defines "person" broadly to include "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity."  R.I. Gen. Laws § 6-13.1-1.  The TPPs do not allege that they have purchased or provided reimbursement for the drugs at issue "primarily for [their] personal, family, or household purposes", and accordingly, they do not have standing to bring claims under the Rhode Island Deceptive Trade Practices Act.  See ERI Max Entertainment, Inc. v. Streisand, 690 A.2d 1351, 1354 (R.I. 1997)(holding that a video store did not having standing to bring a claim under the Rhode Island Deceptive Trade Practices Act because it plainly was not "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes.") (internal citation

omitted).  Accordingly, the Court dismisses claims under the Rhode Island Deceptive Trade Practices Act for lack of standing.

Utah.  Utah's Illinois Brick-repealer law permits only "[a] person who is a citizen of this state or a resident of" Utah to bring an antitrust-damages claim.  See Utah Code Ann. § 76-10-3109.  The EPPs have failed to allege that any of its named class members are citizens or residents of Utah, and thus, the Court dismisses any claims brought under the antitrust laws of Utah.  See Lipitor, 336 F. Supp. 3d at 419 (requiring at least one named plaintiff be a resident or citizen of Utah to bring a claim under Utah antitrust law) (citing In re Opana ER Antitrust Litig., 162 F. Supp. 3d 704, 725 (N.D. Ill. 2016); Aggrenox I, 94 F. Supp. 3d at 251-52; Niaspan, 42 F. Supp. 3d at 759-60; Nexium I, 968 F. Supp. 2d at 410; In Re Magnesium Oxide Antitrust Litig., No. 10-5943, 2011 WL 5008090, at *8 n.10 (D.N.J. Oct. 20, 2011)).

### b.   Antitrust Claims[17]

Defendants argue that the EPPs' antitrust claims should be dismissed.  Defs.' Renewed Mot. to Dismiss 65-67.  First, Defendants argue that four states – Arizona, Hawaii, Nevada, and

---

[17] The EPPs do not press antitrust claims under the laws of Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, Georgia, Idaho, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, New Jersey, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas, Virginia, Washington, and Wyoming.  Accordingly, the Court does not address Defendants' arguments with respect to these claims.  See generally EPP State Law Claims Chart.

Utah - have pre-filing notice requirements with which the EPPs failed to comply.  Id. at 65.  The EPPs counter that dismissal for failure to comply with pre-suit notice requirements to the Attorneys General of these states would be inconsistent with the remedial purpose of the statutes.  EPPs' Opp'n to Renewed Mot. to Dismiss 21.  Moreover, they say, these state law requirements are procedural and, thus, preempted by federal procedural rules under Shady Grove.  Id. at 21-22.

The Court concludes that Rule 23 is not so broad as to preempt these state statutory notice provisions.  These notice provisions create a prerequisite for filing an antitrust lawsuit under the states' laws; they do not create requirements for maintaining a class action.  See Shady Grove, 559 U.S. at 399 (law at question was preempted because it "attempt[ed] to answer the same question" as Rule 23).  The state notice provisions in question do "not seek to displace the Federal Rules or have [Rule 23] cease to function." Godin, 629 F.3d at 88.  Moreover, "to decline to apply these laws in federal court would encourage forum shopping and the inequitable administration of laws."  In re Asacol Antitrust Litig., No. 15-CV-12730-DJC, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016) ("Asacol II") (citing Godin, 629 F.3d at 92).  For these reasons, the Court dismisses the antitrust claims under the laws of Arizona,

Hawaii, and Nevada.[18]

Second, Defendants argue the EPPs failed to allege intrastate conduct as required by the antitrust laws of the District of Columbia, Hawaii, Massachusetts, Mississippi, Nevada, New York, Oregon, Tennessee, and West Virginia.  Defs.' Renewed Mot. to Dismiss 66.  This Court joins the majority of courts in concluding that the EPPs have sufficiently pled intrastate activity where they allege nationwide antitrust violations, the antitrust impact of which was felt within each state.  See, e.g., Aggrenox I, 94 F. Supp. 3d at 253 ("it is not obvious why the intra state effect of anticompetitive conduct would not be reached by the cited statutes merely because inter state conduct predominates"); Solodyn I, 2015 WL 5458570, at *16 (holding that allegations of nationwide antitrust violation that results in increased prices paid within each state are sufficient to allege intrastate commerce (citing In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 407-08 (S.D.N.Y. 2011)("Digital Music"))); Suboxone, 64 F. Supp. 3d at 698-99; Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 393-402 (E.D. Pa. 2010) ("Wellbutrin SR").

Third, Defendants argue that the EPPs' monopolization claims

---

[18] The Court has previously concluded that the EPPs do not have standing to bring their antitrust claim under Utah law, and so, that claim is dismissed for the reasons explained above.

under the state laws of Kansas, New York, and Tennessee are premised on Warner Chilcott's unilateral conduct, and thus, do not satisfy the concerted action required by those states' laws. Defs.' Renewed Mot. to Dismiss 66-67. They contend the EPPs' claims are not cognizable under California law for a similar reason. Id. The First Claim for Relief in the EPPs' Complaint alleges monopolization and a monopolistic scheme under state law against Warner Chilcott. EPP Compl. ¶¶ 338-45. Specifically, it alleges that "[t]hrough the overarching anticompetitive scheme, as alleged extensively [in the Complaint], Warner Chilcott willfully maintained its monopoly power . . . using restrictive or exclusionary conduct" and injured the plaintiffs as a result. Id. ¶ 340. Among other things, the EPPs allege that Defendants "knowingly, willfully, and wrongfully maintained their monopoly power and harmed competition" by committing fraud on the PTO, listing the patent in the Orange Book, filing sham lawsuits, entering into a reverse payment with Watson, and effectuating a product hop. Id. ¶ 342.

The EPPs have alleged sufficient concerted action to plead a cause of action under the state antitrust laws of Kansas, New York, and Tennessee, insofar as they allege a reverse payment with Watson. Their monopolization claims may proceed only to the extent they are premised on this alleged reverse payment. See Lipitor, 336 F. Supp. 3d at 421 (holding that the antitrust laws of Kansas,

New York, and Tennessee require concerted action between parties, granting the defendants' motion to dismiss as it related to claims alleging unilateral conduct, and declining to dismiss claims alleging reverse payment agreements).

For the reasons stated, the Court dismisses the EPPs' antitrust claims brought under the laws of Arizona, Hawaii, Illinois, Nevada, Puerto Rico, and Utah.  The EPPs' antitrust claims under the laws of California, the District of Columbia, Florida, Iowa, Maine, Michigan, Minnesota, Mississippi, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin may proceed.  The EPPs' antitrust claim under Rhode Island law may proceed with respect to damages incurred after July 15, 2013, and the EPPs' monopolization claims under Kansas, New York, and Tennessee law may proceed insofar as they allege a reverse payment with Watson.

### c.  Consumer Protection and Deceptive Trade Practices Claims[19]

Defendants move to dismiss the EPPs' consumer protection

---

[19] The Court uses the terms "Unfair or Unconscionable Acts and Practices Claims" and "Consumer Protection and Deceptive Trade Practices Claims" interchangeably.  Moreover, the EPPs do not pursue consumer protection claims under the laws of the following states:  Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Montana, New Jersey, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, South Carolina, South Dakota, Texas,

claims.   See Defs.' Renewed Mot. to Dismiss 67; Defs.' Reply to Renewed Mot. to Dismiss 8, 23.   First, Defendants challenge the EPPs' monopolization claim under two California statutes, arguing that (1) California's Cartwright Act does not recognize unilateral conduct, and (2) California's Unfair Competition Law "does not authorize awards of damages at law [. . . .]"  Defs.' Renewed Mot. to Dismiss 66-67 (quoting In re Terazosin Hydrochloride Antitrust Litig., 160 F. Supp. 2d 1365, 1379 (S.D. Fla. 2001) ("Terazosin")). The EPPs assert their claim under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., and not under the Cartwright Act.   See EPPs' Opp'n to Defs.' Renewed Mot. to Dismiss 25.  While the parties agree that the California Unfair Competition Law does not allow for damages awards at law, even the case cited (out of context) by Defendants held that the end payors there had stated a claim for relief because the California Unfair Competition Law  "explicitly provides that '[t]he court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money . . . which may have been acquired by . . . unfair competition.'"  Terazosin, 160 F. Supp. 2d at 1379 (quoting Cal. Bus. & Prof. Code § 17203).  Accordingly, Defendants' Renewed Motion to Dismiss is denied as to the EPPs' claim for monetary

_____

Utah, Vermont, Virginia, Washington, Wisconsin, and Wyoming.   See generally EPP State Law Claims Chart.

relief under the California Unfair Competition Law.

Second, Defendants argue that the EPPs have failed to comply with West Virginia's consumer protection law pre-filing notice requirement.  Defs.' Renewed Mot. to Dismiss 67.  For the reasons stated above with respect to certain of the EPPs' state law antitrust claims requiring pre-suit notice, the Court dismisses the EPPs' West Virginia consumer protection claim.

Third, Defendants aver the EPPs did not allege intrastate conduct as required by the consumer protection laws in Florida, New Hampshire, and New York.  Defs.' Renewed Mot to Dismiss 67; Defs.' Reply to Renewed Mot. to Dismiss 23-25.[20]  Notably, the TPP class has a named TPP headquartered or with reimbursements in each of these states.  See generally Appendix A, EPPs' Mem. in Opp'n to Defs.' Renewed Mot. to Dismiss and Mot. for J. on the Pleadings, ECF No. 613-1.  As stated above in the context of the EPPs' state law antitrust claims, the Court concludes that the EPPs sufficiently pled intrastate activity under the named consumer protection laws where they allege overcharge damages for purchases at supracompetitive prices, the impact of which was felt within each state.  See, e.g., Flonase, 692 F. Supp. 2d at 537-38 (Florida); Wellbutrin XL, 260 F.R.D. at 162 (Florida); Suboxone,

_____

[20] The Court holds that the EPPs do not have standing to pursue their consumer protection claim under Massachusetts law, and the EPPs do not pursue their consumer protection claim under North Carolina law.  The Court does not address these arguments.

64 F. Supp. 3d at 702 (holding that end-payor plaintiffs sufficiently pled intrastate conduct under New York's consumer protection law, N.Y. Gen. Bus. L. § 349, where they alleged overcharges occurred in the state); Solodyn I, 2015 WL 5458570, at *16 (holding that allegations of nationwide antitrust violation that results in increased prices paid within each state, including New Hampshire and New York, were sufficient to allege intrastate commerce (citing Digital Music, 812 F. Supp. 2d at 407-08)). Accordingly, Defendants' renewed motion to dismiss the consumer protection claims under the laws of Florida, New Hampshire, and New York is denied.

Fourth, Defendants contend that the EPPs cannot bring claims in nine states that limit actions to consumers: Iowa, Kansas, Maine, Missouri, Montana, North Carolina, Rhode Island, Utah, and Vermont. Defs.' Reply to Renewed Mot. to Dismiss 27-29. In light of the EPPs' Notice of Submission in Response to the Court's September 17, 2019 Order, see ECF No. 1231, the Court denies as moot Defendants' Renewed Motion to Dismiss with respect to the consumer protection claims under the laws of Iowa, Kansas, Maine, Missouri, Montana, North Carolina, Utah, and Vermont. With respect to Rhode Island, and as discussed above, the TPPs do not have standing under the Rhode Island consumer protection statute, and therefore, that claim is also dismissed.

Fifth, Defendants argue that the EPPs have not alleged

consumer deception or reliance as required by the consumer protection laws of Michigan, Nevada, New York, and Tennessee. Defs.' Renewed Mot. to Dismiss 68-69; see also Defs.' Mot. to Dismiss 156-58. They further argue that the consumer protection laws of the District of Columbia and New Mexico require Plaintiffs to allege and prove affirmative unconscionable conduct. Defs.' Renewed Mot. to Dismiss 68-69.

Michigan. Michigan's consumer protection statute prohibits "[u]nfair, unconscionable, or deceptive methods, acts or practices," which includes "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold." Mich. Comp. Laws Ann. § 445.903(1)(z). The EPPs allege overcharges caused by Defendants' anticompetitive conduct, and this squarely falls within the statute. See Solodyn I, 2015 WL 5458570, at *17 (holding that Michigan's consumer protection law covered the end-payor plaintiffs' reverse payment allegations). The Court denies Defendants' Renewed Motion to Dismiss with respect to Michigan's consumer protection statute.

Nevada. Nevada's consumer protection statute provides that "[a] person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923(3). The EPPs plainly pled violations of state and

31

federal law relating to the sale of goods.  The Court joins the majority of courts in holding that the Nevada Deceptive Trade Practices Act does not require plaintiffs to plead consumer reliance.  See In re Effexor Antitrust Litig., 337 F. Supp. 3d 435, 464–65 (D.N.J. 2018) ("Effexor") (citing In re Pharm. Indus. Average Wholesale Price Litig., 252 F.R.D. 83, 98 (D. Mass. 2008); In re Packaged Seafood Prods. Antitrust Litig., 242 F. Supp. 3d 1033, 1080-81 (S.D. Cal. 2017) ("Packaged Seafood Prod.")). Therefore, the Court denies Defendants' Renewed Motion to Dismiss with respect to the EPPs' claims predicated on the Nevada Deceptive Trade Practices Act.

