# EXHIBIT A

Case 1:13-md-02472-WES-PAS Document 1304-2 Filed 11/08/19 Page 2 of 59 PageID #:
209456
Case 3:14-md-02516-SRU Document 368 Filed 10/21/16 Page 1 of 130

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

IN RE:                              :  No. 3:14-MD-2516(SRU)
                                    :  915 Lafayette Boulevard
AGGRENOX ANTITRUST LITIGATION       :  Bridgeport, Connecticut
                                    :
                                    :  October 14, 2016

- - - - - - - - - - - - - - - x


MOTIONS HEARING


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFFS:

        FARUQI & FARUQI, LLP
            101 Greenwood Avenue
            Jenkintown, Pennsylvania  19046
        BY:  PETER KOHN, ESQ.

        MOTLEY RICE LLC
            600 Third Avenue
            New York, New York  10016
        BY:   MICHAEL BUCHMAN, ESQ.

        LOWEY DANNENBERG COHEN & HART, P.C.
            One North Broadway
            White Plains, New York  10601-2310
        BY:   PETER ST. PHILLIP, ESQ.
            URIEL RABINOVITZ, ESQ.

(continued)

Case 1:13-md-02472-WES-PAS   Document 1301-2   Filed 11/08/19   Page 3 of 59 PageID #:
209457
Case 1:14-md-02516-SRU   Document 568   Filed 10/23/19   Page 81 of 130

81

1          MR. HOLDING:  But if the prediction was -- I

2     guess you and I have a different set of expectations of

3     what discovery would show.  I'm anticipating that

4     there's -- there certainly is an actual document that says

5     last year for Aggrenox we actually spent whatever to cover

6     it, and that gets built into an analysis that says how are

7     we doing, are our premiums covering it?  Now, we might

8     have to do it for Lipitor and a whole bunch of other

9     things as well, but it's part of detailed, data-driven

10    analysis that says where are we going in the future.

11         THE COURT:  No one is buying Aggrenox insurance.

12    They're buying prescription drug coverage.

13         MR. HOLDING:  Correct.

14         THE COURT:  And so the insurance companies are

15    making all kinds of assumptions about how many people are

16    going to buy this versus buy that, what's the cost of this

17    versus the cost of that.  It's a grain of sand on the

18    beach in terms of setting -- in terms of setting premiums.

19         MR. HOLDING:  Well, I think that we should be

20    given the opportunity to determine what does the data

21    actually show because if they have, if it turns out,

22    Judge, that your instinct on this one is just wrong, and

23    the data shows that they are addressing it and they are

24    building it into the premium and that the premiums are

25    covering their costs, then I think the law is clear they

1    haven't suffered an actual damage.  And so this part of

2    the table too is going to be asking us for an enormous

3    amount of money based on their actual damages, and we want

4    to say, Look, it turns out you did a good job, you covered

5    it correctly, you weren't harmed, and we should be

6    entitled to investigate that.

7            THE COURT:  Well, yes, you can investigate it.

8    What I'm looking for is an actuary who says, We changed

9    our rates based upon something that happened with

10   Aggrenox, up or down, not -- as opposed to we changed our

11   rates because of our predictions about what our

12   policyholders are going to spend on prescription drugs.

13   And the fact that Aggrenox is a prescription drug doesn't

14   get you what you want.  It has to be, We are concerned

15   about Aggrenox, it is so widespread, and the price is so

16   critical to the way we value or we adjust our premiums

17   that when the price of -- in fact, we have a ticker around

18   our office that shows the price of Aggrenox on a wholesale

19   and retail basis, and when it ticks, we start getting

20   nervous about changing our premiums.

21           MR. HOLDING:  So, again, the record isn't before

22   us.  What one question is, let's go look for those

23   documents.  Let's see what they have.

24           THE COURT:  What documents?

25           MR. HOLDING:  Do they have documents that

1      demonstrate that in the process of figuring out their

2      premiums from one year and then figuring out how did they

3      do and then figuring out what do they need to do the next

4      year, are there actually documents that show that they

5      considered Aggrenox or not, because if documents show it,

6      that means it's built in and they're covering it.

7              THE COURT:  You know, this is like not a fishing

8      expedition, it's like a flotilla.  I mean, the net is

9      getting cast so widely here that it's going to catch every

10     minnow in the sea.

11             MR. HOLDING:  I really have a hard time --

12     obviouly, you and I see this very differently.  I have a

13     hard time understanding that.  I think the net is being

14     cast very specifically.  It's saying, You guys are saying

15     that you were harmed, and we're saying we think you're not

16     out of pocket because you got the money from these other

17     people.  So were you harmed or were you not?  Does the

18     premium in fact cover you for this cost?  That's what we

19     want to know.

20             I think that is -- that is probably one of the

21     key questions for the damages claims that the EPPs are

22     going to put on, were they harmed or not.  They paid, they

23     certainly had an outflow of money, but that's not the

24     legal standard for them.  The question is, did somebody

25     else reimburse you for that, and we think the answer is

1    going to show the answer is yes.  Whether it was the whole

2    amount or half of it or something else, it offsets their

3    damages.

4            THE COURT:  A premium is not a reimbursement.  A

5    premium is the cost for the right to demand a

6    reimbursement.  So it's not --

7            MR. HOLDING:  A prepayment of the cost that

8    they're going to have to pay.  It's a prepayment.

9    Whether --

10           THE COURT:  No, no, it's not a prepayment.  It's

11   insurance.  I don't know what health problems I'm going to

12   have in the next year.  Maybe my doctor is going to

13   prescribe Aggrenox.  I bought Blue Cross/Blue Shield.

14   It's going to cover me.  I don't have to worry.  I'm

15   buying peace of mind, and the insurance company is

16   providing me with peace of mind and absorbing the risk

17   that I get prescribed Aggrenox or anything or I break my

18   arm or whatever.

19           MR. HOLDING:  But Humana says, I have a bunch of

20   enrollees, and some, hopefully a large number of them, are

21   going to continue next year and stay with me and not go to

22   Cigna or Aetna or somebody else, and they have data

23   experience that says we know that for our enrollees last

24   year, there were a whole bunch of them that took Aggrenox,

25   and it cost us "X," and it's probably likely that they're

Case 1:13-md-02472-WES-PAS   Document 1301-2   Filed 11/08/19   Page 7 of 59 PageID #:
209461
Case 1:14-md-02516-SRU   Document 368   Filed 10/23/19   Page 85 of 230

85

1    going to stay here with us and not go to Aetna, and

2    because Aggrenox is the kind of drug you're supposed to

3    take for a long time, they're going to continue to take

4    that.  So as we think about what our costs are, for them

5    it's not insurance, it's we have a cost that we're

6    virtually certain we're going to have to pay.  We can't

7    just pay it all ourselves because we'll go out of buiness.

8    We need money from these guys to help pay for it.

9         THE COURT:  But it's not a reimbursement.  It's

10   a prediction.  It's a prediction that the insured is going

11   to stay on Aggrenox, it's a prediction that they're not

12   going to use a substitute, it's a prediction they're not

13   going to die, it's a prediction that they're not going to

14   get better.  I mean, it's too many variables.  The price

15   of Aggrenox is a piece of sand, a grain of sand on the

16   beach in terms of setting premiums.  If there were one

17   drug in America and Aggrenox were it, yes, you would get

18   this discovery.  You probably still would not have a good

19   legal argument, but you'd get the discovery.  But when you

20   have hundreds of thousands of drugs, the idea that any one

21   of them is driving the premium is nonsensical.

22        MR. HOLDING:  I certainly am not suggesting that

23   Aggrenox by itself is responsible, but I do think that the

24   portion of the premium that is built on the prescription

25   drug benefit, that is itself an amount that's based on the

1    aggregation of a bunch of individual costs.  That's how

2    actuaries work.  Otherwise, actuaries would just be

3    guessing and throwing a dart against the wall.  And that's

4    what actuaries do.

5         THE COURT:  And so people who never took

6    Aggrenox, never had to buy Aggrenox are paying for it, and

7    people who took Aggrenox are paying for it, and they're

8    paying for it in the same way, through a premium.  That's

9    not a reimbursement of the --

10        MR. HOLDING:  I agree with you factually that

11   that's probably what happens, but the question is, how do

12   the funds flow?  Follow the money.  It sounds like

13   Watergate.  How do the funds flow?  And if they're getting

14   an offset, that means they're not suffering actual

15   damages, whether it happens --

16        THE COURT:  It's not an offset.

17        MR. HOLDING:  -- before or after.

18        THE COURT:  It's not an offset.  They're making

19   predictions about how many people are going to sign up for

20   their insurance plan.  If they get another hundred

21   thousand people to sign up, they can reduce the price even

22   if the price of all drugs are going up.  Why?  Because

23   they have that many more people among whom to spread the

24   risk.  It just doesn't work.  It's insurance.  It's not an

25   offset.  This is not -- it's not a rebate.

# EXHIBIT B

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT C

**Page 1**

```
                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * 13-MDL-2472-WES
                                  *
IN RE:                            *
                                  *
LOESTRIN 24 FE ANTITRUST * SEPTEMBER 11, 2019
LITIGATION                        *
                                  *
* * * * * * * * * * * * * * PROVIDENCE, RI



          BEFORE THE HONORABLE WILLIAM E. SMITH

                       CHIEF JUDGE

                (Motions for Summary Judgment)



APPEARANCES:

FOR THE PLAINTIFFS:       STEVE D. SHADOWEN, ESQ.
(End-Payor Plaintiffs)    Hilliard & Shadowen
                          919 Congress, Suite 1325
                          Austin, TX  78701

(Direct Purchaser         THOMAS M. SOBOL, ESQ.
Plaintiffs)               KRISTEN A. JOHNSON, ESQ.
                          Hagens Berman Sobol Shapiro
                          55 Cambridge Parkway, Ste 301
                          Cambridge, MA  02142

(Retailer Plaintiffs      BARRY L. REFSIN, ESQ.
CVS and Rite Aid)         Hangley Aronchick Segal
                          Pudlin & Schiller
                          One Logan Square, 27th Floor
                          Philadelphia, PA  19103
```

**Page 2**

```
FOR THE DEFENDANTS:       J. MARK GIDLEY, ESQ.
(Warner Chilcott &        White & Case
Watson)                   601 Thirteenth Street NW
                          Suite 600
                          Washington, DC  20005

                          ROBERT MILNE, ESQ.
                          JACK E. PACE, III, ESQ.
                          White & Case
                          1155 Avenue of the Americas
                          New York, NY  10036

                          MICHAEL HAMBURGER, ESQ.
                          White & Case
                          1121 Avenue of the Americas
                          New York, NY  10020

                          JACLYN PHILLIPS, ESQ.
                          White & Case
                          701 13th Street NW
                          Washington, DC  20005

                          NICOLE J. BENJAMIN, ESQ.
                          Adler, Pollock & Sheehan
                          One Citizens Plaza, 8th Floor
                          Providence, RI  02903

Court Reporter:           Denise P. Veitch, RPR
                          One Exchange Terrace
                          Providence, RI  02903
```

**Page 3**

```
      11 SEPTEMBER 2019 -- 10:00 A.M.
           THE COURT:  Good morning, everyone.  We're here
 in the matter In Re: Loestrin 24 Antitrust Litigation.
 Before we get started, it occurs to me it's almost
 exactly this time 18 years ago when we saw the first
 planes hit the Twin Towers and I thought it might be
 appropriate if we took just a moment of silence to
 recognize the importance of this date and this moment
 in our history, so I ask you just to do that.
           (Pause)
           THE COURT:  All right.  Thank you.  So we have a
 lot to do today.  I'd like to just get started with
 having you enter your appearances for the record, and
 then we'll talk a little bit about how the day will
 progress and then begin the arguments.
           MR. SOBOL:  Good morning, your Honor.
 Thomas Sobol, Hagens Berman Sobol Shapiro, for the
 Direct Purchasers.
           MS. JOHNSON:  Good morning, your Honor.
 Kristen Johnson for the Direct Purchasers.
           MR. REFSIN:  Good morning, your Honor.
 Barry Refsin for the Retailer Plaintiffs CVS and Rite
 Aid.
           MR. SHADOWEN:  Good morning, your Honor.
 Steve Shadowen on behalf of the End-Payor Plaintiffs.
```

