## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IN RE: LOESTRIN 24 FE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>DIRECT PURCHASER ACTIONS | MDL NO. 2472<br><br>Master File No. 1:13-md-2472-WES-PAS |

## MEMORANDUM OF LAW IN SUPPORT OF DIRECT PURCHASER CLASS PLAINTIFFS' UNOPPOSED MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARD FOR THE CLASS REPRESENTATIVE

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................3

        A.      The direct purchasers allege that the defendants violated federal antitrust
                law and imposed overcharges on the class. ............................................................3

        B.      The parties engage in extensive discovery...............................................................5

        C.      The Court certifies the direct purchaser class. ........................................................7

        D.      The parties move for summary judgment and prepare for trial. ..............................8

        E.      The direct purchasers and the defendants settle the case for $120 million............11

        F.      The Court denies all summary judgment motions. .................................................12

        G.      The First Circuit denies the defendants' appeal of class certification. .................12

III.    ARGUMENT .......................................................................................................13

        A.      The request for approval of the direct purchasers' litigation expenses is
                reasonable and appropriate. ...................................................................................13

        B.      The request for approval of a percentage-of-fund fee of one-third of the
                settlement fund (net of expenses) is reasonable and appropriate..........................14

                1.      The "percentage of the fund" methodology is the prevailing
                        method for calculating a reasonable class counsel fee...............................15

                2.      The requested one-third fee is fair and reasonable. ..................................18

                        a.      Courts regularly approve a one-third fee. ......................................18

                        b.      The reasonableness factors commonly applied in this
                                Circuit support class counsel's request for a one-third fee. ..........24

                        c.      The fund is significant in size and benefits an entire
                                industry. .........................................................................................25

                        d.      The experience, skill, and efficiency of the attorneys
                                involved, as demonstrated by their work before this Court,
                                justifies the request. .......................................................................26

                        e.      The complexity of this litigation supports the requested fee. ........26

                        f.      The risks of litigation support the requested fee...........................27

g. Class counsel devoted a substantial amount of time to this case..................................................................................................28

h. The request is reasonable when compared to empirical evidence of awards in similar cases. ...............................................28

i. Public policy considerations fully support the requested fee.........29

3. The lodestar cross-check confirms the reasonableness of the fee request. ...........................................................................................30

C. The request for approval of a service award for the class representative is reasonable and appropriate. ..................................................................32

IV. CONCLUSION.............................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Asacol Antitrust Litig.*,
   No. 15-cv-12730, 2017 WL 11475275 (D. Mass Dec. 7, 2017).................................... *passim*

*Bilewicz v. FMR LLC*,
   Nos. 13-cv-10636 & 14-cv-10035, 2014 WL 8332137 (D. Mass. Oct. 16,
   2014) ...........................................................................................................................16

*Blum v. Stenson*,
   465 U.S. 886 (1984).....................................................................................................15

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980).....................................................................................................15

*Bussie v. Allmerica Fin. Corp.*,
   No. 97-cv-40204, 1999 WL 342042 (D. Mass. May 19, 1999)...............................16

*In re Cabletron Sys., Inc. Sec. Litig.*,
   No. 99-cv-00408, 239 F.R.D. 30 (D.N.H. 2006) ...............................................16, 17

*Central R.R. & Banking Co. v. Pettus*,
   113 U.S. 116 (1885).....................................................................................................15

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ......................................................................32

*Chieftain Royalty Co. v. Laredo Petroleum, Inc.*,
   No. civ-12-1319, 2015 WL 2254606 (W.D. Okla May 13, 2015) ...........................24

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).......................................................................................................23

*In re Effexor XR Antitrust Litig.*,
   No. 11-cv-5479, 2014 WL 4988410 (D.N.J. Oct. 6, 2014) ......................................28

*In re Elec. Carbon Prods. Antitrust Litig.*,
   447 F. Supp. 2d 389 (D.N.J. 2006) ............................................................................27

*In re Fidelity/Micron Sec. Litig.*,
   167 F.3d 735 (1st. Cir. 1999)......................................................................................13

*Flournoy v. Honeywell Int'l, Inc.*,
   No. CV 205-184, 2007 WL 1087279 (S.D. Ga. Apr. 6, 2007)................................24

*Goldberger v. Integrated Resources, Inc.*,
   209 F.3d 43 (2d Cir. 2000)...........................................................................18, 26, 27, 29

*Gunter v. Ridgewood Energy Corp.*,
   223 F.3d 190 (3d Cir. 2000)......................................................................................18

*Hawaii v. Standard Oil Co. of Cal.*,
   405 U.S. 251 (1972)..................................................................................................15

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
   384 F. App'x. 299 (5th Cir. 2010) ............................................................................15

*Ingram v. The Coca-Cola Co.*,
   200 F.R.D. 685 (N.D. Ga. 2001)...............................................................................33

*Internal Imp. Fund Trs. v. Greenough*,
   105 U.S. 527 (1881)..................................................................................................15

*Jernigan v. Protas, Spivok & Collins, LLC*,
   No. 16-cv-3058, 2017 WL 4176217 (D. Md. Sept. 20, 2017)..................................24

*In re Keyspan Corp. Sec. Litig.*,
   No. 01-cv-5852, 2005 WL 3093399 (E.D.N.Y. Sept. 30, 2005) ..............................28

*King Drug Co. of Florence, Inc. v. Smithline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015)......................................................................................23

*In re Lipitor Antitrust Litig.*,
   46 F. Supp. 3d 523 (D.N.J. 2014) .............................................................................28

*Lipsett v. Blanco*,
   975 F.2d 934 (1st Cir. 1992)........................................................................................2

*In re Loestrin 24 Fe Antitrust Litig.*,
   261 F. Supp. 3d 307 (D.R.I. 2017).............................................................................5

*In re Loestrin 24 Fe Antitrust Litig.*,
   45 F. Supp. 3d 180 (D.R.I. 2014)...............................................................................4

*In re Loestrin 24 Fe Antitrust Litig.*,
   814 F.3d 538 (1st Cir. 2016)..............................................................................5, 23

*In re Loestrin 24 Fe Antitrust Litig.*,
   No. 13-md-2472, 2019 WL 3214257 (D.R.I. July 2, 2019) ..............................1, 7

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   205 F.R.D. 369 (D.D.C. 2002)...................................................................................32

*In re Lupron Mktg. & Sales Practices Litig.*,
   228 F.R.D. 75 (D. Mass. 2005)..................................................................................32

*In re Lupron Mktg. & Sales Practices Litig.*,
  No. 01-cv-10861, 2005 WL 2006833 (D. Mass. Aug. 17, 2005) ...............................25, 27, 30

*Mazola v. May Dept. Stores Co.*,
  No. 97-cv-10872, 1999 WL 1261312 (D. Mass. Jan. 27, 1999)...............................................18

*Medoff v. CVS Caremark Corp.*,
  No. 09-cv-554, 2016 WL 632238 (D.R.I. Feb. 17, 2016) .................................................15, 16

*Mokover v. Neco Enters., Inc.*,
  785 F. Supp. 1083 (D.R.I. 1992)...............................................................................................16

*Montague v. Dixie Nat. Life Ins. Co.*,
  No. 09-cv-687, 2011 WL 3626541 (D.S.C. Aug. 17, 2011)......................................................24

*New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.*,
  No. 05-cv-11148, 2009 WL 3418628 (D. Mass. Oct. 20, 2009) .......................................17, 30

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  842 F.3d 34 (1st Cir. 2016)........................................................................................................28

*Nilsen v. York Cty.*,
  400 F. Supp. 2d 266 (D. Me. 2005) ..........................................................................................17

*In re Nineteen Appeals-San Juan Dupont Plaza Hotel Fire Litig.*,
  982 F.2d 603 (1st Cir. 1992)......................................................................................................13

*In re Puerto Rican Cabotage Antitrust Litig.*,
  815 F. Supp. 2d 448 (D.P.R. 2011)....................................................................................17, 25

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979)...................................................................................................................14

*In re Relafen Antitrust Litig.*,
  231 F.R.D. 52 (D. Mass. 2005)........................................................................................ *passim*

*In re Remeron Direct Purchaser Antitrust Litig.*,
  No. 03-cv-85, 2005 WL 3008808 (D.N.J. Nov. 9, 2005)...................................................24, 33

*In re Revco Sec. Litig.*,
  No. 89-cv-593, 1992 WL 118800 (N.D. Ohio May 6, 1992) ...................................................33

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005)................................................................................................30, 31

*In re San Juan Dupont Plaza Hotel Fire Litig.*,
  111 F.3d 220 (1st Cir. 1997)......................................................................................................13

*Singleton v. Domino's Pizza, LLC,*
  976 F. Supp. 2d 665 (D. Md. 2013) .................................................24

*In re Skelaxin (Metaxalone) Antitrust Litig.,*
  No. 12-cv-83, 2014 WL 2946459 (E.D. Tenn. June 30, 2014) .............16

*In re Solodyn Antitrust Litig.,*
  No. 14-md-2503, 2018 WL 7075881 (D. Mass. July 18, 2018)...........16

*Spicer v. Chi. Bd. Options Exchange, Inc.,*
  844 F. Supp. 1226 (N.D. Ill. 1993) .................................................32

*Sprague v. Ticonic Nat'l Bank,*
  307 U.S. 161 (1939)......................................................................15

*Stoner v. CBA Info. Servs.,*
  352 F. Supp. 2d 549 (E.D. Pa. 2005) .............................................24

*Stop & Shop Supermarket Co. v. Smithkline Beecham Corp. (Paxil),*
  No. 03-cv-4578, 2005 U.S. Dist. LEXIS 9705 (E.D. Pa.) .................22

*Sutton v. Med. Serv. Ass'n of Pa.,*
  No. 92-cv-4787, 1994 WL 246166 (E.D. Pa. June 8, 1994)................27

*In re Synthroid I,*
  264 F.3d 712 (7th Cir. 2001) .........................................................17

*The Pillsbury Co. v. Conboy,*
  459 U.S. 248 (1983)......................................................................14

*In re Thirteen Appeals Arising
out of the San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295 (1st Cir.
  1995) ..........................................................................................15

*Trombley v. Bank of Am. Corp.,*
  No. 08-cv-456, 2013 WL 5153503 (D.R.I. Sept. 12, 2013) .................16

*Vizcaino v. Microsoft Corp.,*
  290 F.3d 1043 (9th Cir. 2002) .......................................................31

*In re Wellbutrin XL Antitrust Litig.,*
  133 F. Supp. 3d 734 (E.D. Pa. 2015) .............................................28