New York.  New York's consumer protection statute provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. Law § 349(a).  The EPPs again have alleged that they paid overcharges based on Defendants' alleged misconduct, and the Court is satisfied that this states a claim for relief under Section 349 of the New York General Business Law.  See Effexor, 337 F. Supp. 3d at 466 (holding that end-payor plaintiffs' stated claim for relief under N.Y. Gen. Bus. Law § 349(a) where they alleged defendants' anticompetitive conduct caused them to pay overcharges); In re TFT-LCD (Flat Panel) Antitrust Litig., 586 F. Supp. 2d 1109, 1128-29 (N.D. Cal. 2008) ("TFT-LCD I")(same); In re Dynamic Random Access Memory (DRAM)

32

Antitrust Litig., 536 F. Supp. 2d 1129, 1143-44 (N.D. Cal. 2008) (same).  The Court denies Defendants' Renewed Motion to Dismiss with respect to New York's consumer protection statute.

Tennessee.  Tennessee's consumer protection statute sets forth a list of unfair and deceptive acts, followed by a catch-all provision that prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person."  Tenn. Code Ann. § 47-18-104(b)(27).  After scouring the statute, the Court concludes that the EPPs' allegations fall only within this catch-all.  However, the catch-all further states "that enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter", and accordingly, the Court dismisses the EPPs' consumer protection claim under Tennessee law.  See Solodyn I, 2015 WL 5458570, at *17.  Because the Tennessee consumer protection claim fail for this reason, the Court need not address Defendants' argument that the Tennessee consumer protection claim fails due to a state class action bar.  See Defs.' Renewed Mot. to Dismiss 67.

New Mexico.  Defendants move to dismiss the EPPs' claims under the New Mexico Unfair Practices Act for failure to allege unconscionable conduct towards consumers, which Defendants say requires affirmative misconduct.  Defs.' Renewed Mot. to Dismiss 68.  The New Mexico Unfair Practices Act prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in

33

the conduct of any trade or commerce". N.M. Stat. Ann. § 57-12-3. The statute further defines "unconscionable trade practice" as "an act or practice in connection with the sale . . . of any goods or services . . . that to a person's detriment . . . results in a gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2(E). The Court concludes that the EPPs have sufficiently pled that Defendants' alleged anticompetitive conduct caused them to pay overcharges that constitute a "gross disparity" between the value paid and that received, and denies Defendants' Renewed Motion to Dismiss on this score accordingly. See Effexor, 337 F. Supp. 3d at 465 (citing cases); TFT-LCD I, 586 F. Supp. 2d at 1127. But see In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007) (dismissing claims under the laws of the District of Columbia, Arkansas, Kansas, and New Mexico because "pleading unconscionability requires something more than merely alleging that the price of a product was unfairly high").

District of Columbia. The Court is similarly satisfied that the EPPs have stated a claim for relief under the District of Columbia's consumer protection statute. See TFT-LCD I, 586 F. Supp. 2d at 1126 (holding that the District of Columbia's consumer protection statute is a "comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers", and thus, the plaintiffs could maintain a claim

34

for price fixing (quoting <u>Atwater v. District of Columbia Dep't of Consumer & Reg. Affairs</u>, 566 A.2d 462, 465 (D.C. 1989))); <u>see also In re New Motor Vehicles Canadian Export Antitrust Litig.</u>, 350 F. Supp. 2d 160, 182–83 (D. Me. 2004) ("<u>New Motor I</u>") (allowing an antitrust claim to proceed under the District of Columbia consumer protection statute).  Moreover, the EPPs were not required to plead an affirmative unconscionable act to state a claim under the statute.  <u>See</u> <u>In re Processed Egg Prods. Antitrust Litig.</u>, 851 F. Supp. 2d 867, 899 (E.D. Pa. 2012) ("<u>Processed Egg Prods.</u>") (holding that, while "certain of the enumerated 'unlawful trade practices' as defined by D.C. Code § 28-3904 may require the element of unconscionable conduct to be alleged," unconscionable conduct is not required to plead "a violation of the Antitrust Act to constitute an unlawful trade practice under" the District of Columbia's consumer protection statute); <u>see also</u> <u>Packaged Seafood Prod.</u>, 242 F. Supp. 3d at 1073 (same).

Sixth, Defendants move to dismiss the EPPs consumer protection claims in Arizona, the District of Columbia, Idaho, Michigan, Nebraska, New Mexico, and New York for failure to plead that "deceitful conduct" occurred with a specific consumer transaction or with a direct consumer nexus.  Defs.' Renewed Mot. to Dismiss 69.  The Court joins the majority of courts in concluding that it is sufficient, under the consumer protection

laws of Arizona, the District of Columbia, Idaho,[21] Michigan, Nebraska, New Mexico, and New York, to allege that a defendant's anticompetitive conduct of the sort alleged here caused end-payor plaintiffs to pay overcharges in the form of higher prices for brand drugs.  See In re Remicade Antitrust Litig., 345 F. Supp. 3d 566, 588 (E.D. Pa. 2018) (holding that the indirect purchaser plaintiffs had sufficiently pled a cause of action "under the 'substantial nexus' requirement of California, New York and North Carolina" where they alleged that the defendants' "exclusionary scheme resulted in [the drug and related products] being sold at artificially inflated prices and caused overcharges in those states"); Suboxone, 64 F. Supp. 3d at 702 (holding that similar allegations had set forth a viable claim under New York law); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 207, 219, 221 (S.D.N.Y. 2012) (holding that indirect-purchaser plaintiffs plausibly alleged a cause of action under the consumer protection laws of Arizona, Idaho, Michigan, New Mexico, and New York in a suit alleging Walker Process fraud, sham litigation, and fraudulent listing in the Orange Book, among other things); New

---

[21] Defendants also argue the Idaho Consumer Protection Act only allows for the recovery of restitution (not damages) and that the EPPs' expert, Dr. French, has not proposed a method by which to quantify such restitution.  Defs.' Renewed Mot. to Dismiss 63. Defendants do not explain why a restitution theory of recovery cannot be maintained using Dr. French's damages model, and the Court is confident it can.

Motor I, 350 F. Supp. 2d at 184-85 (holding that plaintiff-consumers stated a claim for relief under the Idaho Consumer Protection Act where they alleged antitrust violations, the statute instructs courts to be deferential to the Federal Trade Commission Act, and the Idaho Supreme Court has directed courts to construe the ICPA liberally in light of the legislative intent "to deter deceptive or unfair trade practices and to provide relief for consumers exposed to proscribed practices" (quoting State ex rel. Lance v. Hobby Horse Ranch Tractor and Equip. Co., 929 P.2d 741, 743 (Idaho 1996)); Lipitor, 336 F. Supp. 3d at 423 (holding that end-payor plaintiffs in a reverse payment suit adequately pled a cause of action under the Nebraska Consumer Protection Act where they alleged that the anticompetitive scheme "had an indirect impact on Nebraska consumers" and therefore, "the scheme impacted the public interest"); Processed Egg Prods., 851 F. Supp. 2d at 897-98 (holding that indirect purchaser plaintiffs had alleged a claim under the District of Columbia Consumer Protection Act); In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 583-84 (M.D. Pa. 2009) (stating that the District of Columbia Consumer Protection Act "subsumes a Sherman Act claim and creates an indirect purchaser cause of action for conspiratorial price fixing regardless of whether defendants have engaged in deceptive conduct").

For the reasons stated above, the Court dismisses the EPPs'

consumer protection claims under the states of Illinois, Massachusetts, Rhode Island, Tennessee, and West Virginia. The EPPs' consumer protection claims under the laws of Arizona, California, the District of Columbia, Florida, Hawaii, Idaho, Michigan, Nebraska, Nevada, New Hampshire, New Mexico, and New York may proceed.

### d.   Unjust Enrichment Claims[22]

The EPPs bring unjust enrichment claims under the laws of every state except for Indiana, Ohio, and Puerto Rico. See EPP State Law Claims Chart n.1. Defendants mount challenges to each claim. See generally Defs.' Mot. to Dismiss 165-75.

First, Defendants argue that the EPPs cannot assert unjust enrichment claims in states in which Illinois Brick-repealer statutes have not been passed, viz., Alabama, Alaska, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana,

---

[22] Defendants assert that the EPPs have failed to press their unjust enrichment claims because they attached a "a compilation of the federal and state antitrust and consumer protection laws at issue in this case", and they did not include a list of unjust enrichment claims. See Decl. of Michael M. Buchman ¶ 3, ECF No. 528-2 (attaching "a compilation of the federal and state antitrust and consumer protection laws at issue in this case"); see also EPPs' Chart of Antitrust and Consumer Protection Laws, ECF No. 528-5 (including no unjust enrichment claims). The Court declines to deem the EPPs' unjust enrichment claims abandoned on this basis, and nor does the Court consider Defendants' challenges to these claims waived. See EPPs' Opp'n to Renewed Mot. to Dismiss 39-41 (arguing the Court should deem waived Defendants' challenges to their unjust enrichment claims).

New Jersey, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, and Virginia.  See Appendix 3 at viii-ix, Defs.' Mem. in Support of Mot. to Dismiss, ECF No. 198.  The Court agrees and joins other courts in holding "that indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes, absent a showing that the common law of the state in question expressly allows for such recovery." Solodyn I, 2015 WL 5458570, at *18 (quoting Niaspan, 42 F. Supp. 3d at 763); see also Wellbutrin SR, 737 F. Supp. 2d at 425. Accordingly, the unjust enrichment claims under the laws of Alabama, Alaska, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, New Jersey, Oklahoma, Pennsylvania, South Carolina, Texas, Utah, and Virginia are dismissed.  Rhode Island now has an Illinois Brick-repealer statute, and thus, the unjust enrichment claim under Rhode Island law is no longer contrary to the public policy of that state.

Second, Defendants argue that neither California nor Mississippi recognize unjust enrichment as an independent cause of action.  Defs.' Mot. to Dismiss 166.[23]  With respect to California,

---

[23] The Court need not address this argument with respect to Georgia and Illinois because those claims are dismissed for the reasons set forth above.  See Defs.' Mot. to Dismiss 166.

both parties are correct.   As the Ninth Circuit recently noted, "some California courts do not recognize a claim for unjust enrichment," 1617 Westcliff LLC v. Wells Fargo Bank N.A., 686 F. App'x 411, 415 n.6 (9th Cir. 2017) (citing Durell v. Sharp Healthcare, 183 Cal. App. 4th 1350 (2010)), but "others, including [the Ninth Circuit] treat it as an equitable cause of action with restitution as a remedy." Id. (citing Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1070 (9th Cir. 2014); Ghirardo v. Antonioli, 924 P.2d 996, 1003 (Cal. 1996) ("[A]n individual may be required to make restitution if he is unjustly enriched at the expense of another.")).   Because California law is unclear on this issue, and there is a California Supreme Court case recognizing the cause of action, this Court joins several other district courts in concluding that there is no "settled basis on which to dismiss the end payors' unjust enrichment claim." Solodyn I, 2015 WL 5458570, at *20 (citing Processed Egg Prods., 851 F. Supp. 2d at 913 (denying defendants' motion to dismiss California unjust enrichment claim because "California courts have not uniformly or definitively barred an independent cause of action for unjust enrichment")).

The Court also rejects Defendants' argument that Mississippi law does not recognize an independent cause of action for unjust enrichment.   A simple search yields many cases out of the Mississippi Supreme and Appellate Courts within the past decade

recognizing unjust enrichment as a cause of action under Mississippi law. _See, e.g._, _Willis v. Rehab Solutions, PLLC_, 82 So.3d 583, 588 (Miss. 2012) ("Unjust enrichment applies in situations where no legal contract exists, and the person charged is in possession of money or property which, in good conscience and justice, he or she should not be permitted to retain . . . ."); _Carlson v. Brabham_, 199 So.3d 735, 744 (Miss. App. Ct. 2016) ("Unjust enrichment is defined as money paid to another by mistake of fact.") (internal citations omitted); _Triangle Constr. Co. v. Fouche & Assocs., Inc._, 218 So. 3d 1180, 1187 (Miss. Ct. App. 2017) ("To collect under an unjust enrichment or quasi-contract theory, the claimant must show there is no legal contract but . . . the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another." (quoting _Franklin v. Franklin ex rel. Phillips_, 858 So.2d 110, 121 (Miss. 2003) (citations and quotations omitted))). Accordingly, the Court denies Defendants' motion to dismiss the claims for unjust enrichment under California and Mississippi law.