**Page 4**

```
           MR. GIDLEY:  Your Honor, good morning.
 Mark Gidley for Defendants Warner Chilcott and Watson.
           MR. HAMBURGER:  Good morning.  Michael Hamburger
 for the Warner Chilcott and Watson Defendants.
           MR. MILNE:  Good morning, your Honor.
 Robert Milne on behalf of Warner Chilcott.
           MS. BENJAMIN:  Good morning, your Honor.
 Nicole Benjamin also on behalf the Warner Chilcott and
 Watson Defendants.
           MS. PHILLIPS:  Good morning, your Honor.
 Jaclyn Phillips for the Warner Chilcott and Watson
 Defendants.
           THE COURT:  All right.  Thank you.
           Anyone else who needs to enter their appearance?
 It doesn't look like it.  I have a list of those
 expecting to have speaking roles today.  I'm not sure
 how you've broken this up.
           MR. VAN TINE:  Matthew E. Van Tine, your Honor,
 for Plaintiffs.  You might hear from me briefly at the
 end of the day.
           THE COURT:  Okay.
           Mr. Sobol.
           MR. SOBOL:  If I may, your Honor.  So the
 parties spoke briefly.  My colleague, Mr. Shadowen, has
 an engagement so he must leave at around 4:00 or
```

```
 1   planet in a complicated case of this sort with the
 2   issues you just heard about this morning would be
 3   counseling his or her client that, you know, you've got
 4   an 85 percent for sure chance of winning.
 5        THE COURT:  Well, Plaintiffs found one, --
 6        MR. MILNE:  They paid them.
 7        THE COURT:  -- Mr. Lentz.  And maybe two; right?
 8        MR. MILNE:  Well, if you're looking for actual
 9   advice rather than, you know, paid advice, paid
10   testimony, I don't think you're going to get a patent
11   lawyer to tell you that you got an 85 percent chance of
12   winning when you have money on the line and you're
13   deciding what to do in litigation.
14        And the thing that's even doubly implausible
15   about this, your Honor, is that it requires the
16   assumption that both sides share that view, which is
17   also utterly implausible.  And when you take a step
18   back and think about what you heard about this
19   morning, the Schering or Bayer, I guess they went
20   through some corporate transactions along the way, but
21   a company as sophisticated as Bayer would have for that
22   same patent chosen not to litigate -- because, again,
23   the assumption is everybody in the world is supposed to
24   understand that there's an 85 percent chance or
25   85 percent near certainty that this patent is going to
```

```
 1   be invalidated, that a company like Bayer would decide,
 2   okay, I'm going to forego that and I'm going to agree
 3   to pay licenses and royalties to the tune of a hundred
 4   million dollars over time.  It's just implausible in
 5   the extreme and certainly not enough to create a jury
 6   issue for a trial here, your Honor.
 7        So for all of those reasons and the reasons that
 8   are covered in detail in the briefs, we --
 9        THE COURT:  Just to --
10        MR. MILNE:  Sure.
11        THE COURT:  I get it, I get your argument, but
12   aren't you really asking me to draw some inferences in
13   favor of the Defendant here, which is to say that,
14   look, you can make that argument to the jury.
15   Mr. Sobol I think this morning said there are all sorts
16   of reasons why a company would decide not to bring the
17   invalidity defense and the patent litigation, that
18   you're getting into the tactics that, you know, so
19   forth and so on; and this is the flip side of that from
20   a common sense point of view, well, maybe so, but who
21   would pay a hundred million dollars if they thought
22   they had an 85 percent chance to win.
23        Why isn't all of that sort of fodder for experts
24   to talk about to a jury and let a jury figure out?  You
25   know, if I was a, well, if I was a CEO of a major
```

```
 1   pharmaceutical company or a patent lawyer, that's what
 2   I would have said, or not said, or whatever.
 3        MR. MILNE:  Well, your Honor, I think where I
 4   would start is the failure of proof as to anyone
 5   actually considering this in the real world because,
 6   remember, that's what we have to look at.  Would these
 7   parties -- not might they have or what their incentives
 8   have been -- would they have entered into an
 9   alternative settlement with an earlier entry date.  And
10   as I mentioned, there's zero evidence that Warner
11   Chilcott ever would have considered it, ever would have
12   entertained the idea of settling it at a different
13   entry date, and no suggestion whatsoever in the
14   evidence along those lines.
15        So then to have to rely entirely on
16   probabilistic analyses like these that depend on, I
17   would submit, facially untenable assumptions about
18   everybody assuming near certainty of one side winning
19   isn't enough to get you to the jury.  And I would
20   commend your Honor's attention to the *Wellbutrin* Third
21   Circuit decision.  If we could go to that slide, Dan.
22        There the Third Circuit granted summary judgment
23   for failure of proof on injury causation and, you know,
24   one of the legs of the argument that the plaintiffs
25   made is this alternative settlement/earlier entry date
```

```
 1   argument.  But there, the plaintiffs had evidence that
 2   there actually was some negotiation between the parties
 3   about an alternative settlement that would not
 4   necessarily have involved the challenged types of
 5   payments.  And there, the Third Circuit said even
 6   that's not enough, even that's too speculative.  And
 7   we've got some of the quotes there, your Honor.  This
 8   is not some more relaxed inquiry.  This is actual proof
 9   needs to be brought forward that this would have
10   happened.
11        And so what I would say to you in response to
12   your question is the expert testimony that you were
13   describing, total speculation; it needs to be grounded
14   in some evidence that is completely lacking here.  So
15   if your Honor doesn't have any more questions on
16   causation, I'd like to move on, if I could, to the
17   reverse payment issues.
18        THE COURT:  Yes.
19        MR. MILNE:  And so on reverse payment, your
20   Honor, we submit that the Plaintiffs cannot create a
21   triable issue of fact on the existence of a net reverse
22   payment by Warner Chilcott to Watson, let alone one, as
23   I mentioned, that is large; and without that, the
24   ability to create that fact issue, their reverse
25   payment claim fails.  We don't need to proceed to all
```

1  forecast was made.  If we go to the next slide, their
2  response to our statement of undisputed facts concede,
3  and we've got it -- it's maybe hard to read down here,
4  the highlighted snippet at the bottom.  They concede
5  that Warner did project the possibility of realizing
6  30.2 million.  There was also a cost component,
7  4.25 million that you can take out of that spreadsheet
8  as well.
9       The footnote down at the bottom there, your
10 Honor, shows that the Plaintiffs did quibble with the
11 expense piece and they said that an additional
12 $2 million should have been included as an expense as
13 against these incoming revenues.  So what we -- we'll
14 take that, we would contest it ultimately in the case,
15 but for purposes of this motion we'll accept it.  So
16 let's go back one, Dan, two, the one that shows us the
17 on the Generess.  Okay.  So 4.25 plus 2 gives us
18 6.25 million in expenses, as against the 30.2 in
19 incoming revenue to Warner Chilcott.
20      So if we jump back, your Honor, to my chart, you
21 see that that's what we put in, 30.2 million in
22 undisputed dollars coming in the door to Warner
23 Chilcott, and 6.25 million in, if you will, sacrificed
24 expenses, however you want to characterize that.
25      So to the Femring agreement, the Femring

1  agreement, here the Plaintiffs' expert Mr. Tupman
2  actually did a net present value analysis for the
3  Femring agreement and calculated it as of January of
4  2009 contemporaneous with the settlement, that the NPV
5  for that agreement was $9.5 million.  So again, if we
6  go to the next slide, Dan.
7       You can see, here's the spreadsheet and the
8  forecast from back at that time that Mr. Tupman used as
9  part of his net present value calculation, and what
10 that shows is that Warner Chilcott calculated that it
11 was $21.2 million better off having this co-promotion
12 agreement than not having it.  And the briefs cover the
13 detail here, but this was a product that Warner
14 Chilcott was having bandwidth problems, it wasn't going
15 to be able to promote on its own, so this was not
16 something it was going to be doing itself internally.
17 So this was clearly a benefit, setting aside anything
18 related to the delay or later generic entry date, pure
19 benefit to Warner Chilcott on the four corners of that
20 agreement between the two companies.
21      We are not going to quibble over the 9.5 or the
22 21.2 as the net benefit.  We'll just go with the lower
23 number that Mr. Tupman put forward, and if we go back
24 to the chart you can see where that comes out.
25 9.5 million benefit, and the costs and sacrifices are

1  baked into the net present value, so there's no entry
2  for the cost and expense side.  So that's the two
3  business agreements.
4       Going to the exclusive license piece, here we
5  have the Plaintiffs asserting -- and again, we dispute
6  these things -- but the Plaintiffs asserting various
7  levels of sacrifice by Warner Chilcott for giving up
8  the right for six months to enter with an authorized
9  generic.  So Plaintiffs' expert Dr. McGuire has various
10 numbers that he -- you can see his chart there.  Some
11 are relating to various product hop scenarios, and then
12 he's got a no hop, he calls it, scenario there at the
13 top with a number of 36.9 million as a claim sacrifice.
14      As far as we understand, the Plaintiffs continue
15 to assert product hop theories, so it doesn't seem
16 appropriate to use the 36.9 as the high end, but, as it
17 turns out it doesn't matter, and I'll show you that in
18 a few minutes.  But the highest number that any of the
19 Plaintiffs have come forward with for a product hop
20 scenario is 29.8 million as a claim sacrifice that
21 Warner Chilcott supposedly made in order to give that
22 exclusivity term.
23      We have down at the bottom the Retailers'
24 economist, Dr. Leffler.  He has a different range, but
25 the max of his range is 21.9 million.

1       And just a quick digression, because we are
2  going to accept the Plaintiffs' numbers, but these
3  numbers are grotesque overestimates, in our strong
4  view, your Honor.
5       If we go to the next slide, just hitting a
6  couple of the big ones.  This is supposed to be an
7  ex ante at the time analysis, and at the time there was
8  a significant issue as to whether authorized generics
9  were going to remain lawful.  Legislation had been
10 introduced in Congress for several sessions before the
11 negotiations began, and there was legislation pending
12 while the negotiations were going on; and then the
13 negotiations were occurring right over the holiday
14 season at the end of the calendar year.  So Congress
15 went out of session, came back into session the
16 following year, and within a week or so after the
17 parties signed the settlement agreement at issue here,
18 another bill was introduced in Congress that would have
19 that same effect of outlawing authorized generics
20 altogether.  And you have the Obama Administration and
21 others who were taking the position that these were bad
22 and needed to be outlawed.
23      So the sacrifice you're making by promising not
24 to come to the market with an authorized generic has
25 got to be discounted to some extent for at the time the

169

uncertainty about whether you were giving up anything
at all.  If it was going to become unlawful to have an
authorized generic at all, you would not be giving up
anything, or there would need to be a discount factor.

There's a similar issue on a claimed first-mover
advantage that Dr. McGuire uses in his calculations,
and I won't cover the detail there, your Honor.  It's
in the citations that we include on the slide.

If we can go to the next slide.  So going back
to our chart here, we put in the highest number that
the Plaintiffs have as an alleged sacrifice for the
product hop, alleged product hop scenario for the
exclusive license, and that's 29.8 million, and which
brings us to the acceleration clause.  And I won't
spend any time on that because no one is claiming that
there was a profit sacrifice relating to that alleged
reverse payment.  We think on so many levels, your
Honor, that doesn't even qualify because it's a
procompetitive provision in its own right, and even the
Plaintiffs' expert, Dr. McGuire, conceded that, at
least considered in isolation it benefitted Warner
Chilcott, so you might even think that we should be
able to put a positive in the chart on that one.  So
that basically is going to the chart, there's no entry
necessary for that one.

170

Bringing us to the saved litigation costs, and
here again we're going to use the Plaintiffs' estimate.
Their expert, Dr. McGuire, gave a $9.3 million estimate
of avoided litigation costs.  We again, we think that's
an understatement but will accept it for this exercise.
We think it's an understatement among other things
because it ignores the -- it basically just focuses on
how much you had to pay the lawyers.  It doesn't factor
in the very real costs that go along with having to
continue litigation, the inability to plan fully, the
distraction that executives have and all of those
things which are very real costs.

So if we go back, and I think you know the punch
line here.  When you do the math this is, again,
accepting the Plaintiffs, giving them every benefit of
the doubt.  You have a 12.95 million net benefit to
Warner Chilcott, the opposite of a sacrifice.  So that
the idea that Warner Chilcott was using these terms as
a way to buy delay, it just doesn't, it just doesn't
work.  And we think that that delta will be even
greater if we ever had to go through this issue at
trial.

Just as a sensitivity here, I mentioned before
there was that 36.9 million which was a no hop
scenario.  Even if you include that, there is still a

171

net benefit.  And then there's yet one more number I
want to show you because I saw it on one of the slides
that the Plaintiffs have.  They use a $41.1 million
number as an alleged sacrifice relating to the
exclusivity provision, and that is another one of those
hard hop scenarios; and Dr. McGuire withdrew that
number when he was confronted with the fact that there
were some costs that he clearly had overlooked, and at
least in that respect he made a correction which
brought it down in, again, in the no hop scenario to
the 36.9 number that we have on the prior chart.  But
again, even if you use that number, still a net
benefit.

And so at the end of the day, your Honor, there
isn't a fact dispute that Warner Chilcott actually did
not sacrifice; actually made more money as a result of
this confluence of business agreements and patent
settlement than it expended, that you could say it
sacrificed.  And without that, you don't get to go
further in the *Actavis* inquiry because you need to have
both.  You need to have a sacrifice and then you need
to have some significant benefit to the generic, of
course, to create the issue of inducement.  But without
that threshold sacrifice, you don't even get there.

Now the Plaintiffs say, and just very briefly,

172

your Honor, the Plaintiffs say that, well, it doesn't
matter if Warner Chilcott made more money than it
expended here.  What they say is that it's still a
sacrifice if Warner Chilcott didn't make even more,
that it didn't make money up to some alleged market
value, fair market value level, and that that really is
the standard.

I would definitely love to spend more time on
this, your Honor, but a couple of quick things.  First
of all, if the *Actavis* court had intended to have
market value, fair market value be the standard,
Justice Breyer would have said it.  Justice Breyer
chose to speak in terms of fair value, not market
value.  And we believe that was an advertent choice and
we think the rules of construction of Supreme Court
decisions require you to assume that, but we think it's
true here.  And one of the ways we think it's true here
is, if you go to the next slide, in the briefing before
the Supreme Court in the *Actavis* case the defendants
were complaining and raising the issue about how
difficult it would be to deal with a market value test
when you had business agreements being done alongside a
patent settlement, because it's just a very difficult
thing to administer the idea that -- so for me to know
as a business executive can I do this deal, I have to

# EXHIBIT D

1

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3   WALGREEN CO., ET AL.     : CIVIL ACTION
                  PLAINTIFFS  :
 4        VS.                 :
     CEPHALON, INC. ET AL.    :
 5              DEFENDANTS     : NO. 09-3956
     ----------------------------------------------
 6   RITE AID CORPORATION, ET AL.: CIVIL ACTION
                  PLAINTIFFS  :
 7        VS.                 :
     CEPHALON INC., ET AL.    :
 8              DEFENDANTS     : NO. 09-3820
     ----------------------------------------------
 9   GIANT EAGLE, INC. ET AL. :
                  PLAINTIFFS  :
10        VS.                 :
     CEPHALON, INC., ET AL.   :
11              DEFENDANTS     : NO. 10-5164
     ----------------------------------------------
12   APOTEX, INC.             : CIVIL ACTION
                  PLAINTIFFS  :
13        VS.                 :
     CEPHALON, INC., ET AL.   :
14              DEFENDANTS     : NO. 06-2768
     ----------------------------------------------
15
                PHILADELPHIA, PENNSYLVANIA
16                WEDNESDAY, JUNE 14, 2017

17

18   BEFORE:  THE HONORABLE MITCHELL S. GOLDBERG, J

19                     JURY TRIAL
                        DAY 3
20
                  SUZANNE R. WHITE, CM
21           FEDERAL CERTIFIED REALTIME REPORTER
                FIRST FLOOR U. S. COURTHOUSE
22                  601 MARKET STREET
                  PHILADELPHIA, PA 19106
23                    (215)627-1882

24   PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

25
```

3

```
     (CONTINUED APPEARANCES:)

 2   BERNARD D. MARCUS, ESQUIRE
     MARCUS & SHAPIRA
 3   ONE OXFORD CENTRE
     PITTSBURGH, PA 15219
 4   COUNSEL FOR RETAILER PLAINTIFFS

 5   KEVIN LANDAU, ESQUIRE
     ARCHANA TAMOSHUNAS, ESQUIRE
 6   TAUS CEBULASH & LANDAU, LLP
     80 MAIDEN LANE, SUITE 1204
 7   NEW YORK, NY 10038-4811
     COUNSEL FOR RETAILER PLAINTIFFS

 8

 9   J. DOUGLAS BALDRIDGE, ESQUIRE
     DANIELLE R. FOLEY, ESQUIRE
10   LISA JOSE FALES, ESQUIRE
     JESSICA SWAUGER, ESQUIRE
11   DAVID FEINBERG, ESQUIRE
     PAUL FEINSTEIN, ESQUIRE
12   VENABLE, LLP
     600 MASSACHUSETTS AVENUE, NW
13   WASHINGTON, DC  20001
     COUNSEL FOR DEFENDANT, RANBAXY
14
     ALSO PRESENT:
15
     ROBERTA LOOMAR (APOTEX)
16   HUNTER MURDOCH

17
18
19
20
21
22
23
24
25
```

2

```
 1   APPEARANCES:

 2   BRIAN J. SODIKOFF, ESQUIRE
     THOMAS MAAS, ESQUIRE
 3   KATTEN MUCHIN ROSENMANN LLP
     525 WEST MONROE STREET
 4   CHICAGO, IL 60661-3693
     COUNSEL FOR THE PLAINTIFF
 5   APOTEX, INC.