**Other Authorities**

Fed. Jud. Ctr., *Manual for Complex Litigation (Fourth)* (2004) ............16, 30

Fed. R. Civ. P. 23(h) .....................................................................14

Hon. Kathryn Vratil, Presentation, *The Power of 1407 Remand* (Oct. 29, 2014), https://judicialstudies.duke.edu/sites/default/files/centers/judicialstudies/mdl2 015/P6-B4-Breaking_Up_Hard_To_Do.pdf.............................................................................23

Joint Statement of Pls. and Defs. Medicis Pharm. Corp. & Impax Labs., Inc. Regarding Pls.' Challenges to Privilege Log Entries, *In re Solodyn Antitrust Litig.*, No. 14-md-2503-DJC (D. Mass. Nov. 4, 2016), ECF No. 398 ....................................23

Mem. in Supp. of Plaintiffs' Mot. to Compel Produc. & for *In Camera* Review of Pfizer & Greenstone Docs., *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 14-cv-361 (E.D. Va. Nov. 30, 2016), ECF No. 118 ................................................................23

Order Granting Final Judgment & Order of Dismissal Approving Direct Purchaser Class Settlement & Dismissing Direct Purchaser Class Claims Against the Cephalon Defs., *King Drug Co. of Florence v.Cephalon, Inc.*, No. 06-cv-0197 (E.D. Pa. Oct. 8, 2015), ECF No. 870............................................................................................22

Order, *In re Prograf Antitrust Litig.*, No. 11-md-2242 (D. Mass. May 20, 2015), ECF No. 678 .......................................................................................................... *passim*

William Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (5th ed. 2012) .............................................................................................................16

## I.    INTRODUCTION

On December 13, 2019—days before jury selection and a few weeks to trial—direct purchaser class plaintiff Ahold USA, Inc. reached an agreement on behalf of itself and the certified class of direct purchasers to settle all claims against Warner Chilcott[1] and Watson Laboratories, Inc., related Warner Chilcott and Watson entities,[2] and parent entity Allergan, plc. The settlement provides for a payment from the defendants in the total gross amount of $120 million in cash to the direct purchaser class; in exchange, the direct purchasers dismiss their case with prejudice and provide a full release of all claims.[3] To get there, class counsel[4] expended, over about seven years, more than 54,973 hours of uncompensated professional time on behalf of the direct purchaser class.

Class counsel now respectfully seek three things: (1) reimbursement of out-of-pocket litigation expenses totaling $3,965,558, (b) an award of attorneys' fees of one-third of the settlement (after first deducting for reimbursement of expenses from the total settlement amount), totaling $38,678,147,[5] and (c) a service award of $100,000 for Ahold in recognition of its service to the class.

*Expenses*. Class counsel have incurred approximately $3,965,558 in litigation-related

---

[1] Warner Chilcott Co., LLC f/k/a Warner Chilcott Co., Inc.; Warner Chilcott (US), LLC; and Warner Chilcott Sales (US), LLC (together and individually, "Warner Chilcott").

[2] Warner Chilcott plc n/k/a Allergan WC Ireland Holdings Ltd.; Warner Chilcott Holdings Co. III, Ltd.; Warner Chilcott Corp.; Warner Chilcott Laboratories Ireland Limited; and Watson Pharmaceuticals, Inc.

[3] *See* Ex. 1 to Sobol Decl. in Supp. of Direct Purchaser Class Pls.' Am. Mot. for Prelim. Approval of Settlement, ECF No. 1141-1.

[4] On July 2, 2019, the Court appointed Hagens Berman Sobol Shapiro LLP ("HBSS"), Faruqi & Faruqi LLP ("F&F"), Berger Montague P.C. ("BM"), and Kessler Topaz Meltzer & Check LLP ("KTMC") as co-lead counsel for the direct purchaser class. *In re Loestrin 24 Fe Antitrust Litig.*, No. 13-md-2472, 2019 WL 3214257, at *17 (D.R.I. July 2, 2019). In addition, the direct purchaser class was represented by the Radice Law Firm ("RL"), Taus Cebulash & Landau LLP ("TCL"), and Lynch & Pine.

[5] $120 million − $3,965,558 in expenses = $116,034,442 × $\frac{1}{3}$ = $38,678,147.

1

expenses.[6] The largest component of this figure by far is expert fees, totaling approximately $2,798,527; this amount is not unexpected given the number of complex legal and factual issues (and the number of expert reports) involved here. The remaining expenditures were for expenses such as filing fees, court reporting fees, document management/database hosting fees, and travel costs to attend depositions and hearings.[7] We outline the safeguards used to assure the Court these expenses are reasonable.

*Fees.* The fee request is reasonable using the prevailing percentage-of-fund approach, and then deriving a percentage using either the holistic or mimic-the-market methods. With only a few outliers, district courts have awarded a full one-third fee in similar generic suppression and other pharmaceutical antitrust cases over the last fifteen years. Despite the unique challenges in this case, and the growing complexities, risk, and expense of pharmaceutical antitrust litigation generally, the settlement represents a significant recovery for members of the class. Using the lodestar cross-check sometimes, used in class action fee awards, the requested fees represent 130% of class counsel's reported lodestar (that is, a 1.3 multiplier at the hourly rates in effect at the time the work was performed),[8] a reasonable request given the nature of the case, the degree of risk undertaken in bringing the action, and the excellent result.

*Service award.* Class counsel also request that the Court approve a service award of

---

[6] *See* Decl. of Co-Lead Counsel Peter R. Kohn in Supp. of Direct Purchaser Class Pls.' Mot. for Award of Attorney's Fees, Reimbursement of Expenses & Service Award to the Class Representative ("Kohn Decl.") ¶¶ 105-07 (submitted herewith).

[7] *See id.*

[8] Total loadstar using hourly rates in effect at the time the work was performed equals $29,542,219. A fee award of $38,678,147 results in a multiplier of 1.31 ($38,678,147 ÷ 29,542,219 = 1.31). Class counsel also report their lodestar for all hours incurred in the case using the rates for each professional in effect in December 2019 when the case settled. *See* Kohn Decl. ¶ 109. Expressing the lodestar figure in terms of current rates because of the delay in payment of fees for the services provided is consistent with precedent in this Circuit. *See Lipsett v. Blanco*, 975 F.2d 934, 942-43 (1st Cir. 1992). The reported loadstar using 2019 rates is $31,684,741. Using this figure results in a multiplier of 1.22.

$100,000 to the class representative, Ahold, in recognition of its vital participation in this case and the time and effort expended in prosecuting the action on behalf of the class.[9]

## II.      BACKGROUND

In support of this motion, class counsel submit three things. First, the Kohn declaration describes in detail the work undertaken by class counsel from inception of this case through settlement. Second, each co-lead counsel firm provides a separate declaration summarizing the individual firm's involvement, hours expended by each professional, hourly rates, total lodestar from inception to settlement of the case, out-of-pocket expenses by category and any contributions to the joint litigation fund used to pay case related expenses.[10] Third, the Fitzpatrick declaration[11] provides empirical information of fee determinations in similar cases and provides a context for the fee request here.

The Court is too familiar with the procedural and substantive history of this matter. For the Court's convenience, a short summary of the litigation follows. As the Court knows, the direct purchasers coordinated much of their discovery and pre-trial work with the other two plaintiff groups, the end payers and the retailers.

## A.      The direct purchasers allege that the defendants violated federal antitrust law and imposed overcharges on the class.

Starting in March 2012, co-lead and class counsel for direct purchasers performed an independent investigation of the facts in this case—before the Supreme Court's decision in *FTC*

---

[9] *See* Kohn Decl. ¶¶ 111-13.

[10] *See* Kohn Decl. Exs. A-G.

[11] *See* Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl.") submitted herewith. Brian Fitzpatrick is a professor at Vanderbilt University Law School. His teaching and research focus on class action litigation. In addition, he has published several articles on class action litigation, including *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (Fitzpatrick Decl. Appendix 2). Professor Fitzpatrick has also published many papers on how the economic incentives of attorneys and others affect class action litigation, culminating in his recent book, *The Conservative Case for Class Actions* (Univ. of Chicago Press 2019).

*v. Actavis, Inc.*[12] In May 2013, the first Loestrin 24 direct purchaser complaint was filed.[13] In October 2013, the Judicial Panel on Multidistrict Litigation transferred four actions pending in the Eastern District of Pennsylvania to this district for consolidated pretrial proceedings.[14] In December 2013, the direct purchasers filed the first of three consolidated amended class action complaints.[15] Each complaint alleged that the defendants engaged in a wrongful anticompetitive scheme to impede and delay market entry of AB-rated, less expensive, generic versions of Warner Chilcott's brand name prescription drug, Loestrin 24.[16] The direct purchasers alleged that, as a result of the violations, they were forced to pay artificially inflated prices for branded products.[17]

In February 2014, the defendants moved to dismiss the direct purchasers' Consolidated Amended Class Action Complaint.[18] This amended complaint included only a reverse payment claim under § 1 of the Sherman Act, 15 U.S.C. § 1. At the time, the *Actavis* decision was less than a year old, and there were few district court opinions interpreting it.[19] In September 2014, this Court dismissed the amended complaint, holding that only cash reverse payments are actionable under *Actavis*.[20]

The direct purchasers timely appealed the dismissal to the United States Court of Appeals

---

[12] Kohn Decl. ¶ 6.

[13] *Am. Sales Co., LLC v. Warner Chilcott Public Ltd. Co.*, No. 13-cv-347 (D.R.I. May 14, 2013), ECF No. 1.

[14] JPML Transfer Order, ECF No. 1.

[15] Direct Purchaser Class Pls.' Consol. Am. Class Action Compl. & Jury Demand, ECF No. 39.

[16] *See* Kohn Decl. ¶¶ 8-12 (detailing the multi-part anticompetitive scheme).

[17] *Id*. ¶ 13.

[18] Mot. to Dismiss the Direct Purchaser Class Pls.' Consol. Am. Class Action Compl., ECF No. 74.

[19] Kohn Decl. ¶¶ 14-15.

[20] *In re Loestrin 24 Fe Antitrust Litig.*, 45 F. Supp. 3d 180, 195 (D.R.I. 2014), *vacated*, 814 F.3d 538 (1st Cir. 2016).

for the First Circuit.[21] Briefing in the First Circuit was voluminous, and the direct purchasers

took the laboring oar on appeal. The direct purchasers submitted appellate briefing separate from

the other plaintiffs[22] and helped facilitate five *amicus* briefs.[23] In February 2016, the First Circuit

vacated the Court's decision and remanded for further proceedings.[24]

In May 2016, the direct purchasers filed their second amended complaint—a nearly 100-

page pleading.[25] With the benefit of additional investigation, the direct purchasers added patent

and hard switch-related claims against Warner Chilcott under § 2 of the Sherman Act, 15 U.S.C.