Third, Defendants contend that the EPPs have improperly dressed up their antitrust violations as unjust enrichment claims. Defs.' Mot. to Dismiss 167-69. They say the EPPs' unjust enrichment claims must fail (1) where there is an adequate remedy at law, (2) where they serve as an end-run to _Illinois Brick_, and

(3) under the laws of states in which the EPPs assert no claims other than unjust enrichment.  Id.  As stated above, the Court agrees with Defendants that the EPPs may not use unjust enrichment claims as an end-run to Illinois Brick.  And while it is generally true that one cannot recover under an unjust enrichment theory where a remedy at law is available, the EPPs are entitled to plead alternative theories.  See Solodyn I, 2015 WL 5458570, at *19 (holding that end-payor plaintiffs could "plead in the alternative equitable claims along with legal claims").  The EPPs may also proceed with their unjust enrichment claims under the laws of the states in which they assert no other claims, so long as the state has passed an Illinois Brick-repealer statute signaling that such a cause of action would not violate the state's public policy. See In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) ("Cardizem").  In rejecting a similar argument, one court noted that such an argument "confuses Plaintiffs' right to recover an equitable remedy under a common law claim based upon principles of unjust enrichment with its right to recover a remedy at law for an alleged violation of a state's antitrust laws".  Id. Indeed, "courts often award equitable remedies under common law claims for unjust enrichment in circumstances where" other state law claims fail.  Id.

Fourth, Defendants move to dismiss the EPPs' unjust enrichment claims on the basis that they have failed to allege a

42

special relationship between the EPPs and Defendants.  Defs.' Mot.
to Dismiss 169-70.  Specifically, Defendants argue that the EPPs
failed to allege privity (or something similar), as required by
five states' unjust enrichment laws, and failed to allege a
relationship with Defendants leading to a direct benefit, as
required under the laws of twenty-four states.  Id. at 170-75.
Because the EPPs' unjust enrichment claims under the laws of
Alabama, Florida, Georgia, Idaho, Illinois, Maryland,
Massachusetts, New Jersey, Pennsylvania, and South Carolina are
dismissed for reasons set forth above, the Court does not address
this argument with respect to these states' laws.

Upon review of state appellate court and federal district
court cases interpreting state law, the Court concludes that the
following states do not require a plaintiff to plead the conferral
of a direct benefit in order to state a claim for unjust
enrichment:  Arizona, District of Columbia, Kansas, Michigan,
North Carolina, West Virginia, and Wisconsin.  See Solodyn I, 2015
WL 5458570, at *18 (citing Processed Egg Prods., 851 F. Supp. 2d
at 927-35 (addressing Kansas, North Carolina, Utah, and West
Virginia law)); Cardizem, 105 F. Supp. 2d at 671 (addressing
Michigan and North Carolina law); In re Lidoderm Antitrust Litig.,
103 F. Supp. 3d 1155, 1176 (N.D. Cal. 2015) ("Lidoderm")
(addressing Arizona, District of Columbia, Kansas, and North
Carolina law); In re Auto. Parts Antitrust Litig., 29 F. Supp. 3d

982, 1028 (E.D. Mich. 2014) (Wisconsin); Suboxone, 64 F. Supp. 3d at 710 (Wisconsin).

    With respect to Rhode Island, Washington, and Wyoming, the Court similarly concludes that the laws of these states do not require a direct benefit be conferred in order for a party to plead a claim for unjust enrichment.  The cases cited by Defendants do not convince the Court otherwise.  See Defs.' Mot. to Dismiss 174. In the Rhode Island cases cited by Defendants, the question was whether any benefit was conferred, not whether it was conferred indirectly.  See R & B Elec. Co., Inc. v. Amco Constr. Co., Inc., 471 A.2d 1351, 1356 (R.I. 1984) (Shea, J.) (holding that defendants were not liable under an unjust enrichment theory because they were unable to retain the benefit conferred and thus, they had not been unjustly enriched); Alessi v. Bowen Court Condo., No. 03-0235, 2010 WL 897246, at *4 (R.I. Super. Ct. Mar. 10, 2010) (concluding, that the defendant "did not hold a present interest in the property at the time of the [p]laintiff's purchase" and therefore, "a benefit arguably was not conferred upon and appreciated by the [d]efendants individually").  And thus, the Court joins other courts in concluding that the EPPs have a well pled claim for unjust enrichment under Rhode Island law.  See In re Auto. Parts Antitrust Litig., 50 F. Supp. 3d 869, 898 (E.D. Mich. 2014) (citing In re TFT-LCD (Flat Panel) Antitrust Litig.,

M 07–1827 SI, 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) ("TFT-LCD IV") (addressing unjust enrichment under Rhode Island law)).

The Court is further unconvinced that a direct benefit is required under Washington law. In support of their argument, Defendants cite a single unpublished Washington Court of Appeals case that provides the alternate holding that recovery under an unjust enrichment theory was unavailable because the plaintiff there could enforce a promissory note and thus had a remedy at law. Defs.' Mot. to Dismiss 174 (citing Keil v. Scholten, 110 Wash. App. 1035 (2002)).

With respect to Wyoming law, Defendants similarly cite a single case, in which that court found a trucking company not liable for, among other things, unjust enrichment. See Defs.' Mot. to Dismiss 175; see also Boyce v. Freeman, 39 P.3d 1062, 1065-66 (Wyo. 2002)). In Boyce, the Supreme Court of Wyoming affirmed judgment for the defendant trucking company, noting that none of the elements of an unjust enrichment claim had been satisfied where the seller never received payment for the truck it conveyed to the trucking company's employee. Boyce, 39 P.3d at 1064-65. In support of its argument that Wyoming law requires the direct conferral of a benefit to support an unjust enrichment claim, Defendants latch on to the court's statement that the trucking company "received no direct benefit from this action, had no knowledge that [the seller] expected it to provide compensation

45

for the pickup truck, and engaged in no conduct inducing" the seller to supply the pickup to the employee. Id. at 1066 (emphasis added). But a closer look reveals that, in reality, "there was no true benefit bestowed on" the trucking company, id. at 1065 (emphasis added), and thus, the Court is not convinced that the Wyoming Supreme Court would not recognize a claim for unjust enrichment where a true, but indirect, benefit is bestowed on a defendant.

Because these are Defendants' best cases under Washington and Wyoming law, and the Court is not convinced they stand for the proposition Defendants posit, the Court declines to dismiss the EPPs' unjust enrichment claims under the laws of Washington and Wyoming for failure to plead a conferral of a direct benefit. See Solodyn I, 2015 WL 5458570, at *18 (noting that district courts have declined to dismiss unjust enrichment claims in certain states where the "states' unjust enrichment laws do not necessarily require a plaintiff to plead a conferral of a direct benefit").

Under Maine, New York, and North Dakota law, however, a plaintiff must plead the conferral of a direct benefit in order to state a claim of unjust enrichment and, accordingly, the EPPs' unjust enrichment claims under these laws must be dismissed. See Solodyn I, 2015 WL 5458570, at *18 (citing Aftermarket Filters, 2010 WL 1416259, at *3 (Maine); Lidoderm, 103 F. Supp. 3d at 1176, 1179 (New York and North Dakota) (citing omitted).

46

For the reasons set forth above, the Court dismisses the EPPs' unjust enrichment claims under the laws of Alabama, Alaska, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Missouri, Montana, New Jersey, New York, North Dakota, Oklahoma, Pennsylvania, South Carolina, Texas, Utah, and Virginia.  The EPPs' claims for unjust enrichment under the laws of Arizona, Arkansas, California, the District of Columbia, Hawaii, Iowa, Kansas, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, Washington, West Virginia, Wisconsin, and Wyoming may proceed.

### B.  **Daubert Motions**

Before taking up the EPPs' Motion for Class Certification, the Court must address the parties' challenges to the expert analysis underpinning their claims and defenses.  In connection with their Motion for Class Certification, the EPPs move to exclude the opinions and testimony of Dr. James Hughes, Dr. Bruce Strombom, and Timothy Kosty.  In connection with their opposition to the Motion for Class Certification, Defendants have moved to exclude Dr. Gary French, Laura Craft, Myron Winkelman, and Eric Miller. The Court addresses the motions in seriatim.

Rule 702 of the Federal Rules of Evidence sets forth the criteria a party must satisfy in order to proffer expert opinion.

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court "serves as the gatekeeper for expert testimony by 'ensuring that [it] . . . both rests on a reliable foundation and is relevant to the task at hand.'" Milward v. Rust-Oleum Corp., 820 F.3d 469, 473 (1st Cir. 2016) (quoting Daubert v. Merrell Dow Pharms., 509 U.S. 579, 597 (1993)). The proponent "has the burden of establishing both its reliability and its relevance." Id. (citing Daubert, 509 U.S. at 593 n.10; Fed. R. Evid. 702, advisory committee's note). The First Circuit has advised that "Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998). Instead, "[i]t demands only that the proponent of the evidence show that the expert's conclusion has

been arrived at in a scientifically sound and methodologically reliable fashion." Id.

> ### 1. Defendants' Motion to Exclude the Opinions and Testimony of Eric Miller, Laura Craft, and Myron Winkelman (ECF No. 698)[24]

Defendants move to exclude three of the EPPs' experts – Eric Miller, Laura Craft, and Myron Winkelman – who lay the foundation for the EPPs' argument that they could successfully gather and compile pharmaceutical industry data to ascertain the members of the EPP class with enough certainty to satisfy the requirements set forth in Asacol.  Winkelman further opines on the relationship between TPPs and pharmacy benefit managers ("PBMs") and any cost sharing they may or may not do.

> #### a.   Laura Craft

Laura Craft is the President of an economic and financial consulting firm, OnPoint Analytics, Inc. ("OnPoint"), that specializes in data analytics for complex litigation.  Declaration

---

[24] To the extent the EPPs' Motion to Exclude Kosty and Strombom, ECF No. 733, argues that those experts are not qualified to render their opinions, it is DENIED.  See EPPs' Mem. of Law in Supp. of Mot. to Exclude the Opinions and Test. of Kosty and Strombom 3, 15, ECF No. 736-1.  The Motion is otherwise DENIED AS MOOT in light of the Court's conclusion here.  The Court carefully considered Kosty's and Dr. Strombom's opinions and testimony, but ultimately is persuaded by the EPPs' experts, as set forth below, that the relevant data may be reliably obtained and compiled; the TPP class is ascertainable; and the EPPs have demonstrated by a preponderance of the evidence that each TPP in the TPP class was injured by the alleged conduct.  If Defendants wish to offer these experts at trial for any other purpose, the EPPs may renew any specific, relevant objections at that time.

of Laura R. Craft ("Craft Decl.") ¶ 2, ECF No. 633-4.  For the past fifteen years, OnPoint has focused on antitrust and/or pharmaceutical class actions.  Id.  It specializes in developing large and complex relational databases using data from multiple sources.  Sur-Rebuttal Report of Laura Craft ("Craft Sur-Rebuttal Report") ¶ 6, ECF No. 751-3.  Craft, as President, oversees data specification and acquisition, data interpretations, identifying and defining frameworks for statistical analyses, and the development and quality assurance of all empirical results.  Id. ¶ 5.  She has personally worked on more than fifty pharmaceutical engagements involving antitrust violations, unfair competition, and fraud on the market, among other things.  Id. ¶ 6.  In addition to her work at OnPoint, Craft co-authored a book entitled Empirical Challenges in Pharma Litigation in 2017 and has taught continuing legal education courses in this area.  Id. ¶ 7.

The Court concludes that Craft is qualified to provide the opinions set forth in her Declaration and Sur-Rebuttal Report.  She is highly experienced in pharmaceutical data management and compilation for complex litigation.  She has worked closely – and managed those working closely – with pharmaceutical sales, marketing, and reimbursement data.  The Court thus is convinced that she is knowledgeable about the types of data available, their presentation and formatting, and their use in analytical applications.

Craft describes the pharmaceutical industry as "one of the most heavily regulated, reported and tracked industries in the world", largely due to the volume of point-of-sale data. Craft Decl. ¶ 5. She opines that the data required to identify class members is available and that OnPoint can identify all uninjured parties using class-wide data. Id. ¶¶ 5-6.

To identify class members and apply class exclusions, Craft proposes the following methodology. OnPoint, under her direction, will: collect data from multiple participants regarding the relevant transactions; convert the data into a single data type; resolve formatting errors; standardize field and variable names and values; join tables using shared data fields containing data unique to each transaction; link records; exclude transactions where necessary; analyze transactions using common code; and report results in tables. Craft Sur-Rebuttal Report ¶ 11. The Court is satisfied that this methodology, while no doubt labor and time intensive, is not so different from the sort of aggregate data manipulation and analysis that businesses, researchers, and governmental agencies employ regularly. See id. ¶¶ 12-13.

Defendants move to exclude Craft's opinion and testimony as speculative and unreliable. Defs.' Mem. of Law in Supp. of Mot. to Exclude the Opinions and Test. of EPPs' Experts Eric Miller, Laura Craft, and Myron Winkelman ("Defs.' Mot. to Exclude Miller, Craft, Winkelman") 20-21, ECF No. 696-1. While it is true that

51

Craft and OnPoint have never performed the exact task proposed here, Craft's Declaration, Sur-Rebuttal Report, and <u>Daubert</u> hearing testimony have demonstrated that the EPPs, subpoenas in hand, are capable of securing, compiling, and analyzing the requisite data to identify class members and apply the class exclusions.[25] The Court denies Defendants' <u>Daubert</u> motion as to Laura Craft, addressing Defendants' additional arguments as they relate to the EPPs' Motion for Class Certification below.