 6   MARY KAY BROWN, ESQUIRE
     BROWN, MCGARRY & NIMEROFF, LLC
 7   2001 MARKET STREET
     SUITE 3420
 8   PHILADELPHIA, PA 19103
     COUNSEL FOR PLAINTIFF
 9   APOTEX, INC.

10   JAMES MATTHEWS, ESQUIRE
     KATY KOSKI, ESQUIRE
11   REDI KASOLLJA, ESQUIRE
     MELISSA LERNER, ESQUIRE
12   JOEL DIAMOND, ESQUIRE
     FOLEY & LARDNER LLP
13   SUITE 2600
     1100 HUNTINGTON AVENUE
14   BOSTON, MA 02199
     COUNSEL FOR THE PLAINTIFF
15   APOTEX, INC.

16   RICHARD ALAN ARNOLD, ESQUIRE
     SCOTT E. PERWIN, ESQUIRE
17   ANNA T. NEILL, ESQUIRE
     KENNY NACHWALTER, P.A.
18   201 S. BISCAYNE BLVD.
     1100 MIAMI CENTER
19   MIAMI, FL. 33131-4327
     COUNSEL FOR RETAILER PLAINTIFFS
20
     BARRY L. REFSIN, ESQUIRE
21   MONICA L. KILEY, ESQUIRE
     HANGLEY ARONCHICK SEGAL & PUDLIN
22   1 LOGAN SQUARE, SUITE 27
     PHILADELPHIA, PA 19103
23   COUNSEL FOR RETAILER PLAINTIFFS

24

25
```

4

```
 1             (CLERK OPENS COURT.)