§ 2. The direct purchasers also bolstered the reverse payment claims by pleading more precise

dollar figures attributable to the no-AG clause and Femring and Generess deals.[26]

The second amended complaint resulted in a renewed round of motion to dismiss briefing

consisting of over 300 pages in total.[27] In August 2017, the Court upheld all of the direct

purchasers' causes of action but dismissed claims against parent companies Allergan, plc and

Actavis, Inc.[28]

## B.    The parties engage in extensive discovery.

While awaiting the Court's second motion to dismiss decision, the parties began

discovery, both formal and informal, from parties and multiple non-parties.[29] The Court ordered

---

[21] Direct Purchaser Pls.' Notice of Appeal, ECF No. 121.

[22] Br. of Appellants Am. Sales Co., LLC & Rochester Drug Co-Op., Inc., *In re Loestrin 24 Fe Antitrust Litig.*, No. 14-2071 (1st Cir. June 9, 2015), Doc. No. 00116847493.

[23] Kohn Decl. ¶ 16.

[24] *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538 (1st Cir. 2016).

[25] Direct Purchaser Class Pls.' Second Consol. Am. Class Action Compl. & Jury Demand, ECF No. 164.

[26] *See id.* ¶¶ 198, 213, 216.

[27] Kohn Decl. ¶ 20.

[28] *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307 (D.R.I. 2017); *see* Kohn Decl. ¶¶ 22-23.

[29] Kohn Decl. ¶¶ 24-28.

production of documents to be substantially complete by October 5, 2017[30] and set the close of fact discovery on June 29, 2018.[31] While all parties worked to minimize discovery disputes, it was necessary for the plaintiffs to file several formal motions to compel, all of which required hearings before Magistrate Judge Sullivan.[32] The defendants and various non-party subpoena recipients produced over 410,000 documents totaling over 3.5 million pages and over a million lines of data.[33] All of this discovery needed to be analyzed. This was accomplished by dividing plaintiffs' counsel from all three plaintiff groups into various "issue teams" corresponding to each firm's expertise in a particular subject. In this way duplication of effort was largely avoided. Counsel for the direct purchasers was involved in nearly all issue teams.[34]

Under the deposition protocol negotiated by the parties (with the help and input of Magistrate Judge Sullivan), the parties deposed numerous individuals and non-parties. The plaintiffs deposed 27 fact witnesses. The direct purchasers were actively involved in nearly all fact depositions. The defendants took many depositions of non-parties in which the direct purchasers participated.[35]

Counsel for the direct purchasers also retained several experts to prepare expert reports and to testify at trial. For the sake of efficiency and economy, specific lawyers served as the primary point of contact with specific experts. The direct purchasers retained 13 testifying experts, who collectively issued 32 reports (opening reports and rebuttal reports), comprising

---

[30] Interim Case Management Order No. 8, ECF No. 326.

[31] Interim Case Management Order No. 13, ECF No. 480.

[32] Kohn Decl. ¶¶ 29-33.

[33] *Id.* ¶ 34

[34] *Id.* ¶ 35 (including list of issue teams and direct purchaser attorneys assigned to each).

[35] *Id.* ¶ 40 (including list of depositions and direct purchaser attorney involved in each).

thousands of pages of exhibits, and backup materials.[36] The defendants retained 17 expert witnesses to respond to the direct purchasers' experts and in support of their various defenses. In total, the defendants' experts issued 25 reports.[37] While these expert efforts were (sensibly) shared across the three plaintiff groups (direct class, end payer class, retailers), the efforts were a huge and complicated undertaking for all.

## C.   The Court certifies the direct purchaser class.

In November 2018, the parties completed briefing on direct purchaser class certification.[38] In February 2019, the Court held a full-day hearing on the issue. Despite the fact that the defendants raised all manner of arguments opposing class certification related to numerosity, impact, and typicality, the Court certified the following direct purchaser class:

> All persons or entities in the United States and its territories who purchased brand or generic Loestrin 24 directly from Warner [Chilcott] or Amneal at any time during the period from September 1, 2009, through and until June 3, 2015, and all persons or entities in the United States and its territories who purchased brand Minastrin 24 directly from Warner [Chilcott] at any time during the period from September 1, 2009, through and until March 14, 2017 (the "Class Period").

> Excluded from the Class are defendants, and their officers, directors, management, employees, subsidiaries, or affiliates, and, all federal governmental entities. Also excluded from the class are educational institutions such as universities and colleges.[39]

Following submission of requests for exclusion from the class submitted by certain entities that had independently filed actions against defendants, the Court excluded the retailer group (Walgreen Co., The Kroger Co., Safeway Inc., HEB Grocery Company L.P., Albertson's

---

[36] *Id.* ¶ 45 (including a list of plaintiff experts, their area of expertise and the number of expert reports issued).

[37] *Id.* ¶ 47 (including a list of defense experts, their areas of expertise, and the number of expert reports issued).

[38] Reply in Further Supp. of Direct Purchaser Class Pls.' Mot. for Class Certification, ECF No. 627

[39] *Loestrin 24*, 2019 WL 3214257, at *7.

LLC, CVS Pharmacy, Inc., Rite Aid Corporation, and Rite Aid Hdqtrs. Corporation).[40]

## D.    The parties move for summary judgment and prepare for trial.

The Court considered two separate rounds of summary judgment briefing.

First, in July 2018, the defendants filed a motion for summary judgment "due to lack of market power," a motion that included over 690 exhibits.[41] In October 2018, the plaintiffs counter-moved for summary judgment on market power, submitting two voluminous statements of fact and over 200 exhibits of their own.[42] Each side submitted multiple expert reports in support of their respective summary judgment motion. In March 2019, this Court held a full-day hearing on summary judgment related to the issue of market power, and in October 2019 this Court held a second hearing on the issue.

Second, in May 2019 the defendants filed a comprehensive summary judgment motion on all issues other than market power, including on plaintiffs' patent-related, reverse payment, and hard switch claims—again submitted with several hundred exhibits.[43] The plaintiffs opposed the motion, filing a responsive statement of facts,[44] an additional statement of facts[45] and several hundred exhibits of their own.[46] Counsel for direct purchasers took the lead role in compiling the plaintiffs' responsive and affirmative statements of facts—filings totaling 107 pages.[47] The direct purchasers also took on leadership roles in drafting the patent, reverse payment agreement and

---

[40] *See* Text Order Allowing [1295] Retailers' Requests to Opt Out from the Direct Purchaser Class, Nov. 14, 2019.

[41] Defs.' Mot. for Summ. J. Due to Lack of Market Power, ECF No. 496.

[42] Pls.' Mot. for Summ. J. on Market Power, ECF No. 569.

[43] Defs.' Mot. for Summ J., ECF No. 842; *see* Kohn Decl. ¶¶ 62-63.

[44] Pls.' Resp. to Defs.' Statement of Undisputed Facts, ECF No. 1061.

[45] Pls.' Add'l Statement of Material Undisputed Facts, ECF No. 1062.

[46] *See* Decl. of Kristen Johnson in Supp. of Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF No. 981.

[47] *See* ECF Nos. 1061, 1062.

causation sections of plaintiffs' 60-page opposition brief.[48] In total, the summary judgment briefing for all issues comprised 523 pages of defense briefs and fact statements (exclusive of declarations, exhibits and appendices), 587 pages of plaintiff briefs and fact statements (again, exclusive of declarations, exhibits and appendices), and three days of oral argument.[49] In September 2019, this Court held a full day hearing.

During the fall and winter of 2019, with summary judgment motions pending, the parties continued to prepare for trial. The plaintiffs and defendants filed *Daubert* motions directed to most experts. The direct purchasers played an active role in drafting nearly all of the plaintiffs' 16 *Daubert* motions, most of which resulted in some limitation of the respective defense expert's testimony.[50] The defendants filed 8 *Daubert* motions pertinent to the direct purchaser case.[51]

In preparation for trial, the plaintiffs filed an omnibus motion *in limine*[52] consisting of 41 targeted motions, as well as a standalone motion *in limine* related to Warner Chilcott executives.[53] The defendants filed 9 motions *in limine* of their own,[54] all of which required opposition briefing by the plaintiffs.[55]

Due to the inability to compel the attendance at trial of certain witnesses, each party designated portions of a number of deposition transcripts for use at trial. The plaintiffs designated portions of 49 deposition transcripts, and the defendants designated portions of 95

---

[48] Pls.' Opp'n to Defs.' Mot. for Summ. J., ECF No. 1060; *see* Kohn Decl. ¶ 63.

[49] Kohn Decl. ¶ 53.

[50] *Id*. ¶¶ 72-73 (including list of the direct purchasers' *Daubert* motions and the responsible attorneys).

[51] *Id*. ¶¶ 74-75 (including list of defendants' *Daubert* motions and responsible attorneys).

[52] Mem. in Supp. of Purchasers' Omnibus Mot. *in Limine*, ECF No. 1301.

[53] ECF No. 1300; *see* Kohn Decl. ¶¶ 78-79 (including list of motions *in limine* related to the direct purchasers' case).

[54] *See* ECF Nos. 1279-87.

[55] Kohn Decl. ¶ 80 (listing defendants' motions *in limine*).

transcripts.[56] In an initial exchange of potential trial exhibits, the plaintiffs designated 1,609 exhibits, while defendants designated 7,192 potential trial exhibits. The parties exchanged counter designations, lodged specific objections to nearly all the exhibits and deposition designations, and conducted many lengthy meet-and-confers on admissibility of exhibits.[57] Counsel for direct purchasers largely led these efforts.[58]

On December 8, 2019, the parties submitted a 231-page Joint Pretrial Memorandum that, as the Court instructed, would provide a "roadmap" for trial. To avoid duplication of effort and streamline the process, each subject-matter team was tasked with drafting their respective section. The direct purchasers extensively contributed to the patent, reverse payment, market power, and causation-related portions of the document. Given that this was a joint filing, it also required cooperation and negotiation with defense counsel.[59]

Several other important trial tasks were completed by the direct purchasers. On November 25, 2019, the parties filed competing sets of detailed jury instructions and verdict forms.[60] Counsel for the class led the drafting of plaintiffs' proposed instructions and verdict form and conducted the related research. Ultimately, the plaintiffs filed 131 detailed jury instructions spanning 179 pages.[61]

With trial scheduled to begin on January 6, 2020, the parties began the process, led by the Court, of vetting potential jurors through proposed jury questionnaires.[62] Counsel for direct

---

[56] Kohn Decl. ¶ 84.