### b. Eric Miller

Defendants also move to exclude the opinion and testimony of Eric Miller. Miller is employed as the Senior Vice President of Case Management for A.B. Data, Ltd. <u>See</u> Decl. of Eric J. Miller ("Miller Decl."), ECF No. 633-5. In that role, Miller oversees class action claim administration services. <u>Id.</u> ¶ 2. He has worked in claims administration for over eighteen years and has worked on more than twenty-five indirect purchaser pharmaceutical class actions. <u>Id.</u> In support of the EPPs' Motion for Class

---

[25] The Court empathizes with Defendants' grievance that, during discovery in this matter, the EPPs repeatedly asserted that they could not provide some of the transaction data they now say is readily available. EPP Hr'g Tr. vol. II, 153:1–160:25 (Feb. 14, 2019), ECF No. 808. The Court concludes that that data were not missing or unavailable; instead, neither party was motivated to subpoena the PBMs and other entities involved until <u>Asacol</u> was decided. The Court appreciates Defendants' frustration but concludes it would be improper to deny class certification on this basis to secure retribution where the EPPs have otherwise met their burden.

52

Certification, Miller provides a declaration detailing four cases in which A.B. Data or Rust Consulting (Miller's former employer) obtained records from pharmacies and PBMs to identify consumer class members. Id. ¶¶ 10-20. Miller offers his opinion that there is an administratively feasible method for identifying EPP class members and that there are data sources capable of identifying who purchased Loestrin 24, Minastrin, and their generic equivalents. Id. ¶ 4.

Because the Court declines to certify an EPP class including consumers, it is unclear whether Miller's opinion and testimony remains relevant or probative. To the extent it is, the Court accordingly limits his opinion, and consideration thereof for purposes of deciding the EPPs' Motion for Class Certification, to Miller's opinion that it would be possible to compile the data of patients who purchased Loestrin 24, Minastrin, and their generic equivalents. See id. ¶¶ 3, 4. Miller does not purport to provide a method for excluding uninjured consumers or insurers. See generally id.; see also Defs.' Motion to Exclude Miller, Craft, Winkelman 14. To the extent Miller's opinion that there is an administratively feasible way to identify class members does not account for the need to apply class exclusions, it is excluded. Accordingly, Defendants' motion to exclude the opinion and testimony of Eric Miller is GRANTED in part and DENIED in part.

### c.   Myron Winkelman

The EPPs also proffer the opinion of Myron D. Winkelman on PBM data systems and retention, as well as the cost-sharing structure of the pharmaceutical industry.   See generally Expert Report of Myron D. Winkelman ("Winkelman Report"), ECF No. 633-3. Winkelman is the President of Winkelman Management Consulting. Id. ¶ 1.   In this position, he provides consulting and management services with a focus on pharmacy benefit management.   Id. ¶ 6. After obtaining his bachelor's degree in pharmacy, Winkelman managed, and later served as a senior executive at, various PBMs. Id. ¶ 4.   Winkelman's curriculum vitae reflects an accomplished career in management and consulting for some of the biggest names in the pharmacy benefit management industry, and there can be no real question that he is qualified to provide expert opinion in that arena.   He opines that:   (1) the entities that purchased, paid for, and/or reimbursed for Loestrin 24, Minastrin, and their generic equivalents are identifiable; (2) how much those entities paid and whether they used coupons is ascertainable; and (3) "PBMs do not purchase, pay or reimburse TPPs for" Loestrin 24, Minastrin, and/or their generic equivalents.   Id. ¶ 10.

Defendants move to exclude Winkelman's opinion and testimony, primarily by disputing Winkelman's take on how PBMs manage and retain data.   Defs.' Mot. to Exclude Miller, Craft, Winkelman 21-27.   These arguments are addressed below, in connection with the

EPPs' Motion for Class Certification.   The Court concludes that Winkelman's testimony is reliable, as Winkelman has extensive industry experience and knowledge related to the actual workings of the PBM industry.

Defendants further take issue with Winkelman's opinion that PBMs do not pay any portion of the cost of the drugs at issue in this case.   Id. at 27.   While Winkelman states that some PBMs contract with TPPs to provide rebate guarantees and spread pricing, for the reasons set forth below, see infra Part II.F.1.b., the Court is persuaded that this arrangement does not constitute payment for the drug.   See In re Nexium (Esomeprazole) Antitrust Litig., 297 F.R.D. 168, 179 (D. Mass. 2013) ("Nexium II"), aff'd In re Nexium Antitrust Litig., 777 F.3d 9 (1st Cir. 2015) ("Nexium III") (finding that PBMs are "'mere conduits' for TPP payments to pharmacies, and as financial intermediaries, are not a part of the putative class") (internal citation omitted).

To summarize, for the reasons set forth above and below, the Court DENIES Defendants' Motion to Exclude the Opinions and Testimony of Miller, Craft, Winkelman as to Craft and Winkelman, and GRANTS IN PART AND DENIES IN PART as to Miller.

> ### 2.   Defendants' Motion to Exclude Opinion and Testimony of Gary French, Ph.D. (ECF No. 575) and the EPPs' Motion to Exclude the Testimony and Opinions of James W. Hughes Ph.D. (ECF No. 634)

Defendants move to exclude the opinions and testimony of Dr.

Gary French.[26]  See generally Defs.' Mot. to Exclude Opinion and Testimony of Gary French, Ph.D., ECF No. 575.  They argue that (1) Dr. French's opinion regarding injury-in-fact is based on unsupported assumptions; (2) his analysis fails to identify and exclude uninjured class members; and (3) his damages calculations are speculative and unreliable.  Defs.' Mem. in Supp. of Mot. to Exclude Opinion and Test. of EPPs' Expert Gary L. French ("Defs.' Mot. to Exclude French") 4-21, ECF No. 573.

The EPPs similarly move to exclude the testimony and opinions of Defendants' rebuttal expert, Dr. James W. Hughes, see ECF No. 634.  Both motions are addressed below, but because the EPPs have the burden on their Motion for Class Certification, the Court focuses on Dr. French's ability to satisfy that burden, noting rulings on the Daubert motion to exclude Dr. Hughes's opinions as they arise.

The fight here largely boils down to two economists who employ, on the whole, reliable and sound methodology but part ways on which inputs and benchmarks to use in their respective models.

---

[26] Dr. French has been employed as an economist and Senior Advisor with an economic and financial consulting firm, Nathan Associates Inc.  Expert Report of Gary L. French, Ph.D., Regarding Impact and Damages to EPPs ¶ 1 ("French Report"), ECF No. 528-6. He holds a bachelor's degree in business administration, as well as a master's degree and doctorate in economics, all from the University of Houston.  Id. ¶ 2.  He has rendered opinions in other pharmaceutical antitrust cases.  Id. ¶ 4.  The Court gleans no objection to his qualifications to render his opinion in this matter.

In the end, they agree on one thing: there is no perfect benchmark. And because the Court agrees and, with few exceptions, finds both experts' analyses defensible, a jury will need to weigh each expert's opinion and make a decision.

### a.   Dr. French's Opinions and Testimony

In his expert report, Dr. French concludes that there is common evidence demonstrating common impact of Defendants' anticompetitive conduct on Class members.   To that end, he sets forth a "feasible and reliable methodology" to determine injury and to estimate damages on an aggregate basis to all members of the Class using common evidence.   See generally Section II & III, Expert Report of Gary L. French, Ph.D., Regarding Impact and Damages to EPPs ("French Report"), ECF No. 528-6.[27]   Due to Defendants' alleged anticompetitive conduct, Dr. French opines, putative class members were unable to substitute lower-priced generic Loestrin 24 and/or Minastrin for the higher-priced brand Loestrin 24 and Minastrin.   French Report ¶¶ 28-29.   Class members were further injured because sustained and robust generic competition would have driven down the price of generic Loestrin 24 and Minastrin.   Id. ¶ 30.

---

[27] See also Reply Report of Gary L. French, Ph.D., Regarding Impact and Damages to EPPs ("French Reply Report"), ECF No. 633-17; Sur-Reply Report of Gary L. French, Ph.D. Regarding Impact and Damages to EPPs ("French Sur-Reply Report"), ECF No. 751-1; Supplemental Declaration of Gary L. French, Ph.D. ("French Supp. Decl."), ECF No. 786-2.

Dr. French uses common proof to demonstrate that all class members were injured by Defendants' alleged anticompetitive conduct.  First, he relies upon government and academic studies regarding the effects of generic entry,[28] and second, he uses common empirical evidence to prove common impact by performing an economic analysis of the prices and market share of Loestrin 24 and Minastrin after their generic equivalents entered the market.  Id. ¶¶ 32, 59.  Using IQVIA[29] data, Dr. French concludes that "if the entry of generic Loestrin 24 had occurred earlier, we would have observed a rapid substitution from branded Loestrin 24 to generic Loestrin 24."  Id. ¶ 58.  This would have resulted in a shift from purchases of brand Loestrin 24 to generic Loestrin 24, as well as a "significant price discount" on the price of brand Loestrin 24. Id.  Purchasers of brand Minastrin were also injured in that

---

[28] Dr. French summarizes the findings of these studies as:

(i) once a generic version of a branded drug enters the market, the generic version is sold at a significantly lower price than the branded drug; (ii) if an authorized generic version also enters at the same time when the generic version enters, the price gap between the branded drug and the generic versions widens; and, (iii) the generic versions' market share increases over time eventually taking most sales of the molecule away from the branded product.

French Report ¶ 33.

[29] IQVIA is a data vendor for pharmaceutical products, and its data is "considered the industry standard source of pharmaceutical data used by researchers and academics."  French Reply Report ¶ 23.

sustained and robust generic Loestrin 24 competition would have resulted in those purchases largely shifting to less costly generic Loestrin 24 absent a product hop.  Id.

Dr. French calculates class-wide damages using common proof. To do so, he uses two generally accepted methods – both of which have been endorsed by the First Circuit – the "before-during-after" method and the "yardstick" method.  French Report ¶ 60; see also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 175 F.3d 18, 24 n.3 (1st Cir. 1999) (noting that the "before and after" method and the "yardstick method" are "two accepted methods of economic analysis").  Using the before-during-after method, Dr. French establishes a suitable benchmark by identifying a period of time during which Defendants' alleged anticompetitive conduct was absent from the market.  Comparing supracompetitive prices charged when the alleged anticompetitive conduct was present with competitive prices charged before or after this period allows Dr. French to calculate the percentage overcharge flowing from the anticompetitive conduct.  French Report ¶ 60.

In contrast, the yardstick method looks to either another geographic market with competitive sales of the product or another, comparable product in the same geographic market to estimate damages.  The difference between the "yardstick" and the product sold at supracompetitive prices provides an estimate of the overcharge flowing from the anticompetitive conduct.  Id.

Dr. French identifies the prices in the actual world following generic Minastrin entry as a competitive benchmark.[30]   Id. ¶ 61. He then uses a "during and after" approach to estimate overcharges using the competitive benchmark.   Id.   As Dr. French explains it, the conversion ratio of brand Loestrin 24 to generic Loestrin 24 is not a useful benchmark – due to the product hop, there were very few brand Loestrin 24 prescriptions filled once generic entry occurred.   Id. ¶ 68.   Instead, Dr. French reasons that "the market experience when generic Minastrin entry occurred is an appropriate benchmark for what would have happened in the Loestrin 24 market" in a but-for world.   Id. ¶ 70.   While he examines the Minastrin generic entry experience, Dr. French acknowledges that no benchmark perfectly reflects the but-for world and concludes that, because the competition was less intense, the Minastrin benchmark probably results in understated damages calculations.   Id. ¶¶ 73-74.

Dr. French uses IQVIA NPA and Insights[31] data to calculate overcharge damages, using common evidence, by estimating the

_____

[30] In his opening report, Dr. French employed both the Loestrin 24 and the Minastrin experiences as competitive benchmarks.   French Report ¶ 68, 71.   In refining his analysis and responding to Dr. Hughes's reports, Dr. French has abandoned the Loestrin experience and uses only Minastrin as a competitive benchmark.   French Reply Report ¶ 60 ("I am no longer using the Loestrin 24 experience to calculate but-for prices . . ."); id. ¶ 22 ("I am updating my analysis to employ only the Minastrin experience benchmark").

[31] According to Dr. French, the IQVIA National Prescription

retail sales volumes and prices for the branded products as well as their generic equivalents.[32] Id. ¶ 61. Specifically, Dr. French applies the market shares of brand and generic Minastrin to the actual retail sales volume of Loestrin 24, shifted back in time, to estimate the total but-for retail sales volumes. Id. ¶ 75. Dr. French further calculates the but-for unit prices using the Minastrin experience, id. ¶ 76, and uses these values to calculate the damages for brand and generic Loestrin 24 sales and brand and generic Minastrin sales using the Minastrin generic entry experience. Id. ¶¶ 78-88.

For the TPP class,[33] Dr. French calculates overcharge damages as the difference between actual TPP payments for brand Loestrin 24 and the but-for TPP payments for generic Loestrin 24. Reply Report of Gary L. French, Ph.D., Regarding Impact and Damages to End-Payor Plaintiffs ("French Reply Report") ¶ 49, ECF No. 633-17. In performing this calculation, Dr. French nets out consumer

---

Audit (NPA) dataset "contains both dollar and physical volume sales on a weekly or monthly basis for" both brand and generic prescription drugs. EPP Hr'g Tr. vol. I, 80:2-12. The "Insights" dataset provides the number of prescriptions by type of payor, viz., cash payors, government payors, and third-party payors. Id.