 2             THE COURT:  GOOD MORNING.  WE WANT TO SEE

 3   IF WE CAN RESOLVE SOME DISPUTES OVER DEMONSTRATIVE

 4   EXHIBITS TO BE USED IN OPENINGS, SO I GUESS WE'RE GOING

 5   TO HAVE -- WE'RE GOING TO HAVE TWO OPENINGS FROM THE

 6   PLAINTIFFS' SIDE, RIGHT?

 7             MR. ARNOLD:  THAT'S CORRECT, YOUR HONOR.

 8             THE COURT:  AND ARE THERE EXHIBITS THAT

 9   EITHER ONE OF THE PLAINTIFFS' ATTORNEYS WANTS TO USE

10   THAT THERE ARE OBJECTIONS ON?

11             MR. MATTHEWS:  YES, YOUR HONOR.  I HAVE A

12   SET OF THE SLIDES, IF I COULD BRING THEM UP TO YOU.  I

13   WILL LET MR. BALDRIDGE SPEAK TO WHAT HIS OBJECTIONS ARE.

14   I WANT TO SAY THAT THIS IS NOT GOING TO BE USUAL.  WE

15   HAVE WORKED HARD AND WE HAVE NARROWED THE OBJECTIONS.

16             THE COURT:  THAT'S OKAY.  THAT IS FINE.

17             THIS IS WHAT THEY'RE PAYING ME THE BIG

18   BUCKS TO DO, TO RESOLVE.

19             MR. MATTHEWS:  I THINK THAT THE BOTTOM

20   LINE IS IN THIS SET OF SLIDES THAT I AM HANDING YOU,

21   YOUR HONOR, WE ARE PROPOSING USING SEVERAL EXHIBITS,

22   WHICH ARE RANBAXY'S OWN PLEADINGS, AND MR. BALDRIDGE

23   OBJECTS TO THEIR ADMISSION, AND SINCE THEY HAVE NOT BEEN

24   ADMITTED, HE DOES NOT WANT ME TO USE THEM BECAUSE --

25             THE COURT:  LET'S TAKE THEM ONE AT A
```

113

1   AMOUNT, BUT LET'S TAKE IT IN THE CONTEXT OF THE
2   PHARMACEUTICAL INDUSTRY.  YOU HAVE TO DECIDE WAS IT A
3   LARGE PAYMENT WITHIN THE CONTEXT AND UNDER THE
4   CIRCUMSTANCES OF WHEN THAT PAYMENT WAS MADE, AND THOSE
5   ARE CIRCUMSTANCES WITH A BUNCH OF PHARMACEUTICAL
6   COMPANIES.  IT WAS NOT ME GIVING YOU 26 MILLION, WHICH
7   DARN SURE WOULD PROBABLY CHANGE ONE OF YOUR LIVES.  I
8   KNOW IT WOULD CHANGE MINE.
9          SO LET'S LOOK AT THAT 26 MILLION IN
10  PROPER CONTEXT.  THE FIRST THING I WOULD LIKE YOU TO
11  LOOK AT IS YOU ARE GOING TO HEAR FROM AN ESTEEMED DOCTOR
12  IN ECONOMICS.  HIS NAME IS DR. BELL, AND HE IS GOING TO
13  TELL YOU THAT THE WORLDWIDE PHARMACEUTICAL MARKET AT THE
14  TIME OF THIS SETTLEMENT WAS 600 BILLION, THAT IS WITH A
15  B, IN SALES.  THAT IS THE SIZE OF WORLDWIDE.  RIGHT
16  THERE.  600 BILLION, 6.5 BILLION.  THAT IS HOW BIG THE
17  WORLDWIDE PHARMACEUTICAL MARKET WAS IN 2005.
18         IF YOU TAKE PLAINTIFFS' NUMBER, WHICH I
19  DISAGREE WITH, AS I HAVE SAID, OF 26 MILLION THAT THEY
20  CLAIM MY CLIENT WAS PAID AND YOU DIVIDE IT BY THAT 600
21  MILLION -- OR BILLION, I SHOULD SAY, STATISTICALLY, MY
22  CLIENT WAS PAID 0 PERCENT OF THE WORLDWIDE FINANCIAL --
23  OF THE WORLDWIDE PHARMACEUTICAL MARKET.  0 PERCENT, IF
24  YOU PUT THIS INTO CONTEXT.  IT'S LIKE .0000 SOMETHING.
25  I WENT TO LAW SCHOOL FOR A REASON.  I'M NOT VERY GOOD AT

114

1   MATH.  I WILL TELL YOU STATISTICALLY THAT IT'S
2   0 PERCENT.
3          LOOKING AT IT AGAIN FROM PLAINTIFFS'
4   STANDPOINT OF A $26 MILLION PAYMENT THAT THEY ALLEGE AND
5   YOU TAKE THE AMOUNT OF SALES THAT MR. MATTHEWS PUT IN
6   FRONT OF YOU, YOU KNOW, HE SAID $5.7 BILLION IN PROVIGIL
7   SALES.  SO IF YOU TAKE THEIR NUMBER, WHAT THEY PAID US,
8   26 MILLION, AND YOU DIVIDE IT BY 5.7 BILLION,
9   5.7 BILLION IN PROVIGIL SALES -- AND I WANT TO GET THIS
10  RIGHT -- THAT COMES OUT TO .0045, LESS THAN A HALF OF A
11  PERCENT.  LESS THAN ONE HALF OF A PERCENT.
12         SO WHAT THE PLAINTIFFS' THEORY IS, IS
13  THEIR THEORY IS THAT IT WAS A LARGE PAYMENT FOR CEPHALON
14  TO PAY LESS THAN A HALF OF A PERCENT OF WHAT THEY WERE
15  MAKING OFF THIS BLOCKBUSTER DRUG TO GET US OFF OF THE
16  MARKET.  I SAY LOOK AT THE EVIDENCE AND ASK YOURSELF,
17  DOES THAT SOUND LIKE SOMEBODY IS PAYING SOMEBODY TO GET
18  THEM OFF OF THE MARKET, LESS THAN A HALF OF A PERCENT TO
19  PROTECT A 5.7 BILLION FRANCHISE, USING THEIR NUMBER.
20         NOW, I THINK LOOKING AT "LARGE," STILL
21  FROM THE VIEW OF THEIR $26 MILLION NUMBER, LET'S LOOK AT
22  THE SETTLEMENTS, THE SETTLEMENT AMOUNTS REALLY WITH THE
23  OTHER GENERIC DEFENDANTS THAT SETTLED.  MR. MATTHEWS PUT
24  A SLIDE UP, HE HAD THE NUMBERS, RIGHT, IF YOU REMEMBER.
25  IN HIS SLIDE TEVA WAS PAID BY CEPHALON $164 MILLION.

115

1   BARR WAS PAID $63 MILLION.  MYLAN WAS PAID $48 MILLION.
2   MY CLIENT, RANBAXY, WAS PAID $26 MILLION, ACCORDING TO
3   THEM.  AND, AGAIN, I DISAGREE.  IF YOU ADD THAT ALL UP,
4   THE TOTAL AMOUNT OF PAYMENTS FROM CEPHALON TO THESE
5   SETTLING GENERIC DEFENDANTS WAS $300 MILLION.
6          NOW, THAT 300 MILLION IS ACTUALLY 301
7   SOMETHING.  AGAIN, IN GOOD FAITH, THEY HAVE A NUMBER, WE
8   HAVE A NUMBER.  IT'S A MILLION BUCKS APART, YOU SEE, IN
9   THIS RANGE, BUT IT'S 300 MILLION, ESSENTIALLY.
10         NOW, IF WE DO THE MATH OF HOW MUCH WAS
11  26 MILLION TO MY CLIENT DIVIDED BY THE 300 MILLION, WHAT
12  PERCENTAGE DID RANBAXY RECEIVE OF THE OVERALL PAYMENTS
13  MADE BY CEPHALON, EVEN IF WE TAKE THEIR $26 MILLION
14  NUMBER?  WELL, THE ANSWER IS 8.6 PERCENT TO RANBAXY.
15  THAT MEANS WHAT, 92.4 PERCENT, 93.4 PERCENT WENT TO
16  SOMEBODY OTHER THAN RANBAXY.
17         IN THIS CONTEXT, WHEN 93 PERCENT OF THE
18  MONEY PAID BY CEPHALON WENT TO TEVA, MYLAN AND BARR AND
19  NOT TO RANBAXY IN THE CONTEXT OF THE PHARMACEUTICAL
20  INDUSTRY, THESE BIG DEALS, IS THAT A LARGE PAYMENT?
21  I'LL TELL YOU THE EVIDENCE IS GOING TO SHOW YOU JUST
22  THAT AND IT IS NOT LARGE.
23         NOW, THE SECOND VIEW I WANTED TO LOOK AT
24  LARGE -- UNDER PROMISE ONE, I'M GOING TO GET THIS ALL
25  POLISHED UP AFTER A WHILE, DIFFERENT SUBSETS TO EACH

116

1   PROMISE -- IS I WANT YOU TO LOOK AT THIS FROM THE VIEW
2   OF THE PROFITS.
3          NOW, AS COUNSEL SAID, WE DID SOME WORK,
4   WHETHER THEY THINK IT WAS GOOD WORK OR BAD WORK OR
5   NECESSARY WORK IS WHAT WE ARE BATTLING ABOUT HERE.  BUT
6   WE DEFINITELY SUPPLIED TEN TONS, TEN TONS OF MODAFINIL
7   API TO CEPHALON.  WE DID LICENSE TWO PATENT APPLICATIONS
8   WHICH WE HAD TO DO THE WORK TO TURN INTO PATENTS TO GET
9   THE MONEY.  AND ALL IN, ALL PAYMENTS TO RANBAXY, THE
10  EVIDENCE IS GOING TO SHOW RANBAXY MADE A PROFIT ON THIS
11  DEAL -- THESE DEALS OF $17 MILLION.  THAT IS WHAT THE
12  EVIDENCE IS GOING TO SHOW.
13         IF YOU DO THE SAME MATH, AND I'M NOT
14  GOING TO GO THROUGH IT AND WRITE IT OUT AGAIN, THAT IS
15  ZERO PERCENT STATISTICALLY OF THE WORLDWIDE
16  PHARMACEUTICAL INDUSTRY.  THAT IS ONE-THIRD OF 1 PERCENT
17  OF CEPHALON'S 5.7 BILLION IN SALES.  REMEMBER THAT
18  NUMBER?  SO THE AMOUNT OF PROFITS WE RECEIVED IS A THIRD
19  OF 1 PERCENT OF THE PROFITS CEPHALON -- EXCUSE ME -- THE
20  SALES CEPHALON WAS HAVING OF PROVIGIL.  SO WHAT THEIR
21  THEORY IS, IS THAT FOR ONE-THIRD OF 1 PERCENT, THAT IS A
22  LARGE PAYMENT TO KEEP MY CLIENT, A GENERIC COMPANY,
23  RANBAXY, AWAY FROM THEIR $5.7 BILLION FRANCHISE.  FIRST
24  OF ALL, THAT IS NOT LARGE.  AND SECONDLY, I SUGGEST THE
25  EVIDENCE WILL SHOW IT DOES NOT MAKE ANY SENSE.

117

1   THE NEXT POINT, VIEW THREE, VIEW THREE OF
2   LARGE, WHAT WAS ACTUALLY COMING RANBAXY'S WAY UNDER
3   THESE AGREEMENTS?  NOW, MR. ARNOLD DID A GOOD JOB OF
4   EXPLAINING THE AGREEMENTS TO YOU, BUT LET ME TELL YOU
5   ACTUALLY WHAT HAPPENED THE WAY THE NUMBER BROKE DOWN.
6   HE GAVE YOU REAL NUMBERS, IT'S JUST A LITTLE DIFFERENT.
7   THE IP AGREEMENT WHERE HE SAID 5 MILLION,
8   HE IS RIGHT.  BUT THERE WAS 1 MILLION GUARANTEE.  THAT
9   WAS AN UPFRONT PAYMENT TO RANBAXY.  DR. BERNEMAN FROM
10  RIGHT DOWN THE STREET IS GOING TO COME IN AND TELL YOU
11  THAT IS DONE ALL THE TIME IN THE PHARMACEUTICAL INDUSTRY
12  FOR INTELLECTUAL PROPERTY AGREEMENTS.
13  THE REMAINING 4 MILLION TO COME UP WITH
14  MR. ARNOLD'S $5 MILLION NUMBER, RANBAXY HAD TO MEET WHAT
15  ARE CALLED MILESTONES.  THAT MEANS THEY HAD TO DO
16  SOMETHING.  YOU ARE GOING TO HEAR WHAT THEY HAD TO DO TO
17  EARN THAT ADDITIONAL 4 MILLION.  AND ONE THING THEY HAD
18  TO DO WAS THEY HAD TO GET PATENTS ON THEIR TECHNOLOGY.
19  THEY WORKED ALL OF THE WAY THROUGH THAT PROCESS THAT
20  THEY DESCRIBED AS BEING A RATHER DIFFICULT PROCESS, AND
21  THEY DIDN'T GET THAT EXTRA 4 MILLION UNTIL THEY ACTUALLY
22  DELIVERED TO CEPHALON USEFUL IP THAT HAD GONE THROUGH
23  THE ENTIRE REGULATORY PROCESS ON RANBAXY'S NICKEL.  SO
24  THE GUARANTEED AMOUNT FROM THE IP AGREEMENT WAS 1
25  MILLION.

118

1   LET'S GO TO THIS API AGREEMENT, REMEMBER
2   THAT ACTIVE PHARMACEUTICAL INGREDIENT.  THE API
3   AGREEMENT, WHEN RANBAXY SIGNED THAT AGREEMENT AND
4   ENTERED INTO IT WITH CEPHALON ON DECEMBER 22ND, 2005,
5   HERE IS HOW MUCH WAS GUARANTEED RANBAXY UNDER THE API
6   AGREEMENT.  ZERO.  ABSOLUTELY ZERO.  RANBAXY HAD TO GET
7   THE API, AND THEY GOT IT FROM A COMPANY CALLED MATRIX,
8   WHICH THEY HAD AN ONGOING RELATIONSHIP WITH.  THEY
9   DIDN'T JUST PUT IT THROUGH A SALT GRINDER OR ANYTHING
10  LIKE THAT, THEY HAD TO QUALIFY IT.  THE CONTRACT SAYS
11  YOU HAVE TO DELIVER TO US, CEPHALON, MODAFINIL THAT
12  MEETS OUR SPECIFICATIONS.  IT'S NOT JUST SALT.  IT HAS
13  TO MEET SPECIFICATIONS FOR CEPHALON TO IN TURN MAKE A
14  PRODUCT OUT OF IT.
15  SO WHAT RANBAXY DID, THEY DELIVERED 10
16  TONS OF AN API, AND THEY EARNED MONEY SELLING THAT API
17  FOR THE AMOUNT, THE 440 THAT MR. ARNOLD PUT UP ON THE
18  BOARD.  NOW HE MISSPOKE AND IT WAS COMPLETELY INNOCENT.
19  HE SAID THAT TEVA CHARGED 475.  HIS OWN EXHIBIT SAID
20  575.  AND THAT IS JUST SOMETHING I'M SURE I HAVE DONE A
21  NUMBER OF TIMES TODAY WHERE HE JUST GOT THE NUMBER
22  WRONG.
23  SO EVEN WITHIN THE CONTEXT OF THIS DEAL,
24  YOU CAN SEE THAT THE PRICE RANBAXY CHARGED WAS LOWER
25  THAN OTHER SETTLING DEFENDANTS, AND IT IS CERTAINLY

119

1   WITHIN THE RANGE OF PRICES CHARGED FOR API.
2   IN THAT REGARD, HELSINN, YOU HEARD ABOUT
3   HELSINN WITH THE LOW NUMBER, SELLING THE API.  YOU
4   REMEMBER THAT ONE?  HELSINN ENTERED INTO A DEAL WITH
5   CEPHALON FOR THE API THAT INVOLVED WHAT IS CALLED A TECH
6   TRANSFER.  THAT MEANS THAT CEPHALON GAVE HELSINN ITS
7   TECHNOLOGY TO DO IT.  THAT IS WHY THE PRICE IS LOWER.
8   CEPHALON DID NOT GIVE RANBAXY ANYTHING TO PERFORM, AND
9   THAT IS HOW YOU GET A LOWER PRICE.  AND YOU ARE GOING TO
10  HEAR EVIDENCE THAT THE HELSINN CONTRACT WAS UP RIGHT AT
11  THE TIME -- THAT SAME TIME PERIOD AS THE SETTLEMENT
12  OCCURRED, AND BY UP I MEAN THAT IT WAS EXPIRED.
13  NOW, THAT WAS PART OF THE GUARANTEED
14  PAYMENT, 1 MILLION.  AND OTHER PART OF THE GUARANTEED
15  PAYMENT WAS THE 2 MILLION IN SAVED LITIGATION COST THAT
16  MR. ARNOLD TALKED ABOUT.  SO AT THE TIME THE SETTLEMENT
17  OCCURRED, DECEMBER 22ND, 2005, WHICH YOU ARE GOING TO BE
18  INSTRUCTED IN THE ONLY WAY HE CAN DO IT IS A RELEVANT
19  TIME PERIOD AT LEAST.  THAT IS THE DATE OF SETTLEMENT.
20  THE TOTAL AMOUNT IS THAT 2 MILLION PLUS THE 1 MILLION
21  UNDER THE IP THAT WAS GUARANTEED.  WHEN RANBAXY SIGNED
22  THAT DEAL, SIGNED THE DEALS ON DECEMBER 22ND, 2005, THEY
23  KNEW THEY WERE GOING TO MAKE $3 MILLION.  WE DO THE SAME
24  MATH, IT GETS NOTHING BUT LOWER.  ZERO PERCENT
25  WORLDWIDE, JUST NEGLIGIBLE AS A PERCENTAGE OF THE $5.7

120

1   BILLION FRANCHISE ON PROVIGIL.
2   TO ME, IF YOU LOOK AT THIS EVIDENCE AND
3   YOU PUT IT IN THE CONTEXT OF THE PHARMACEUTICAL
4   INDUSTRY, NOT IN THE CONTEXT OF PEOPLE LIKE YOU AND ME
5   AND SOME OF THE PEOPLE IN THIS ROOM, IT IS NOT A LARGE
6   PAYMENT.  IT'S A LOT OF MONEY, BUT IS IT LARGE IN TERMS
7   OF A PHARMACEUTICAL DEAL TO KEEP SOMEBODY OFF THE MARKET
8   TO PROTECT A $5.7 BILLION FRANCHISE?  I THINK THE
9   EVIDENCE WILL SHOW THAT IT'S NOT LARGE.
10  NOW, ANOTHER THING THAT YOU WERE
11  PRELIMINARILY INSTRUCTED ON, AND I THINK IT WAS
12  INSTRUCTIONS FROM JUDGE GOLDBERG AT THE SAME TIME, HE
13  SAID "LARGE AND UNEXPLAINED."  AND HE USED THE TERM
14  "UNJUSTIFIED."  SO IN OTHER WORDS, EVEN IF THE PAYMENT
15  IS LARGE, IF THERE ARE USES WHERE IT IS LEGITIMATE
16  LAWFUL EXPLANATIONS FOR THE PAYMENT, IF THEY ARE
17  LEGITIMATE LAWFUL EXPLANATIONS FOR THE PAYMENT, EVEN THE
18  LARGE PAYMENT IS OKAY.
19  NOW, THE EXAMPLE HE GAVE WAS LET'S SAY
20  YOU ARE PROVIDING THE SERVICES, REAL SERVICES.  INSTEAD
21  OF A PAYMENT OF MONEY, YOU KNOW, HERE IS A BUCKET OF
22  MONEY, STAY OFF THE MARKET, BUT I'M GIVING YOU A BUCKET
23  OF MONEY FOR SOMETHING IN RETURN, IN OUR CASE PROVIDING
24  API OR PROVIDING IP.  IS THAT AN EXPLANATION THAT MAKES
25  EVEN A LARGE PAYMENT, IF YOU WERE TO THINK THIS WERE

# EXHIBIT E

1

```
 1            UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3                 No. 12-md-02409-WGY
 4
 5
 6
 7   In Re:  NEXIUM (ESOMEPRAZOLE)
     ANTITRUST LITIGATION
 8
 9
10
11                   *********
12
13            For Jury Trial Before:
14            Judge William G. Young
15
16        EXCERPT:  JURY CHARGE
17
18            United States District Court
             District of Massachusetts (Boston)
19            One Courthouse Way
             Boston, Massachusetts 02210
20            Wednesday, December 3, 2014
21                   *********
22
23        REPORTER:  RICHARD H. ROMANOW, RPR
              Official Court Reporter
24          United States District Court
     One Courthouse Way, Room 5510, Boston, MA 02210
25            bulldog@richromanow.com
```

2

```
 1        P R O C E E D I N G S
 2        (EXCERPT, begins.)
 3        (Jury enters, 9:45 a.m.)
 4        THE COURT:  Good morning.  You know I thanked you
 5   throughout and it's really on behalf of all the
 6   litigants and the lawyers as well.  Your care, your
 7   attention, your promptness, have set a very very
 8   important standard in this case.
 9        I have one -- for those of you keeping track and
10   to be precise, one of our exhibits here is Number 184.
11   When I admitted the document in evidence, I had called
12   it, for identification, "CET."  Actually it's "EOY."
13   But the document itself is in evidence as "174" and
14   you'll have it in the jury room.
15        Now, the way we planned to do this, after talking
16   with the lawyers, I think we're all agreed that I should
17   go first and give you my instructions as to the law,
18   then a 15-minute break, then we'll hear from defense
19   counsel, another 15-minute break, we'll hear from
20   plaintiffs' counsel, making their arguments, and then
21   along about the lunch hour the case will be in your
22   hands.
23        So this is the judge's charge in the case.  It's
24   my duty really -- it's your constitutional right to be
25   accurately instructed as to the law and it's my duty
```

3

```
 1   accurately to explain the law.
 2        Let me start by reflecting on your function as
 3   jurors.  All 11 of you are going to deliberate.  All 11
 4   of you are equal.  We're going to ask certain questions
 5   -- as you will see, the questions are a little different
 6   than the example I gave you when we started, and I will
 7   explain why.  But during the course of this instruction
 8   I will give you the jury verdict slip and we ask you
 9   some specific questions.
10        Now, in answering those questions you all must
11   agree, the verdict must be the unanimous verdict of all
12   11 jurors deliberating together.  Your verdict must be
13   based upon evidence that you have seen and heard right
14   here in the courtroom and on nothing else whatsoever.
15   No bias.  No prejudice.  No sympathy for anyone.  And I
16   can't say it better than I did at the beginning, just
17   that careful dispassionate sifting of the evidence so
18   that here, in this courtroom, justice truly may be done.
19        Now, a couple of things to remember.  It's not the
20   party that called the most witnesses, it's what you make
21   of those witnesses.  And there are a variety of issues.
22   Also have in mind here that while the plaintiffs, they
23   represent classes of entities and individuals,
24   wholesalers, retailers, end users of Nexium, there's no
25   advantage to that and there's no disadvantage.  They
```

4