[57] *Id*. ¶¶ 84-86.

[58] *Id*.

[59] *Id*. ¶ 87.

[60] *See* ECF Nos. 1348-51.

[61] Kohn Decl. ¶ 89; Pls.' Proposed Jury Verdict, ECF No. 1350; Pls.' Proposed Jury Instructions, ECF No. 1351.

[62] Interim Case Management Order No. 16 at 2, ECF No. 1277.

purchasers also took on a leadership role in plaintiffs' jury selection—reviewing juror questionnaires and establishing criteria by which to vet potential jurors.

By the time of the December 2019 direct purchaser settlement, the plaintiffs had spent hundreds of hours reviewing and preparing the witnesses and documentary evidence necessary to try the case to a jury and had conducted a mock trial to help refine arguments to be presented at trial.[63]

### E.    The direct purchasers and the defendants settle the case for $120 million.

Settlement negotiations between direct purchaser class counsel and counsel for the defendants were quite typical for cases such as this—hard fought, arm's length and spanning about two years. In December of 2018, the parties' first formal attempt to mediate their dispute occurred at a mediation session before mediators Layn R. Phillips and David Murphy of Phillips ADR. The direct purchasers and defendants both submitted detailed mediation briefs with exhibits prior to the mediation. Settlement talks were unsuccessful at that time, and the parties continued to litigate.[64]

With trial looming, in December 2019, the direct purchasers and the defendants again explored settlement. On December 11, 2019, a mediation session was held at White & Case LLP's New York office, overseen by mediator David Murphy of Phillips ADR. On December 13, 2019, the parties entered into a binding settlement term sheet between direct purchaser counsel and counsel for defendants.[65] That term sheet was followed by a letter between the

---

[63] Kohn Decl. ¶ 91.

[64] *Id.* ¶ 93.

[65] Ex. 2 to Sobol Decl. in Supp. of Direct Purchaser Class Pls.' Am. Mot. for Prelim. Approval of Settlement, ECF No. 1141-2.

parties related to the terms of the proposed settlement.[66] Subsequently, the parties negotiated the terms of a full settlement agreement, consistent with and incorporating the terms of the December 13, 2019 term sheet.[67] On January 14, 2020, the parties executed the settlement agreement, thereby agreeing to settle all direct purchaser claims for a total cash payment of $120 million.[68] On March 23, 2020, this Court granted the settlement preliminary approval. On April 6, 2020 and pursuant to that order, notice was sent to all class members via First Class mail. The notice advised that class counsel would be filing their motion for fees, reimbursement of expense, and an incentive award on April 20, 2020, and that Class counsel would be seeking up to a fee of one-third of the common fund, after deduction of expenses.[69]

**F.      The Court denies all summary judgment motions.**

On December 17, 2019—days after the direct purchasers and the defendants reached a binding agreement to settle, but with claims still pending by the end payer and retailer plaintiffs—this Court denied all motions for summary judgment.[70]

**G.      The First Circuit denies the defendants' appeal of class certification.**

On January 7, 2020, the United States Court of Appeals for the First Circuit denied the defendants' Rule 23(f) petition for leave to appeal the Court's certification of a direct purchaser class.[71]

---

[66] Ex. 3 to Sobol Decl. in Supp. of Direct Purchaser Class Pls.' Am. Mot. for Prelim. Approval of Settlement, ECF No. 1141-3.

[67] Kohn Decl. ¶ 94.

[68] Ex. 1 to Sobol Decl. in Supp. of Direct Purchaser Class Pls.' Am. Mot. for Prelim. Approval of Settlement, ECF No. 1141-1.

[69] Class Notice of Proposed Settlement at 10, https://www.loestrin24antitrustlitigation.com/pdf/Notice-for-Mailing.pdf.

[70] Op. & Order on Summ. J. and Order Regarding Mots. to Exclude Certain Expert Ops., ECF No. 1380.

[71] Judgment, *City of Providence v. Warner Chilcott Pub. Ltd. Co.*, No. 19-8014 (1st Cir. 2020).

## III.    ARGUMENT

### A.    The request for approval of the direct purchasers' litigation expenses is reasonable and appropriate.

"[L]awyers whose efforts succeed in creating a common fund for the benefit of a class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax."[72] The reasonableness of expenses is judged by the legitimate needs, size, and complexity of a case.[73]

Class counsel have incurred $3,965,558 in litigation-related expenses.[74] Litigation expenses were incurred by class counsel in two ways. First, most direct purchaser firms contributed to a common litigation fund from which common expenses were paid. These included such expenses as expert fees, court filing fees, and document hosting fees. Expenditures from the common litigation fund total $3,250,761.[75]  Second, each direct purchaser firm advanced and kept track of their own firm's non-common litigation expenses, such as expenses related to travel and legal research.  These class counsel firm litigation expenses total $492,947.92.[76] The requested reimbursement for expenses also includes payment for certain unpaid invoices associated with the case totaling $160,218, as well as an estimate for payment for future work to be performed by the claims administrator who will administer the settlement and distribute the net settlement funds and the class's economic expert who will assist the claims administrator in reviewing any data submitted in the claims process and calculating each class

---

[72] *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999); *accord In re Nineteen Appeals-San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 606 (1st Cir. 1992).

[73] *See In re San Juan Dupont Plaza Hotel Fire Litig.*, 111 F.3d 220, 233-38 (1st Cir. 1997).

[74] *See* Kohn Decl. ¶¶ 103-07.

[75] *Id.* ¶ 105.  The largest common expenditure by far was for expert fees, totaling approximately $2,798,527. (This amount represents the agreed share paid by the direct purchasers and does not include sums expended by the other plaintiff groups).

[76] *Id.*

members' share of the net settlement fund.[77] These additional estimated future expenses to

needed to bring the case to a close equal $61,631.[78]

Under the circumstances of this case, the request for approval of the direct purchasers'

litigation expenses is reasonable and appropriate for several substantive and procedural reasons.

Substantively, this figure is reasonable in a complex case such as this that settled shortly before

trial. The expenses for which class counsel seek reimbursement are the type of costs routinely

charged to fee-paying clients. The size of the expert costs is not unexpected given the number of

complex legal and factual issues (and number of expert reports) involved in this matter.

Procedurally, the direct purchasers' expenses were independently reviewed under an

accounting arrangement prior to *ex parte* submission to the Court and were submitted on a

quarterly basis by procedures this Court established before discovery. The ongoing coordination

of efforts between the three plaintiff groups largely assured the lack of duplication of expert and

other shared costs (e.g., document database, certain deposition expenses).

**B.    The request for approval of a percentage-of-fund fee of one-third of the settlement fund (net of expenses) is reasonable and appropriate.**

Under Rule 23(h), "[i]n a certified class action, the court may award reasonable

attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."[79]

Fee awards encourage the prosecution of private antitrust actions, litigation the Supreme Court

has recognized as necessary to assure compliance with and effective enforcement of the antitrust

laws.[80] As the First Circuit has affirmed, lawyers who create a common fund pursuing such

---

[77] *See* Kohn Decl. ¶ 106.

[78] $3,250,761 + $492,947 + $160,218 + $61,631 = $3,965,558.

[79] Fed. R. Civ. P. 23(h).

[80] *See, e.g., The Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of certain federal regulatory statutes, including the federal antitrust laws."); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) (noting that private challenges to antitrust violations provide "a significant supplement to the limited resources available to the

litigation are entitled to compensation: "The common fund doctrine is founded on the equitable principle that those who have profited from the litigation should share its costs."[81]

Here, the efforts of class counsel resulted in the creation of a common fund of $120 million. By any measure, this is a substantial amount of money to compensate direct purchasers for their antitrust injuries.

### 1. The "percentage of the fund" methodology is the prevailing method for calculating a reasonable class counsel fee.

The Supreme Court holds that a "percentage of the fund" calculation may be appropriate for determining common fund fee awards.[82] Under this method, courts select a percentage that they believe is fair to counsel, multiplying the settlement amount by that percentage to arrive at a fee award.

In the First Circuit, district courts have the discretion to use either the percentage of the fund method or the lodestar method in common fund cases.[83] The lodestar method, under which courts award counsel a fee equal to the number of hours they worked on the case multiplied by both a reasonable hourly rate and a discretionary multiplier based on the risk of non-recovery

---

Department of Justice for enforcing the antitrust laws and deterring violations"); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972) (noting that Congress created rights for private citizens to enforce the antitrust laws, and Rule 23 provides for class actions that may "enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture").

[81] *Medoff v. CVS Caremark Corp.*, No. 09-cv-554, 2016 WL 632238, at * 8 (D.R.I. Feb. 17, 2016) (citing *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995)); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (holding that common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"); *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 384 F. App'x 299, 302 (5th Cir. 2010) (per curiam) ("It is well established that federal courts, through the exercise of their equity powers, may call upon a group that benefits from litigation efforts to share the costs of litigation, including attorneys' fees.").

[82] *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class . . . ."); *see also Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-66 (1939); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Internal Imp. Fund Trs. v. Greenough*, 105 U.S. 527, 532 (1881).

[83] *See Thirteen Appeals*, 56 F.3d at 307 ("[W]e hold that in a common fund case the district court, in the exercise of its informed discretion, may calculate counsel fees either on a percentage of the fund basis or by fashioning a lodestar.").

and other factors, has fallen out of favor in common fund cases.[84] This is because it was often difficult to calculate the lodestar, and the method did not align the interests of counsel with the interests of the plaintiffs.[85]

Instead, this Court, other courts in this district, and courts throughout the country often apply the percentage-of-fund method in calculating attorneys' fees.[86] This method of calculating fees "appropriately aligns the interests of the class with the interests of class counsel . . . ."[87] The vast majority of courts of appeals now permit or direct application of the percentage method.[88]

In determining *what* percentage to apply, court apply one of the three approaches this Court described in *Cabletron*—the holistic approach, the mimic-the-market approach and a benchmark approach. Commonly, courts in this district use the holistic approach with a lodestar

---

[84] *See* Fitzpatrick Decl. ¶ 11.

[85] *Id.*; *see also Mokover v. Neco Enters., Inc.*, 785 F. Supp. 1083, 1087-88 (D.R.I. 1992) (discussing advantages of the percentage of the fund approach over the lodestar method, but applying the lodestar approach prior to the First Circuit's 1995 decision in *Thirteen Appeals*).