[32] Dr. French considers updated information – including updated IQIVIA data and data sets produced by Dr. Hughes – in his Reply Report. See, e.g., French Reply Report ¶¶ 8, 23-26.

[33] As discussed further below, the Court declines to certify an EPP class that includes consumers. The Court, as a result, does not address Dr. French's methodology and analysis – and Defendants' challenges – pertinent to consumers only.

sales paid in cash and those not covered by a TPP.  Id. ¶ 50.  He further nets out rebates paid to TPPs.  Id.  Dr. French makes no adjustments for coupons, as those only affect consumers.  Id.  To calculate the TPPs' payment share, he uses the Optum Health claims data for another oral contraceptive, Yasmin, to establish a reliable benchmark.  Id. ¶ 51.  He multiples generic Yasmin's TPP payment share by the total dollars TPPs would have paid but-for generic Loestrin 24.  Id.  This yields the amount that the TPPs would have paid for but-for generic Loestrin 24.  Id.  He applies a similar methodology to calculate the overcharges the TPPs allegedly paid on branded Minastrin.  Id. ¶ 53.

### b.   Dr. French's Methodology

Defendants argue that, rather than examine data available in the actual world, Dr. French relies on academic studies, aggregated retail prices, and forecasts.  Defs.' Mot. to Exclude French 5. The Court concludes that Dr. French's methodology – namely, his reliance on academic studies, the actual Minastrin experience with generic entry, and manufacturer forecasts – is sufficiently reliable.[34]  In pharmaceutical antitrust actions, courts have long

---

[34] Dr. French's analysis of the Minastrin experience is consistent with the literature on generic entry: "The price discounts on generic Minastrin in relation to the price of branded Minastrin, which has continually grown as generic competition intensified, and the resulting rapid substitution of lower priced generic Minastrin for higher priced branded Minastrin is consistent with the literature's description of branded drugs

accepted opinions based on exactly the sources from which Dr. French models his opinions: academic studies, aggregated retail prices, and forecasts. In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir. 2009) (endorsing the use of aggregate damages calculations in class actions); In re Namenda Direct Purchaser Antitrust Litig., 331 F. Supp. 3d 152, 182 (S.D.N.Y 2018) ("The use of Defendants' own forecasts to model a but-for world has been held to be a sound economic methodology."); In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. CV 14-MD-02503, 2017 WL 4621777, at *8 (D. Mass. Oct. 16, 2017) ("Solodyn II") (finding expert methodology reliable where based in part on forecasts).

Defendants take further issue with many of the assumptions underlying Dr. French's analysis. But these go to the weight of the evidence, not its admissibility. This Court cannot make a factual determination on how many generics would have entered and when, or whether consumers preferred chewable Minastrin over generic Loestrin 24. See, e.g., Defs.' Mot. to Exclude French 14-15 (arguing that Dr. French's analysis improperly assumes that Minastrin users would have preferred it to generic Loestrin 24 in a but-for world); Renumbered Expert Report of James W. Hughes ("Hughes Report") ¶ 186, ECF No. 606-1 (opining that Warner

---

facing generic competition for the first time." French Report ¶ 57.

Chilcott would not have promoted Loestrin 24 to the same extent in a but-for world).[35]  These issues go to the heart of this case and are ripe for jury consideration.

Defendants next argue that Dr. French's approach is flawed because he uses the Minastrin experience benchmark from its generic entry in 2017, which post-dates the Patient Protection and Affordable Care Act's ("ACA") free contraceptive mandate, which began in August 2012.[36]  Defs.' Mot. to Exclude French 14. Defendants say that the Yasmin generic entry in 2008 would be more instructive of the 2009 market conditions.  Id.  On the flip side, the EPPs take issue with Dr. Hughes's use of the Yasmin experience as the benchmark for calculating the generic penetration rate in

---

[35] To the extent Dr. Hughes opines that depressed promotion efforts would have resulted in the EPPs purchasing a lower volume of Loestrin 24, resulting in lower damages to the EPP class, it is excluded.  Compare Hughes Report ¶ 186 with French Reply ¶¶ 82-83.  An antitrust plaintiff is entitled to damages on the actual volume purchased.  Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 487-94 (1968).

[36] ACA, signed into law on March 23, 2010, requires group health plan and issuers to provide preventive care coverage to women, without cost sharing, as defined in guidelines promulgated by the Health Resources and Services Administration ("HRSA"). HRSA, Women's Preventive Services Guidelines, available at https://www.hrsa.gov/womens-guidelines/index.html (last visited Oct. 16, 2019).  In August 2011, HRSA issued binding guidelines requiring health plans and insurers to cover "[a]ll Food and Drug Administration approved contraceptive methods", at no cost to the patient.  Id.  These guidelines went into effect in the first plan year beginning on or after August 1, 2012, for plans or policies created or sold after March 23, 2010, or older plans or policies that made certain changes since that date.  Id.

the but-for world.  EPPs' Combined Mem. of Law in Supp. of Their Mot. to Exclude the Testimony and Opinions of James W. Hughes, Ph.D. 19, ECF No. 632-2; EPP Hr'g Tr. vol. I, 91:21-92:25 (Feb. 13, 2019), ECF No. 807.  Both benchmarks have their weaknesses. Yasmin had a different generic entry pattern that makes it an imperfect analogue, but it also experienced generic entry pre-ACA and was priced similarly to Loestrin 24.  Minastrin, on the other hand, had a generic entry pattern similar to the EPPs' Loestrin 24 generic entry theory, but entered post-ACA, when purchasing behavior may have been different.  Sur-Reply Expert Report of James W. Hughes ("Hughes Sur-Reply Report") ¶¶ 10, 59-67.  These perceived weaknesses merely highlight the differences between "competing scientific theories."  <u>Ruiz-Troche</u>, 161 F.3d at 85. This all goes to the weight, not the admissibility of the dueling experts' testimony and opinions, and counsel may test these theories on cross-examination before the jury.

### c.   Rebates, Coupons, and Free Samples

Defendants argue that Dr. French's reliance on national averages and his failure to fully appreciate cost-sharing between consumers and TPPs render his analysis unsound.  Defs.' Mot. to Exclude French 8-10.  They say that Dr. French's failure to account for Warner Chilcott's "price concessions"[37] leads to understated

---

[37] While Defendants maintain that their rebates, coupons, and free samples amount to "price concessions", they can also be

generic prices and overstated brand prices.  Id. at 10.  Dr. Hughes opines that once rebates, coupons, and free samples are accounted for, and once the but-for price is calculated using the correct benchmark, but-for prices are higher than actual Loestrin 24 prices from October 2009 to at least June 2010.  See Hughes Report ¶ 126, Exs. 8.C & 9.

Each expert has a reasoned approach to applying rebates to the pricing data.[38]  In calculating the price of the relevant drugs net rebates, Drs. French and Hughes apply different methodologies, which yield different conclusions.  Dr. French applies the rebates reported in one month to the units dispensed in the previous three months, whereas Dr. Hughes applies the rebates reported contemporaneously to the month in which they are reported (i.e., netting out monthly rebates from monthly retail dollar sales and dividing by units dispensed to reach the average rebate per unit).

---

understood as marketing tools.  See, e.g., Hughes Dep. 47:2-7, ECF No. 632-5 ("Q. Warner Chilcott distributed free samples as a marketing tool, correct?  A. That's certainly my presumption, yes. I mean, just from knowledge of the pharmaceutical industry that free sampling is a common method of marketing pharmaceutical products.").

[38] In Nexium III, the First Circuit held that rebates paid from a drug manufacturer to PBMs only affect injury-in-fact to the TPPs where the rebates are "passed-through" to the TPPs as a "discounted price when the PBMs bill the TPPs".  777 F.3d at 28 n.23.  If the TPPs are instead charged the list price and later "refunded a portion based on the rebate amount", these rebates may be used to offset any damages award but do not "affect the fact of injury."  Id.  To the extent Dr. Hughes' testimony and opinion are inconsistent with this holding, it is excluded.

French Reply Report ¶ 36.  The Court is confident that both Drs. French's and Hughes's methodologies are reliable and sound.  To the extent the parties discern weaknesses to their opposing experts' methodologies, it is fodder for cross-examination.

Defendants also argue that Dr. French fails to exclude payors who benefitted from Warner Chilcott's coupons.  Defs.' Mot. to Exclude French 12.  Because the coupons benefitted consumers only, the Court need not address Defendants' argument on this score. See id. at 15 (explaining that consumers benefit from coupons); see also EPP Hr'g Tr. vol. I, 169:8-21 (testimony of Dr. Hughes, explaining that, after receiving feedback from Dr. French, he included value of coupons in his pharmacy prices).

The parties hotly contest the treatment of free samples.  As the Court understands it, Warner Chilcott gave doctors free samples to distribute to their patients.  What doctors and patients did with these free samples is unknown.  There is no data informing whether a doctor actually distributed the free samples to patients (or otherwise stuck them in a drawer); whether a patient took the samples she received; whether a patient tried the sample but never filled a prescription afterward; or whether a patient filled and paid for Loestrin 24 prescriptions after enjoying a free sample. A patient's free sample use has no corresponding data point in the pharmaceutical sales data.  EPP Hr'g Tr. vol. II, 49:6-12 (Feb. 14, 2019), ECF No. 808.  What we do know is that "[p]aying an

67

overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show – as a legal and factual matter – impact or fact of damage." Nexium III, 777 F.3d at 27.   And this "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset" by "savings attributable to the same or related transaction." Id. (citing Adams v. Mills, 286 U.S. 397, 407 (1932); Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262 n.14 (1972)).   Thus, the benefit a patient may have enjoyed from a free sample at one point in time cannot be used to offset the injury that she or her TPP suffered at some other point in time.   See French Reply Report ¶¶ 57-59; see also id. ¶ 11 ("free samples are not prescribed [to] or purchased by Class members, and are not Class transactions").   To the extent Dr. Hughes's opinions and testimony are to the contrary, they are excluded.

### d. Potentially Uninjured TPPs and Class Exclusions

PBM Cost-Sharing.   Defendants move to exclude Dr. French's opinion and testimony on the basis that he fails to consider the variety of ways insurers share prescription drug costs with patients, retail pharmacies, and PBMs, and how this varies across plans, time, and drugs.   Defs.' Mot. to Exclude French 17.   This argument is intertwined with Defendants' argument that the TPP class should not be certified because PBMs absorb some of the TPPs'

purported antitrust injury, <u>see</u> Defs.' Sur-Reply in Opp'n to EPPs' Mot. for Class Certification ("Defs.' Sur-Reply") 2, ECF No. 697-1, and the Court addresses this below, <u>see</u> <u>infra</u> Part II.F.1.b.

<u>Uninjured TPPs</u>. Defendants argue that, under <u>Asacol</u>, Dr. French's injury-in-fact analysis cannot stand, as it subsumes uninjured class members into the proposed class. Defs.' Mot. to Exclude French 3. In light of the Court's holding, below, declining to certify a class of consumers, insofar as Defendants move to exclude Dr. French's opinions regarding consumers, those arguments are moot. With respect to the TPPs, the Court is satisfied, for the reasons set forth below, <u>see</u> <u>infra</u> Part II.C.6.a.ii, that Dr. French's methodology and analysis reliably demonstrate by a preponderance of the evidence that all TPPs were likely injured and that there are no brand-loyal TPPs. <u>Cf.</u> <u>Nexium III</u>, 777 F.3d at 28-29 (addressing similar arguments and concluding that the EPPs had demonstrated that the subgroups of TPPs were injured).

<u>Class Exclusions</u>. Defendants make a handful of arguments related to the EPPs' ability to identify and remove their stated class exclusions. Defs.' Mot. to Exclude French 11; <u>see also</u> Defs.' Sur-Reply 24. The Court is satisfied that, for the reasons set forth below, Dr. French's and Craft's methodology for identifying and removing fully-insured TPPs is sufficiently reliable. <u>See</u> <u>infra</u> Part II.C.5.b (detailing Craft's methodology

for excluding fully-insured TPPs).  With respect to excluding non-class governmental purchases, the Court is also satisfied with the proffered methodology.  See French Reply Report ¶¶ 27-31; see also Craft Decl. ¶ 18.

Exclusion of PBMs from the EPP Class.  Defendants argue that it is impermissible for Dr. French to ignore PBMs in his analysis – and by extension the EPPs to exclude them from their class – because PBMs fall within the category of entities that indirectly purchased, paid for, and/or provided reimbursement for some or all the purchase price of the drugs.  Defs.' Mot. to Exclude French 18-19 (citing EPPs' Mot. for Class Certification 12).  But the EPPs have expressly excluded PBMs from their class, and Defendants point to no authority suggesting this was impermissible on their part.  See EPPs' Reply Mem. of Law in Further Support of Their Mot. for Class Certification and Appointment Of Class Counsel ("EPPs' Reply") 6, ECF No. 636.  Indeed, other pharmaceutical antitrust classes excluding PBMs from their EPP class definitions have been certified in this Circuit.  See, e.g., Nexium III, 777 F.3d at 17, 28 nn. 13, 23 (noting that PBMs were initially part of the class definition but were then excluded).

    e.   **Dr. French's Damages Model and Related Damages Calculations**

Finally, Defendants take issue with Dr. French's damages methodology and analysis.  Defs.' Mot. to Exclude French 4-5.  They

argue that he fails to offset his damages calculation by Warner Chilcott's so-called price concessions; his damages calculations do not properly account for the implementation of the ACA's free contraceptive mandate and understate brand loyalists; and he fails to isolate damages caused by the various categories of alleged unlawful conduct, thus rendering it impossible for a jury to calculate damages if some but not all of the EPPs' theories of harm proceed.  Defs.' Mot. to Exclude French 4-21, 24.