```
 1   stand absolutely equal and AstraZeneca and Ranbaxy stand
 2   absolutely equal at the bar of justice before this jury.
 3   So you will, in a dispassionate way focusing on the
 4   evidence, determine your unanimous view as to each of
 5   the questions that we are going to put to you.
 6        My function is to teach you the law.  It's like a
 7   law school class.  And there's a variety of things you
 8   should remember about the teaching.  First, mechanically
 9   you have every right to ask me a question.  Don't raise
10   your hand now and say, "Can't you do that a little
11   better?"  I understand that one or more of you are
12   teachers and I think you can judge my teaching.  But I
13   am candidly trying to teach you the law, to build for
14   you a mental framework, a legal framework, within which
15   you and you alone -- I have nothing to say about it, are
16   going to determine what the facts show, what they prove
17   or what they fail to prove within the framework as I
18   describe it to you.
19        Now, candidly this framework is a little different
20   than I explained to you at the beginning of the trial
21   and I will tell you why.  Because in terms of the law,
22   I've come to -- having presided over the trial, I've
23   come to see the central issues as somewhat different.
24   My instructions now govern.  These are the instructions
25   you must follow.  They will be comprehensive and they'll
```

33

1       The defense has introduced evidence suggesting
2  that the market isn't just Nexium, but the whole market
3  for proton pump inhibitors.  That inevitably Nexium,
4  though it's a patented product, that doesn't mean the
5  doctor has to prescribe it, it -- the real market, the
6  actual relevant market is all proton pump inhibitors.
7       Now, if you were to believe that, that doesn't
8  mean that the plaintiffs have lost and that AstraZeneca
9  doesn't have market power.  I've defined to you what
10  "market power" is, but I will tell you it makes it less
11  likely.  All right?
12       Now, the witnesses who may be of assistance on
13  this aspect are an opinion witness, Meredith Rosenthal,
14  Jennifer King, Matthew Diggons, Gary Rowles, Joseph
15  Todisco, Matthew Pike, Richard Fante, Linda Palczuk.
16       So far we haven't gotten to any violation of
17  the -- any even alleged violation of the antitrust laws.
18  It's not a violation of the antitrust laws -- it's not a
19  violation of the antitrust laws that AstraZeneca have
20  market power from its patent monopoly and likewise it's
21  not a violation -- what the antitrust laws restrain,
22  what they prohibit is contracts, combinations, and
23  conspiracies that unreasonably restrain trade.  Here the
24  plaintiffs' theory is that the contract, or contracts --
25  it's up to you what the deal was, that AstraZeneca made

34

1  with Ranbaxy to settle its patent litigation with
2  Ranbaxy, was a violation of the antitrust laws.
3       Now, we start out with the proposition that the
4  law favors settlements.  Settlements are not only
5  appropriate, most cases settle, judges encourage
6  settlement, settling saves you money, the money that
7  you're spending for your attorneys and the like.  The
8  law favors settlements.  Even so, patent settlements can
9  violate the antitrust laws.  And the flag -- just to
10  have monopoly power doesn't violate the antitrust laws.
11  Settling patent cases doesn't violate the antitrust
12  laws.  Settling patent cases with a date of entry
13  sometime in the future doesn't violate the antitrust
14  laws.  And because these matters are so complex -- and
15  now we come right to Question 2, the law requires that
16  in order to give the matter scrutiny -- in order to give
17  the matter scrutiny to concern about whether there has
18  been a violation of the antitrust laws, the plaintiff
19  has to prove that AstraZeneca, when it settled with
20  Ranbaxy, made to Ranbaxy a large and unjustified
21  payment.  And I need to define those things.
22       And, first of all, what do we mean by "payment"?
23  "Payment" doesn't have to be in money, but "payment" has
24  to be in value.  There has to be -- not only that they
25  negotiated a date when Ranbaxy could have a license and

35

1  see if it could bring its version to market, but in
2  addition to that AstraZeneca transferred value to
3  AstraZeneca -- to Ranbaxy, excuse me.  I misspoke.  And
4  the law -- and the plaintiffs have to prove that there
5  was such a large and unjustified payment.  So the
6  payment need not be in money.
7       An "unjustified payment" is one that does not
8  reflect traditional settlement considerations such as
9  but not limited to avoided litigation costs, fair value
10  for services, and a reasonable compromise of litigation.
11       So let's come to the factual disputes here.  What
12  was actually the deal between AstraZeneca and Ranbaxy?
13  Was the deal just the settlement agreement or was the
14  deal the settlement agreement plus various side
15  agreements?  You figure out what it was.  Then when you
16  figure that out, you look to see that as a result of
17  that deal was value transferred to Ranbaxy?  Still no
18  red flag up.  But was the value transferred to Ranbaxy,
19  was that large?  Well, it's got to be at least more than
20  the, um, money that they saved by not paying these
21  lawyers -- not our lawyers, but the lawyers who were in
22  on the patent case, and that costs money, substantial
23  money.  So the value has to be at least more than that.
24       Whether a payment is "large" depends upon the
25  specific circumstances of a particular case.  As I said,

36

1  it's got to be at least more than AstraZeneca's
2  reasonably estimated save-litigation costs.  Likewise if
3  the side deals were for fair value, even if they were
4  part of it, if that's what in the market you would have
5  to buy to get these services, then that isn't an
6  unjustified payment, they're just agreeing to buy
7  things, one from the other.  The plaintiffs have to
8  prove a large and unjustified payment.
9       Now, "unjustified" means this, and this -- and now
10  we get to the alleged violation.  If you're taking your
11  profits from your lawful monopoly and you're using those
12  profits to buy off a generic to induce them to agree to
13  a later entry date than they would have agreed if they
14  weren't getting part of the income stream, the profits
15  from the patent monopoly, that's an abuse of the patent
16  monopoly, and that can be a violation of the antitrust
17  laws.  That's what the plaintiffs allege.  That's what
18  they have to prove in this case.
19       So the fact -- if you answer -- first of all, back
20  to Question 1.  If you answer "no" to Question 1, there
21  can't be any violation of the antitrust laws because
22  they don't have market power, AstraZeneca.  The case is
23  over.  Question 2, is there a red flag here, does this
24  require increased scrutiny for a possible violation of
25  the antitrust laws?  Well, the plaintiffs, have they

# EXHIBIT F

Case 2:06-cv-03491-HAA-ES   Document 97   Filed 09/15/2008   Page 5 of 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WARNER CHILCOTT COMPANY,    :
INC.        :
       :    **DOCUMENT ELECTRONICALLY**
     Plaintiff,    :    **FILED**
     v.        :
       :    Civil Action No. 2:06-CV-3491
WATSON PHARMACEUTICALS,    :    (HAA(ES))
INC. and WATSON        :
LABORATORIES, INC.      :    **STIPULATION OF DISMISSAL**
          **WITHOUT PREJUDICE**

     Defendants.

Pursuant to Rules 41(a)(1) and 41(c) of the Federal Rules of Civil Procedure,
the Plaintiff and Defendants, by their undersigned attorneys, hereby stipulate and
agree that the above captioned action, including all claims, counterclaims and
affirmative defenses, is dismissed without prejudice.

Each party will bear its own costs, disbursements and attorneys' fees.

WCL0682267

Dated: January 15 , 2009
Newark, New Jersey

Respectfully submitted,


s/ Kevin J. McKenna
Kevin J. McKenna, Esq.

Of Counsel:
Robert D. Bajefsky, Esq.
Rebecca D. Hess, Esq.
William Strauss, Esq.
FINNEGAN, HENDERSON,
  FARABOW, GARRETT &
  DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Tel.: (202) 408-4000
Fax: (202) 408-4400

Elvin Esteves, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
Tel.: (973) 596-4500
Fax: (973) 596-0545
Email: kmckenna@gibbonslaw.com

Attorneys for Plaintiff Warner Chilcott
Company, Inc.


Of Counsel:
Steven J. Lee, Esq.
Charles A. Weiss, Esq.
Michael A. Freno, Esq.
Melissa Alegre, Esq.
KENYON & KENYON L.L.P.
1 Broadway
New York, NY 10004-1007
Tel.: (212) 425-7200
Fax: (212) 425-5288

Glenn D. Curving, Esq.
Joshua S. Bratspies, Esq.
RIKER, DANZIG, SCHERER, HYLAND
  & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
Tel.: (973) 538-0800
Fax : (973) 538-1984

Attorneys for Defendants Watson
Pharmaceuticals, Inc. and Watson
Laboratories, Inc.

2

WCL0682268

# EXHIBIT G

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000
FAX: (202) 393-5760
www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
SAN FRANCISCO
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

January 16, 2009

**BY HAND DELIVERY**

Director of Operations and Civil Enforcement
Antitrust Division, Department of Justice
950 Pennsylvania Ave., N.W.
Room 3335
Washington, D.C.  20530

Re:    Filing Under the Medicare Prescription Drug, Improvement, and Modernization
Act of 2003

Dear Sir or Madam:

Pursuant to Section 1112(a) of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA"), enclosed on behalf of Watson Pharmaceuticals, Inc. are two (2) copies of each of the following agreements:

- a Settlement and License Agreement entered into by Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., and Warner Chilcott Company, Inc. in connection with a civil action pending in the United States District Court for the District of New Jersey, captioned *Warner Chilcott Company, Inc. v. Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc.*, 2:06-CV-03491 and

- a Settlement and License Agreement entered into by Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., and Warner Chilcott Company, Inc. in connection with a civil action pending in the United States District Court for the District of New Jersey, captioned *Warner Chilcott Company, Inc. v. Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc.*, 2:07-CV-4697.

Also enclosed are two (2) copies of each of the following agreements:

- a Supply Agreement entered into by Watson Pharma, Inc. and Warner Chilcott Company, Inc.;

- a Patent License Agreement entered into by Watson Pharma, Inc. and Warner Chilcott Company, Inc.;

Highly Confidential – Attorneys' Eyes Only

WCL0109817

January 16, 2009

- a Finished Product Supply Agreement entered into by Watson Laboratories, Inc. and Warner Chilcott Company, Inc.; and

- a Co-Promotion Agreement entered into by Watson Pharma, Inc. and Galen (Chemicals) Limited.

Watson Pharmaceuticals, Inc. takes no position on whether these agreements are related to the agreements submitted pursuant to Section 1112(a) of the MMA or whether they are required to be filed.

Two (2) copies of each agreement have also been submitted to the Federal Trade Commission.

We request that the materials be kept confidential to the full extent provided by all applicable laws and regulations, including protection from disclosure pursuant to the Freedom of Information Act. The enclosed materials are entitled to confidential treatment pursuant to Section 1114 of the MMA, 16 C.F.R. §§ 2.41, 4.9 and 4.10, 15 U.S.C. § 46(f), and 5 U.S.C. §§ 552(b)(3) and (4). *See* 21 U.S.C. § 355 *note*, § 1114 ("Any information or documentary material filed with the Assistant Attorney General or the Commission pursuant to this subtitle shall be exempt from disclosure" pursuant to the Freedom of Information Act, "and no such information or documentary material may be made public, except as may be relevant to any administrative or judicial action or proceeding").

Kind regards,

Julia Kupfer York

Enclosures

Page 2

Highly Confidential – Attorneys' Eyes Only

WCL0109818

# EXHIBIT H

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| IN RE: LOESTRIN 24 FE ANTITRUST LITIGATION<br><br>*All Actions* | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

MDL No. 2472

Case No. 1:13-md-2472-WES-PAS

## DECLARATION OF ROGER BOISSONNEAULT

I, Roger Boissonneault, hereby declare and state as follows:

1.      I am the former CEO of Warner Chilcott plc.  I was the CEO of Warner Chilcott from January 2005 through the end of 2013, when Warner Chilcott was acquired by Actavis plc.

2.      I am currently the CEO of Millicent Pharma.

3.      From approximately 1990 through 1995 I was the Vice President of Parke-Davis's Female Health Care Division.

4.      In 1995, I left Parke-Davis and went to Warner Chilcott, which at the time was the generics division of Warner Lambert.  Once I moved to Warner Chilcott in 1995, I no longer had any responsibilities for, or involvement with, Parke-Davis's Female Health Care Division.

5.      In March 1996, Warner Lambert sold Warner Chilcott to Nale Laboratories, P.L.C.  After Warner Chilcott came under new ownership, I worked for Warner Chilcott in various positions until I became CEO in 2005, a position I held until 2013.

## No Role in Invention or Prosecution of the '394 Patent Underlying Loestrin 24

6.      Dr. Gary Hodgen, who was a researcher at the Jones Institute for Reproductive Medicine/Eastern Virginia Medical Center, is named the inventor of U.S. Patent No. 5,552,394 (the "'394 patent"), which covers the 24-day oral contraceptive, Loestrin 24 Fe ("Loestrin 24"). I am not an inventor of the '394 patent.

7.      I had no role in drafting or prosecuting the '394 patent.  Although at times in the early 1990s Dr. Hodgen contacted me while I was at Parke-Davis with information concerning the invention behind the '394 patent, at that time my focus was on oral contraceptives involving multiphasic dosing regimens—particularly, the product that ultimately became Estrostep Fe and the invention that is embodied in my '070 and '098 patents.  Unlike those patents concerning multiphasic oral contraceptives with graduated estrogen, the '394 patent does not change the ratio of estrogen/progestin, it was monophasic.  The '394 patent is for a continuous, or monophasic, dosage form, which is fundamentally different from a multiphasic, or graduated dose.  The invention in the '394 patent would be outside of my patents involving multiphasic oral contraceptives involving graduated estrogen.

8.      At the time I stopped working at Parke-Davis in 1995, Parke-Davis had not agreed to license the '394 patent from the Jones Institute/EVMS.  Although Dr. Hodgen urged

1

Parke-Davis to license the '394 patent, I never agreed to license the '394 patent, and I never
signed a patent license agreement related to the '394 patent.

## Warner Chilcott's 2003 Acquisition of the '394 Patent

9.      In March 2003, to grow its Women's Healthcare portfolio, Warner Chilcott
announced it was acquiring from Pfizer the brands comprising the hormone replacement product
Femhrt, and the oral contraceptives Estrostep and Loestrin—not including Loestrin 24, which
had not yet been developed. Ex. A, WC_MY0062157, News Release, *Galen Holdings PLC
Proposed Acquisition of Women's Healthcare Products Portfolio from Pfizer* (Mar. 6, 2003).
Incident to that transaction, and only after agreement on the purchase price and public
announcement of the deal, the '394 patent was added in to the bundle of IP rights Warner
Chilcott was acquiring.

10.     To my knowledge, at the time Warner Chilcott acquired the '394 patent, neither
Pfizer nor any of its predecessors had developed any pharmaceutical products relying on the '394
patent.

## Warner Chilcott Saw the '394 Patent as Strong and Valuable

11.     The '394 patent and the IP protection it provided were essential to Warner
Chilcott's decision to invest in and develop the innovative new oral conceptive Loestrin 24.

12.     Absent the IP protection and patent exclusivity of the '394 patent Warner Chilcott
acquired in 2003, Warner Chilcott would never have invested in developing the 24-day oral
contraceptive product, which ultimately came to market in 2006 as Loestrin 24.   This is
especially true when dealing with chronic medications like oral contraceptives.

13.     As an inventor and businessman, separate and apart from any legal advice or
assessment (which is not discussed here and upon which I do not rely for purposes of any of the
testimony provided here), I believed that Warner Chilcott had several reasons to have confidence
in the strength and protections of the '394 patent it acquired in 2003. Three in particular are
worth mentioning here.