[86] *In re Cabletron Sys., Inc. Sec. Litig.*, No. 99-cv-00408, 239 F.R.D. 30, 37 (D.N.H. 2006) ("The POF method has emerged in the last decade-plus as the preferred method of awarding fees in common fund cases. As the First Circuit has noted, the POF method has distinct advantages over the lodestar approach."); *see, e.g., Medoff*, 2016 WL 632238 at * 8 (approving attorneys' fees using the percentage of the fund method); *Trombley v. Bank of Am. Corp.*, No. 08-cv-456, 2013 WL 5153503, at * 8 (D.R.I. Sept. 12, 2013) (same); *In re Solodyn Antitrust Litig.*, No. 14-md-2503, 2018 WL 7075881, at *2 (D. Mass. July 18, 2018); *In re Asacol Antitrust Litig.*, No. 15-cv-12730, 2017 WL 11475275, at *4 (D. Mass Dec. 7, 2017) (awarding attorneys' fees totaling one-third of the settlement fund, plus costs, and interest earned); Order at 7-8, *In re Prograf Antitrust Litig.*, No. 11-md-2242 (D. Mass. May 20, 2015), ECF No. 678 ("*Prograf* Order") (awarding attorneys' fees totaling one-third of the settlement fund, plus costs, and interest earned); *Bilewicz v. FMR LLC*, Nos. 13-cv-10636 & 14-cv-10035, 2014 WL 8332137, at *6 (D. Mass. Oct. 16, 2014) (awarding one-third of the $12 million settlement amount plus expenses); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005) (awarding fees of one-third of the settlement fund); *see also In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-cv-83, 2014 WL 2946459, at *1 (E.D. Tenn. June 30, 2014) (concurring with observations made by other courts that "the lodestar method is cumbersome; the percentage-of-the-fund approach more accurately reflects the result achieved; and the percentage-of-the-fund approach has the virtue of reducing the incentive for plaintiffs' attorneys to over-litigate or 'churn' cases").

[87] *Bussie v. Allmerica Fin. Corp.*, No. 97-cv-40204, 1999 WL 342042, at *2 (D. Mass. May 19, 1999) (quoting *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997)); *see also* Fitzpatrick Decl. ¶¶ 12-13.

[88] Fed. Jud. Ctr., *Manual for Complex Litigation (Fourth)* § 14.121 (2004) ("MCL") (gathering cases from circuits); 4 William Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:6 n.7 (5th ed. 2012) ("The percentage method is strongly preferred in common fund class actions; indeed, one commentator has argued that Due Process concerns require utilization of the percentage method." (citing Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here* 1809 (2000))).

cross-check. As one court explained, "the weight of the caselaw . . . approves of percentage of the fund as the methodology for determining attorneys' fees, with a lodestar calculation as a pragmatic cross-check."[89]

The mimic-the-market approach, utilized primarily in the Seventh Circuit,[90] has also been used by district courts in this Circuit to affix the appropriate percentage.[91] Absent some bidding process for class counsel services at the beginning of the case, in utilizing this approach a district court estimates what the percentage fee would have been in the market for class counsel's services prior to the commencement of the case. To do so, one examines various factors, including fee contracts large stakes class members may have entered into with their counsel prior to the litigation, fee contracts large stakes plaintiffs may have signed with counsel in similar litigation, and the fee percentages awarded by other district court judges in similar litigation.

In this case, we respectfully suggest that application of either the holistic approach or the mimic-the-market approach yields the same result—selection of a percentage of one-third of the common fund. Under the holistic approach—which admittedly has been previously described as "unprincipled"[92] when used to simply backfill a result—class counsel immodestly suggest the facts of this case hit each of the numerous considerations in favor of the proposed one-third fee award, thus avoiding the potential for an arbitrary result. Under the mimic-the-market approach,

---

[89] *New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.*, No. 05-cv-11148, 2009 WL 3418628, at *1 (D. Mass. Oct. 20, 2009) (collecting authorities). Although often conducted, a lodestar cross-check is not required. *See In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 464 (D.P.R. 2011) (citing *In re Thirteen Appeals*, 56 F.3d at 307).

[90] *See, e.g.*, *In re Synthroid I*, 264 F.3d 712 (7th Cir. 2001).

[91] *Cabletron*, 239 F.R.D. at 39-40 (mimic-the-market approach "emulates the incentives present in a private-client attorney relationship, primarily, that the market prices should take into account 'the risk of nonpayment,' 'quality of . . . performance,' 'the amount of work,' and 'the stakes of the case'" (quoting *Nilsen v. York Cty.*, 400 F. Supp. 2d 266, 276 (D. Me. 2005)).

[92] *Nilsen*, 400 F. Supp. 2d at 277.

Prof. Fitzpatrick addresses each of the relevant factors in the context of this litigation[93] and concludes that they more than support the one-third fee request here.[94]

### 2. The requested one-third fee is fair and reasonable.[95]

#### a. Courts regularly approve a one-third fee.

"[I]n this circuit, percentage fee awards range from 20% to 35% of the fund. This approach mirrors that taken by the federal courts in other jurisdictions."[96] In awarding a one-third fee in *In Relafen Antitrust Litigation*,[97] Judge Young acknowledged the appropriateness of such a fee in light of the complexity of the legal and regulatory issues inherent in pharmaceutical antitrust cases and held that a one-third fee "is not unreasonable as a matter of law."[98] Similarly, in approving final distribution and awarding attorneys' fees of one-third of the settlement amount in *Asacol*, the court considered the factors set forth in *Gunter v. Ridgewood Energy Corp.*[99] and *Goldberger v. Integrated Resources, Inc.*[100] and found, *inter alia*:

- The settlement conferred "a monetary benefit to every member of the Class and the settlement amount [was] substantial;"[101]

- Class counsel (including several of the firms serving as counsel here) were "skillful, experienced counsel" who had "effectively and efficiently prosecuted

---

[93] The third factor, fee percentages awarded by other district court judges in similar litigation, is also discussed at length below in the context of the percentage of the fund analysis.

[94] *See* Fitzpatrick Decl. ¶¶ 35-44.

[95] For convenience, reference is made to class counsel's request for a "one-third fee." However, the requested fee is actually less than one third. Class counsel propose to calculate their fee based on the remaining funds in the settlement after deduction for reimbursement of reasonable out-of-pocket litigation expenses. Deducting expenses prior to applying the 1/3 requested fee amount results in a fee request that is actually 32.23% of the gross $120 million settlement amount.

[96] *Mazola v. May Dept. Stores Co.*, No. 97-cv-10872, 1999 WL 1261312, at *4 (D. Mass. Jan. 27, 1999).

[97] 231 F.R.D. 52 (D. Mass. 2005).

[98] *Id.* at 80, 82 (noting the "highly technical and complex issues with regard to pharmaceutical pricing and distribution, health insurance and federal regulation and preemption issues" involved in generic delay class action antitrust case).

[99] 223 F.3d 190 (3d Cir. 2000).

[100] 209 F.3d 43 (2d Cir. 2000).

[101] *Asacol,* 2017 WL 11475275, at *4; *see also Prograf* Order at 11.

this complex action on behalf of the Class;"[102]

- Class counsel had undertaken "numerous and significant risks on behalf of members of the class with no guarantee that they would be compensated;"[103]

- Class counsel "reasonably expended thousands of hours, and incurred [substantial] out of pocket expenses, in prosecuting the action, with no guarantee of recovery;"[104] and

- "Fee awards similar to the fee requested by Class Counsel here have been awarded in similar cases, including numerous Hatch-Waxman antitrust class actions similarly alleging impeded entry of generic drugs."[105]

Each of these observations applies equally in this case. Class counsel's request for one-third of the net settlement fund falls within that range and has been regularly approved in other direct purchaser pharmaceutical antitrust class cases.

To avoid the notion of cherry-picking examples, we provide below a summary of fee percentage determinations from all other generic suppression, antitrust direct purchaser actions that are publicly reported. We are of the view this is the most apt comparison. The cases share many features; they (i) occur against a uniquely complicated regulatory and business background, (ii) involve subject areas in antitrust, patents, FDA regulation, pharmaceutical market dynamics and medicine, (iii) impose huge expert costs, largely from multi-disciplinary areas of expertise, (iv) pose complicated and often cutting-edge legal issues, and (v) require an understandably longer time to litigate.

In direct purchaser, generic delay pharmaceutical cases over the past fifteen years, court have awarded a one-third fee (on either the gross settlement amount, or the net after payment of

---

[102] *Asacol,* 2017 WL 11475275, at *4; *see also Prograf* Order at 11.

[103] *Asacol,* 2017 WL 11475275, at *4; *see also Prograf* Order at 11.

[104] *Asacol,* 2017 WL 11475275, at *4; *see also Prograf* Order at 11.

[105] *Asacol,* 2017 WL 11475275, at *4; *see also Prograf* Order at 11. (citing, *e.g., In re TriCor Direct Purchaser Antitrust Litig.,* No. 05-cv-340, 2009 U.S. Dist. LEXIS 133251, at *15 (D. Del. Apr. 23, 2009)).

expenses) in at least 25 of 29 matters. The below chart lists them.[106]

**Attorneys' Fee Awards in Direct Purchaser Generic Delay Pharmaceutical Antitrust Cases**

|  | Date | Case | Settlement Amount | Fee Awarded (%) |
|---|---|---|---|---|
| 1. | 09/20/18 | *In re Lidoderm Antitrust Litig.*, No. 09-md-2081 (E.D. Pa.), ECF Nos. 459-1, 464 | $166M | 45M (27.11%) |
| 2. | 07/18/18 | *In re Solodyn Antitrust Litig.*, No. 14-md-2503, 2018 WL 7075881 (D. Mass.) | $72.5M | $24.16M (33.34%) |
| 3. | 04/18/18 | *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 14-cv-351, 2018 WL 2382091 (E.D. Va.) | $94M | $30.72M (32.68%)[107] |
| 4. | 10/05/17 | *In re K-Dur Antitrust Litig.*, No. 01-cv-1652 (D.N.J.), ECF No. 1057 | $60M | $20M (33.34%) |
| 5. | 12/19/17 | *In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (D. Conn.), ECF Nos. 707-1, 740 | $146M | $29.2M (20%) |
| 6. | 12/07/17 | *In re Asacol Antitrust Litig.*, No. 15-cv-12730, 2017 WL 11475275 (D. Mass.) | $15M | $5M (33.33%) |
| 7. | 10/08/15 | *King Drug Co. of Florence, Inc. v. Cephalon, Inc. (Provigil)*, No. 06-cv-1797 (E.D. Pa.), ECF No. 870 | $512M | $140.8M (27.5%) |
| 8. | 05/20/15 | *In re Prograf Antitrust Litig.*, No. 11-md-2242 (D. Mass.), ECF No. 678 | $98M | $32.67M (33.34%) |
| 9. | 01/20/15 | *In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141 (E.D. Mich.), ECF No. 68 | $19M | $6.33M (33.32%) |
| 10. | 08/06/14 | *In re Neurontin Antitrust Litig.*, No. 02-cv-1830 (D.N.J.), ECF No. 114 | $191M | $63.33M (33.33%) |
| 11. | 09/06/14 | *Mylan Pharm., Inc. v. Warner Chilcott plc*, No. 12-cv-3824 (E.D. Pa.), ECF No. 665 | $15M | $5M (33.33%) |

---

[106] Independently, Fitzpatrick conducted his own analysis of the fees awarded in a somewhat broader range of pharmaceutical antitrust cases and concludes that in 30 of 33 such cases, the court awarded a one-third fee. Fitzpatrick Decl. ¶ 17 & Appendix 4.