As with Defendants' other arguments, and as discussed in relation to the injury-in-fact analysis, these arguments go to the weight, not the admissibility, of Dr. French's opinion and testimony.  The Court is confident that a jury would be well-equipped, with Dr. French's opinions and testimony in hand, to determine the proper damages if it finds persuasive some but not all of EPPs' theories of harm.

For these reasons, the Court DENIES Defendants' Motion to Exclude the Opinions and Testimony of Dr. French, ECF No. 575, and GRANTS IN PART AND DENIES IN PART the EPPs' Motion to Exclude the Opinions and Testimony of Dr. Hughes, ECF No. 634.

### C.   The EPPs' Motion for Class Certification

To certify a class, the Court "must undertake a 'rigorous analysis'" to determine whether the putative class satisfies each of the four prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure:  numerosity, commonality, typicality,

71

and adequacy of representation.  Nexium III, 777 F.3d at 18 (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011); Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982)).  In addition, the putative class must also demonstrate that it satisfies one of the requirements set forth in Rule 23(b), Nexium III, 777 F.3d at 18; in this case, the putative classes argue that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Rule 23(b)(3); see also EPPs' Mot. for Class Certification.  To meet this requirement, the putative class must demonstrate "that 'the fact of antitrust impact can[] be established through common proof' and that 'any resulting damages would likewise be established by sufficiently common proof.'"  Nexium III, 777 F.3d at 18 (quoting In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008) ("New Motor II")).

The Supreme Court has explained that "Rule 23 does not set forth a mere pleading standard" but rather, a plaintiff "must affirmatively demonstrate [its] compliance with the Rule." Dukes, 564 U.S. at 350.  To do so, a plaintiff has the burden to demonstrate by a preponderance of the evidence that Rule 23's prerequisites to class certification are satisfied.  Nexium III,

72

777 F.3d at 27.  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1195 (2013); see also Comcast, 569 U.S. at 35 (stating that a court must determine whether the plaintiff's burden is satisfied under Rule 23 "even when that requires inquiry into the merits of the claim").

The EPPs moved for class certification in July 2018.  After the EPPs filed their opening brief in support of their Motion for Class Certification, but before Defendants filed their Opposition, the First Circuit Court of Appeals issued its Opinion in Asacol. That decision has significant ramifications for the EPPs' Motion for Class Certification, and accordingly, the Court provisionally denied Defendants' Motion to Strike (1) the EPPs' Three New Rebuttal Experts, (2) Portions of the Rebuttal Expert Report of Gary L. French, and (3) Portions of the EPPs' Reply in Support of the Motion for Class Certification.  See Order, Dec. 28, 2018, ECF No. 686 (provisionally denying ECF No. 637).  The Court reaffirms that ruling and considers all the briefing and expert opinions presented on class certification, unless otherwise limited by its rulings on Daubert Motions.

In their Reply brief, and in response to Asacol, the EPPs amend their proposed class and offer a second, alternate class.

First, the EPPs propose the following amended class definition:

> All persons or entities in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Loestrin 24 Fe and/or its AB-rated generic equivalents in any form, and/or Minastrin 24 Fe and/or its AB-rated generic equivalents in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class" or the "End-Payor Class"), other than for resale, during the period September 1, 2009 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, persons or entities "purchased" Loestrin 24 Fe, Minastrin 24 Fe, or their generic equivalents if they indirectly purchased, paid and/or reimbursed for some or all of the purchase price (the "End-Payor Class").

EPPs' Reply 4.   Expressly excluded from this proposed class are the following persons and entities:

> a. Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;
> b. All federal or state governmental entities, excluding cities, towns or municipalities with self-funded prescription drug plans;
> c. All persons or entities who purchased Loestrin 24 Fe or its AB-rated generic equivalent, and/or Minastrin 24 Fe or its AB-rated generic equivalent, for purposes of resale or directly from Defendants or their affiliates;
> d. Fully insured health plans (i.e., Plans that purchased insurance from another third party payor covering 100% of the Plan's reimbursement obligations to its members);
> e. Any "flat co-pay" consumers (i.e., consumers who paid the same co-payments amount for brand and generic drugs);
> f. Any "brand loyalist" consumers who purchased Minastrin 24 after an AB-rated generic equivalent of Minastrin 24 became available and who did not purchase any such AB-rated generic equivalent;
> g. Pharmacy Benefit Managers; and
> h. The judges in this case and any members of their immediate families.

Id. at 4-5.

If the Court declines to certify the End-Payor Class as defined in this amended class definition, the EPPs propose an alternate class they refer to as the "TPP Class":

> All Third-Party Payor entities ("TPPs") in the United States and its territories who indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price for Loestrin 24 Fe and/or its AB-rated generic equivalents in any form, and/or Minastrin 24 Fe and/or its AB-rated generic equivalents in any form, for consumption by their members, employees, insureds, participants, or beneficiaries (the "Third Party Payor Class"), other than for resale, during the period September 1, 2009 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, entities "purchased" Loestrin 24 Fe, Minastrin 24 Fe, or their generic equivalents if they indirectly purchased, paid and/or reimbursed for some or all of the purchase price (the "TPP Class").

Id. at 6. Expressly excluded from the TPP Class are the following people and entities:

> a. Defendants and their subsidiaries, or affiliates;
> b. All federal or state governmental entities, excluding cities, towns or municipalities with self-funded prescription drug plans;
> c. All entities who purchased Loestrin 24 Fe or its AB-rated generic equivalent, and/or Minastrin 24 Fe or its AB-rated generic equivalent, for purposes of resale or directly from Defendants or their affiliates;
> d. Fully insured health plans (i.e., Plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members); and
> e. Pharmacy Benefit Managers.

Id.

Defendants oppose the EPPs' Motion for Class Certification. They contend that the proposed EPP Class is unascertainable and

that the EPPs have failed to demonstrate by a preponderance of the evidence that the proposed class satisfies the Rule 23 typicality and adequacy requirements.   Defs.' Sur-Reply 1-2.   Defendants further argue that the EPPs' damages theory is inconsistent with their liability theory, and a class action is not a superior method by which to resolve the EPPs' claims.   Id. at 3.

### 1.   Numerosity[39]

Rule 23(a)(1) requires that members of a class be "so numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   Generally, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."   García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009) (quoting Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)).   With respect to the TPP Class, Plaintiffs proffer that at least 40 TPPs are class members, in light of the fact that there were approximately 24,534 employer-sponsored health plans in the United States in 2012.   See EPPs' Reply 10 (citing Craft Decl. ¶ 28).   Defendants do not dispute this.   See generally Defs.' Sur-Reply.   The Court concludes that the TPP class is too numerous to render joinder practical, and thus numerosity is established.

---

[39] Because the Court has concluded, for the reasons explained below, that a consumer class may not be certified, the Court's analysis of the Rule 23 criteria focuses on the alternative TPP class.

### 2.  Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class."  The Supreme Court has stated that a common question is defined as "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350.  "'[E]ven a single [common] question' will do[.]"  Id. at 359 (quoting id. at 376 n.9 (Ginsburg, J., concurring in part, dissenting in part); Richard Nagareda, The Preexistence Principle and the Structure of the Class Action, 103 Colum. L. Rev. 149, 176, n.110 (2003)).  The EPPs easily establish that the anticompetitive conduct they allege involves numerous common questions of law and fact, and Rule 23(a)(2) is readily satisfied.

### 3.  Typicality

In order to certify a class, Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). Defendants challenge the named plaintiffs' typicality, principally arguing that the laws under which the named plaintiffs' claims are brought are not substantially similar to those of the class members they seek to represent nationwide.  Defs.' Sur-Reply 4-10.[40]  In

---

[40] Because the Court does not certify a consumer class, it need not address the typicality arguments concerning the named-

light of the Court's standing analysis and that addressing Defendants' Renewed Motion to Dismiss, the Court is confident that the named plaintiffs are typical of those in jurisdictions in which this class may be certified, and thus the typicality requirement is satisfied.

### 4.   Adequacy of Representation

Defendants next argue that the EPPs have not established adequacy under Rule 23(a)(4).   First, they say the class representatives are inadequate because the EPPs move to certify a class that does not include PBMs but seek damages for any overcharges paid by such PBMs.   Defs.' Sur-Reply 10.   Defendants argue that, because PBMs bear some price risk, there is "no principled basis for excluding" them from a putative class of end-payor plaintiffs.   Id. at 11.   Second, Defendants argue that the EPPs have a conflict because they have proposed a subclass of EPPs, viz., the TPPs.   Defs.' Sur-Reply 13.   Neither argument is persuasive.

As addressed below, the EPPs have met their burden of proving by a preponderance of the evidence that the PBMs did not absorb any injury in connection with Defendants' alleged anticompetitive conduct such to render the TPPs uninjured.   See infra Part II.C.6.b.   Moreover, the EPPs are free to structure their proposed

consumer plaintiffs.

class as they see fit.  See EPPs' Sur-Sur-Reply in Supp. of Mot. for Class Certification ("EPPs' Sur-Sur-Reply") 10-11, ECF No. 750; In re TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583, 590-91 (N.D. Cal. 2010) ("TFT-LCD III"), amended in part, No. M 07-1827 SI, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (denying defendant's motion to strike the proposed modifications to class definition where plaintiffs changed their class definition during the motion for class certification briefing).  Defendants cite no case or rule suggesting that the EPPs are required to include a set of putative plaintiffs who arguably could fit within some broader class.  Cf. Nexium II, 297 F.R.D. at 179 (finding that PBMs are "'mere conduits' for TPP payments to pharmacies, and as financial intermediaries, are not a part of the putative class").

In addition, the Court discerns no conflict in proposing an alternative class.  The EPPs asked the Court to certify an alternative TPP-only class if, and only if, they failed to convince the Court to certify the broader class.  This is not inconsistent with the consumers' interests.  Indeed, it is conceivable that, given the state of the law post-Asacol, proposed class counsel have a duty to its class members to propose an alternative class.

Defendants further argue that consumers and TPPs are attempting to recover the same overcharge.  Defs.' Sur-Reply 11-12 (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 610, 625-28 (1997)).  But the TPPs seek recovery of their reimbursements,

not the consumers' co-pays.  And, here, only the TPP class has been certified.   The Court is satisfied that the adequacy requirement is satisfied.

### 5.  The TPP Class is Ascertainable

In order to carry their burden on a motion for class certification, a putative class must demonstrate "by a preponderance of the evidence, that the class is currently and readily ascertainable based on objective criteria." Nexium III, 777 F.3d at 19 (quoting Carrera v. Bayer Corp., 727 F.3d 300, 306 (3d Cir. 2013)) (quotation marks omitted).   The putative class must demonstrate a methodology for distinguishing the injured from the uninjured purchasers that is both "administratively feasible" and "protective of defendants' Seventh Amendment and due process rights." Asacol, 907 F.3d at 52.

Defendants assert that the EPP class is not ascertainable. As addressed infra in Part II.C.6.a.i, the Court agrees that there is no administratively feasible way to identify the consumers in the EPP class given that some of those consumers are indisputably brand loyalists.  The Court does, however, conclude that the TPPs can be identified and is satisfied that the EPPs have demonstrated by a preponderance of the evidence that each TPP has been injured. The Court addresses Defendants' arguments in seriatim.

### a. Availability of Data Covering the Entire Class Period to Identify Class Members

Defendants argue that the TPP class is not ascertainable because the EPPs have not provided a reliable methodology for identifying all TPPs and for excluding those that fall within the class exclusions.  Defs.' Sur-Reply 16-24.  Defendants primarily dispute the EPPs' ability to obtain and compile the data necessary to complete this task for the entire class period.  Id.

To compile a list of all TPPs, the EPPs propose surveying PBMs, state insurance commissioners, and IRS Form 5500s.  Craft Sur-Rebuttal Report ¶¶ 74-77; see also Craft Decl. ¶ 10 (stating that such a list would also be available from MMIT formulary data, IQVIA Prescription-by-Plan data, and Defendants).  In addition, they propose using the National Council for Prescription Drug Programs' Telecommunications Standards ("NCPDP Standards") to identify the TPPs that purchased Loestrin 24, Minastrin, and their generic equivalents.  Craft Sur-Rebuttal Report ¶ 18.  HIPAA requires the use of NCPDP Telecommunications Standards for adjudicating and tracking pharmacy prescriptions.  Id. ¶ 20; see also Kosty Dep. 58:18-24, 59:22-25, 60:8-12.  As a result, the NCPDP Standards were used for substantially all prescription transactions in the United States during the class period.  Craft Sur-Rebuttal Report ¶ 18.