14.     First, based on my experience working on oral contraceptives, and as the holder
of ten patents in that area, the 24-day dosing for Loestrin 24 was novel and unprecedented. After
Loestrin 24 was released, manufacturers of new oral contraceptives moved away from 21-day
regimens to 24-day and other longer term regimens. I am not aware of any branded 21-day oral
contraceptive that was developed and marketed after Loestrin 24 came on the market.

15.     Second, in 2004 ███ recognized the strength of the '394 patent by seeking a
license for the patent. Warner Chilcott entered into a license with ███ whereby ███

███████████████████████████████████████████████████████████

███████████████████ I viewed ███ as very capable of bringing patent
litigation, so ███ desire to obtain a license under the '394 patent ███
rather than litigate, was informative.

16.     Third, in 2006 Warner Chilcott entered into another license under the '394 patent
with another major producer of oral contraceptives—Bayer. At that time Bayer was one of the
largest manufacturers of oral contraceptives, and Warner Chilcott viewed Bayer's Yaz and
Yasmin products as strong branded competition. In March 2006, Warner Chilcott had sued

2

Bayer for patent infringement of the '394 patent by Bayer's 24-day Yaz product. Just months later, in November 2006, Bayer agreed to enter into a license agreement with Warner Chilcott. As consideration for the license, Bayer agreed, among other things, to pay and to pay royalties on the net sales of Bayer's Yaz product

My understanding is that those royalties on the net sales of Yaz through 2013 were on the order of ████ making the Bayer license a roughly ████ license for the '394 patent from a key competitor in the OC space that had the resources to litigate.

17.     On behalf of Warner Chilcott, I stated publicly on numerous occasions while we were selling Loestrin 24 that Warner Chilcott believed that Loestrin 24 enjoyed strong IP protection with the '394 patent. For instance, in our earnings call to investors for Q3 2006, I announced the settlement and license allowing Bayer to market and sell Yaz under the '394 patent in exchange for payments to Warner Chilcott discussed above, stating: "This is a great outcome for Warner Chilcott. We believe it speaks to the strength of our intellectual property protecting our Loestrin 24 franchise."

## 2009 Watson Patent Settlement Agreements and Contemporaneous Generess and Femring Agreements

18.     On January 9, 2009, Warner Chilcott settled two patent litigations with Watson. One patent litigation related to Loestrin 24 and the other related to another drug, Femcon Fe.

### *Loestrin 24 Patent Settlement*

19.     Under the terms of the patent litigation settlement related to Loestrin 24, the parties agreed to a date certain for early entry of Watson's generic version of Loestrin 24. Watson was permitted to enter with its generic version of Loestrin 24 in January 2014—six months prior to the expiration of the '394 patent. A date certain was beneficial for both parties because it saved both sides millions of dollars in litigation costs and allowed both sides to plan for the future with greater confidence. A date certain for generic entry also enabled Watson to plan for a strong entry by building inventory, promoting the generic launch to customers, and planning a timeline for stocking perishable product.

20.     Watson's early entry date prior to patent expiry incorporated in an exclusive license, meaning that for the first 6 months after Watson's generic launch, Warner Chilcott would neither enter with its own authorized generic product, nor license another generic to enter. For Warner Chilcott, agreeing not to launch its own authorized generic of Loestrin 24 was of minor consequence to us: Warner Chilcott rarely launched authorized generics. We considered it a distraction from our core business, and something that unnecessarily complicated our messaging to our investors. Instead, as we made clear to investors, our business model and strategy was to focus on innovations in order to launch new, improved products prior to patent expiry.    Therefore, by agreeing that Watson could have exclusive entry for six months, similar to what Watson would normally be entitled to as the ANDA first filer, we were not giving up anything that Warner Chilcott's management considered valuable. Warner Chilcott would not have agreed to any entry date earlier than the one in the Watson-Warner Chilcott settlement.

21.     Absent a settlement, if Warner Chilcott had gotten approval for Minastrin by March of 2009, as we originally anticipated, and Watson had not launched their ANDA product at risk by then, Warner Chilcott would not have proceeded with an authorized generic version of Loestrin 24 ████ Instead, I expect that Warner Chilcott would have introduced its new

3

branded Minastrin product upon approval                                        Watson did not get
approval for their ANDA product until September 2009, so even if Warner Chilcott had not
settled with Watson,

                                        Warner Chilcott would have focused on Minastrin and
Warner Chilcott's other strong-selling oral contraceptive LoLoestrin.

                                                                                        At the

time, Warner Chilcott thought an at-risk launch by Watson was very unlikely.

22.     I also note that the exclusivity provision with Watson did not figure into the
negotiations – the parties had agreed on the January 2014 6-month early-entry date for Watson
by December 4, 2008, and the subject of an exclusivity aspect never arose. Watson included the
provision in a draft sent *after* we had reached agreement on the key terms. I understood the draft
was meant to "paper" the key terms to which we had agreed, and otherwise to include customary
"boilerplate" provisions typically found in settlement of this kind.

23.     Watson never suggested that including the exclusivity term was a deal breaker for
Watson, and they never once hinted that without that provision Watson would have demanded an
earlier entry date. At that time (2008) I understood exclusivity provisions like this were fairly
common in pharmaceutical patent settlements. Frankly, I didn't think much of the exclusivity
provision since foregoing the opportunity to launch an AG of Loestrin 24 was of such little
consequence to Warner Chilcott.

### Generess and Femring Agreements

24.     Separately, at the same time on January 9, 2009, as a result of parallel business
discussions that explored synergies between Warner Chilcott and Watson, Warner Chilcott
entered into two separate business agreements with Watson. First, Warner Chilcott entered into
license & supply agreements for a new chewable oral contraceptive then in development, which
later came to be known as Generess. Second, Warner Chilcott and Watson entered into a co-
promotion agreement under which Watson would co-promote Femring, an older hormone
replacement therapy drug that Warner Chilcott was not actively promoting at the time.

25.     Warner Chilcott negotiated each of these business agreements on an arms-length
basis. As discussed in detail below, we thought that each provided a unique opportunity that was
in the best interest of Warner Chilcott and that each business agreement stood on its own merits.
We would have entered into the Generess agreements or Femring agreement independently of
the Loestrin 24 settlement. Similarly, had we not entered into these business agreements,
Warner Chilcott would still have entered into the Loestrin 24 settlement agreement with Watson.

26.     In my experience, it was not unusual to discuss various business opportunities
with a single company at one time. While at the negotiating table with Watson, it was efficient
to explore other business arrangements that may be worthwhile for both companies.

27.     **Generess License & Supply Agreements.** Under the 2009 Generess agreements,
Watson paid Warner Chilcott a 15% royalty for the right to market Generess once it was
approved. The royalty rate of 15% was customary and in line with deals that Warner Chilcott
had done in the past. In fact, the 15% royalty tracked the terms of the

4

28.     The Generess License & Supply Agreements made business sense for both parties because Warner Chilcott did not have plans to market Generess. In 2008/2009 Warner Chilcott did not have room in its marketing line-up to market the product because we were focused on our ultra-low dose oral contraceptive product that we expected to get approved by the end of 2009 (which we ultimately brought to market as Lo Loestrin Fe). Enabling Watson to market Generess allowed Warner Chilcott to gain revenue on a drug that otherwise would not have been marketed and otherwise did not have value to Warner Chilcott.

29.     Watson was one of the only options for Warner Chilcott to partner with on the Generess deals. There were very few pharmaceutical companies in the branded women's healthcare space by late 2008. Warner Chilcott did not want to license or supply a new product to our direct brand competitors Bayer (which was selling Yaz), and Janssen (which was selling Ortho Tri-Cyclen Lo). Other companies with a history in the women's health space, such as Organon, had been acquired by late 2008 and their women's health businesses sold off. This left only a very few companies in women's health space—primarily generic companies, including Watson and Barr/Teva—as options for a partnership.

30.     Based on the negotiations with Paul Bisaro, the CEO of Watson, I understood that in-licensing Generess was of interest and beneficial for Watson because at the time Watson, although experienced in women's healthcare and generic products, was focused on building its branded portfolio, as well as increasing Watson's presence in the OB/GYN space. Because Watson expressed this interest, it made sense to enter the Generess deals with them, especially given the lack of other options. I thought that Watson with Paul Bisaro at the helm would put in the effort necessary to make Generess a success, which in turn would create royalties for Warner Chilcott.

31.     Doctors and patients benefitted from Warner Chilcott's licensing Generess to Watson because the commercial agreement resulted in another oral contraceptive—a chewable oral contraceptive—being developed, launched, and marketed with the accompanying education for doctors by Watson's representatives. Watson's licensing of Generess expanded the oral contraceptive choices available to patients and doctors.

32.     **Femring Co-Promotion Agreement.** Under the 2009 Femring co-promotion agreement, Watson was obligated to perform a certain number of details for an annual fee and royalty for a certain baseline above net sales for a period of three years. As of 2009, Warner Chilcott had not been promoting Femring for several years due to resource constraints, but we had plans at the time to develop and eventually launch an improved version of the Femring product. In the interim, the co-promotion agreement with Watson enabled Watson to invest in promoting the Femring product to grow the brand and raise its profile with doctors and patients—which had strategic and financial value for Warner Chilcott. From Watson's perspective, the agreement provided Watson another opportunity to promote drugs to OB/GYNs and build the connections it was trying to grow in the women's healthcare space.

33.     Warner Chilcott had similar reasons for entering a partnership with Watson on Femring as it did on Generess, as discussed above. Namely, Warner Chilcott did not believe there were many viable options and thought Watson would put in the necessary effort to make the product successful given Watson's desire to expand their Women's Health presence. And, once we were talking with Watson about licensing Generess once it had approval, it was natural to explore what other products could be licensed in the meantime.

34.     In 2008/2009 and after, Warner Chilcott thought that Femring would be useful as a sort of annuity for Warner Chilcott. We thought that we could later develop new indications or uses for the Femring technology.

35.     Recently, as publicly announced, my current company, Millicent Pharma, purchased Femring in May 2018 from Allergan.

## Advantages of Chewable Oral Contraceptives and Minastrin 24 Fe

36.     Experience has shown over the last 30+ years that chewable formulations, such as chewable Minastrin 24 Fe, have advantages over non-chewable formulations, and are preferred by some patients and doctors. In my time at Parke-Davis and Warner Chilcott, I worked on various chewable products, including Cholybar, a drug used to treat high cholesterol and itching caused by biliary obstruction, and Natachew, the first chewable prenatal vitamin. Natachew was designed to enhance patient compliance. Warner Chilcott developed Natachew in-house and launched it in November 1999 and sold it until 2009, when Natachew and its related patents were acquired by Mission Pharmacal Company.

37.     Because chewable Ovcon 35 was sold alongside Ovcon, the chewable version was renamed Femcon to avoid patient confusion. Femcon enjoyed sales of over $40 million a year for several years, notwithstanding that Ovcon was still available, and despite the availability of generic versions of Ovcon. Despite this competition from branded and generic (non-chewable) oral contraceptives, Femcon sold over $40 million in each of 2008, 2009, and 2010.

38.     Even before Warner Chilcott developed Minastrin, the FDA recognized the benefits of a chewable oral contraceptive. When the FDA approved chewable Ovcon 35 in 2003, the FDA issued a press release informing patients that there was another oral contraceptive option available—the first chewable oral contraceptive. Ex. B, FDA Talk Paper, *FDA Approves Ovcon 35 as the First Chewable Oral Contraceptive Tablet for Women* (Nov. 14, 2003). This was the first, and only, time in my career at Warner Chilcott that the FDA had issued a press release announcing the approval of one of Warner Chilcott's drugs. The FDA's announcement underscored that the FDA saw how unique and important the chewable Ovcon 35 oral contraceptive was for patients.

39.     Our research also confirmed patient and doctor interest in chewable oral contraceptives. As part of its development of chewable Ovcon 35 and Minastrin, Warner Chilcott commissioned market research of doctors and patients about the benefits of chewable oral contraceptives. Among other things, at least as early as 2005, Warner Chilcott regularly commissioned surveys of physicians at meetings of the American College of Obstetricians & Gynecologists to gain insight into a new chewable hormonal contraceptive. This survey confirmed that 55% of doctors thought that convenience and compliance were advantages of a chewable birth control pill. Ex. C, WCL2383265, *Summary of Survey Results Physicians' Reactions to a Chewable Contraceptive* (May 2005), at slide 13.

40.     From my personal experience I knew that chewable oral contraceptives would provide a benefit to patients. For instance, in connection with my experiences in the field at Warner Chilcott, I have been in an Ob/Gyn office when the nurses were discussing which oral contraceptive was the smallest so that they could prescribe it for women who could not swallow pills. I realized that it did not matter to them which pill they were prescribing (i.e., 30mcg,

6

20mcg, 21-day), so long as it was the smallest, given the patient's swallowing issues. Providing a chewable option would allow patients and prescribers to make a more informed choice not solely based on the size of the pill.

41.     After the success with patients and doctors for chewable Femcon, Warner Chilcott sought to develop two new chewable oral contraceptives, which became Minastrin 24 Fe and Generess. As with Femcon, Warner Chilcott sought to provide patients the benefit of additional chewable options, in order to enhance patient compliance and to provide alternatives for women who have trouble swallowing pills. Both chewable formulations—Minastrin and Generess—had good sales as patients and doctors switched to them or started new patients on them, despite the broad range of OC products on the market.

42.     Warner Chilcott launched Minastrin in July of 2013, and Minastrin garnered sales of $55 million in 2013. Similarly, Watson successfully launched Generess and, I understand, had commercial success. Generess was a wholly new chewable product (not a successor to a non-chewable product), underscoring the appeal of the chewable feature to patients and doctors who chose to switch to Generess, rather than taking older, established oral contraceptives.