[107] In the *Celebrex* litigation, the fee was determined by first deducting case expenses and then awarding one-third of the remaining settlement amount. In all other cases listed here, the fee award was determined based on the gross settlement amount, with expenses deducted second.

| 12. | 06/30/14 | *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, 2014 WL 2946459 (E.D. Tenn.) | $73M | $24.33M (33.33%) |
| 13. | 06/14/13 | *In re Flonase Antitrust Litig.*, No. 08-cv-3149 (E.D. Pa.), ECF No. 496 | $150M | $50M (33.33%) |
| 14. | 11/07/12 | *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431 (E.D. Pa.), ECF No. 485 | $37.5M | $12.5M (33.33%) |
| 15. | 05/31/12 | *Rochester Drug Co-Op., Inc. v. Braintree Labs., Inc.*, No. 07-cv-142 (D. Del.), ECF No. 243 | $17.25M | $5.75M (33.33%) |
| 16. | 01/12/12 | *In re Metoprolol Succinate Antitrust Litig.*, No. 06-cv-52 (D. Del.) ECF No. 194 | $20M | $6.67M (33.35%) |
| 17. | 11/28/11 | *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-cv-2237 (S.D.N.Y.), ECF No. 113 | $20.25M | $6.75M (33.33%) |
| 18. | 11/21/11 | *In re Wellbutrin SR Antitrust Litig.*, No. 04-cv-5525 (E.D. Pa.), ECF No. 413 | $49M | $16.33M (33.33%) |
| 19. | 08/11/11 | *Meijer, Inc. v. Abbott Labs.*, No. 07-cv-5985 (N.D. Cal.), ECF No. 514 | $52M | $17.33M (33.33%) |
| 20. | 01/31/11 | *In re Nifedipine Antitrust Litig.*, No. 03-mc-223 (D.D.C.), ECF No. 333 | $35M | $11.67M (33.34%) |
| 21. | 01/25/11 | *In re Oxycontin Antitrust Litig.*, No. 04-md-1603 (S.D.N.Y.), ECF No. 360 | $16M | $5.33M (33.31%) |
| 22. | 04/23/09 | *In re TriCor Direct Purchaser Litig.*, No. 05-340, 2009 U.S. Dist. LEXIS 133251 (D. Del.) | $250M | $83.33M (33.33%) |
| 23. | 04/20/09 | *Meijer, Inc. v. Barr Pharm., Inc.*, No. 05-cv-2195 (D.D.C.), ECF No. 210 | $22M | $7.33M (33.32%) |
| 24. | 11/08/05 | *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-cv-85 (D.N.J.), ECF No. 185 | $75M | $25M (33.33%) |
| 25. | 05/20/05 | *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp. (Paxil)*, No. 03-cv-4578, 2005 U.S. Dist. LEXIS 9705 (E.D. Pa.) | $100M | $20M (20%) |
| 26. | 04/19/05 | *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-md-1317 (S.D. Fla.), ECF No. 1557 | $74M | $24.17M (32.41%) |
| 27. | 11/30/04 | *N. Shore Hematology-Oncology Assoc., P.C. v. Britol-Myers Squibb Co.*, No. 04-cv-248 (D.D.C.), ECF No. 30 | $50M | $16.33M (32.66%) |
| 28. | 04/09/04 | *In re Relafen Antitrust Litig.*, No. 01-cv-12239, | $175M | $58.33M |

| | | 231 F.R.D. 52 (D. Mass.) | | (33.33%) |
|---|---|---|---|---|
| 29. | 04/11/03 | *La. Wholesale Drug Co. v. Bristol-Myers Squibb Co.*, No. 01-cv-7951 (S.D.N.Y.), ECF No. 22 | $220M | $70.33M (33.33%) |

The few exceptions to the cases reaching a one-third determination show how the one-third portion should apply here. In *Provigil*, for example, the court granted a fee award of 27.5% in 2015, but that settlement involved a $512 million cash payment—one of the highest cash payments ever awarded in a pharmaceutical case—and generated a $140.8 million fee that represented a multiplier of 4.12 on the total lodestar.[108] The courts in *Aggrenox* (2017) and *Paxil* (2005) similarly departed from the norm, each granting a 20% fee award. But these two cases both settled early in the litigation. In *Aggrenox*, the case settled for $146 million before any class certification or summary judgment briefing had been submitted and after only a few preliminary depositions had been taken.[109] In *Paxil*, the case settled for $100 million almost before it even got underway; the 20% fee awarded in that case still amounted to a 15.6 multiplier on barely $1 million in total lodestar.[110]

Delayed generic entry antitrust cases such as this and the circumstances surrounding them have only grown *more* complex, riskier, longer, and more expensive over the years. The components of the alleged anticompetitive conduct—patent fraud, sham litigation, promises related to the timing of authorized generics, product hops, etc.—evolve, requiring more decisions

---

[108] *See* Order Granting Final Judgment & Order of Dismissal Approving Direct Purchaser Class Settlement & Dismissing Direct Purchaser Class Claims Against the Cephalon Defs., *King Drug Co. of Florence v. Cephalon, Inc. (Provigil)*, No. 06-cv-0197 (E.D. Pa. Oct. 8, 2015), ECF No. 870.

[109] *See generally In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (D. Conn.).

[110] *See Stop & Shop Supermarket Co. v. Smithkline Beecham Corp. (Paxil)*, No. 03-cv-4578, 2005 U.S. Dist. LEXIS 9705, at *60 (E.D. Pa. May 20, 2005).

by the appellate courts.[111] The parties engage in more discovery battles, including battles over

tens of thousands of withheld documents.[112] In time, class certification standards have become

increasingly more rigorous: the Supreme Court recently held that "at the class-certification

stage . . . , any model supporting a 'plaintiff's damages case must be consistent with its liability

case, particularly with respect to the alleged anticompetitive effect of the violation.' And for

purposes of Rule 23, courts must conduct a more 'rigorous analysis' to determine whether that is

so."[113] As a result of these changes, the number of experts involved in these cases grows. And

the cases often take more years to resolve.[114]

Some courts apply a "lodestar cross-check" on attorneys' fees requests. In *Prograf*, Judge

Zobel applied the lodestar cross-check and found that the request for attorneys' fees and

reimbursement of expenses was reasonable at a multiplier of 2.35.[115] Here, the requested fee

---

[111] *See, e.g.*, *Loestrin 24*, 814 F.3d 538 (vacating and remanding the district court's dismissal of this case, and holding that "non-monetary reverse payments fell under scope of Supreme Court's 2013 *FTC v. Actavis, Inc.* decision, and "facts must be alleged sufficient to support the legal conclusion that the settlement at issue involves a large and unjustified reverse payment, but the plaintiffs are not required to provide precise figures and calculations at the pleading stage); *King Drug Co. of Florence, Inc. v. Smithline Beecham Corp.*, 791 F.3d 388 (3d Cir. 2015) (vacating and remanding the district court's dismissal of the case, and holding that "inference arose that settlement between manufacturers was payment to eliminate risk of competition" and "plaintiffs stated rule-of-reason claim").

[112] *See, e.g.*, Mem. in Supp. of Plaintiffs' Mot. to Compel Produc. & for *In Camera* Review of Pfizer & Greenstone Docs. at 5-13, *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 14-cv-361 (E.D. Va. Nov. 30, 2016), ECF No. 118 (chronicling plaintiffs' three-month-long effort to parse 43,747 entries on seven iterations of defendants' privilege log and persuade the defendants to correct the log's myriad of deficiencies before ultimately resorting to motion practice); Joint Statement of Pls. and Defs. Medicis Pharm. Corp. & Impax Labs., Inc. Regarding Pls.' Challenges to Privilege Log Entries at 1, *In re Solodyn Antitrust Litig.*, No. 14-md-2503 (D. Mass. Nov. 4, 2016), ECF No. 398 (elucidating plaintiffs' targeted challenges to defendants' privilege logs containing over 44,000 documents and defendants' subsequent revision and de-designation of hundreds of entries).

[113] *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (citations omitted) (quoting ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* 57, 62 (2d ed. 2010)).

[114] According to Fitzpatrick's empirical study, this case, lasting seven years, has lasted more than twice as long as the average and median class actions (three years), and twice as long as the average and median antitrust class actions (also three years). *See* Fitzpatrick Decl. ¶ 29; *see also*, Hon. Kathryn Vratil, Presentation, *The Power of 1407 Remand* at 32 (Oct. 29, 2014), https://judicialstudies.duke.edu/sites/default/files/centers/judicialstudies/mdl2015/P6-B4-Breaking_Up_Hard_To_Do.pdf (noting average months to term for antitrust MDL between 2004 and 2014 was 49.4 and higher than any other type of litigation analyzed).

[115] *Prograf* Order at 11 (finding that while "[t]he First Circuit does not require a court to cross check," cross checking provides a "useful perspective," and most multipliers fall in the 1.0—4.0 range); *see Relafen*, 231 F.R.D. at 81-82 (noting 2.02 multiplier in that case); *Asacol*, 2017 WL 11475275, at *4.

award would provide plaintiffs with a very modest multiplier of 1.31.[116]

Class counsel respectfully submit that a fee award of one-third is fair here, considering that class counsel have worked for seven years without compensation, without any guarantee of compensation, and without any guarantee that millions of dollars of self-funded, out-of-pocket costs would ever be reimbursed. Since a fee above one-third may be merited in some cases of similar complexity and challenge, the fee here is reasonable.[117]

> **b.    The reasonableness factors commonly applied in this Circuit support class counsel's request for a one-third fee.**

The First Circuit has not prescribed a particular set of factors for assessing an application for attorneys' fees and has instead allowed district courts to exercise their discretion in applying appropriate factors. Factors the district courts have applied include: (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations,

---

[116] *See Relafen*, 231 F.R.D. at 81-82 (noting 1.0-4.0 range for most multipliers).