The Court is also convinced that the data are available and

accessible.   Prescription drug transactions are well documented and TPPs have the capability to retrieve information about the drugs they have purchased, the date on which they were purchased, and the price paid for the drugs.  Id. ¶¶ 16, 19.  These records are maintained by some combination of the TPPs, the PBMs, and pharmacies.  Id.  Most TPPs retain PBMs to administer prescription drug benefits to their members and members' beneficiaries, and PBMs process claims related to pharmaceutical purchases at pharmacies (i.e., at the point of sale).  Id. ¶¶ 22, 33; see also id. ¶¶ 23-29 (detailing how PBMs and TPPs engage with one another and how the PBMs' data management system works).

Thus, from PBM and pharmacy data, the EPPs could compile a list of TPPs that purchased Loestrin 24, Minastrin, and their generic equivalents, that includes payment amounts, coverage, and plan characteristics.  See Craft Sur-Rebuttal Report ¶¶ 16-19.[41] Approximately 96-99% of prescription transactions could be compiled from PBM and pharmacy data.  Id. ¶ 40.  The data from various sources would be merged, and the EPPs would identify and

---

[41] The EPPs state that, as a practical matter, pharmacy data is only needed to obtain information on purchases by cash-payment consumers.  EPPs' Sur-Sur-Reply 15-16.  The Court understands, however, that some TPPs may not use PBMs and, thus, their transactions may not be included in PBM data.  It is because pharmacy data is available that the Court is not troubled by the possibility that up to twenty percent of prescriptions are handled by large insurance companies rather than PBMs.  See Defs.' Mot. to Exclude Miller, Craft, Winkelman 26.

eliminate data errors, standardize the data, eliminate duplicates, and compile the list.  Craft Decl. ¶ 15.

Defendants aver that the NCPDP Standards are transmission, not data storage or maintenance, standards and thus, PBMs may store their data using different data fields.  Defs.' Motion to Exclude Miller, Craft, Winkelman 22-23.  But the EPPs offer evidence that PBMs and pharmacies <u>maintain</u> data in this format as well. Winkelman Report ¶ 30.  And as far as the claim that the data are not stored in a standardized format, EPPs' expert, Craft, explains in detail how OnPoint would cull through the data fields used by various PBMs to standardize them.[42]  <u>See, e.g.</u>, Craft Decl. ¶ 7.

Winkelman states that, while PBMs and pharmacies are only required to maintain data for seven years, based on his experience in the industry, he understands "that such records are archived and accessible indefinitely".  Winkelman Report ¶ 41.  He uses Walgreens as an example – its website states that it does not

---

[42] The Court is aware that at least one court has noted that "the players in the pharmaceutical industry [do not utilize] all of the fields set out in NCPFP standards".  <u>In re Wellbutrin XL Antitrust Litig.</u>, 308 F.R.D. 134, 150 (E.D. Pa. 2015) ("<u>Wellbutrin XL II</u>").  While the court in <u>Wellbutrin</u> declined to certify an indirect-purchaser class on the record before it, the court explicitly held that its conclusion was limited to the record evidence presented and that it did "not hold a view regarding whether indirect purchaser classes in other cases involving pharmaceutical purchases are ascertainable or not."  <u>Id.</u> at 151. Given the EPPs' expert testimony in this case, the Court is confident that the EPPs can execute their plan in an administratively feasible manner.

delete prescriptions from a patient's history and older prescription history may be transferred to microfilm and obtained upon request.  Id.

The Court is further satisfied that the economic incentives for PBMs, pharmacies, and other relevant actors are aligned with retaining this data in some form for as long as possible.  Craft Sur-Rebuttal Report ¶ 22 n.35.  Data retention allows these entities to prove that they have satisfied their contractual obligations and complied with regulatory requirements.  Id.; see also Winkelman Report ¶ 41 (detailing PBMs' retention practices).  Defendants' expert, Dr. Bruce Strombom, concedes that he is not aware of any instance in which a PBM affirmatively deleted data.  EPP Hr'g Tr. vol. II, 121:21-122:1.  While some of the older data may be archived, the EPPs represent that they have the capability to programmatically read and analyze archived data.  Craft Sur-Rebuttal Report ¶ 22 n.35.

### b.   Availability of Data to Apply Class Exclusions[43]

The EPPs also demonstrate, by a preponderance of the evidence, that they will be able to successfully gather and compile the data

---

[43] Because the Court declines to certify a class inclusive of consumers, it need not address Defendants' argument that the EPPs will not be able to identify flat co-pay consumers.  See EPPs' Sur-Sur-Reply 17.

necessary to apply class exclusions.

With respect to state and federal governmental entities, the EPPs will request that the PBMs remove federal and state plans from their dataset and, in addition, OnPoint will be able to identify them by name. Craft Decl. ¶ 18. Federal employee health benefit plans are fully insured plans that contract with carriers to provide health insurance. French Reply Report ¶ 28. The carrier offering the plan – not the federal government – is the TPP for any class transactions. Id. For state plans, Dr. French conservatively assumes that all state employee plans are self-insured. Id. ¶ 29.

For fully-insured health plans, Craft explains that the Internal Revenue Service requires most employer-sponsored health plans to file annually an IRS Form 5500, which discloses whether a plan is fully insured, self-insured, or mixed insured. Craft Decl. ¶ 20. Defendants retort that many small health plans (those with fewer than 100 members) do not file an IRS Form 5500. See Expert Report of Bruce A. Strombom ¶¶ 45-46, ECF No. 697-3. While this may be true, the Court is confident that PBM data will fill any holes left from missing IRS Form 5500 data. Craft Sur-Rebuttal Report ¶ 78. In any event, plans with fewer than one-hundred members are likely to be fully insured and thus excluded from the putative class. Id. ¶ 79 (citing U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Group Health Plans Report: Abstract of 2012

Form 5500 Annual Reports 24 (June 2015); U.S. Dep't of Labor, Emp. Benefits Sec. Admin., Group Health Plans Report: Abstract of 2015 Form 5500 Annual Reports 22 (Oct. 2017)).[44]

In order to identify PBMs (which are expressly excluded from the class), the EPPs would employ lists maintained by the Pharmacy Benefit Management Institute and RxResource.org.   Craft Decl. ¶ 21.   The six largest PBMs collectively control about 92% of the PBM marketplace, and these other data sources would enable the EPPs to readily identify the forty or so other small PBMs.   Id.

### c.   Generic Purchases from Non-Defendants

Defendants argue that the EPPs improperly include purchasers that bought generic Loestrin 24 from third-party (non-Defendant) manufacturers.   Defs.' Renewed Mot. to Dismiss 17-19.   For the reasons set forth in this Court's Opinion and Order on the DPPs' Motion for Class Certification, the EPPs' purchases of generic Loestrin 24 from third-party manufacturers is not a barrier to class certification.   See In re Loestrin 24 Fe Antitrust Litig., No. 1:13-MD-2472, 2019 WL 3214257, at *8-10 (D.R.I. July 2, 2019) ("Loestrin II").

### d.   So-Called Brand Loyalists

----

[44] Craft further testified that, if the EPPs were unable to determine whether a TPP is self-insured to some extent, they could call the TPP. EPP Hr'g Tr. Vol. II, 37-38.  If affirmation could not be provided over the telephone, the EPPs would exclude that TPP in order to ensure that no fully-insured TPP was included in the class.  Id.

Defendants contend that any TPP that did not purchase generic Loestrin 24 in the actual world must be excluded from the class as an uninjured brand loyalist. Defs.' Sur-Reply 38-39. The Court disagrees. This definition of "brand loyalist" is overly narrow, even with Asacol in mind, vis-à-vis the TPPs.

While Asacol held that plaintiffs seeking to certify a class must have an "administratively feasible" plan for identifying and excluding uninjured purchasers, it also defined "brand loyalist" as a purchaser that "would have continued to purchase a brand drug" after generic entry. 907 F.3d at 51, 52. Under Asacol, those TPPs that did not purchase generic Loestrin 24 in the actual world – ostensibly due to the delay and suppression of generic competition caused by Defendants' alleged anticompetitive conduct – but would have in a but-for world are not brand loyalists.

The EPPs have demonstrated through Dr. French's sound analysis, by a preponderance of the evidence, that the TPPs that did not purchase generic Loestrin 24 and/or Minastrin in the actual world were indeed injured because they would have made at least a single purchase of an AB-rated generic equivalent in the but-for world. See Solodyn II, 2017 WL 4621777, at *18 ("an insurer with brand-loyal members is only uninjured here if every one of its members would have been brand-loyal for all [drug] purchases in each 'but-for' scenario . . . It is highly unlikely, therefore, that institutional payors were uninjured even if some of their

members are brand-loyal or purchased the generic during the period in question.").

### 6.   Common Questions of Law or Fact Predominate

To certify a class, under Rule 23(b)(3), "questions of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).   In conducting the predominance inquiry, the Court must determine "whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" Asacol, 907 F.3d at 51 (citing Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013)).   A court may certify a class if it determines a plan to adjudicate individual issues that is both "administratively feasible" and "protective of defendants' Seventh Amendment and due process rights."   Id. at 52 (quoting Nexium III, 777 F. 3d at 19).

This poses a considerable hurdle after the First Circuit's Opinion in Asacol; one that the EPP Class cannot clear with respect to its consumer class.

### a.   Injury

The EPPs allege that each of its class members (consumers and TPPs) were injured when they purchased, paid for, or provided reimbursement for Loestrin 24 or Minastrin, or their generic equivalents.   See EPPs' Mot. for Class Certification 23.   In a but-for world, they would have instead paid for a less expensive

88

generic Loestrin 24.  Id.  This proof of injury, or "injury-in-fact", is an element of an antitrust class action plaintiff's case. Asacol, 907 F.3d at 51 (citing New Motor II, 522 F.3d at 19 n.18).

### i.   Injury: Consumers

It is undisputed that the proposed EPP Class contains some consumers who were brand loyalists – i.e., that some consumers would have continued purchasing brand Loestrin 24 in a but-for world in which Defendants' alleged anticompetitive conduct never occurred and generic Loestrin 24 entered the market earlier.  EPPs' Sur-Sur-Reply 23-24.  It is further undisputed that economic modeling may allow for the approximation of the percentage of these so-called "brand loyalists" in the class as a whole, but it does not allow the Court and parties to identify precisely who among the EPP Class would have been brand loyalists without – simply put – asking them.  See id. at 24.  Even at the most conservative end, the EPPs' own expert, Dr. French, calculates this to be approximately 6.7% of the proposed consumer class.  French Reply Report ¶ 40.  In a class that conservatively would include hundreds of thousands of consumers, that is a heavy lift.  See Craft Decl. ¶ 27.

As noted above, the First Circuit, in the midst of briefing on the instant Motion for Class Certification, issued its decision in Asacol, 907 F.3d 42.  In that opinion, the court squarely addressed "the proper treatment of uninjured class members at the

class certification stage" in a pharmaceutical antitrust case not unlike the instant one.  Id. at 51.  It reaffirmed that, "a class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both 'administratively feasible' and 'protective of defendants' Seventh Amendment and due process rights.'"  Id. at 52 (quoting Nexium III, 777 F.3d at 19).  While Nexium held that consumer testimony, "if unrebutted", could serve to set apart the uninjured from the injured, Nexium III, 777 F.3d at 20-21 (emphasis added), Asacol makes clear that a case in chief of this sort that proffers rebutted evidence fails to properly heed the dictate that it be "administratively feasible" and "protective of defendants' Seventh Amendment and due process rights." Asacol, 907 F.3d at 52-53; see also id. at 53 (emphasizing that inadmissible hearsay, like affidavits of individual consumers, may not be used at or after trial to prove injury in fact).

Here, Defendants state that they would rebut any affidavits proffered in connection with the consumers' case.  Defs.' Renewed Mot. to Dismiss 14-15.  And, thus, even if the EPPs could convince the Court that it could compile the data discussed above and identify all consumers who purchased Loestrin 24, Minastrin, and/or their generic equivalents during the Class period, the problem of how to identify the brand loyalists amongst them – those price insensitive consumers – would remain.

To this point, the EPPs concede that the only way this Court can remain faithful to <u>Asacol</u> and certify an EPP Class inclusive of consumers is to hold that there is a presumption of injury and/or causation.[45]

The EPPs accordingly ask the Court to hold that the putative consumer class is entitled to presumptions of injury and causation. EPP Hr'g Tr. vol. I, 22:20-23:19.  With respect to a presumption of injury, the EPPs argue that, because Defendants' alleged wrongful conduct (the reverse payment followed by the product hop) caused the absence of proof of injury as to each putative class member, such a presumption applies.  EPPs' Sur-Sur-Reply 2-3.  In other words, as applied here, the EPPs ask for a presumption that every single consumer would have purchased a less expensive generic equivalent in the but-for world.  This, of course, presumes no brand loyalty.