43.     All of the above I could have testified to, and would have testified to, in the deposition that was scheduled for June 19, 2018, but was cancelled by Plaintiffs.


I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in Branford, Connecticut on February 4 , 2019.

Roger Boissonneault

# EXHIBIT I

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IN RE LOESTRIN 24 FE | : 13-MD-02472(WES) |
| ANTITRUST LITIGATION | : |
| | : United States Courthouse |
| | : Providence, Rhode Island |
| | : |
| | : Thursday, September 12, 2019 |
| | : 10:00 a.m. |
| | : |

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES CHIEF DISTRICT COURT JUDGE

A P P E A R A N C E S :

FOR DIRECT           THOMAS M. SOBOL, ESQ.
PURCHASERS:          KRISTEN A. JOHNSON, ESQ.
                     Hagens Berman Sobol Shapiro
                     55 Cambridge Parkway, Suite 301
                     Cambridge, MA  02142

FOR WALGREEN CO.     ANNA T. NEILL, ESQ.
PLAINTIFF:           Kenny Nachwalter, P.A.
                     Four Seasons Tower
                     1441 Brickell Avenue, Suite 1100
                     Miami, FL  33131

FOR THE CVS and      BARRY L. REFSIN, ESQ.
RITE-AID             Hangley Aronchick
PLAINTIFFS:          One Logan Square, 27th Floor
                     Philadelphia, PA  19103

FOR WARNER CHILCOTT  NICOLE J. BENJAMIN, ESQ.
and WATSON           Adler, Pollock & Sheehan, PC
DEFENDANTS:          One Citizens Plaza, 8th Floor
                     Providence, RI  02903

                     ROBERT A. MILNE, ESQ.
                     ALISON HANSTEAD, ESQ.
                     PETER J. CARNEY, ESQ.
                     BRYAN GANT, ESQ.
                     MICHAEL J. GALLAGHER, ESQ.
                     J. MARK GIDLEY, ESQ.
                     White & Case LLP
                     1221 Ave. of the Americas, 49th Floor
                     New York, NY  10020

Court Reporter:  Lisa Schwam, CSR, CRR, RPR, RMR

1          (In open court)

2          THE COURT:  All right.  Good morning, everyone.

3     So this is a big day in our court because last night

4     our new judge was confirmed.  And you'll be happy or

5     not happy to know I'm not going to transfer this case.

6     Maybe I should, but I won't.

7          All right.  So do you have a plan for today?

8          MR. MILNE:  Well, your Honor, Robert Milne for

9     Warner Chilcott.  First of all, we know your Honor

10    raised the question, a specific question, on *Walker*

11    *Process* issues.  We're happy to address that kind of

12    upfront to get it out of the way.

13         THE COURT:  Good.

14         MR. MILNE:  And there's been some discussion

15    among the parties, as we understand it, in terms of how

16    to deal with the *Daubert* arguments.  And really I don't

17    think we -- we understand that the plaintiffs wish to

18    treat at least one of their motions as a motion in

19    limine and that's one relating to Meyer, Schilling and

20    Robbins.  And we're happy with -- it's their motion so

21    we're happy if they wish to do that.  But I think

22    beyond that, the schedule that's in the roadmap

23    document is what we would plan to sort of work through.

24         And just in general, it looks like we're trying

25    to structure it so that the patent issues kind of get

1    consistent with the stats we heard from Mr. Carney

2    earlier today.  And I think if we looked at the other

3    cases, they would also fall in line.

4            THE COURT:  But you made the point, and

5    Ms. Johnson emphasized this point, that every case has

6    to be evaluated on its own merits and the statistics

7    only take you so far in this type of an assessment.

8    And, you know, you can think of any number of analogies

9    in the law where, let's say, the breach of contract or

10   tort or whatever is just so obvious that no one could

11   reasonably dispute the liability of one side to the

12   other.

13           And if someone who has the skills and the

14   expertise makes that assessment, then it seems like the

15   data is really grist for cross-examination as opposed

16   to a reason to exclude the witness.  And so when you

17   get right down to it, I mean, why doesn't it really

18   just become a -- you know, and it's what's good for the

19   goose is good for the gander, you're going to argue

20   about Judge Ward in a bit, but it's going to be a

21   battle of the experts.

22           Both sides are going to put up their experts to

23   say what the chances of success are, and you're going

24   to be able to cross-examine those experts.  I'm not

25   going to let anybody testify as to what was in

# EXHIBIT J

EXHIBIT

17

6-14-18

## SETTLEMENT AND LICENSE AGREEMENT

This is an agreement (hereinafter referred to as "Agreement") dated as of this 9th day of January, 2009, by and among Warner Chilcott Company, Inc. ("WCCI"), a corporation organized and existing under the laws of Puerto Rico, and Watson Pharmaceuticals, Inc. ("WPI"), a corporation organized and existing under the laws of the State of Nevada, and Watson Laboratories, Inc. ("WLI", and, together with WPI, "Watson"), a corporation organized and existing under the laws of the State of Nevada. WCCI and Watson are sometimes individually referred to herein as a "Party" and collectively referred to herein as "Parties."

WHEREAS, the Parties are presently involved in the Lawsuit, in which it has been asserted that Watson infringes certain claims of U.S. Patent No. 5,552,394 (the "Patent" and the asserted claims therein, the "Patent Claims"), with respect to certain of which Patent Claims Watson has asserted affirmative defenses and counterclaims alleging invalidity, unenforceability and/or non-infringement; and

WHEREAS, the Parties wish to fully settle the Lawsuit concerning the Patent Claims with respect to the Watson Product upon the terms and subject to the conditions set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. The following terms, when used with initial capital letters shall have the meaning set forth below.

    a.   "Affiliate" shall mean with respect to a Party, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Party at any time during the period for which the determination of affiliation is being made. For the purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or affairs of a person, whether through ownership of voting securities or general partnership or managing member interests, by contract or otherwise, including the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such person. Without limiting the generality of the foregoing, a person shall be deemed to control any other person in which it owns, directly or indirectly, a majority of the voting interests.

    b.   "ANDA" shall mean an Abbreviated New Drug Application as defined under 21 U.S.C. § 355(j).

    c.   "FDA" shall mean the United States Food and Drug Administration.

    d.   "Launch Date" shall mean the earliest of (i) January 22, 2014, (ii) the date of a final, nonappealable judicial order that the Patent is invalid, unenforceable or not infringed by a Third Party's generic version of the WCCI Product and (iii) the date on which Watson is licensed under Paragraph 7 to launch.

Highly Confidential – Attorneys' Eyes Only

e. "<u>Lawsuit</u>" shall mean *Warner Chilcott Company, Inc. v. Watson Pharmaceuticals, Inc. and Watson Laboratories, Inc.*, 2:06-CV-03491, U.S. District Court for the District of New Jersey.

f. "<u>Losses</u>" shall mean all pending and potential claims, demands, all manner of actions, causes of action, suits, debts, liabilities, losses, damages, attorneys' fees, costs, expenses, judgments, settlements, interest, punitive damages and other damages or costs of whatever nature, whether known or unknown, pending or future, certain or contingent.

g. "<u>Person</u>" means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal Person or organization.

h. "<u>Proceeding</u>" shall mean any action, audit, litigation, investigation, suit or other proceeding.

i. "<u>Related Parties</u>" shall mean a Party's Affiliates, directors, officers, employees, agents, representatives, heirs, assigns, predecessors, successors or other related parties.

j. "Third Party" shall mean any Person other than a Party or its Affiliates.

k. "<u>Watson Product</u>" shall mean the oral contraceptive drug that is described in, and is the subject of, ANDA No. 78-267 or any other ANDA filed by Watson or its Affiliates for which the WCCI Product is the reference product.

l. "<u>WCCI NDA</u>" shall mean New Drug Application (an "<u>NDA</u>") No. 021871.

m. "<u>WCCI Product</u>" shall mean the oral contraceptive drug that is described in, and is the subject of the WCCI NDA, which is currently marketed by WCCI under the trademark Loestrin® 24 Fe.

2. Upon the terms and subject to the conditions of this Agreement, in consideration of the mutual execution of this Agreement and the mutual agreement to be legally bound by the terms hereof, each Party, on behalf of itself and its Related Parties, hereby releases, acquits and forever discharges each other Party and its Related Parties from any and all Losses arising out of, derived from, predicated upon or relating to the Patent Claims, the actions asserting such Patent Claims and the Lawsuit; provided, however, nothing in this Agreement shall prevent or impair the right of any Party to bring a Proceeding in court or any other forum for a breach of this Agreement or any representation, warranty or covenant herein. Notwithstanding this release or anything herein to the contrary, nothing herein shall preclude Watson from challenging the validity, enforceability and/or infringement of the Patent in any future litigation concerning a product other than (i) the Watson Product, or (ii) any other product that, as designed, could be AB rated to the WCCI Product. The Parties agree to the entry of a dismissal without prejudice of the Lawsuit, with each side bearing its own costs and attorneys' fees. Promptly following the

2

Highly Confidential – Attorneys' Eyes Only

WCL2539154

execution of this Agreement, the Parties shall cause to be filed with the United States District Court for the District of New Jersey, all necessary papers, including a Stipulation of Dismissal, attached as Attachment A, required to dismiss all claims and counterclaims, motions, and petitions asserted in the Lawsuit and shall take all other necessary actions to obtain the settlement and dismissal of the Lawsuit.

3.   Each Party acknowledges and agrees that:

a.   It may have sustained Losses that are presently unknown and unsuspected, and that such Losses might give rise to Losses in the future.  Nevertheless, each Party acknowledges and agrees that this Agreement has been negotiated and agreed upon, notwithstanding the existence of such possible Losses, all of which have been hereby released under Paragraph 2 hereof.

b.   If any fact relating to this Agreement or the Lawsuit and now believed to be true is found hereafter to be other than, or different from, that which is now believed, each Party expressly assumes the risk of such difference in fact and agrees that this Agreement shall be, and will remain, effective notwithstanding any such difference in fact, subject to each Party's right to bring a Proceeding for a breach of this Agreement or any representation, warranty or covenant herein.

c.   This Agreement may be pleaded as a full and complete defense to, and used as a basis for injunction against, any Proceeding that may be instituted, prosecuted or attempted in breach hereof.  Should any Party institute a Proceeding to enforce any provision of this Agreement, or for Losses by reason of any alleged breach of any provision hereof, or for a declaration of such Party's rights or obligations hereunder, or for any other judicial remedy predicated upon the breach by the other Party of this Agreement or as may otherwise be permitted hereunder, the prevailing Party shall be reimbursed by the losing Party for all reasonable and necessary costs and expenses incurred thereby, including, but not limited to, reasonable attorneys' fees for the services rendered to the Party finally prevailing in any such Proceeding.

4.   Watson covenants and agrees that it shall not sell the Watson Product prior to January 22, 2014 or such earlier date upon which it is licensed to sell the Watson Product pursuant to Paragraphs 5, 7 or 8 hereof.  Watson agrees that to the extent that Watson or its Affiliates sells, has sold, or offers for sale any Watson Product in the United States in violation of this Paragraph 4, such breach will cause irreparable harm to WCCI.  Watson hereby irrevocably and unconditionally consents to immediate entry of a temporary restraining order, preliminary injunction and permanent injunction, without the requirement to post a bond, to enforce the provisions of this Paragraph 4.

5.   WCCI covenants and agrees that neither it nor its Affiliates shall market or supply, or grant a Third Party any rights (under the Patent or otherwise) to market a generic version of the WCCI Product, whether manufactured under the WCCI NDA or an ANDA, on any date prior to the date that is one hundred eighty (180) days following the Launch Date, unless WCCI agrees to establish an early launch date for Watson that is at least one hundred eighty (180) days prior to the commencement of marketing by WCCI, its Affiliates or such Third Party (an "Early Launch

3

Date"). Any authorization of or license to a Third Party by WCCI to market the WCCI Product in which WCCI assigns or transfers the exclusive right to market the WCCI Product shall not trigger this provision, so long as such authorization or license is subject to the terms and conditions of this Agreement. WCCI shall, to the extent reasonably practicable, provide Watson with 60 days' advance written notice of any such Third Party sale or license. For the avoidance of doubt, nothing in this Paragraph 5 shall prevent WCCI and its Affiliates from marketing or from supplying, authorizing or licensing a Third Party to market a generic version of the WCCI Product, so long as such product is not sold commercially until the day that is one hundred eighty (180) days following the Launch Date or the Early Launch Date.

6.   Upon the terms and subject to the conditions of this Agreement, WCCI grants to Watson a non-exclusive, fully paid-up, worldwide, royalty-free, irrevocable license, under the Patent and all regulatory exclusivities pertaining to and covering the WCCI Product, to manufacture and offer for sale in the United States commencing prior to January 22, 2014 for sale commencing on January 22, 2014, and to sell effective January 22, 2014 and thereafter, the Watson Product, all for the terms of such Patent and regulatory exclusivities. WCCI shall use its commercially reasonable efforts to cooperate with Watson, at Watson's sole cost and expense, as may be required to obtain FDA approval of Watson's ANDA No. 78-267 effective January 22, 2014.

7.   If a Third Party commercially launches a generic version of the WCCI Product without authorization from WCCI, then WCCI shall grant to Watson the license granted pursuant to Paragraph 6 hereof, effective on the same date as such Third Party launch. Further provided, in the event a Third Party commercially launches a generic version of the WCCI Product and WCCI subsequently succeeds in having such Third Party cease its sales of such product, then the license granted pursuant to this Paragraph 7 shall be suspended at such time as the Third Party product is no longer commercially available or, if such cessation of sales is pursuant to an injunction issued by a court, the date of such injunction, whichever is earlier, and the license shall be reinstated upon the subsequent occurrence, if any, of an "at risk" launch as described in the first sentence of this Paragraph 7. WCCI shall use its commercially reasonable efforts to cooperate with Watson, at Watson's sole cost and expense, as is required to obtain FDA approval of Watson's ANDA No. 78-267 under a license granted pursuant to this Paragraph 7.

8.   If a Third Party obtains a final, nonappealable judicial order that the Patent is invalid, unenforceable or not infringed by a Third Party's generic version of the WCCI Product, then WCCI shall grant to Watson a non-exclusive license under the Patent so adjudicated and all regulatory exclusivities to enter the market with the Watson Product at the time of such order, and WCCI shall use its commercially reasonable efforts to cooperate with Watson, at Watson's sole cost and expense, as may be required to obtain FDA approval of Watson's ANDA No. 78-267 at or as soon as practicable after such order. For clarity, if the Patent is found in a final, nonappealable judicial order to be invalid, unenforceable or not infringed by a Third Party's generic version of the WCCI Product, Watson shall be entitled to exercise all rights with respect to the Patent to the extent any Third Party would legally be able to do so.