[117] As the Western District of Oklahoma noted, "An award of forty percent (40%) of the settlement value is well within the range of acceptable fee awards in common fund cases." *Chieftain Royalty Co. v. Laredo Petroleum, Inc.*, No. 12-cv-1319, 2015 WL 2254606, at *3 (W.D. Okla May 13, 2015) (citing cases); *see, e.g.*, *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 685 (D. Md. 2013) ("In considering awards in similar cases, courts look to cases of similar size, rather than similar subject matter. Fees awarded under 'the percentage-of-recovery' method in settlements under $100 million have ranged from 15% to 40%."); *Stoner v. CBA Info. Servs.*, 352 F. Supp. 2d 549, 553 (E.D. Pa. 2005) (same). This mirrors other contingency fee cases: "In non-class contingency fee litigation, a 30% to 40% contingency fee is typical." *Montague v. Dixie Nat. Life Ins. Co.*, No. 09-cv-687, 2011 WL 3626541, at *2-3 (D.S.C. Aug. 17, 2011); *dee Flournoy v. Honeywell Int'l, Inc.*, No. CV 205-184, 2007 WL 1087279, at *2 (S.D. Ga. Apr. 6, 2007) ("Forty percent fee contracts are common for complex and difficult litigation . . . ."); *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-cv-85, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation.").

Fees of 40% of the common fund have been awarded in numerous class cases, including those deemed by the court to be relatively straightforward. *Jernigan v. Protas, Spivok & Collins, LLC*, No. 16-cv-3058, 2017 WL 4176217, at *8 (D. Md. Sept. 20, 2017) (approving 40% fee even after finding the case was not complex but was "undoubtedly important to the class members" and recognizing that class members, "in all likelihood, would have had no recourse in the absence of a class action"); *Chieftain Royalty Co.*, 2015 WL 2254606, at *2 (awarding 40% attorneys' fees in a $6.7 million case litigated for almost three years).

if any.[118] Applying these factors to this case demonstrates that the fee request here is reasonable.

### c.    The fund is significant in size and benefits an entire industry.

"Analyzing net dollars and cents results accomplished by counsel for their clients is often the most influential factor in assessing the reasonableness of any attorneys' fee award."[119] The settlement here represents a significant percentage recovery of class damages. The direct purchaser's expert estimated that, depending on the date on which the jury determined a generic Loestrin 24 would have entered the market, single damages ranged from a high of $640 million to a low of $145 million. Accordingly, the $120 million recovery represents between 18.75% and 82.75% of the class's single damages—a significant achievement given the complexities and uncertainties involved in this case.[120]

The $120 million fund created by the settlement also provides significant benefits to direct purchasers of Loestrin 24: their overpayments for brand and generic Loestrin 24 Fe and brand Minastrin 24 will be partially reimbursed, and their interest in enforcement of the federal antitrust laws will be validated. The fund will benefit an entire industry: the class includes the vast majority of the direct purchasers of brand and generic oral contraceptives in the United States.

---

[118] *See Puerto Rican Cabotage*, 815 F. Supp. 2d at 457-58 (citing *Goldberger*, 209 F.3d at 50); *accord In re Lupron Mktg. & Sales Practices Litig.*, No. 01-cv-10861, 2005 WL 2006833, at *3 (D. Mass. Aug. 17, 2005) (same); *see also Relafen*, 231 F.R.D. at 79 (listing similar factors, including "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases").

[119] *Puerto Rican Cabotage*, 815 F. Supp. 2d at 458 (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983), for the proposition that the "most critical factor is the degree of success obtained").

[120] *See* Fitzpatrick Decl. ¶ 27 (citing John M. Connor & Robert H. Lande, *Not Treble Damages: Cartel Recoveries are Mostly Less Than Single Damages*, 100 Iowa L. Rev. 1997, 2010 (2015) (finding the weighted average of recoveries—the authors' preferred measure—to be 19% of single damages for cartel cases between 1990 and 2014)).

### d. The experience, skill, and efficiency of the attorneys involved, as demonstrated by their work before this Court, justifies the request.

"[T]he quality of representation is best measured by results."[121] The results here show success. Class counsel's experience, skill, and efforts resulted in the creation of a $120 million settlement fund, despite vigorous opposition and a complex set of factual and legal claims and defenses.

Class counsel have been active in the area of pharmaceutical antitrust litigation for more than fifteen years (some more than 20). Over the same period, one or more of class counsel has served as court-appointed lead counsel, co-lead counsel, or a member of the steering committee in virtually every pharmaceutical antitrust action litigated across the country. The area of law is highly specialized, and successful class litigation in this area requires knowledge of unique legal, regulatory, scientific, and industry-specific facts implicating patent law, antitrust law, and FDA regulations. Class counsel used their specialized knowledge and years of experience to develop a trial-ready record while litigating against some of the largest law firms in the country, including White & Case LLP and Adler Pollock & Sheehan P.C. (counsel for defendants in this case). With the benefit of a full record and with trial imminent, class counsel was able to negotiate a favorable settlement with defendants, securing guaranteed compensation for the class without the substantial risks, continuing costs and uncertainties of trial.

### e. The complexity of this litigation supports the requested fee.

The complexity of this case weighs heavily in favor of the requested fee award. This case involved intertwined legal issues spanning several areas of law, along with complicated scientific and medical information, patent and regulatory issues, and antitrust economics. Class counsel have had to demonstrate, factually and legally, that the defendants' conduct was anticompetitive

---

[121] *Goldberger*, 209 F.3d at 55.

and illegal, and that the class incurred significant overcharge damages as a result of those violations.

Having closely supervised this case for years, the Court is familiar with the parties' litigation activities and they are recounted for the Court in detail in the accompanying declaration in support of this motion.[122]

### f.        The risks of litigation support the requested fee.

Courts recognize the risk assumed by an attorney as a key factor in determining an appropriate fee.[123] In this case, class counsel devoted enormous resources and millions of dollars in expenses to an action in which the allegations and defenses were complex and the plaintiffs' burden of proof was challenging, and there was no guarantee that the time and costs would ever be reimbursed.

Trial of this case would also have been risky.[124] The defendants raised vigorous defenses that presented significant legal and factual hurdles. The direct purchasers bore the burden of proving to a lay jury that, among other things, Warner Chilcott engaged in an anticompetitive scheme to impede generic competition for Loestrin 24, that it had market power, that the alleged reverse payments constituted a large and unjustified payment for delay of generic Loestrin 24, that Warner Chilcott engaged in an illegal product hop to Minastrin 24, and that defendants' conduct caused harm to the direct purchaser class.

---

[122] *See generally* Kohn Decl.

[123] *Goldberger*, 209 F.3d at 54.

[124] *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J. 2006); *Lupron*, 2005 WL 2006833, at *4 ("History is replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages."); *accord Sutton v. Med. Serv. Ass'n of Pa.*, No. 92-cv-4787, 1994 WL 246166, at *7 (E.D. Pa. June 8, 1994) (granting final approval, noting that "even assuming that plaintiffs ultimately would have prevailed on liability, they faced the risk that they could not establish damages . . . that is achieved by this Settlement Agreement").

Any recovery in this case was hardly a foregone conclusion;[125] in recent years, pharmaceutical antitrust cases have met with mixed results in the courts.[126] Class counsel's success in achieving a favorable result despite significant hurdles further demonstrates the reasonableness of the fee request. Class counsel bore significant risk.

### g.  Class counsel devoted a substantial amount of time to this case.

Class counsel devoted substantial time to prosecuting the class's claims. In *In re Relafen*, the court took special note of the "mass of discovery" adduced in that case. The court pointed to "hundreds of hours" spent with experts, and the review of "hundreds of boxes of documents."[127] In this case, class counsel collectively expended more than 54,973 hours from inception of the case to the eve of trial. The one-third fee request here is entirely reasonable considering this immense effort.

Class counsel had every incentive to work efficiently, and the time expended is not at all surprising given the defendants' aggressive defense, the skill of their counsel, the complexity of the issues, and a voluminous record.

### h.  The request is reasonable when compared to empirical evidence of awards in similar cases.

Professor Fitzpatrick's empirical study found that the most common percentages awarded by all federal courts using the percentage method were 25%, 30% and 33%, with a fee award of

---

[125] *Cf. In re Keyspan Corp. Sec. Litig.*, No. 01-cv-5852, 2005 WL 3093399, at *5-6 (E.D.N.Y. Sept. 30, 2005) (asserting risk of litigation is low where settlement is virtually assured).

[126] *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34 (1st Cir. 2016) (affirming verdict and entry of judgment for defendants following a six-week jury trial); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015) (granting summary judgment for defendants on grounds, inter alia, that the purchaser plaintiffs could not prove that they had suffered antitrust injury), *aff'd*, 868 F.3d 132 (3d Cir. 2017); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 WL 4988410 (D.N.J. Oct. 6, 2014) (granting in part a motion to dismiss), & *In re Lipitor Antitrust Litig.*, 46 F. Supp. 3d 523 (D.N.J. 2014) (finding plaintiffs failed to state an antitrust claim against a brand pharmaceutical manufacturer), *both rev'd and remanded sub nom*, *In re Lipitor Antitrust Litig.*, Nos. 14-4202, 14-4203, 14-4204, 14-4205, 14-4206, 14-4602, 15-1184, 15-1185, 15-1186, 15-1187, 15-1274, 15-1323 & 15-1342, 2017 WL 3585180 (3d Cir. Aug. 21, 2017).

[127] *Relafen*, 231 F.R.D. at 80.

33% falling within the most populous range of fee awards nationwide.[128] While the size of the settlement may have an inverse relation to the fee percentage awarded,[129] and there is no doubt $120 million is a large settlement, as Professor Fitzpatrick points out, "nothing in the First Circuit law requires that fee percentages decline as settlement size increases."[130] He further explains that decreasing percentage fee awards merely because of the size of the settlement can undermine public policy by creating "perverse incentive for class counsel to settle too early for too little."[131] The case law is replete with examples of fee awards of 33% or more in large cases.[132] Courts in this circuit and across the country have approved fees comparable to the one requested here in cases yielding similar recoveries, even when the recovery is large.[133] The requested award of one-third in this case is thus fully supported by the "comparables."

        **i.**      **Public policy considerations fully support the requested fee.**

The requested fee supports recognized public policy goals.