But the EPPs' request falls flat because <u>Asacol</u>, read as a whole, plainly does not contemplate such a presumption.  What is more, the court admonished that the plaintiffs' claims process to

---

[45] <u>See, e.g.</u>, EPP Hr'g Tr. vol. I, 28:20-22 ("I acknowledge this question of who has the burden is essential to our getting the class certified as to the consumers."); <u>id.</u> at 29:13-16 ("[B]ecause the reality is if you were to decide there's not a presumption and, therefore, we acknowledge, therefore, there cannot be a consumer part of this class."); EPP Hr'g Tr. vol II, 5:21-25; EPP Sur-Sur-Reply 3 ("Defendants' conduct made the common proof regarding brand-loyal Loestrin 24 consumers unavailable . . . .").

sort uninjured from injured purchasers provided the defendants with "no meaningful opportunity to contest" whether the purchasers were in fact injured.  Asacol, 907 F.3d at 53.  This process was at odds with the court's central concern that the defendants have the right to "challenge . . . a plaintiff's ability to prove an element of liability."  Id.  Most tellingly, the court stated that, although the Supreme Court, in Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258 (2014), "permitted class certification based on a proper presumption furnished by the applicable law, even if the presumption might be rebutted as to individual plaintiffs in a few instances, here we have no such presumption." Id. (emphasis added) (citation omitted).  This (direct) language, along with various other statements throughout the opinion, leave this Court no room to rewrite what the First Circuit has clearly scripted.  See, e.g., id. at 54 (stating, in distinguishing Asacol from Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036 (2016), "plaintiffs point to no such substantive law that would make an opinion that ninety percent of class members were injured both admissible and sufficient to prove that any given individual class member was injured").

Were the Court writing on a clean, pre-Asacol slate, it may very well adopt a presumption of injury.  The Court is troubled that over ninety percent of consumers in the proposed EPP class may have been injured by Defendants' alleged unlawful conduct, but

92

now have no practical recourse under antitrust law.  See In re Intuniv Antitrust Litig., No. 1:16-CV-12396-ADB, 2019 WL 3947262, at *7 n.8 (D. Mass. Aug. 21, 2019) (expressing similar concerns and noting that while Asacol "eliminates the possibility that some consumers might obtain a recovery for damages they did not suffer, it also ensures that a much larger number of . . . consumers will receive no remedy for harm actually suffered").  Perhaps the Court of Appeals will have occasion in this case or another to reconsider this holding; or, if not, perhaps Congress will take up the issue.

But for now, the EPPs' argument is not supported by the law of this Circuit.  The Court concludes that, with respect to consumer injury-in-fact, individual issues predominate over common ones, and there is no administratively feasible way to adjudicate these individual issues while paying due reverence to Defendants' Seventh Amendment and due process rights.

### ii.   Injury: TPPs

For a TPP to prove injury, it must demonstrate only that it incurred an overcharge on a single transaction during the class period.  See Nexium III, 777 F.3d at 32 (citing Baker v. Carr, 369 U.S. 186, 204-06 (1962)).

Defendants contend that there are uninjured TPPs in the EPPs' proposed class.  Defs.' Sur-Reply 35, 40-41.  More specifically, they argue that there are brand-loyal TPPs that would have continued buying the more expensive, branded product in the but-

93

for world; the price of brand Loestrin 24 was on average lower than the but-for price of generic Loestrin 24; and PBMs absorb part of any overcharges incurred, thus undermining TPP injury. Id. at 35, 40-41, 50, 52. The Court finds none of these arguments persuasive.

Whether There Are So-Called "Brand-Loyal" TPPs.[46] Defendants argue that some subset of TPPs are so-called "brand loyal." Defs.' Sur-Reply 35, 40-41. That is, even in a but-for world, some TPPs would have continued to purchase all brand Loestrin 24 or Minastrin. Id. Defendants' argument misses the mark. Dr. French has provided the Court with a compelling analysis suggesting that, in a but-for world, each TPP would have reimbursed at least a single purchase of generic Loestrin 24 during the class period at a price lower than its branded alternative. See French Reply ¶ 114; see also EPP Hr'g Tr. vol I, 86:1-24. To argue otherwise is to suggest that it is likely that each of a TPP's relevant plan members (i.e., those who purchased Loestrin 24 or Minastrin during

---

[46] Defendants manufacture tension in highlighting that the EPPs' pre-Asacol class excluded "[a]ny 'brand loyalist' consumers or third-party payors who purchased Loestrin 24 Fe and who did not purchase any AB-rated generic equivalent after such generics became available." EPPs' Mot. for Class Certification 13; see also Defs.' Sur-Reply 35 n.31. But this can hardly be seen as an admission that its proposed TPP class includes brand loyalists. That a TPP did not purchase generic Loestrin 24 once it became available is of no moment when we have evidence that, with sustained and robust generic competition, each TPP likely would have made at least one such purchase.

the class period) were brand loyal.  See In re Celexa & Lexapro Mktg. & Sales Practices Litig., 915 F.3d 1, 13 (1st Cir. 2019) (noting that the odds were "infinitesimal" that a TPP was unharmed by off-label promotion that caused over half of the pediatric prescriptions for the drug at issue); Solodyn II, 2017 WL 4621777, at *18 ("It is highly unlikely, therefore, that institutional payors were uninjured even if some of their members are brand-loyal . . ."). This is so even if some TPPs have not reimbursed for generic Loestrin 24 in the actual world.

Whether PBMs Absorb Part of TPPs' Injury. Defendants argue that PBMs bear some of the risk of drug prices and thus would have absorbed part of the TPPs' injury, rendering some TPPs uninjured. Defs.' Sur-Reply 10-11, 52-55. The EPPs proffer evidence that PBMs are highly profitable businesses that do not "share in the 'risk' of paying" for Loestrin 24, Minastrin, and/or their generic equivalents. Winkelman Report ¶¶ 46, 56. A PBM's role is not as "the ultimate payor of prescription benefits, but rather it acts as an intermediary to facilitate payment for prescription drugs." Id. ¶ 46. TPPs pay PBMs to provide administrative services, including claims processing, retail pharmacy network management services, formulary management and compliance, and drug utilization review. Id. ¶ 47. To ensure that they do not cost share with TPPs, PBMs employ several strategies, including holding advance payment from TPPs for prescription drugs in a reserve or

95

adopting contractual terms that render late payment by TPPs financially unattractive. Id. ¶ 49. Moreover, PBMs do not consider manufacturer rebates "a mechanism by which they pay for [TPPs'] purchases of prescription drugs", but rather, they view them as a "source of revenue." Id. ¶ 53; see also id. ¶ 56 (opining that PBMs "are not paying for the pharmaceutical products"). Instead, rebate guarantees represent profit sharing. Id.

Therefore, the Court is not persuaded that practices like spread pricing and rebate guarantees pay for specific drugs or reflect PBMs absorbing risk for specific drugs. See Winkelman Report ¶¶ 45-56 (opining that PBMs are not subsidizing insurers' drug purchases and are, instead, making a profit on the cost of the prescriptions they administer); Chesler Dep. 91:14-92:8 (stating that rebates from PBMs to insurers are passed along months after the purchases and, to the extent they are passed through, are done in a single lump sum covering many drugs and many drug purchases).

Whether Some TPPs Paid Less for Brand Loestrin 24 Than Generic Loestrin 24 in the But-For World. Defendants argue that individual issues predominate because some TPPs paid less for brand Loestrin 24 and Minastrin than they would have paid for their generic equivalents in a but-for world. Defs.' Sur-Reply 48-51; see also Hughes Sur-Reply Report ¶¶ 140-42 & Ex. 13. This, in part, is due

96

to the way insurers influence patient choice by placing drugs on different tiers within their formularies.  Defs.' Sur-Reply 49.

To reach this conclusion, Dr. Hughes calculates the average cost for a TPP by subtracting the average copayment from the average pharmacy price for each year between 2009 and 2013.  Hughes Sur-Reply Report Ex. 13.  According to Dr. French, this results in an overstatement of the generic price and an understatement of the brand price.  Id. ¶ 41.  Dr. French opines that Dr. Hughes has understated the brand price by improperly netting the value of coupons and rebates, in addition to choosing formulary positions for brand Loestrin 24 and Minastrin that do not reflect that of brand drugs without generic counterparts on the market.  See Sur-Reply Report of Gary L. French, Ph.D. Regarding Impact and Damages to EPPs ("French Sur-Reply Report") ¶ 83-84, ECF No. 751-1; Hughes Sur-Reply Report Ex. 13 n.4 (noting that his pharmacy price is "adjusted for rebates and coupons").  Dr. French favors, instead, using the actual average consumer copays, as well as accounting for deductibles and coinsurance, for TPP class transactions.  Supplemental Declaration of Gary L. French, Ph.D. ¶ 3 ("French Supp. Decl."), ECF No. 786-2.

In response to Defendants' attack, Dr. French examined Optum Health datasets of 38 to 67 plans with brand purchases of Loestrin

24 or Minastrin in the years 2009 through 2017.[47]  _Id._ ¶¶ 12-16 & Exs. 1-3.  From those, he concludes that for all but one, the plan had at least one transaction for which it paid more for brand Loestrin 24 or Minastrin than the but-for plan payment for generic Loestrin 24 in the corresponding year.  _Id._; Ex. 3 to French Supp. Decl.  Because the Optum Health data is broken down by plan, and TPPs regularly have more than one plan, the fact that a single plan was not injured does not demonstrate that the TPP to which it belonged was not injured.  _Id._ ¶ 15 n.18

Having held that Dr. French's methodology and analysis are sound and reliable, the Court concludes that Dr. French has demonstrated by a preponderance of the evidence that each TPP sustained injury from Defendants' alleged anticompetitive conduct. Accordingly, the EPPs have demonstrated by a preponderance of the evidence that "questions of law [and] fact common to class members predominate over any questions affecting only individual members" of the TPP class with respect to injury and damages.[48]  And for this reason, and the reasons stated above, the Court has GRANTED

---

[47] Defendants take issue with what they call Dr. French's "individualized" approach.  _See_ Defendants' PowerPoint Slide: Issues with IPP Class Certification and Trial Timing 4 (Sept. 11, 2019), ECF No. 1230-6.  But it is only in response to Defendants' criticism that Dr. French undertook this analysis:  Defendants mount a challenge to Dr. French's analysis by plucking out uninjured TPPs; the EPPs demonstrate why this is wrong.

[48] With respect to damages, _see_ _supra_ Part II.B.2.e.

the EPPs' Motion for Class Certification with respect to the alternative TPP class and DENIED it with respect to the broader EPP class including consumers.

### b.   Damages

Defendants take issue with the EPPs' proposed damages model and aver that individual issues predominate over those affecting the class.  Defs.' Sur-Reply 55-56.  Most of their arguments are addressed above, and the Court need not regurgitate its conclusions here other than to note that it has found Dr. French's methodology and analysis reliable.  Counsel for Defendants may explore perceived weaknesses in the source and date range of Dr. French's data sets on cross examination, but they have not convinced the Court that Dr. French's damages model is unsound and should be thrown out.

For these reasons, the Court has concluded by a preponderance of the evidence that "questions of law or fact common to class members predominate over any questions affecting only individual members".  Fed. R. Civ. P. 23(b)(3).  Moreover, it is plain that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Id.

## III. Conclusion

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART Defendants' Renewed Motion to Dismiss and Motion for Judgment on the Pleadings as to Claims in EPPs' Second Amended

Consolidated Class Action Complaint, ECF No. 576, dismissing the EPPs' antitrust claims brought under the laws of Arizona, Hawaii, Illinois, Nevada, Puerto Rico, and Utah. The EPPs' antitrust claim under Rhode Island law may proceed with respect to damages incurred after July 15, 2013, and the EPPs' monopolization claims under Kansas, New York, and Tennessee law may proceed insofar as the EPPs allege a reverse payment with Watson.  The Court dismisses the EPPs' consumer protection claims under the laws of Illinois, Massachusetts, Rhode Island, Tennessee, and West Virginia.  The Court dismisses the EPPs' unjust enrichment claims under the laws of Alabama, Alaska, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Missouri, Montana, New Jersey, New York, North Dakota, Oklahoma, Pennsylvania, South Carolina, Texas, Utah, and Virginia.[49]  The Court also dismisses A.F. of L. - A.G.C. Building Trades Welfare Plan as a named plaintiff in this suit.

The EPPs' Motion for Class Certification, ECF No. 526, was GRANTED IN PART AND DENIED IN PART in the Court's Order dated September 17, 2019, see ECF No. 1226, and amended by the Court's Order dated September 26, 2019, see ECF No. 1239; Defendants' Motion to Exclude the Opinion and Testimony of EPPs' Expert Gary

---

[49] To the extent any claims were pled in the EPPs' Complaint, see ECF No. 165, but are not pressed in the EPPs' State Law Claims Chart, see ECF No. 1231, they are also dismissed.

L. French, Ph.D., ECF No. 575, is DENIED; EPPs' Motion to Exclude the Opinions and Testimony of James W. Hughes, Ph.D., ECF No. 634, is GRANTED IN PART AND DENIED IN PART; Defendants' Motion to Exclude the Opinions and Testimony of EPPs' Experts Eric Miller, Laura Craft, and Myron Winkelman, ECF No. 698, is GRANTED IN PART AND DENIED IN PART; and the EPPs' Motion to Exclude the Opinions and Testimony of Timothy Kosty and Bruce Strombom, Ph.D., ECF No. 733, is DENIED.

IT IS SO ORDERED.

_William E. Smith_
William E. Smith
Chief Judge
Date: October 17, 2019