9.   All rights not expressly granted to Watson under Paragraphs 6, 7 and 8 are expressly reserved to WCCI. Watson expressly disclaims any right to use the WCCI Product, Patent or Patent Claims except in accordance with the express grants hereunder, and WCCI has no

4

Highly Confidential – Attorneys' Eyes Only

obligation to make available any intellectual property rights or to take any other actions other than as expressly set forth herein; provided, however, that WCCI shall not use or sue or bring a Proceeding seeking to enforce any of the Patent or Patent Claims or any other intellectual property rights pertaining to the WCCI Product to prevent or restrict Watson or its Affiliates, licensees, sublicensees or subcontractors from undertaking the licensed activities permitted under this Agreement, so long as all such activities comply in all material respects with the terms contained herein.

10. Notwithstanding anything to the contrary contained in this Agreement, Watson may grant sublicenses in order to exercise its rights and carry out its obligations under this Agreement: (a) to its Affiliates, without the prior written consent of WCCI; and (b) to third parties, with WCCI's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Watson acknowledges that the grant of a sublicense or use of a subcontractor shall not relieve Watson from, and Watson shall remain responsible for, all of its obligations under this Agreement. Watson shall be responsible for the compliance of its Affiliates, sublicensees and subcontractors with this Agreement.

11. Each Party hereto represents and warrants to the other Party that, as of the date hereof:

a. this Agreement is a legal, valid and binding obligation of the warranting party, enforceable against such party in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by general principles of equity;

b. the warranting party is not subject to any judgment, order, injunction, decree or award of any court, administrative agency or governmental body that would or might interfere with its performance of any of its material obligations hereunder; and

c. the warranting party has full power, right and authority to enter into and perform its obligations under this Agreement in accordance with its terms.

12. WCCI represents and warrants that, as of the date hereof:

a. it presently owns, licenses or has the legal rights to use the Patent and the WCCI NDA, and to grant the licenses hereunder, and that it has the right to settle the Lawsuit; and

b. it has no pending patent applications claiming the WCCI Product.

13. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF APPLICABLE LAW.

14. Neither Party hereto may assign any of its rights or obligations under this Agreement without the prior written consent of the other Party, except to an Affiliate, or in connection with a merger, reorganization, change of control or sale of all or substantially all of the applicable business. Notwithstanding the foregoing, Watson may assign this Agreement to any successor-

5

Highly Confidential – Attorneys' Eyes Only

WCL2539157

in-interest to the Watson Product, whether by merger, asset sale, operation of law or otherwise. Any purported assignment in violation of the foregoing shall be null and void *ab initio* and of no force or effect. No assignment of this Agreement will relieve the assigning Party from any of its obligations hereunder. In the event of a permitted assignment, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns.

15. For avoidance of doubt, all rights and licenses granted under or pursuant to any paragraph of this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code (the "Bankruptcy Code"), licenses of "intellectual property" as defined under the Bankruptcy Code. The Parties shall retain and may fully exercise all of their respective rights and elections under the Bankruptcy Code; provided, however, that should WCCI become a party to a bankruptcy proceeding and such proceeding is not dismissed within thirty (30) days then, to the extent permitted by law, this Agreement and the licenses granted by WCCI hereunder shall be adopted by any bankruptcy trustee or relevant Third Party charged with the disposition of same, and shall not be rejected by same, it being the Parties' intent that, in such event, Watson and its Affiliates and sublicensees shall be entitled to retain the rights granted to them hereunder by WCCI. Further, upon the bankruptcy of WCCI, Watson shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property, and such, if not already in its possession, shall be promptly delivered to Watson unless WCCI elects to continue, and continues, to perform all of its obligations under this Agreement.

16. From the date hereof until the date on which Watson is permitted to commence sales of the Watson Product hereunder, WCCI will use its reasonable best efforts to provide Watson with 30 days' advance notice of any proposed labeling changes with respect to the WCCI Product requested by WCCI or any specific labeling amendments or supplements with respect to the WCCI Product including, but not limited to, any changes made in response to an order or request of the FDA.

17. Each Party shall, at its own cost and expense, take all actions and do all things reasonably necessary or proper, including under applicable law, to make effective and further the intents and purposes of the transactions contemplated by this Agreement, including executing any further instruments reasonably requested by the other Party.

18. Each Party acknowledges and agrees that:

a. The Mutual Confidential Disclosure Agreement between WPI and WCCI, dated as of November 8, 2007, as amended (the "Confidentiality Agreement"), shall remain in full force and effect, the terms of which are hereby incorporated by reference, as amended and/or clarified by this Agreement and this Paragraph 18.

b. The Parties hereby acknowledge and agree that (i) WLI agrees to be bound by the terms and conditions of the Confidentiality Agreement as if it were originally a party thereto; (ii) the term of the Confidentiality Agreement is amended such that it shall not terminate until the tenth anniversary of the date of this Agreement; (iii) the terms of this Agreement and the transactions contemplated hereunder, and any information exchanged hereunder shall be deemed "Confidential Information" for purposes of the Confidentiality

Highly Confidential – Attorneys' Eyes Only

WCL2539158

Agreement and any use or disclosure thereof shall be governed by such agreement; and (iv) the legal department of each Party shall be permitted to retain one copy of the other Party's Confidential Information solely for archival purposes, notwithstanding paragraph 3 of the Confidentiality Agreement.  Each Party acknowledges that any and all other information provided to it by the other Party or its representatives concerning such other Party and its Affiliates shall remain subject to the terms and conditions of the Confidentiality Agreement.

    c.   If either Party becomes aware or has knowledge of any unauthorized use or disclosure of the other Party's Confidential Information, it shall promptly notify the disclosing Party of such unauthorized use or disclosure.

    d.   Except (i) as set forth in any press release mutually agreed by the Parties, (ii) as consistent with the press release issued pursuant to this Paragraph 18(d) and (iii) as may be required to be made by a Party to the extent that such disclosure is legally required including, without limitation, all applicable securities and regulatory laws and regulations, neither Party shall make or allow the publication of any press release or public announcement with respect to this Agreement or any of the transactions contemplated hereby, without the prior written approval of the other Party, which shall not unreasonably be withheld, conditioned or delayed.

19. Each Party shall, at its own cost and expense, take all actions and do all things reasonably necessary or proper, including under applicable law, to make effective and further the intents and purposes of the transactions contemplated by this Agreement, including executing any further instruments reasonably requested by the other Party.

20. This Agreement (including all attachments hereto) constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior agreements or understandings, oral or written, with respect to such matters, except for the Confidentiality Agreement, which shall remain in full force and effect as modified hereunder, the terms of which are incorporated by reference.  The Parties may amend or modify the provisions of this Agreement, including this provision, only by mutual agreement in writing.

21. The Parties agree and acknowledge that this Agreement is the product of all of the Parties and shall not be construed against any of the Parties.

22. All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon a Party, if delivered by registered or certified mail (return receipt requested) or by a reputable overnight express courier service (charges prepaid), or if sent by facsimile to the person at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such person as follows:

Highly Confidential – Attorneys' Eyes Only

WCL2539159

In the case of WCCI:

    Warner Chilcott Company, Inc.
    Union Street Km. 1.1
    Fajardo
    Puerto Rico
    Facsimile: 787 863 5355
    Attn: Senior Director, Business Management

    with a copy to:

    Warner Chilcott (US), LLC
    100 Enterprise Drive
    Rockaway, NJ 07866
    Facsimile: (973) 442-3316
    Attn: General Counsel

In the case of Watson:

    Watson Pharmaceuticals, Inc.
    311 Bonnie Circle
    Corona, California 92880
    Facsimile: (951) 493-5821
    Attn: General Counsel

Such notices will be deemed to have been given on the date delivered in the case of hand delivery or delivery by overnight courier, on the date set forth in the confirmation sheet in the case of facsimile delivery, and on the fifth (5th) business day following the date of post mark in the case of delivery by mail.

    23. This Agreement and any dispute arising out of or related to this Agreement shall be governed by and construed in accordance with the laws of the State of New York. With respect to any Proceeding relating to this Agreement, each Party irrevocably agrees and consents to the exclusive jurisdiction of the federal and state courts in New York and waives any objection to venue of any such Proceeding brought in any such court. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY SUCH PROCEEDING.

    24. WCCI shall defend, indemnify and hold harmless each of Watson and its Affiliates and their respective directors, officers and employees (each an "Indemnified Party") from and against any reasonable fees, costs or expenses (including expert witnesses and attorneys) incurred by an Indemnified Party in connection with any action, investigation, subpoena, lawsuit or proceeding, whether formal or informal, civil or criminal, brought by a governmental entity or Third Party against an Indemnified Party (each a "Proceeding") arising from the Parties' entering into of this Agreement (each or collectively "WCCI Liability"). An Indemnified Party claiming a right to indemnification under this Paragraph 24 shall notify WCCI of any Proceeding within five (5) business days after the Indemnified Party has knowledge of such Proceeding. At the

8

Highly Confidential – Attorneys' Eyes Only

WCL2539160

Indemnified Party's request, WCCI shall use reasonable efforts to cooperate with the Indemnified Party and its legal representatives in the investigation and defense of any Proceeding.  WCCI shall remit and pay any and all WCCI Liability to the respective Indemnified Party on a quarterly calendar year basis; provided that, WCCI's obligation to reimburse Indemnified Parties for WCCI Liability shall be limited to one million dollars ($1,000,000) in each calendar year (January 1 through December 31 of each year).  For the avoidance of doubt, WCCI shall never be obligated to indemnify Watson and its Affiliates and their respective directors, officers and employees for WCCI Liability in an amount greater than $1,000,000 in a given year, regardless of the amount of WCCI liability in any other year.

25. This Agreement may be executed in any number of counterparts, and execution by each of the Parties of any one of such counterparts will constitute due execution of this Agreement.  Each such counterpart hereof shall be deemed to be an original instrument, and all such counterparts together shall constitute but one agreement.

26. If any provision of this Agreement is held invalid, illegal or unenforceable for any reason, the Parties shall negotiate in good faith for a substitute provision to continue the intent and purpose of such invalid provisions, and the validity, legality and enforceability of the remaining provisions shall not be in any way impaired thereby.

[Signature page follows]

9

This Agreement is signed as indicated below by duly authorized representatives of WCCI and Watson, respectively, effective as of the date first written above.

WARNER CHILCOTT COMPANY, INC.

By: _____

Name:  Max Torres

Title:  Senior Director

WATSON LABORATORIES, INC.

By: _____

Name:

Title:

WATSON PHARMACEUTICALS, INC.

By: _____

Name:

Title:

Highly Confidential – Attorneys' Eyes Only

WCL2539162

This Agreement is signed as indicated below by duly authorized representatives of WCCI and Watson, respectively, effective as of the date first written above.

WARNER CHILOTT COMPANY, INC.

By: _____

Name:  Max Torres

Title:  Senior Director

WATSON LABORATORIES, INC.

By: _____

Name:  *Paul M. Bisaro*

Title:  *President & CEO*

WATSON PHARMACEUTICALS, INC.

By: _____

Name:  *Paul M. Bisaro*

Title:  *President & CEO*

Highly Confidential – Attorneys' Eyes Only

ATTACHMENT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, INC. | : | |
| Plaintiff, | : | DOCUMENT ELECTRONICALLY FILED |
| v. | : | |
| WATSON PHARMACEUTICALS, INC. and WATSON LABORATORIES, INC. | : | Civil Action No. 2:06-CV-3491 (HAA(ES)) |
| | : | **STIPULATION OF DISMISSAL WITHOUT PREJUDICE** |
| Defendants. | : | |

Pursuant to Rules 41(a)(1) and 41(c) of the Federal Rules of Civil Procedure, The Plaintiff and Defendants, by their undersigned attorneys, hereby stipulate and agree that the above captioned action, including all claims, counterclaims and affirmative defenses, are dismissed **without prejudice**.

Each party will bear its own costs, disbursements and attorneys' fees.

2

Highly Confidential – Attorneys' Eyes Only

WCL2539164

Dated: _____, 2008   Respectfully submitted,

Of Counsel:       Kevin J. McKenna, Esq.
Robert D. Bajefsky, Esq.    Elvin Esteves, Esq.
Rebecca D. Hess, Esq.     GIBBONS P.C.
William Strauss, Esq.     One Gateway Center
FINNEGAN, HENDERSON, FARABOW, Newark, NJ  07102-5310
 GARRETT & DUNNER, L.L.P.  Tel.: (973) 596-4500
901 New York Avenue, N.W.   Fax: (973) 596-0545
Washington, D.C.  20001-4413  Email: kmckenna@gibbonslaw.com
Tel.: (202) 408-4000
Fax: (202) 408-4400     Attorneys for Plaintiff Warner Chilcott
            Company, Inc.

Of Counsel:       Glenn D. Curving, Esq.
Steven J. Lee, Esq.     Joshua S. Bratspies, Esq.
Charles A. Weiss, Esq.    RIKER, DANZIG, SCHERER, HYLAND
Michael A. Freno, Esq.     & PERRETTI LLP
Melissa Alegre, Esq.     Headquarters Plaza
KENYON & KENYON L.L.P.   One Speedwell Avenue
1 Broadway       Morristown, NJ  07962-1981
New York, NY  10004-1007   Tel.: (973) 538-0800
Tel.: (212) 425-7200    Fax : (973) 538-1984
Fax: (212) 425-5288
            Attorneys for Defendants Watson
            Pharmaceuticals, Inc. and Watson Laboratories,
            Inc.

3

Highly Confidential – Attorneys' Eyes Only            WCL2539165

# WCL2539153

## Metadata

| | | |
|---|---|---|
| **BegAttach** | WCL2538998 | ORIGINAL |
| **Confidential** | Highly Confidential  Attorneys Eyes Only | ORIGINAL |
| **Custodian** | WC Journal | ORIGINAL |
| **DateCreated** | 01092009 | ORIGINAL |
| **DateModified** | 01092009 | ORIGINAL |
| **Doc Extension** | pdf | ORIGINAL |
| **Duplicate Custodian** | Walsh, Ryan | ORIGINAL |
| **EndAttach** | WCL2539257 | ORIGINAL |
| **MD5 Hash Value** | 4DEE6EF8E3197D0998F86BC810C232BC | ORIGINAL |
| **TimeCreated** | 12:00:00 AM | ORIGINAL |
| **TimeModified** | 12:00:00 AM | ORIGINAL |

# EXHIBIT K

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT L

# FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT M

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT N

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT O

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**