First, the requested fee furthers the public policy goal of "providing lawyers with sufficient incentive to bring common fund cases that serve the public interest."[134] Prof. Fitzpatrick opines that "the percentage requested here will help further the social goal of appropriately incentivizing lawyers to invest properly in meritorious cases like this one in the

---

[128] Fitzgerald Decl, ¶ 18 fig. 2. This analysis holds true if the subject cases are restricted to those just in the First Circuit as well. Fitzgerald Decl. ¶ 19 fig. 3.

[129] Fitzgerald Decl. ¶ 20.

[130] *Id.* ¶ 21.

[131] *Id.* (citing *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D.Fla. 2006)). Professor Fitzgerald provides the following example: if courts award class action attorneys 33.33% of settlements when they are under $100 million but only 20% of settlement when they are over $100 million, then rational class action attorneys will prefer to settle cases for $90 million (i.e. a $30 million fee award) than $125 million (i.e., a $25 million fee award). *Id.* ¶ 22.

[132] *See* Fitzgerald Decl. ¶ 23 (collecting cases).

[133] *See supra* § II.B.2.a.

[134] *Goldberger*, 209 F.3d at 51.

future."[135] Second, this litigation itself furthered "significant societal interest in obtaining redress for prescription drug [purchasers] whose harms could not, given the cost of litigation, be pursued on an individual basis."[136] Third, "the public interest is also served by the defendants' disgorgement of the proceeds of predatory marketplace behavior."[137]

### 3. The lodestar cross-check confirms the reasonableness of the fee request.

Although not required, courts in this Circuit have endorsed the "lodestar calculation as a pragmatic cross-check" of a percentage-based fee award.[138] A lodestar cross-check here confirms the reasonableness of the one third fee requested.

The reported total lodestar accumulated by class counsel through the date of settlement is $29,542,219. The requested fee of $38,678,147, representing one-third of the settlement funds (after deduction of reimbursement for reasonable litigation expenses totaling $3,965,558), results in a multiplier of approximately 1.31.[139]

Pursuant to the Court's direction, all contemporaneous time records, as well as multiple formatted reports for each quarter and cumulatively from inception of the case, were reviewed, certified and submitted to Magistrate Judge Sullivan quarterly by an independent public

---

[135] Fitzpatrick Decl. ¶ 26.

[136] *Lupron*, 2005 WL 2006833, at *6.

[137] *Id.*

[138] *New Eng. Carpenters Health Benefits Fund*, No. 05-cv-11148, 2009 WL 3418628, at *1 (citing *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215-16 (D. Me. 2003); s*ee Thirteen Appeals*, 56 F.3d at 307; *Manual for Complex Litigation (Fourth)* § 14.122 ("the lodestar is . . . useful as a cross-check on the percentage method by estimating the number of hours spent on the litigation and the hourly rate, using affidavits and other information provided by the fee applicant. The total lodestar estimate is then divided into the proposed fee calculated under the percentage method. The resulting figure represents the lodestar multiplier to compare to multipliers in other cases.")). As the Third Circuit has noted, however, "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005).

[139] $38,678,147 ÷ $29,542,219 = 1.31.

accountant.[140] After reviewing these records, Magistrate Judge Sullivan met quarterly with one

or more representative of co-lead counsel to review the records and provide feedback on hours,

rates and expense charges. This feedback was incorporated by counsel moving forward in the

case so as to ensure that timekeeping and case expenses were in line with the Court's

expectations. Class counsel will make each of those quarterly reports available to the Court

again, should the Court desire to review them. In further support of this motion, class counsel

have also provided sworn declarations from each firm involved in the litigation that explain how

much time and expenses were incurred in this case. These declarations are appended to the Kohn

Declaration.[141]

Even if some adjustment were to be made on the rates or time recorded by class counsel,

under any view the resultant multiplier is entirely reasonable in view of the range customarily

awarded in like cases.[142] Professor Fitzpatrick's empirical study found that of 204 cases where

the district court used the percentage of the fund method with a lodestar crosscheck, the

multiplier ranged from .07 to 10.3 with a mean and median of 1.65 and 1.34 respectively.[143] Of

the seven settlements between $100 million and $250 million in Prof. Fitzpatrick's study where

the multiplier could be determined, the average multiplier was 3.47 and the median was 2.20.[144]

---

[140] The accountant, Robert A. Zagrodny, C.P.A., has provided a supplemental declaration in support of this motion, including the certification of certain payments made for expenses owed out of the joint litigation fund maintained by counsel since the last quarterly report submitted to Magistrate Judge Sullivan for the fourth quarter of 2019. *See* Decl. of Robert A. Zagrodny, CPA, attached as Ex. H to the Kohn Declaration.

[141] *See* Kohn Decl. Exs. A-G; *see also Rite Aid*, 396 F.3d at 306-07 ("The district courts may rely on summaries submitted by the attorneys and need not review actual billing records.").

[142] This requested award is well within the range of those multipliers accepted by courts in similar complex and long-running litigation. In *Vizcaino v. Microsoft Corp.*, the Ninth Circuit created an appendix of fee awards and multipliers on 24 common fund cases from 1996 to 2001, and found "a range of 0.6 - 19.6 with most (20 of 24, or 83%) from 1.0 to 4.0 and a bare majority (13 of 24, or 54%) in the 1.5 - 3.0 range." 290 F.3d 1043, 1051 n.6 (9th Cir. 2002). In a similar pharmaceutical antitrust class action, Judge Young relied on the *Vizcaino* analysis in approving a 2.02 multiplier. *Relafen*, 231 F.R.D. at 82.

[143] Fitzpatrick Decl. ¶ 33.

[144] *Id.*

Class counsel's request for a fee resulting in a 1.31 multiplier is eminently reasonable. It represents only a modest premium over straight hourly compensation, a premium that appropriately reflects the fact that counsel were not paid hourly, and all work was done on a contingent basis.

## C.   The request for approval of a service award for the class representative is reasonable and appropriate.

 "Service awards serve an important function in promoting class action settlements."[145] These payments serve "to compensate named plaintiffs for the services they provided and the risks they incurred."[146] "Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives."[147] As "a named plaintiff is an essential ingredient of any class action," a service award is an appropriate means "to encourage or induce an individual to participate."[148]

The direct purchasers request that the Court award the class representative, Ahold, a service award of $100,000 for its service to the class and for the time it expended in prosecuting this case. Ahold diligently and completely fulfilled its obligation to the class. It stepped forward to assert the class's interests by filing suit, undertaking the public service of contributing to enforcement of the nation's antitrust laws. Ahold actively protected the class's interests by undertaking all the responsibilities involved in being a named class representative plaintiff, including monitoring the progress of the case and responding to discovery requests.

---

[145] *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 98 (D. Mass. 2005) (citing *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317 (S.D.N.Y. 2005)); *see Prograf* Order at 9; *Relafen*, 231 F.R.D. at 82 (granting service awards to third-party payor plaintiffs).

[146] *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002).

[147] *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1357 (S.D. Fla. 2011); *see also Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000).

[148] *Relafen*, 231 F.R.D. at 82 (internal quotation and citation omitted);

Discovery was a significant burden to Ahold. Ahold conducted broad document searches and collections, resulting in production of nearly 9,000 documents to defendants.[149] Ahold also prepared for and provided deposition testimony pursuant to individual and Rule 30(b)(6) deposition notices. As trial neared, two Ahold employees prepared to participate at trial.[150] These efforts required employees of Ahold to take time away from their regular job functions—time which has gone uncompensated for the entire seven years this litigation has been pending. The $100,000 requested as a service award for Ahold is within the acceptable range of payments awarded by other courts.[151]

## IV.   CONCLUSION

Class counsel worked diligently and efficiently over the course of many years in this complex, hard-fought litigation, all without any guarantee of compensation, and secured $120 million for the class. We request that this Court (a) approve the requested expense reimbursement ($3,965,558), (b) approve the requested percentage-of-fund one-third fee ($38,678,147), and (c) approve the service award to the class representative Ahold ($100,000).

Dated: April 20, 2020

Respectfully submitted,

/s/ Thomas M. Sobol
Thomas M. Sobol (R.I. Bar No. 5005)
Kristen A. Johnson (*pro hac vice*)
Laura Hayes (*pro hac vice*)

---

[149] Kohn Decl. ¶ 112.

[150] *Id.*

[151] *See, e.g., Asacol*, 2017 WL 11475275, at *4 (awarding an aggregate of $400,000 to four class representatives); *Prograf* Order at 11 (awarding an aggregate of $400,000 to six class representatives); *Skelaxin,* WL 2946459, at *4 ($50,000 awarded to each of five named class representatives); *Remeron*, 2005 WL 3008808, at *18 ($60,000 each awarded to two named plaintiffs); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each); *In re Revco Sec. Litig.*, No. 89-cv-593, 1992 WL 118800, at *7 (N.D. Ohio May 6, 1992) (awarding $200,000 to a class representative). This request for $90,000 for each of the two class representatives is in addition to the service awards of $10,000 that each received as part of the resolution with Sandoz Inc. and Lupin Limited and Lupin Pharmaceuticals Inc. in 2017. The total of $100,000 for each class representative is still in the acceptable range of payments awarded by courts.

HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
kristenj@hbsslaw.com
lhayes@hbsslaw.com

David F. Sorensen (*pro hac vice*)
Ellen T. Noteware (*pro hac vice*)
Aurelia Chaudhury (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
dsorensen@bm.net
enoteware@bm.net
achaudhury@bm.net

Daniel J. Walker (*pro hac vice*)
BERGER MONTAGUE PC
2001 Pennsylvania Ave, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
dwalker@bm.net

Joseph H. Meltzer (*pro hac vice*)
Terence S. Ziegler (*pro hac vice*)
KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com

Peter R. Kohn (*pro hac vice*)
Neill W. Clark (*pro hac vice*)
FARUQI & FARUQI LLP
1617 JFK Boulevard, Suite 1550
Philadelphia, PA 19103
Telephone: (215) 277-5770
Facsimile: (215) 277-5771
pkohn@faruqilaw.com

nclark@faruqilaw.com

David C. Calvello (*pro hac vice*)
FARUQI & FARUQI LLP
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
dcalvello@faruqilaw.com

*Co-Lead Counsel for the Direct Purchaser Class Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Thomas M. Sobol, hereby certify that I caused a copy of the foregoing to be filed electronically via the Court's CM/ECF system. Those attorneys who are registered CM/ECF users may access these filings, and notice of these filings will be sent to those parties by operation of the CM/ECF system.

Dated:  April 20, 2020

/s/ Thomas M. Sobol
Thomas M. Sobol (R.I. Bar No. 5005)